## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

        Plaintiff,

v.

TAYLOR BUDOWICH, in his official capacity as White House Deputy Chief of Staff; KAROLINE LEAVITT, in her official capacity as White House Press Secretary; and SUSAN WILES, in her official capacity as White House Chief of Staff,

        Defendants.

Case No. _____

**Emergency Hearing Requested**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF THE ASSOCIATED PRESS'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Jay Ward Brown (#437686)
Charles D. Tobin (#83626)
Maxwell S. Mishkin (#1031356)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
brownjay@ballardspahr.com
tobinc@ballardspahr.com
mishkinm@ballardspahr.com

Sasha Dudding (#1735532)
1675 Broadway, 19th Floor
New York, NY 10019
Tel: (212) 223-0200
Fax: (212) 223-1942
duddings@ballardspahr.com

*Counsel for Plaintiff The Associated Press*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ..................................................................................... 4

A.    The AP and the White House Press Pool ....................................................... 4

B.    The Gulf of Mexico and Mount McKinley .................................................... 5

C.    The White House Tries to Coerce the AP into Changing its Journalism ............ 6

ARGUMENT ............................................................................................................. 9

I.    THE AP IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ................... 10

    A.    Defendants' Actions Violate the Fifth Amendment Due Process Clause ............. 10

    B.    Defendants' Access Denial Violates the First Amendment ............................... 14

        1.    Defendants' Access Denial Constitutes Impermissible
            Retaliation Against the AP Based on Conduct Protected by the
            First Amendment .................................................................. 15

        2.    Defendants' Denial of Access is an Impermissible Content-
            and Viewpoint-Based Speech Restriction ................................... 18

        3.    Defendants Seek to Compel the AP's Speech in Violation of
            the First Amendment ............................................................ 20

II.    THE AP SATISFIES EACH OF THE OTHER FACTORS WARRANTING
    A TRO AND PRELIMINARY INJUNCTION ................................................... 22

    A.    The AP Will Suffer Irreparable Harm Absent a TRO and Preliminary
        Injunction ........................................................................................ 22

    B.    The Balance of Equities and the Public Interest Strongly Favor a TRO
        and Preliminary Injunction ................................................................. 22

CONCLUSION ......................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ................................................................................20

*Ateba v. Jean-Pierre,*
    706 F. Supp. 3d 63 (D.D.C. 2023) ...........................................14, 15, 19

*Banks v. York,*
    515 F. Supp. 2d 89 (D.D.C. 2007) .........................................................18

*Black Lives Matter D.C. v. Trump,*
    544 F. Supp. 3d 15 (D.D.C. 2021) .........................................................18

*BMW of N. Am., Inc. v. Gore,*
    517 U.S. 559 (1996) .................................................................11, 12, 13

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) .......................................................................10, 16

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ...............................................................................19

*Citizen's Alert Regarding Env't v. Dep't of Justice,*
    1995 WL 748246 (D.D.C. Dec. 8, 1995) ...............................................23

*CNN v. ABC,*
    518 F. Supp. 1238 (N.D. Ga. 1981) ............................................. *passim*

*CNN v. Trump,*
    2018 WL 9436958 (D.D.C. Nov. 16, 2018) ................................3, 10, 13

*Cole v. Buchanan Cnty. Sch. Bd.,*
    504 F. Supp. 2d 81 (W.D. Va. 2007) .....................................................17

*Cox Broad. Corp. v. Cohn,*
    420 U.S. 469 (1975) ...............................................................................24

*Elrod v. Burns,*
    427 U.S. 347 (1976) ...........................................................................2, 22

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ...............................................................................12

*First Nat'l Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) ...............................................................................16

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995)...........................................................................................20, 21

*Karem v. Trump*,
    404 F. Supp. 3d 203 (D.D.C. 2019) ...............................................................3

\**Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ............................................................. *passim*

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993) .......................................................................................14

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974).................................................................................15, 21

*Morgan Stanley DW Inc. v. Rothe*,
    150 F. Supp. 2d 67 (D.D.C. 2001) .................................................................10

*N. Miss. Commc'ns, Inc. v. Jones*,
    792 F.2d 1330 (5th Cir. 1986)  .......................................................................17

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964).......................................................................................15

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971).......................................................................................14

*Nieves v. Bartlett*,
    587 U.S. 391 (2019)........................................................................................15

*Nken v. Holder*,
    556 U.S. 418 (2009)....................................................................................3, 22

*Pell v. Procunier*,
    417 U.S. 817 (1974)........................................................................................10

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ...............................................................2, 10, 22

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)..................................................................................18, 19

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
    487 U.S. 781 (1988) .......................................................................................20

\**Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977) ............................................................. *passim*

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ........................................................................23

*Stevens v. N.Y. Racing Ass'n, Inc.*,
    665 F. Supp. 164 (E.D.N.Y. 1987) .......................................................................18

*Times-Picayune Publ'g Corp. v. Lee*,
    1988 WL 36491 (E.D. La. Apr. 15, 1988) ............................................................17

*Vill. of Hoffman Ests. v. Flipside*, *Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ..............................................................................................11

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................................10

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ..............................................................................................20

## PRELIMINARY STATEMENT

The Associated Press ("the AP") brings this action to vindicate its rights and to stop the Executive Branch from coercing journalists into using only government-approved language. Since February 11, 2025, Defendants have denied the AP's journalists access to the Oval Office and other spaces open to other White House press pool members unless the AP makes the Gulf of America the primary term used in its reporting and Stylebook for the body of water known for 400 years as the Gulf of Mexico. AP now moves for a temporary restraining order ("TRO") and preliminary injunction requiring Defendants to immediately restore the AP's access to the Oval Office, Air Force One, and other limited spaces when those spaces are made open to other members of the press pool.

