UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

                Plaintiff,

      v.

TAYLOR BUDOWICH,
White House Deputy Chief of Staff, et al.,

                Defendants.

Civil Action No. 25-0532 (TNM)

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS[1]

Table of Contents ............................................................................................................. i

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 2

    I.     General Media Access to the White House Press Facilities ................................. 2

    II.    Special Media Access to the President. .............................................................. 3

    III.   The Associated Press Continues to Cover the President Similar to Other Media Organizations with No Special Media Access ............................................. 6

Legal Standards ............................................................................................................... 9

Argument ....................................................................................................................... 12

    I.     The Associated Press Cannot Establish a Likelihood of Success ....................... 12

        A.   There is No Liberty Interest in Having Special Media Access to the President .......................................................................................................... 12

        B.   The Discretion of the President to Choose Who to Grant Special Access Precludes the Associated Press's First Amendment Claim. ......... 16

    II.    The Associated Press Has Failed to Demonstrate Irreparable Harm for a Temporary Restraining Order. .............................................................................. 18

    III.   The Balance of Equities and the Public Interest Tips Decidedly in Favor of the White House ................................................................................................... 20

Conclusion ..................................................................................................................... 21

---

[1] The United States intends to supplement timely this filing with a Table of Authorities consistent with the Court's Standing Order.

Defendants Taylor Budowich, in his official capacity as White House Deputy Chief of Staff; Karoline Leavitt, in her official capacity as White House Press Secretary; and Susan Wiles, in her official capacity as White House Chief of Staff, respectfully submit this opposition to the motion for a temporary restraining order (ECF No. 2, "TRO Mot.") filed by Plaintiff, the Associated Press.

## INTRODUCTION

Notwithstanding its decision not to acknowledge that the body of water abutting the States of Texas, Louisiana, Mississippi, Alabama, and Florida and other portions of North and South America is now the "Gulf of America" per President Trump's recent Executive Order, the Associated Press continues to enjoy general media access to the White House press facilities. This case is not about prohibiting the Associated Press from entering White House grounds. Nor is it about prohibiting the Associated Press from attending briefings in the James S. Brady Briefing Room or using other press facilities at the White House. Instead, this case is about the Associated Press losing special media access to the President—a quintessentially discretionary presidential choice that infringes no constitutional right.

This case seeks to resolve the narrow question of whether the Associated Press has the right to unfettered access to the President's exclusive gatherings, even when other news agencies do not have that right. Most journalists have no routine access to the Oval Office, Air Force One, or the President's home at Mar-a-Lago. Presidents historically provided this special access to the Associated Press, but that discretionary choice does not create a constitutional right. Just as the President need not furnish a personal interview to all journalistic comers, the President has discretion to decide who will have special media access to exclusive events within the Oval Office.

The President has absolute discretion to give interviews to whomever he pleases—the First Amendment does not compel him to give a personal audience to any particular journalist. That

same discretion extends to whom he allows into the Oval Office (his personal workspace), Air Force One (his personal plane), and Mar-a-Lago (his private residence). The President's discretion over these small spaces simply does not implicate constitutional rights—for citizens, journalists, or news organizations alike.

Accordingly, the Associated Press cannot meet its burden to establish a likelihood of success on the merits of its claims sufficient to warrant extraordinary immediate injunctive relief. Nor has the Associated Press established irreparable harm from being treated like most media organizations that do not receive special media access to the President. It continues to cover the President, including during limited access events, by receiving pool reports and media. Lastly, the balance of equities decidedly tips in favor of the President and his ability to choose who has special access to him.

For these reasons, discussed in detail below, the Court should deny the Associated Press's request for extraordinary provisional injunctive relief in the form of a temporary restraining order.

## BACKGROUND

### I.    General Media Access to the White House Press Facilities

The Executive provides members of the media general access to the White House through its press facilities. *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) ("the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom"). "The press facilities include the James S. Brady Briefing Room, the press offices, the press apron, the North Grounds Stand Up Area, and the Driveway[.]" *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 69 (D.D.C. 2023) (Bates, J.), *appeal pending*, No. 24-5004 (D.C. Cir. argued Oct. 15, 2024). Judge Bates recently described the process used by members of the media to gain access to the White House's press facilities:

- 2 -

> The White House offers journalists two principal ways of accessing the press
> facilities. First, a reporter may obtain a "temporary press pass," known as a "day
> pass," which is a daily credential issued upon application to the Secret Service.
> Second, a reporter can obtain a "permanent press pass," known as a "hard pass,"
> which is a credential that allows him or her to come and go freely once the pass is
> issued. Day pass and hard pass holders can access the [press facilities] at the same
> times (from 5:30 a.m. to 10:30 p.m.).