The AP has repeatedly explained to Administration officials that government attempts to control the words that journalists use – and excluding those journalists and retaliating against them when they do not comply – are unconstitutional and contrary to the public interest. AP newsroom leaders even flew to Florida for a meeting at the earliest opportunity offered by the White House Chief of Staff, yet Defendants have refused to restore the AP's access unless the AP changes the words it uses. Instead, White House officials have been barring AP journalists from one event after another. This targeted attack on the AP's editorial independence and ability to gather and report the news strikes at the very core of the First Amendment. This Court should remedy it immediately.

Defendants' actions violate the AP's Fifth Amendment due process rights and its First Amendment free speech rights. Pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 65.1, the Court should order Defendants to cease these efforts to coerce the AP, by denying it access, to use the words the government prefers. All the elements justifying injunctive relief are met: the AP is likely to succeed on the merits; the AP will suffer irreparable

1

harm absent injunctive relief; and the balance of equities and the public interest cut strongly in the AP's favor.

**First**, the AP is likely to succeed on the merits of its claims that Defendants' actions violate the AP's due process and First Amendment rights. Journalists' "first amendment interest" in access to areas of the White House open to the press pool "undoubtedly qualifies as liberty which may not be denied without due process of law under the fifth amendment." *Sherrill v. Knight*, 569 F.2d 124, 130-31 (D.C. Cir. 1977). Defendants failed to comply with the due process requirements of fair notice, an opportunity to challenge, and a final written explanation of their arbitrary decision to rescind the access the AP has had as a pool member for many decades unless the AP adopted their preferred language. Defendants have likewise violated the AP's First Amendment rights. Denying journalists access to White House press events "based upon the content of the journalist's speech" is "prohibited under the first amendment." *Id.* at 129. Defendants' efforts to coerce the AP, through a denial of access, into using the language that the government prefers violates the First Amendment in multiple ways, constituting impermissible retaliation, content- and viewpoint-based speech discrimination, and an insidious attempt to compel speech.

**Second**, Defendants' violation of the AP's constitutional rights, especially its "First Amendment freedoms, . . . unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (same). While this factor is presumed when constitutional rights are violated, the AP has also established the ongoing and severe harm it has faced as the result of Defendants' access denials, which hinder the AP's ability to produce timely and

thorough reporting on the President and White House to the AP's vast readership, which in turn harms the public's ability to learn about the actions of its government.

**<u>Third</u>**, the balance of the equities and the public interest strongly favor injunctive relief. These factors merge where, as here, the government is the defendant. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As a rule, there is no governmental or public interest in the deprivation of constitutional rights. *Id.* Neither Defendants nor the public will experience any harm as a result of an order requiring Defendants to cease their efforts to control the words that the AP uses and to restore the AP's access to spaces open to the press pool. To the contrary, such an order would greatly serve the public interest by restoring the access that the AP relies on to deliver informed, thorough, and timely reporting to billions of readers around the world every day about the workings of the government, a critical public interest.

Courts have granted injunctive relief for these reasons in similar circumstances, including when President Trump revoked the White House press passes of journalists Jim Acosta and Brian Karem, *see Karem v. Trump*, 404 F. Supp. 3d 203, 218 (D.D.C. 2019), *aff'd*, 960 F.3d at 667-68; Hr'g Tr., *CNN v. Trump*, No. 18-cv-2610-TJK, 2018 WL 9436958 (D.D.C. Nov. 16, 2018), and when the Reagan White House barred only TV reporters from access to the press pool, *CNN v. ABC*, 518 F. Supp. 1238, 1240-41 (N.D. Ga. 1981). In those cases, as here, injunctive relief proved necessary to prevent immediate, irreparable harm to the press resulting from the White House's selective, arbitrary denials of access.

Emergency relief is even more warranted here, because the White House's actions are explicitly based on the content of the AP's journalism, and because the denial of access and chilling effect on speech harms not just a single White House correspondent, but *all* of the AP's

journalists—and by extension all of the four billion people worldwide who get their news from the AP each day.  For these reasons, the Court should grant a TRO and a preliminary injunction ordering the immediate restoration of the AP's access to the Oval Office, Air Force One, and other limited spaces when they are open to the press pool.

## **FACTUAL BACKGROUND**

### A.    **The AP and the White House Press Pool**

The AP is one of the world's oldest and most trusted news organizations.  Founded in 1846 and organized as a not-for-profit entity, the AP reaches four billion people every day, including through the thousands of global news outlets that republish the AP's news reports.  The AP's journalism has achieved global recognition for its fast, accurate, and thorough reporting, and has received 59 Pulitzer Prizes.  *See* Compl. ¶ 3.  The AP is also known for its Stylebook, in which it publishes standards for usage, spelling, and grammar to facilitate consistency in news writing for audiences across the nation and the world.  *Id.* ¶ 6.