*Id.* (cleaned up). The White House's press facilities "are perceived as being open to all bona fide Washington-based journalists[.]" *Sherrill*, 569 F.2d at 129. For example, approximately sixty-five media outlets have a seat, or share a seat, in the James S. Brady Briefing Room, and hundreds more journalists have "hard pass" access to the facilities. *See* White House, Press Briefing By Press Secretary Karoline Leavitt (Jan. 29, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/press-briefing-by-press-secretary-karoline-leavitt/ (noting that the White House intends to restore press passes to 440 journalists and create a "new media" seat in the briefing room); White House Correspondents' Ass'n, Briefing Room Seating Chart, https://whca.press/wp-content/uploads/2022/08/BriefingRoom2022-eff-1-3-2022.pdf (last visited Feb. 24, 2025).

Relevant here, Associated Press employees continue to enjoy "hard passes" and general access to the White House's press facilities as other journalists, including a front-row, center seat in the James S. Brady Briefing Room. *See* Miller Decl. (ECF No. 2-3) ¶ 10; Briefing Room Seating Chart, *supra*. At bottom, the Associated Press continues to have media access to the White House press facilities like any other media outlet.

## II.    <u>Special Media Access to the President.</u>

In addition to affording bona fide members of the press access to the White House's press facilities, the President affords special media access to a pool of select journalists. Laurie Kellman, *The relationship between the White House and its press corps is time-tested — and can be contentious*, Assoc. Press (Feb. 12, 2025), https://apnews.com/article/trump-gulf-mexico-america-

ap-first-amendment-4304433d73ad496f5308c9666cbe8e11. "One reason the pool exists is because the Oval Office, the president's official work space, is too small to accommodate every news outlet that would want to cover his executive order signings or meetings with foreign dignitaries." *Id.*; *see also* White House Correspondents' Ass'n, Guide to the White House Beat, https://whca.press/covering-the-white-house/resources/guide-to-the-white-house-beat/ (last visited Feb. 24, 2025). Similarly, there are only thirteen press seats on Air Force One. *See* Guide to the White House Beat, *supra*. "[T]he pool operates with a representative of each medium acting as eyes and ears for the others who can't get in. When a 'pooled' event is over, the print, television and radio poolers share written notes, video and audio with everyone else who is interested." Kellman, *supra*. Indeed, the White House Correspondents' Association has made clear, the role of a pool reporter is not to benefit their own organization but to act "on behalf of the collective in this role[.]" Guide to the White House Beat, *supra* ("Poolers are expected to share info and quotes by pool report before publishing unilaterally, even on social media.").

In the recent past, the White House has endorsed the membership of the pool as determined by the White House Correspondents' Association. *See generally* Guide to the White House Beat, *supra*. For events outside the Washington, DC area, where air travel is necessary, the special access pool generally consists of thirteen members. Kellman, *supra*; *see also* White House Correspondents' Ass'n, Practices and Principles of Coverage Access for Independent White House Press, https://www.poolrotations.com/practices-and-principles (last visited Feb. 24, 2025). The thirteen seats have special access to the President and have recently included three wire reporters (from the Associated Press, Reuters, and Bloomberg), five photographers (from the Associated Press, Reuters, Agence France-Presse, and the New York Times), three television reporters, a radio correspondent, and two other print reporters in rotating seats. *See* Guide to the White House Beat,

- 4 -

*supra*; Pl. Br. (ECF No. 2-1) at 4 (citing Compl. (ECF No. 1) ¶ 22).  The two rotating seats (the "print seat" and the White House Correspondents' Association's seat, formerly known as the "magazine seat") are occupied by print journalists from a collection of outlets (e.g., the New York Times, Politico, the Wall Street Journal, the Washington Post, USA Today) and rotate based on whether the trip is domestic or foreign.  *See* White House Correspondent's Ass'n, Pool Rotation Order, https://www.poolrotations.com/domestic-order  (last visited Feb. 24, 2025); White House Correspondent's Ass'n, Foreign Rotation Order,   https://www.poolrotations.com/news-4 (last visited Feb. 24, 2025).