Given the AP's long and unbroken history of reporting on the nation's affairs, it is no surprise that the AP was a founding member of the group of reporters covering the White House and the President—a group today known as the White House press pool.  *Id.* ¶ 4.  A 13-member press pool accompanies the President almost everywhere he goes, including to the Oval Office and on Air Force One, serving as the eyes and ears of fellow journalists and of the public in small yet critically important spaces.  *Id.* ¶¶ 20-21.  The pool's membership is determined by the White House Correspondents Association (WHCA) and the press corps itself—not by the President.  *Id.* ¶ 22.  In all of its permutations it includes three wire reporters (one each from the AP, Reuters, and Bloomberg), four photographers (one each from the AP, Reuters, AFP, and The New York Times), three network television journalists, a radio correspondent, and at least one print reporter.  *Id.*

The press pool is over a century old.  In fact, an AP reporter became the first documented "pooler" on the presidency when he reported on the condition of President James A. Garfield from inside the White House after he was shot.  *Id.* ¶ 26.  AP pool journalists were also in the motorcade in Dallas when President John F. Kennedy, Jr. was assassinated, and with President George W. Bush during the September 11 terrorist attacks—providing fast, first-hand reporting to a nation in crisis.  *Id.*

The AP's participation in the White House press pool has, for decades, allowed it to send one text reporter and one photographer to report from the Oval Office, Air Force One, and other locations and events open to the press pool.  *Id.* ¶ 27-28.  This access enables the AP to provide the timely, fact-based, informative reporting on the White House and President for which it is known.  *Id.* ¶ 29.  The AP is unaware of any prior attempt by the White House to bar an entire news organization from membership in the press pool and from accessing these spaces open to other members of the pool.  *Id.* ¶ 30.  Pool members such as the wire services, which includes the AP, have the broadest reach and thus the information they report gets to the widest possible audience.  *Id.* ¶ 26.

## B.     The Gulf of Mexico and Mount McKinley

On January 20, 2025, President Trump issued an executive order renaming the Gulf of Mexico as the Gulf of America.  Exec. Order No. 14172.  The Gulf shares borders with Mexico and Cuba, and by its own terms the Executive Order applied only to the area within the United States.  The Gulf has been known as the Gulf of Mexico for over 400 years and remains known around the world as the Gulf of Mexico.  Compl. ¶ 33.

In the same executive order, President Trump also renamed the mountain Denali as Mount McKinley, reversing a 2015 name change issued by Secretary of the Interior Sally Jewell

during the Obama administration.  *See* Dep't of the Interior Order No. 3337 (Aug. 28, 2015).

The mountain lies entirely within the United States.  Compl. ¶ 35.

The AP addressed both of these name changes on January 23, 2025, when it released guidance specifying that it would refer to the Gulf of Mexico by its original name in its reporting and Stylebook while also acknowledging the new name.  *Id.* ¶¶ 34-35.  The AP explained that "as a global news agency that disseminates news around the world, the AP must ensure that place names and geography are easily recognizable to all audiences."  *Id.* ¶ 34.  The AP added that it "regularly reviews its style guidance regarding name changes, in part to ensure its guidance reflects common usage," per its standing policy.  *Id.*  The AP further announced that it would follow the Mount McKinley name change because the federal government has authority to rename locations within the United States.  *Id.* ¶ 35.

### C.     The White House Tries to Coerce the AP into Changing its Journalism

On the morning of February 11, 2025, White House Press Secretary Karoline Leavitt summoned AP Chief White House Correspondent Zeke Miller to her office.  *See* Decl. of Zeke Miller ("Miller Decl.") ¶ 11.  Leavitt told Miller that AP journalists would not be permitted in the Oval Office as press pool members until and unless the AP revised its Stylebook to refer to the body of water known for hundreds of years as the Gulf of Mexico as the Gulf of America. *Id.* ¶ 12.  The only reason that Leavitt provided to Miller for the decision was to compel the AP to change the language of its reporting, which she said was at President Trump's direction.  *Id.* ¶ 13.  Leavitt did not object to any other conduct by AP journalists.  *Id.* ¶ 14.

The AP declined to reverse this editorial decision in response to Leavitt's February 11 demand that the AP makes the Gulf of America the primary term used in its reporting and Stylebook.  Compl. ¶ 36.  As a direct result of the AP's refusal to bow to the White House's

pressure, White House staff barred an AP text journalist from attending a presidential executive order signing and press conference with Elon Musk in the Oval Office that day. *Id.* ¶ 37. The AP's photographer was allowed to attend the event, which was otherwise open to the press pool. *Id.* The AP's text journalist, but not its photographer, was again barred that evening from attending an event in the Diplomatic Reception Room as the President welcomed home an American freed in a prisoner exchange with Russia. *Id.* ¶ 39.

The AP promptly objected to this denial of access. Within an hour of the AP's exclusion from the first Oval Office event, AP Executive Editor Julie Pace published a statement explaining that "limiting our access to the Oval Office based on the content of AP's speech not only severely impedes the public's access to independent news, it plainly violates the First Amendment." *Id.* ¶ 38. Leavitt was undeterred, however, and defended the White House's decision during a press briefing the following day by claiming that the AP was telling "lies" by using the Gulf of Mexico name. *Id.* ¶ 41.