Different media outlets receive special access to the President via the pool depending on whether it is an in-town events or an event at the White House.  *See* Guide to the White House Beat, *supra*.  In either case, access continues to be quite limited so pool reporters share quotes, observations, and materials among those journalists unable to attend, and require no attribution. *See id.*

As this description underscores, the Associated Press has been afforded extra special access to the President via the pool system.  It has, until recently, enjoyed special print and photographic seats in the special access pool above nearly all other media outlets—having two fixed seats in it. Pl. Br. (ECF No. 2-1) at 5 (citing Compl (ECF No. 1) ¶¶ 27–28).  It is undisputed that the White House has now suspended that extra special media access.  As the Associated Press itself reported, the President himself made the decision to terminate its access.  *See* David Bauder, *Trump says AP will be curtailed at the White House until it changes its style to Gulf of America*, Assoc. Press (Feb.    18,    2025),    https://apnews.com/article/trump-ap-white-house-press-corps-pool-91535a6384d681fee1cd7e384ea6c627 ("President Donald Trump said Tuesday that he will

continue to restrict The Associated Press' access to his events and news conferencesuntil the news
outlet goes along with his" Executive Order regarding the Gulf of America.).

## III.    The Associated Press Continues to Cover the President Similar to Other Media Organizations with No Special Media Access.

Given the nature of pool reporting, it comes as little surprise that the Associated Press's
ability to report on the President and his activities has continued unabated despite the suspension
of its seats in the special access press pool.  For example, the Associated Press complains about
being barred from the special access pool for the President's Oval Office event with Indian Prime
Minister Narendra Modi.  Pl. Br. (ECF No. 2-1) at 7.  But the Associated Press published a detailed
report of that meeting including quotes, presumably generated by other print pool reporters, from
the President and Prime Minister Modi and candid photographs of their interactions:



Will Weissert, *Trump calls India's Modi a 'great friend' but warns of higher U.S. tariffs on Indian goods*, Assoc. Press (Feb. 13, 2025), https://apnews.com/article/trump-india-modi-visit-washington-tariffs-83d5f6af65f923dc4feb3f38338c888d (screen capture of top of article from apnews.com). It similarly posted a video report on the interaction, including footage of the meeting, overlayed voice reporting from one of its journalists, and video of the journalist on White House grounds taken from what appears to be a setup on West Executive Avenue, NW immediately adjacent to an entrance to the West Wing:



Chris Megerian, Video: *Tariffs loom over Modi's visit with Trump*, Assoc. Press (Feb. 13, 2025), https://apnews.com/video/tariffs-loom-over-modis-visit-with-trump-e8f341536dac448c93abab6342dc8482 (screen capture from apnews.com).

The Associated Press also complains about being excluded from a February 12, 2025, reception in the Diplomatic Reception Room where the President welcomed home Marc Fogel, a U.S. citizen wrongfully detained in Russia. Miller Decl. (ECF No. 2-3) ¶ 17. But once again, the Associated Press covered that event in detail, posting pool video emblazoned with "AP" on its website:



Video, *Trump says Fogel released as part of 'very reasonable' deal*, Assoc. Press (Feb. 12, 2025), https://apnews.com/video/trump-says-fogel-released-as-part-of-very-reasonable-deal-34db9cbd 6549454696c3b47f11de91c0. The Associated Press also posted an article on the event, which included a still photograph and quotes from Fogel and the President:



Chris Megerian & Eric Tucker, Russia releases imprisoned American Marc Fogel in what US calls a step toward the end of Ukraine war, Assoc. Press. (Feb. 12, 2025), https://apnews.com/article/donald-trump-vladimir-putin-20ab40d17f8a9b4abf9b3498da979859.