The access denials continued that afternoon, when the AP was barred from an Oval Office press conference during the swearing-in of Director of National Intelligence Tulsi Gabbard. *Id.* ¶ 41. That same day, February 12, Pace sent a letter to White House Chief of Staff Susan Wiles, objecting to these denials of access, which "were plainly intended to punish the AP for the content of its speech" in violation of the AP's constitutional rights. *Id.* ¶ 40. The AP "strongly urge[d] the administration to end this practice" and offered to meet to discuss the matter in person. *Id.*

On February 13, 2025, the AP was specifically excluded from a White House East Room press conference held by President Trump and Indian Prime Minister Narendra Modi, which was open to other pool members and journalists with White House press credentials. *Id.* ¶ 42. Miller

signed up to attend but was barred, while at least one other journalist from another news organization who did not sign up was admitted.  Miller Decl. ¶¶ 18-20.

Pace soon issued another statement, objecting to the AP's "deeply troubling" exclusion, which was "an incredible disservice to the billions of people who rely on The Associated Press for nonpartisan news."  Compl. ¶ 43.  The White House, however, persisted in excluding the AP. On February 14, 2025, White House Deputy Chief of Staff Taylor Budowich posted online that the AP's journalists were now indefinitely barred from "access to limited spaces, like the Oval Office and Air Force One" due to the AP's refusal to make the Gulf of America the primary term used in its reporting and Stylebook, adding that the AP's "journalists and photographers will retain their credentials to the White House complex."  *Id.* ¶ 44.  Budowich further claimed, falsely, that the AP had a "commitment to misinformation" and published "irresponsible and dishonest reporting."  *Id.*  The next day, White House Deputy Chief of Staff Stephen Miller suggested further punishing the AP by revoking its White House access entirely.  *Id.* ¶ 45.

On February 18, 2025, Wiles responded to Pace's February 12 letter in which she had protested the AP's exclusion.  *Id.* ¶ 46.  Wiles claimed that "[t]here is no event that the Associated Press is being barred from covering," an obviously false assertion given the AP's exclusion from President Trump's press conference with Prime Minister Modi.  *Id.*  Wiles also echoed other officials in writing that the White House's "view as to why we arrived in this point" is that the AP's Stylebook "has been misused, and at times weaponized, to push a divisive and partisan agenda" and that the AP should use the Gulf of America name "as an American guideline."  *Id.*

President Trump weighed in as well that day, confirming that the White House would "keep [the AP] out until such time that they agree that it's the Gulf of America."  *Id.* ¶ 47.  The

President doubled down on admitting that the White House's actions were based on the AP's journalism, stating that "the Associated Press has been very, very wrong on the election, on Trump and the treatment of Trump" and that "they're doing us no favors and I'm not doing them any favors." *Id.* President Trump made these statements at a Mar-a-Lago press conference from which the AP's journalists were barred. *Id.*

The AP continued to seek to vindicate its rights short of litigation. On February 19, 2025, Pace flew to Miami on one day's notice to meet with Wiles. *Id.* ¶ 48. Wiles, however, continued to insist that the AP must revise its Stylebook to adopt the Gulf of America name without qualification. *Id.* Wiles informed Pace that she would discuss the matter with Trump that evening and follow up with her, but to date, AP has not heard further from Wiles. *Id.* Instead, on February 20, 2025, speaking to the Republican Governors Association, President Trump emphasized that the White House is "holding [the AP] out of any news conferences" because of how the AP refers to the Gulf of Mexico, and he predicted this very case, remarking that the possibility of the AP prevailing in such a lawsuit "doesn't matter" because the effort to coerce the AP into using the government's preferred words "is something we feel strongly about." *Id.* ¶ 50.

Despite AP's diligent efforts, the White House has refused to restore the AP's access. The AP thus has no other option but to file this lawsuit and call on this Court to vindicate the AP's rights to free speech under the First Amendment and to due process under the Fifth Amendment.

## ARGUMENT

A TRO or preliminary injunction is warranted when the moving party can show: (1) a likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the absence

of such relief, (3) that the balance of equities tips in its favor, and (4) that granting an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction."). Because the "[t]he loss of First Amendment 'freedoms'" and other constitutional rights "unquestionably constitutes irreparable injury," *see Pursuing Am.'s Greatness*, 831 F.3d at 511, in such cases, "the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis." *Id.*

Here, all four factors favor the AP and the Court should therefore grant the AP's motion and order Defendants to cease their unconstitutional acts.

## I.    THE AP IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

The AP is likely to establish that, in attempting to coerce the AP into using the government's preferred words by denying AP journalists access to the Oval Office, Air Force One, and other spaces that are open to other members of the press pool, Defendants violated both the Due Process Clause of the Fifth Amendment and the First Amendment.

### A.    Defendants' Actions Violate the Fifth Amendment Due Process Clause

Defendants' actions have violated the AP's Fifth Amendment due process rights. As the D.C. Circuit has made clear, once "White House press facilities hav[e] been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press, requires that this access not be denied arbitrarily or for less than compelling reasons." *Sherrill*, 569 F.2d at 129 (citing *Pell v. Procunier*, 417 U.S. 817, 829-35 (1974) and *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)); *accord Karem*, 960 F.3d at 660; *CNN*, 2018 WL 9436958.