## LEGAL STANDARDS

A temporary restraining order "is an extraordinary, if not drastic, remedy." *Nat'l Treasury Emps. Union v. United States*, Civ. A. No. 19-0050 (RJL), 2019 WL 266381, at *2 (D.D.C. Jan. 18, 2019).  It is "reserved for cases where plaintiffs will suffer irreparable injury before a preliminary injunction hearing is even held."  *Id.*  "An application for a [temporary restraining

order] is analyzed using factors applicable to preliminary injunctive relief." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 81 (D.D.C. 2018) (Kollar-Kotelly, J.).

Similarly, "a preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D. D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 326 (D.D.C. 2018) (Boasberg, J.) (quoting *Davis v. Pub. Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)). The D.C. Circuit has suggested, without deciding, that *Winter*—which overturned the Ninth Circuit's "possibility of irreparable harm" standard—"should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Bartko v. Dep't of Just.*, Civ. A. No. 13-1135 (JEB), 2015 WL 13673371, at *1 (D.D.C. 2015) (citing *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011), and *Davis*, 571 F.3d at 1292); *see also League of Women Voters*, 838 F.3d at 7 (declining to address whether "sliding scale" approach is valid after *Winter*). That

said, the Supreme Court has confirmed that a plaintiff must satisfy all elements of the standard to succeed.  *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 99 n.18 (2024) ("To obtain a preliminary injunction, [plaintiff] was required to establish that she is likely to succeed on the merits, that she would otherwise suffer irreparable harm, and that the equities cut in her favor." (citing *Winter*)).

Even before *Winter*, courts in this Circuit consistently stressed that "a movant must demonstrate 'at least some injury' for a preliminary injunction to issue." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995)).  Thus, "if a party makes no showing of irreparable injury, the court may deny the motion without considering the other factors."  *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012) (Boasberg, J.) (quoting *CityFed Fin. Corp.*, 58 F.3d at 747); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

A movant alleging "speculative injuries" cannot meet the "'high standard for irreparable injury' sufficient to warrant the extraordinary relief of a" temporary restraining order, and "the Court need not reach the other factors relevant to the issue of injunctive relief."  *United Farm Workers v. Chao*, 593 F. Supp. 2d 166, 171 (D.D.C. 2009) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297); *see Bartko*, 2015 WL 13673371 at *2 ("[t]he Court need not grant injunctive relief 'against something merely feared as liable to occur at some indefinite time'") (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  "[T]he movant must demonstrate the injury is of such 'imminence' that there is a clear and present need to equitable relief to prevent irreparable harm." *Id.* (quoting *Jud. Watch, Inc. v. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007) (Leon, J.)).

- 11 -

## ARGUMENT

**I.**     <u>The Associated Press Cannot Establish a Likelihood of Success</u>

The Associated Press lacks a protected liberty interest in special access to the President. And the First Amendment does not preclude a government official from favoring particular journalists with exclusive access, even when the nature of the journalist's coverage is a relevant consideration in deciding who will receive such access. Accordingly, the Associated Press has no likelihood of succeeding in this case.[2]

        **A.**     **There is No Liberty Interest in Having Special Media Access to the President.**

For a procedural due process claim under the Fifth Amendment to proceed, a plaintiff must identify a cognizable property or liberty interest at stake to proceed. *See Scahill v. District of Columbia*, 909 F.3d 1177, 1186 (D.C. Cir. 2018) (affirming dismissal of due process claims, holding, to succeed on a procedural due process claim, plaintiff must first "identify a cognizable liberty or property interest"); *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (affirming dismissal of procedural due process claim; "[a] procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections." (citation omitted)). Here, the Associated Press contends it has a liberty interest in being part of the White House press pool—i.e., having special media access to the President. The Associated Process is wrong.

As a general matter, a person lacks a First Amendment right or liberty interest in accessing the White House. *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("the prohibition of unauthorized entry

---

[2]     The Associated Press's lack of protected interests dooms its claims in this case. That said, the United States reserves its rights to raise other arguments and defenses in response to the Associated Press's motion for a preliminary injunction and on the merits in this action.

into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, [ ] that does not make entry into the White House a First Amendment right.  The right to speak and publish does not carry with it the unrestrained right to gather information").  This is because "[t]he first amendment's protection of a citizen's right to obtain information concerning 'the way the country is being run' does not extend to every conceivable avenue a citizen may wish to employ in pursuing this right."  *Sherrill*, 569 F.2d at 129.