While *Sherrill* and its progeny involved the denial of press passes and the White House here has disclaimed intent to revoke the AP journalists' White House passes, this holding applies more broadly to protect the right of access to spaces the White House makes generally available to the press pool. Indeed, a court addressing the exclusion of TV media from the press pool held that, "under the First Amendment, they have a limited right of access to White House pool coverage in their capacity as representatives of the public and on their own behalf as members of the press," which flowed from the "right of access to news or information concerning the operations and activities of government." *ABC*, 518 F. Supp. at 1244-45.

"This first amendment interest undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." *Sherrill*, 569 F.2d at 130-31. And, due process requires the government to follow constitutionally "adequate procedures" before denying a protected liberty interest. *Id.* at 131 n.24. Indeed, because a denial of access "implicates important first amendment rights," the requirements of due process must be applied in a "particularly 'stringent'" manner. *Karem*, 960 F.3d at 665 (cleaned up) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982)). Specifically, Defendants were required to provide to the AP (1) "notice of the factual bases for denial," (2) "an opportunity for the applicant to respond to these," and (3) "a final written statement of the reasons for denial" of access, (4) which reasons may not be "arbitrar[y]" or "less than compelling." *Sherrill*, 569 F.2d at 130.

Defendants failed to provide the AP with due process in all of these respects:

**First**, Defendants failed to provide fair notice of their decision to deny access. The AP was entitled to "receive fair notice not only of the conduct that would subject it to punishment, but also of the magnitude of the sanction that the White House might impose." *Karem*, 960 F.3d

at 665 (cleaned up) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996)).  And, to be "constitutionally sufficient," notice must be provided "*prior* to being sanctioned."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 257 (2012) (emphasis added).  Yet Defendants provided only post hoc and incomplete notice.  The AP learned of the access denial when Leavitt summoned Miller to her office to announce the decision Defendants had already made: that the AP would no longer be permitted in the Oval Office as part of the press pool unless AP revised its Stylebook guidance to use the Gulf of America name.  Compl. ¶ 32.  Indeed, Defendants began barring AP journalists from attending pool events that day.  *Id.* ¶¶ 37, 39.

Leavitt's notice was also incomplete, as she did not state that the ban would extend to the AP's ability to report from areas other than just the Oval Office, including the White House Diplomatic Reception Room event, the East Room press conference and Black History Month reception, and the Mar-a-Lago press conference from which the AP also was barred, as well as from travel aboard Air Force One.  *Id.* ¶¶ 39, 42, 49.  Because Defendants had never "formally articulated or published" or informed the AP of "this standard for denial of" access prior to imposing it, let alone notified the AP of the severe nature of the sanctions, Defendants failed to meet the notice requirements of due process.  *Sherrill*, 569 F.2d at 130; *see also Karem*, 960 F.3d at 665.

**<u>Second</u>**, Defendants did not provide the AP with an opportunity to challenge their decision to bar AP journalists from pool events before the ban took effect, nor have Defendants provided the AP a formal opportunity to challenge the access denial since that time.  Compl. ¶ 53.  Instead, White House officials have doubled down on this decision, continuing to insist that the only way the AP can regain access to events open to other press pool members is by bowing to their demands as to use of the Gulf of America name.  *Id.* ¶¶ 44, 46.

**Third**, Defendants did not provide to the AP the required final written statement of the reasons for their decision. *Sherrill*, 569 F.2d at 131. Instead, Leavitt announced the already-final decision to Miller verbally, after suddenly summoning him to her office. Compl. ¶ 32; *cf. CNN*, 2018 WL 9436958 (noting, as to the revocation of CNN reporter Jim Acosta's White House press pass, that "when an important interest is at stake and when the government is able to provide this process before deprivation, it generally must do so"). Budowich's short post online describing the denial of AP's access falls far short of the constitutionally required written notice of the bases for denial. Compl. ¶ 44. So, too, does Wiles' subsequent letter to the AP, which was based on the demonstrably inaccurate claim that "[t]here is no event that the Associated Press is being barred from covering." *Id.* ¶ 46. "[T]hese belated efforts" to reduce the government's arbitrary, unsupportable decision to some form of writing "were hardly sufficient to satisfy due process." *CNN*, 2018 WL 9436958.

**Fourth**, Defendants made the decision to deny the AP access "arbitrarily or for less than compelling reasons." *Sherrill*, 569 F.2d at 129; *see also Gore*, 517 U.S. at 587 (Breyer, J., concurring) ("This constitutional concern, itself harkening back to the Magna Carta, arises out of the basic unfairness of depriving citizens of life, liberty, or property, through the application, not of law and legal processes, but of arbitrary coercion."). Indeed, Defendants' denial of the AP's access to pool events is *both* arbitrary *and* based on illegitimate reasons. It is arbitrary because the AP is, to its knowledge, the only news organization affected by the ban, even though all other non-rotating, organizational pool members have, like the AP, continued to use Gulf of Mexico, while noting President Trump's Executive Order. Compl. ¶ 51. And, as discussed in further detail below, Defendants' access denial is based entirely on an impermissible desire to punish the AP for the content and perceived viewpoint of its speech. *See id.* ¶¶ 44-47; *Sherrill*, 569 F.2d at

129 (access denials are "violative of the first amendment" when "based upon the content of the journalist's speech"); *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 86 (D.D.C. 2023) ("The government may not 'den[y] access to a speaker solely to suppress the point of view he espouses." (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993))), *appeal argued*, No. 24-5004 (D.C. Cir. Oct. 15, 2024).  Defendants' improper, arbitrary and express motive to punish the AP for its speech renders the need for emergency relief especially clear here, as compared to the line of press pass cases, where the government's stated interests were in the security and decorum of the press briefing room.  *Cf. Karem*, 960 F.3d at 665; *Sherrill*, 569 F.2d at 130.