Indeed, "the First Amendment does not provide journalists any greater right of access to government property or information than it provides to members of the public, despite the fact that access to government information 'might lead to more thorough or better reporting.'"  *Ateba*, 706 F. Supp. 3d at 75 (quoting *JB Pictures, Inc. v. Dep't of Def.*, 86 F.3d 236, 238 (D.C. Cir. 1996), and citing *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972)).  Instead, "[a]s it pertains to the First Amendment primarily protects the right to 'communicate information once it is obtained,' not the ability to collect it."  *Ateba*, 706 F. Supp. 3d at 75 (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978)).  For this reason, "courts have generally refused to find that the First Amendment requires government entities to admit press into places not otherwise open to the public, provide enhanced access to information under the government's control, or afford journalists heightened access to places open to the general public."  *Ateba*, 706 F. Supp. 3d at 75 (collecting citations).

The D.C. Circuit has recognized one narrow exception to this rule when it comes to press access to the White House.  In *Sherrill*, the court ruled that a journalist has a liberty interest sufficient for procedural due process protections in accessing "White House press facilities" that have "been made publicly available as a source of information for newsmen[.]"  569 F.2d at 129.  In the wake of *Sherrill*, every reported case in this jurisdiction has addressed the confines of that

right—i.e., the right to procedural protections if a journalist's general White House press access is sought to be suspended or terminated. *See, e.g.*, *Karem v. Trump*, 960 F.3d 656, 659 (D.C. Cir. 2020) (considering suspension of White House hard pass); *Ateba*, 706 F. Supp. 3d at 69 (considering rules regarding hard passes); *CNN, Inc. v. Trump*, Civ. A. No. 18-2610 (TJK), 2018 WL 9436958 (D.D.C. Nov. 16, 2018) (considering suspension of hard pass).  None have recognized the existence of an additional liberty interest in being part of a special group with enhanced access to the President beyond the general media access that most credentialed journalists receive.

To the contrary, against the right for journalists to have general access to White House press facilities, cases have held that a government official need not engage with, or provide special access to, journalists.  For example, in *Sherrill* itself, the D.C. Circuit noted its case did not concern "the discretion of the President to grant interviews or briefings with selected journalists[,]" remarking "[i]t would certainly be unreasonable to suggest that because the President allows interviews with some bona fide journalists, he must give this opportunity to all."  569 F.2d at 129. Similarly in *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417–18 (4th Cir. 2006), where a media outlet similarly brought claims alleging the denial of special access due to the content of its reporting, the Fourth Circuit noted:

> Public officials routinely select among reporters when granting interviews or providing access to nonpublic information.  They evaluate reporters and choose to communicate with those who they believe will deliver their desired messages to the public.  By giving one reporter or a small group of reporters information or access, the official simultaneously makes other reporters, who do not receive discretionary access, worse off.  These other reporters are sometimes denied access because an official believes them to be unobjective.

*Id.*  The Fourth Circuit held that this behavior in no way offended the Constitution.  *Id.*

Here, the suspension of the Associated Press's special media access to the President via the White House press pool plainly falls into the latter, non-actionable category of claims.  The

Associated Press does not allege, because it cannot, that the White House press pool is "perceived as being open to all bona fide Washington-based journalists" like the White House press facilities discussed in *Sherrill*, 569 F.2d at 129. Instead, the press pool clearly affords "a small group of reporters" discretionary special access to the President, the circumstance presented in *Baltimore Sun*. The Constitution does not require that the Associated Press receive permanent, guaranteed status in the press pool, and the Associated Press can point to no case holding that any journalist has such a sweeping liberty interest protectable under the confines of the Fifth Amendment's procedural due process clause.

Indeed, the lone, decades-old, non-controlling case cited by the Associated Press where a court addressed the rights of media companies in the White House press pool, *CNN, Inc. v. ABC, Inc.*, 518 F. Supp. 1238, 1239 (N.D. Ga. 1981), does not support its extraordinary request here. In *CNN*, the court considered whether to enjoin provisionally the White House Press Office's policy of "excluding all television media representatives from covering certain White House and presidential events[.]" *Id.* The court did so, entering a preliminary injunction prohibiting the White House "from totally excluding television news representatives from participating in pool coverage of Presidential activities and White House events until a trial on the merits can be held in this case." *Id.* at 1246. But importantly, the court did not command that any single television news organization be included in the pool—the Associated Press's ask here. Moreover, the court's logic turned on the policy implementing a total blockage of television media, not the exclusion of one media group as here. *Id.* at 1245 ("Television film coverage of the news provides a comprehensive visual element and an immediacy, or simultaneous aspect, not found in print media."). As such, *CNN* cannot be read as establishing a liberty interest in any particular journalist to participate in the pool or receive special access to the President therefrom.