Defendants have not met a single one of the constitutionally mandated requirements of due process.  Their arbitrary, unlawful denial of the AP's access to press pool events cannot stand.

**B.   Defendants' Access Denial Violates the First Amendment**

Defendants also have violated the AP's First Amendment rights.  The government's unprecedented and dangerous effort to coerce the AP into using its preferred language is the very sort of harm the First Amendment was drafted to prevent.  As the Supreme Court has observed,

> In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors.  The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government.  The press was protected so that it could bare the secrets of the government and inform the people.  Only a free and unrestrained press can effectively expose deception in government.

*N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).  Indeed, the government's attempted censorship at issue in this case is so harmful that it violates the First

Amendment in at least three ways, constituting unlawful retaliation, content- and viewpoint-based discrimination, and compelled speech.

### 1.     Defendants' Access Denial Constitutes Impermissible Retaliation Against the AP Based on Conduct Protected by the First Amendment

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up).  Unconstitutional retaliation occurs when a plaintiff shows:

> (1) he or she engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him or her.

*Ateba*, 706 F. Supp. 3d at 86 n.10 (cleaned up).  The AP satisfies each element of this test.

**First**, the AP engaged in activity protected by the First Amendment.  The AP's reporting and editorial decisions, including the AP's decision to continue using the name Gulf of Mexico, sits at the very core of the First Amendment's speech protections.  First Amendment freedom for reporting like the AP's derives from our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270-71 (1964).  This commitment flows from the "practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 257 (1974).  Relatedly, the First Amendment protects the press's "exercise of editorial control and judgment." *Id.* at 258.

The AP's access to the Oval Office, Air Force One, and other locations when they are open to the press pool likewise is protected by the First Amendment.  What that means is, *if the*

government decides to open a space like the Oval Office to the press, *then* the Constitution forbids the government from banning certain journalists from those places based on the content of their reporting, or for the purpose of coercing those journalists into using government-favored words and not using government-disfavored words.  The Constitution further forbids the government from denying access to those spaces it has chosen to open without due process.

"[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."  *Branzburg*, 408 U.S. at 681.  Accordingly, the "First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."  *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978).  The D.C. Circuit has therefore concluded that "the protection afforded newsgathering under the first amendment" extends to journalists' right to access and report from "White House press facilities [that] hav[e] been made publicly available as a source of information for newsmen."  *Sherrill*, 569 F.2d at 129.  Press pool members such as the AP thus have, "under the First Amendment," "a limited right of access to White House pool coverage in their capacity as representatives of the public and on their own behalf as members of the press," which flows from the "right of access to news or information concerning the operations and activities of government."  *ABC*, 518 F. Supp. at 1244-45.

**<u>Second</u>**, Defendants retaliated against the AP in ways sufficient to chill the speech of a similarly situated person of ordinary firmness.  By barring the AP from accessing areas open to the press pool until and unless the AP adopts the White House's preferred usage of Gulf of America, Defendants have chilled the AP's exercise of its First Amendment speech and newsgathering rights.  Compl. ¶ 54.  Other news organizations' First Amendment rights are also likely to be, and have been, chilled.  Courts have made clear in other cases that such speech-

chilling access denials satisfy this factor, and in this case they satisfy the factor as well. *See, e.g.,*
*Cole v. Buchanan Cnty. Sch. Bd.*, 504 F. Supp. 2d 81, 87 (W.D. Va. 2007) (noting that a reporter
"is now significantly restricted in his ability to report on school activities such as sporting events
and student exhibitions open to the public," and that the First Amendment activity of similarly
situated reporters "could reasonably be chilled"), *rev'd on other grounds*, 328 F. App'x 204 (4th
Cir. May 14, 2009); *see also Times-Picayune Publ'g Corp. v. Lee*, 1988 WL 36491, at *9 (E.D.
La. Apr. 15, 1988) (enjoining law enforcement agency from retaliating against reporter by
denying access to press conferences based on the content of their news coverage, and holding
that "[o]fficial discrimination against a news media organization in retaliation for the content of
its news stories violates 42 U.S.C. § 1983" (citing *N. Miss. Commc'ns, Inc. v. Jones*, 792 F.2d
1330, 1337 (5th Cir. 1986))).  The same chilling effect is now present here as well.

**Third**, as Defendants themselves repeatedly have admitted, this access denial is based
entirely on the AP's constitutionally protected speech: specifically, its editorial decision not to
make the Gulf of America the primary term used in its reporting and Stylebook.  Defendants
could hardly have made their retaliatory motives clearer:

- Leavitt blamed the access denial on the AP's alleged "lies," Compl. ¶ 41;

- Budowich said that the access denial resulted from the AP's "commitment to misinformation" and "irresponsible and dishonest reporting," *id.* ¶ 44;

- Wiles attributed the access denial to the AP's supposedly "divisive and partisan agenda," *id.* ¶ 46; and

- Defendants' boss, President Trump, said of the decision to "keep [the AP] out" that "the Associated Press has been very, very wrong on the election, on Trump and the treatment of Trump," *id.* ¶ 47, and that the possibility of the AP prevailing in a lawsuit over the White House's actions "doesn't matter" because the effort to coerce the AP into using the government's preferred words "is something we feel strongly about," *id.* ¶ 50.