- 15 -

Ultimately, providing special media access to the President is a quintessentially a discretionary choice of the Executive.  No court has recognized that a particular media member has a liberty interest protected by the Fifth Amendment in perpetually securing special access to the President through the White House press pool.  This Court should not be the first.

### B.    The Discretion of the President to Choose Who to Grant Special Access Precludes the Associated Press's First Amendment Claim.

While the Associated Press suggests it has multiple different First Amendment claims, they are all based on the premise that it is unlawful for the White House to suspend its special media access to the President because it refuses to use the name "Gulf of America."  This very type of claim was addressed in *Baltimore Sun* and rejected.  The Court should do the same here.

In *Baltimore Sun*, a newspaper sued the Governor of Maryland seeking to enjoin his direction that no one in the Governor's office speak with certain of the newspaper's reporters because they were "failing to objectively report on any issue dealing with the" Governor's administration.  437 F.3d at 413.  The newspaper alleged that the restriction was actionable under the First Amendment as retaliatory and a content-based regulation of the newspaper's speech.  *Id.*

The Fourth Circuit began its analysis by noting, "[n]ot every government restriction [ ] is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory."  *Id.* at 416 (cleaned up).  It continued by noting that "when the challenged government action, whether conduct or speech, is so pervasive, mundane, and universal in government operations that allowing a plaintiff to proceed on his retaliation claim would 'plant the seed of a constitutional case' in 'virtually every' interchange" it is not actionable retaliation. *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 148–49 (1983)).

In analyzing the newspaper's claim, the court noted that "reporting is highly competitive, and reporters cultivate access—sometimes exclusive access—to sources, including government

officials."  437 F.3d at 413.  The court further observed that there is a "common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter" and an "equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments[.]"  *Id.* at 418 (quoting *Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528 *1, *4 (4th Cir. 1998)).  So much so that the newspaper in the case acknowledged "that government officials frequently and without liability evaluate reporters and reward them with advantages of access—i.e., that government officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression."  437 F.3d at 418.  Accordingly, the court concluded that to permit the newspaper "to proceed on its retaliation claim addressing that condition would 'plant the seed of a constitutional case' in 'virtually every' interchange between public official and press[,]" and "no actionable retaliation claim arises when a government official denies a reporter access to discretionarily afforded information or refuses to answer questions."  *Id.*  The court also held that "a reporter endures only de minimis inconvenience when a government official denies the reporter access to discretionary information or refuses to answer the reporter's questions because the official disagrees with the substance or manner of the reporter's previous expression in reporting" and that the Governor's order to his subordinates not to speak to the newspaper only regulated government speech, not the newspaper's.  *Id.* at 420–21.

The Fourth Circuit's holding in *Baltimore Sun* is on all fours with situation presented here. The President has subjected the Associated Press to differing treatment from others that have recently received special media access through the press pool because of its refusal to use the Gulf of America name.  While this suspension of special media access may be new in form, the President, and all former Presidents, have exercised their discretion to grant access to different

media organizations based on the content of their coverage—e.g., granting hours-long interviews to some and refusing to call on others in a crowded briefing room.  That the Associated Press may have long received special media access to the President does not mean that such access is constitutionally compelled in perpetuity.  That the Associated Press is now experiencing a lack of special media access is simply part of a "journalist's accepted role in the 'rough and tumble' political arena[.]"  It is not a First Amendment violation.  *Balt. Sun*, 437 F.3d at 418.