17

These explicit efforts to punish the AP's speech are a textbook example of retaliation based on protected First Amendment activity.  *See Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 47 (D.D.C. 2021) (finding, as to First Amendment retaliation claim arising from forcible displacement of Black Lives Matter protesters, that "plaintiffs have plausibly alleged that the defendants did not have a non-retaliatory motive for their actions"), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023); *see also Banks v. York*, 515 F. Supp. 2d 89, 112 (D.D.C. 2007) (even an "'ordinarily permissible' exercise of discretion 'may become a constitutional deprivation if performed in retaliation for the exercise of a [F]irst [A]mendment right'"); *Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987) (finding, as to governmental access restriction on reporter's camera use that "applies to no other member of the press," that "the first amendment prohibits government from restricting a journalist's access to areas otherwise open to the press based upon the content of the journalist's publications"). The government's denial of access to the AP, expressly based on its dislike of the content of the AP's speech, constitutes unlawful retaliation on all fronts, further warranting emergency relief.

## 2.    Defendants' Denial of Access is an Impermissible Content- and Viewpoint-Based Speech Restriction

Defendants' denial of the AP's access to areas open to other press pool members is also unconstitutional because it is content- and viewpoint-based speech discrimination that cannot withstand the searching level of review that courts must apply to such discrimination.

It is beyond question that content-based speech restrictions are subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015).  A "government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," or if it "cannot be justified without reference to the content of the regulated

speech." *Id.* at 163-64 (cleaned up).  Further, "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.* at 170.

Defendants' actions represent just such a content-based regulation of speech, barring the AP's—and only the AP's—access to locations open to the press pool unless the AP accedes to the government's demand that it use the Gulf of America name. *Id.* (town code subjecting signs to different restrictions based on the subject matter they addressed was a content-based restriction).

Viewpoint-based speech restrictions similarly face strict scrutiny. *Id.* at 168 ("Government discrimination among viewpoints . . . is a more blatant and egregious form of content discrimination." (cleaned up).  "Viewpoint discrimination occurs when the government targets a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Ateba*, 706 F. Supp. 3d at 86 (cleaned up).  While the AP is known around the world for its nonpartisan, fact-based reporting, Defendants nonetheless have made clear that they are targeting *what they perceive to be* a news organization that was "very, very wrong on the election, on Trump and the treatment of Trump," and that "push[es] a divisive and partisan agenda" at odds with the President's.  Compl. ¶¶ 5, 46-47.

As a content- and viewpoint-based speech restriction, the access denial triggers strict scrutiny and thus is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. To satisfy strict scrutiny, therefore, the government "must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up).

Defendants cannot meet that exacting standard. Barring the AP from accessing locations open to other pool members based on the content and perceived viewpoint of the AP's speech serves *no* legitimate interest, let alone a compelling one. Defendants' only interest, as their own statements make clear, is in punishing the AP for not using their preferred Gulf of America name, and to coerce the AP into doing so. Their access denial is therefore "violative of the first amendment" because "it is based upon the content" and perceived viewpoint "of the [AP's] speech," aiming only to punish that speech. *Sherrill*, 569 F.2d at 129 (noting the government *agreed* with this proposition); *see also, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 670-73 (2004) (preliminary injunction properly granted to enjoin content-based restriction on speech); *ABC*, 518 F. Supp. at 1245 (granting injunction where "[t]he Court is at a loss to find any direct governmental interest served by" barring pool access to TV reporters). Such an explicitly content- and viewpoint-based access denial is both unprecedented and unconstitutional, and this Court should immediately enjoin the Defendants to remedy these actions.

### 3. Defendants Seek to Compel the AP's Speech in Violation of the First Amendment

Defendants' actions also are unconstitutional because they seek to compel the AP's speech in violation of the First Amendment. It is well established "that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say'"); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 797 (1988) (the First Amendment's protections apply to "decision[s] of both what to say and what *not* to say"). This principle applies to *all* speakers, and to *any* governmental attempts

to compel speech in service of a particular viewpoint or agenda, but especially to government efforts to compel the speech of a news organization, whose editorial independence is at stake.

The proposition that the government may not conscript news organizations into the service of its agenda is clearly articulated in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241.  There, the Supreme Court held unconstitutional under the First Amendment a Florida law providing that political candidates subject to criticism in a newspaper had "the right to demand that the newspaper print, free of cost to the candidate, any reply the candidate may make to the newspaper's charges." *Id.* at 244.  While the Court praised the law's goal of attempting to ensure that "a wide variety of views reach the public," it nonetheless held that the law's means of pursuing that goal unconstitutionally intruded on editorial independence.  *Id.* at 248, 254, 258.  As the Court explained:

> A newspaper is more than a passive receptacle or conduit for news, comment, and advertising.  The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials – whether fair or unfair – constitutes the exercise of editorial control and judgment.  It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

*Id.* at 258.  The government's attempt to force the AP to use certain language when referring to an international body of water presents precisely the same First Amendment problem.  *See Hurley*, 515 U.S. at 573 (the "general rule . . . that the speaker has the right to tailor the speech . . . applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid").  Defendants' effort to compel the AP to use their preferred Gulf of America terminology by denying the AP access to locations open to the press

pool—removing an essential component of the AP's ability to produce the reporting its readers depend on—is yet another way in which Defendants have violated the First Amendment.