## II.    The Associated Press Has Failed to Demonstrate Irreparable Harm for a Temporary Restraining Order.

Even were the Associated Press likely to prevail on its claims, it has suffered no irreparable harm.  The Associated Press's assertion of irreparable harm is contained in a short, two-paragraph portion of its brief.  Pl. Br. (ECF No. 2-1) at 22.  It asserts, (1) from a legal standpoint, that irreparable harm is presumed where a plaintiff has demonstrated a likelihood on the merits of constitutional claims; and (2) from a factual standpoint, its exclusion "from the Oval Office, Air Force One, and other spaces open to other members of the press pool severely hinders its ability to produce timely, thorough, and informative reporting."  Pl. Br. (ECF No. 2-1) at 22.

The Associated Press is incorrect as a matter of law that simply showing a likelihood of a First Amendment deprivation is sufficient to demonstrate irreparable harm.  As another judge in this District has held, "[t]hat abstract principle must be applied to the relevant factual setting[.]" *Getty Images News Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 123 (D.D.C. 2002) (Bates, J.).  In *Getty Images*, a media organization challenged its exclusion from Guantanamo Bay and to compel the Defense Department to establish a press pool at the base.  *Id.* at 114.  Although the Court found "a likelihood of success on [plaintiff's] claim that published equal access standards and more formal procedures are required, at least at some point in time," it refused to enter a

preliminary injunction despite the claim's First Amendment basis when the media group failed to establish irreparable harm absent the requested injunction. *Id.*

The Associated Press is in the same bucket. Its factual contentions—that its reporting of the President and White House have been impaired—are belied by its own website. As noted above, the Associated Press using pool reports timely reported through articles and videos the events from which the White House supposedly excluded it. This is consistent with other members of the White House press corps who do not have special access to the President by being members of the press pool covering a particular event (e.g., the L.A. Times, the Financial Times, the Boston Globe). Moreover, the Court can readily observe from the Associated Press's website that it has had no trouble covering the White House and the President in the last few weeks. *See generally* Assoc. Press, http://www.apnews.com. And again, the role of a pool reporter is not to report for themselves, but to be the eyes and ears for all White House journalists. *See supra*. Consequently, the Associated Press has failed to demonstrate that the suspension of its special media access necessitates an emergency order for it to continue its journalistic endeavors.

Also, the Associated Press continues to use the moniker the "Gulf of Mexico" to refer to the body of water whose shores include many countries and localities beyond Mexico, all of which are in North or South America. Consequently, there has been no discernable chilling effect on the organization's speech or an actual compulsion to change that speech. *See, e.g.*, *Balt. Sun*, 437 F.3d at 419 (finding no chilling effect by being excluded by the Governor; "As typical reporters, they are used to currying their sources' favors, and even though they may have been foreclosed from directly accessing sources when the sources became unhappy with how their information was being reported, they have not been chilled to any substantial degree in their reporting, as they have

- 19 -

continued to write stories for *The Sun*, to comment, to criticize, and otherwise to speak with the full protection of the First Amendment.").

Accordingly, even could the Associated Press establish some likelihood of success on its claims to compel the White House to give it special media access, it cannot demonstrate irreparable harm necessitating a temporary restraining order in this case.

## III.    The Balance of Equities and the Public Interest Tips Decidedly in Favor of the White House.

The final two factors in the provisional relief analysis—balancing the equities and the public interest—often overlap in the context of an action to enjoin the government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). A court "'should pay particular regard for the public consequences'" of injunctive relief. *Id.* at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). This is especially so here where the Associated Press asks this Court to overrule a discretionary decision made by the President himself. *See generally Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867) ("An attempt on the part of the judicial department . . . to enforce the performance of [executive and political] duties by the President [is] 'an absurd and excessive extravagance.'"); *Newdow v. Roberts*, 603 F.3d 1002, 1011 (D.C. Cir. 2010) ("issuing an injunction to prevent [the President's subordinates] from implementing the future President's inaugural plan would be folly, akin to enjoining a sound technician from turning the Chief Justice's microphone on when administering the oath").

*    *    *

## CONCLUSION

For these reasons, the Court should deny the Associated Press's motion for a temporary restraining order.  A proposed order is enclosed herewith.

Dated: February 24, 2025
       Washington, DC

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney


By: _____  /s/ Brian P. Hudak_____
     BRIAN P. HUDAK
     Chief, Civil Division
     601 D Street, NW
     Washington, DC 20530
     (202) 252-2500 (main)

*Attorneys for the United States of America*