## II.    THE AP SATISFIES EACH OF THE OTHER FACTORS WARRANTING A TRO AND PRELIMINARY INJUNCTION

### A.    The AP Will Suffer Irreparable Harm Absent a TRO and Preliminary Injunction

The AP has demonstrated the actual, practical harm it—and by extension its member news organizations and readers—will face as a result of Defendants' attempts to coerce the AP to adopt the government's preferred speech through denials of access available to other press pool members.  The AP's exclusion from the Oval Office, Air Force One, and other spaces open to other members of the press pool severely hinders its ability to produce timely, thorough, and informative reporting.  *See* Miller Decl. ¶¶ 3-4, 22; Compl. ¶ 29; *Karem*, 960 F.3d at 666 (for White House reporters, "sustained access is essential currency").

Even without this record, irreparable injury is *presumed* where, as here, the plaintiff has shown a substantial likelihood of success on the merits of its constitutional claims.  Indeed, it is axiomatic that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod*, 427 U.S. at 373; *see also Pursuing Am.'s Greatness*, 831 F.3d at 511 (same).  "[A] violation of Fifth Amendment due process rights" also constitutes irreparable injury that "support[s] injunctive relief."  *Karem*, 960 F.3d at 668.

### B.    The Balance of Equities and the Public Interest Strongly Favor a TRO and Preliminary Injunction

The balance of equities and the public interest weigh decisively in the AP's favor, particularly given the grave constitutional problems on the merits.  These factors "'merge when,' as here, 'the Government is the opposing party.'"  *Id.* (quoting *Nken*, 556 U.S. at 435).  The government has no legitimate interest in denying the AP access, based on the content of the AP's

speech, to the Oval Office, Air Force One, and other spaces open to other members of the press

pool, let alone in denying such access without due process.[1]  To the contrary, the government's

interest in coercing the AP into using government-preferred words is plainly *illegitimate*.  Nor

will restoring the AP's access harm or even inconvenience Defendants, as "[t]he proposed

injunctive relief would not require the White House to create a particular type of pool system, it

would merely prohibit the . . . total exclusion" of the AP from the places the White House makes

open to the press pool.  *ABC*, 518 F. Supp. at 1246.  At bottom, "the Constitution, . . . does not

permit [Defendants] to prioritize any policy goal over the Due Process Clause" or First

Amendment, "and enforcement of an unconstitutional law is always contrary to the public

interest."  *Karem*, 960 F.3d at 668 (cleaned up).

 Restoring the AP's access will benefit both the government and public.  As to the

government, "pool coverage of presidential activities is important to the President.  A public

awareness and understanding of the President's behavior facilitates his effectiveness as

President."  *ABC*, 518 F. Supp. at 1244.  As to the public, the AP's "participation in White House

pool coverage benefits the public by informing it of the activities of its government."  *Id.* at

1246.  Thus, as the D.C. Circuit has made clear, "[n]ot only newsmen and the publications for

which they write, but also the public at large have an interest protected by the first amendment in

---

[1] The AP also asks that no bond be required or that only a nominal amount be set.  Rule 65(c) "vests broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all."  *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (cleaned up).  Waiving the bond requirement, or requiring the posting of only a nominal amount in security, is appropriate here because, *inter alia*, injunctive relief will cause no monetary damages to Defendants and because the AP seeks to vindicate its constitutional rights.  *See, e.g.*, *id.*; *Citizen's Alert Regarding Env't v. Dep't of Justice*, 1995 WL 748246, at *12 n.10 (D.D.C. Dec. 8, 1995) ("The federal courts have broadly recognized that nominal bond is sufficient and appropriate where public interest groups seek enforcement of environmental laws.").

assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Sherrill*, 569 F.2d at 129-30; *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations[.]").

Ordering Defendants to restore the AP's access to spaces open to other press pool members will serve the public's powerful interest in staying informed about what the President is doing day in and day out. This Court should therefore protect the AP's constitutional rights, and promote the public interest, by entering such an order as promptly as possible.

## CONCLUSION

For the reasons set forth above, the AP respectfully requests that this Court issue a TRO and a preliminary injunction requiring Defendants to immediately rescind their ban on AP's access to the Oval Office, Air Force One, and other areas open to the White House press pool.

Dated:  February 21, 2025

Respectfully submitted,

BALLARD SPAHR LLP

*/s/ Jay Ward Brown*
Jay Ward Brown (#437686)
Charles D. Tobin (#83626)
Maxwell S. Mishkin (#1031356)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
brownjay@ballardspahr.com
tobinc@ballardspahr.com
mishkinm@ballardspahr.com

Sasha Dudding (#1735532)
1675 Broadway, 19th Floor
New York, NY 10019
Tel: (212) 223-0200
Fax: (212) 223-1942
duddings@ballardspahr.com

*Counsel for Plaintiff The Associated Press*