```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3     * * * * * * * * * * * * * * *    )
       ASSOCIATED PRESS,                )    Civil Action
 4                                      )    No. 25-00532
                      Plaintiff,        )
 5                                      )
          vs.                           )
 6                                      )
       TAYLOR BUDOWICH, et al.,         )    Washington, D.C.
 7                                      )    February 24, 2025
                      Defendants.       )    3:04 p.m.
 8                                      )
       * * * * * * * * * * * * * * *    )
 9


10                  TRANSCRIPT OF MOTION HEARING
11          BEFORE THE HONORABLE TREVOR N. McFADDEN
                  UNITED STATES DISTRICT JUDGE
12


13
       APPEARANCES:
14
       FOR THE PLAINTIFF:      CHARLES D. TOBIN, ESQ.
15                             MAXWELL S. MISHKIN, ESQ.
                               BALLARD SPAHR, LLP
16                             1909 K Street, Northwest
                               Twelfth Floor
17                             Washington, D.C. 20006

18                             SASHA DUDDING, ESQ.
                               BALLARD SPAHR, LLP
19                             1675 Broadway
                               19th Floor
20                             New York, New York 10019

21
       FOR THE DEFENDANTS:     BRIAN P. HUDAK, ESQ.
22                             UNITED STATES ATTORNEY'S OFFICE FOR
                                 THE DISTRICT OF COLUMBIA
23                             601 D Street, Northwest
                               Washington, D.C. 20530

24


25
```

```
1    REPORTED BY:              LISA EDWARDS, RDR, CRR
                               Official Court Reporter
2                              United States District Court for the
                                 District of Columbia
3                              333 Constitution Avenue, Northwest
                               Room 6706
4                              Washington, D.C. 20001
                               (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            THE COURTROOM DEPUTY:  Good afternoon, your Honor.

 2            This is Civil Case 25-532, the Associated Press

 3     versus Taylor Budowich, et al.

 4            This matter is set for a motion hearing.

 5            Parties, please introduce yourselves for the

 6     record, starting with the Plaintiff.

 7            MR. TOBIN:  Good afternoon, your Honor.  My name

 8     is Charles Tobin with the law firm of Ballard Spahr.  Along

 9     with Maxwell Mishkin and Sasha Dudding, we represent the

10     Associated Press, the Plaintiff.  With us at counsel table

11     is chief White House correspondent for the Associated Press,

12     Zeke Miller.

13            And if I might take a minute to introduce -- with

14     us at counsel table, as I said, is Zeke Miller.  Also

15     present in the courtroom is Julie Pace, the executive editor

16     of the Associated Press.  Seated next to her is Karen

17     Kaiser, the general counsel of the Associated Press.  And

18     with Ms. Kaiser is Mr. Brian Barrett, who's the associate

19     general counsel of the Associated Press.

20            THE COURT:  Good afternoon, folks.

21            MR. HUDAK:  Good afternoon, your Honor.  Brian

22     Hudak from the U.S. Attorney's Office on behalf of the

23     United States.  With me at counsel table are Deputy White

24     House Chief of Staff Taylor Budowich and U.S. Attorney Ed

25     Martin.
```

```
 1              Your Honor, just one logistical matter, if I may.
 2    Mr. Budowich has other matters pending at the White House
 3    today, and would ask leave to be excused at 4:15 if we're
 4    still continuing at that time.
 5              THE COURT:  That's just fine.
 6              MR. HUDAK:  Thank you, your Honor.
 7              THE COURT:  Good afternoon, gentlemen.
 8              All right.  We are here for a motion on a -- for a
 9    temporary restraining order.
10              Mr. Tobin, I'll hear from you.
11              MR. TOBIN:  Thank you, your Honor.
12              THE COURT:  This is the first time I've seen you
13    in person.  We've had --
14              MR. TOBIN:  That's right, your Honor.
15              THE COURT:  -- hearings during the battle days of
16    COVID before.
17              MR. TOBIN:  I like it better this way.  I hope the
18    Court does as well.
19              THE COURT:  Me, too.
20              MR. TOBIN:  Thank you, your Honor.
21              Your Honor, we thank the Court for quickly
22    convening this hearing this afternoon.
23              Your Honor, the Constitution prevents the
24    president of the United States or any other government
25    official from coercing journalists or anyone into using
```

1    official government vocabulary to report the news.

2          That is exactly what the White House is trying to

3    do with the Associated Press.

4          Your Honor, last month, President Trump issued

5    Executive Order 14172, renaming part of the Gulf of Mexico

6    as the Gulf of America and reverting back the name to Mount

7    McKinley what President Obama had the Interior Department --

8    and his Interior Department had renamed Denali.

9          And as the First Amendment entitles it to do, the

10   AP followed its usual process.  They discussed it as an

11   editorial matter; and they decided, as a matter of their own

12   editorial judgment, which is reserved to them by the First

13   Amendment, that they would continue to refer to the Gulf of

14   Mexico because portions of that body of water actually lie

15   outside of the United States boundaries and remains known as

16   the Gulf of Mexico around the world, as it has for the last

17   400 years.

18         The Associated Press Stylebook does reference the

19   president's executive order and the changing of a portion to

20   a name of Gulf of America.

21         And in their editorial judgment, the Associated

22   Press decided to adhere to the president's renaming of Mount

23   McKinley, since Mount McKinley is within -- completely

24   within the territory of the United States and, therefore, it

25   is undisputedly within the prerogative of the federal

 1    government to rename the entire location as Mount McKinley.

 2            So after it made that decision and beginning on

 3    February 11th, 11 days after the executive order, the White

 4    House told AP that until it changes its Stylebook to adopt

 5    the Gulf of America as its name, its journalists would be

 6    banned from events open to the White House press pool.

 7    That's where it initially started, your Honor.  And that

 8    means that news events taking place, for example, in the

 9    Oval Office or traveling with the president on Air Force

10    One, the Associated Press is no longer welcome to do that.

11            They initially said it would only apply to print

12    members of the Associated Press.  They later expanded it to

13    include photographers.  And then they later went on to

14    expand it to include not just events taking place with the

15    press pool, but now it's all events at the White House.  In

16    fact, sitting here today getting ready for this hearing, the

17    Associated Press was barred from attending -- either its

18    photographers or print journalists -- from attending the

19    press conference being held in the White House by President

20    Trump and French leader Macron.

21            THE COURT:  So you're still allowed to go into the

22    Brady room, I think it's called --

23            MR. TOBIN:  We're allowed into the Brady room.

24    We're allowed into the offices adjacent to that.  We're

25    basically allowed to traverse anywhere where the press is

1    ordinarily allowed to traverse.  But we are not permitted to

2    attend, essentially, events that the president is hosting

3    either in the Oval Office or in the larger venues like the

4    east room or the diplomatic room.

5            Your Honor, part of our concern, part of our due

6    process argument, is the ground seems to keep shifting.  We

7    were initially told that it would be restricted to the Oval

8    Office and press pool events.  We were initially told it

9    would only be text reporters.  And when a photographer tried

10   to -- on February 14th tried to join one of the events, he

11   was barred as well.

12           And so now it appears that it is a total bar on

13   any events in the White House or elsewhere, presidential

14   motorcade, presidential speeches outside of the White House

15   where the press -- the press pool is normally allowed to go.

16           Your Honor, the AP has been a permanent part of

17   the press pool since the press pool's inception 100-plus

18   years ago.  It sends a text reporter and a photographer to

19   essentially every place the president goes that is open to

20   the press at all.  It's the eyes and ears of the public for

21   4 billion people who see the Associated Press's news on a

22   regular basis.

23           And in fact, AP, which was founded in 1846, was

24   the progenitor of the press pool that we've talked about in

25   our papers as to the *amici* that, in 1881, the Associated

1    Press was the single pool reporter who was sitting outside

2    as President Garfield was succumbing to an assassin's

3    bullet.  He was reporting on that.

4         THE COURT:  What if the Correspondents'

5    Association decided that you all had been there for 100-plus

6    years' time; time for some new blood, and therefore you

7    can't come in?  Would that be acceptable?

8         MR. TOBIN:  Well, it wouldn't be the same issue

9    that I'm here to argue today.  It wouldn't be a

10   constitutional issue.  If the Correspondents' Association --

11   let me back up.

12        If the White House has deferred to the

13   Correspondents' Association to decide the membership of the

14   press pool and so if, in the give-and-take inside the press

15   pool, among competitive news outlets, the Associated Press

16   were told it could not be a member of the press pool, that

17   wouldn't be a problem that we would litigate against the

18   White House.  That would be something to be decided

19   internally among the White House Correspondents'

20   Association.

21        THE COURT:  And so could the Correspondents'

22   Association make the same decision that we think you all are

23   being un-American and referring to -- this is the Gulf of

24   Mexico and, therefore, you can't come in?  Could the

25   Correspondents' Association make that determination?

1          MR. TOBIN:  You know, your Honor, I'm not up on

2     the bylaws of the Correspondents' Association sufficiently

3     to answer that question.

4          I would say that, obviously, it would cause an

5     internal problem within the Correspondents' Association if

6     they decided, on the basis that your Honor just articulated,

7     that the Associated Press would lose the seat that it's had

8     since the press pool's inception.

9          But it certainly wouldn't be the same First

10    Amendment, Fifth Amendment issue.  This would be a decision

11    by a private organization rather than the White House

12    itself.

13          The --

14          THE COURT:  I guess I'm just -- it feels a little

15    odd that the White House is somehow bound by decisions that

16    this private organization is making as to who can and cannot

17    come into the Oval Office.

18          MR. TOBIN:  Well, if we were going back to the

19    beginning and the White House was establishing the press

20    pool for the first time, I certainly couldn't argue that

21    they were required to defer to the Correspondents'

22    Association.

23          THE COURT:  By "the beginning," do you mean, like,

24    a couple weeks ago, when the new administration came in?

25          MR. TOBIN:  No.  I'm talking about when the press

```
 1      pool was first established and the tradition of deferring --

 2      the protocol of deferring to the Correspondents'

 3      Association.

 4           THE COURT:  So is this administration somehow

 5      bound by what happened with President McKinley or whatever?

 6           MR. TOBIN:  Perhaps, but not necessarily.  And it

 7      would certainly be making a different argument.

 8           But the issue here is the president hasn't severed

 9      the Correspondents' Association's discretion.  It has simply

10      taken one -- the White House has deferred the discretion to

11      the Correspondents' Association.  The Correspondents'

12      Association has, for many generations, decided that the

13      Associated Press, among other journalists, should be there.

14      And the president has singled out a single member of the

15      pool and ejected them from the Oval Office and other events.

16           THE COURT:  As I understand it, you're basically

17      raising a Fifth Amendment claim and a First Amendment claim.

18      Is that right?  If you were going to have to defend one of

19      those in front of the Circuit, which would you be more

20      anxious to defend on?

21           MR. TOBIN:  Well, I would be eager to defend on

22      both because we're right on both.  But the *Karem* case, the

23      *Acosta* case and the *Ateba* case were all decided on Fifth

24      Amendment due process grounds with the First Amendment

25      underlay --
```

1           THE COURT:  And that's kind of the *Sherrill* case

2     too.  Right?

3           MR. TOBIN:  And the *Sherrill* case, exactly.

4           THE COURT:  And so are you saying the Fifth

5     Amendment is the stronger?

6           MR. TOBIN:  I would say the Fifth Amendment -- the

7     reason we put the Fifth Amendment first is we're asking the

8     Court to follow *Sherrill*, *Karem*, *Acosta* and the reasoning in

9     the *Ateba* case.

10          THE COURT:  So I guess -- I mean, it feels to me

11    like you're going a step further here and that, if the White

12    House had prohibited you from the Brady room, this would be

13    a slam-dunk case.  *Sherrill*, you know:  Do not pass go.

14          But this feels harder to me in that this is a

15    limited-access area that the 500 members of the press pool

16    don't get to go into.

17          So I guess -- help me think through why you are on

18    such solid ground on the Fifth Amendment.

19          MR. TOBIN:  Sure.

20          Well, the -- you know, I'll pick a number --

21    100,000 journalists in the United States don't get to go

22    into the White House every day.  There's a process by which

23    they are selected through the hard pass or the day pass

24    system.  And when these journalists are given a hard pass,

25    we know from *Sherrill*, we know from *Acosta* and we know from

1    *Karem* that a liberty interest attaches.  The liberty

2    interest --

3         THE COURT:  I mean, it looks to me like your

4    clients still have the hard passes.  They're still able to

5    go everywhere they could go in *Sherrill*.  Right?

6         MR. TOBIN:  They do.

7         The principle equally applies, your Honor, to

8    admission into pool events or larger press events.  As long

9    as the president -- as long as there is an established

10   procedure, an established protocol, a history, a tradition

11   where the press is allowed access into a certain place, that

12   access cannot be denied without due process and without

13   adhering to the First Amendment, either as a matter of due

14   process or as a matter of First Amendment retaliation and

15   coercion.  That is our secondary argument.

16        My authority for that, your Honor, is the *Acosta*

17   case and the *Sherrill* case.  Judge Kelly noted in the *Acosta*

18   case, which came up as a TRO motion, quote, "*Sherrill* holds

19   that once the White House opens a portion of it up to

20   reporters for their use, some kind of First Amendment

21   liberty interest protected by a due process right is

22   created, and I simply have no choice but to apply that

23   precedent here."

24        THE COURT:  But again, that's the Brady press

25   room, where your clients are free to go.

1          MR. TOBIN:  That's correct, your Honor.

2          But the case doesn't say -- that portion doesn't

3     say that it's limited to the Brady press room or to hard

4     passes.  It says that once the United States -- once the

5     White House opens a portion of it, opens it to reporters for

6     their use.

7          Your Honor, when the White House has decided that

8     the press pool will come in for an event, or the greater

9     press will be invited into the east room for an event, it is

10    opening up a portion of the White House for the press's use

11    and excluding them without following due process or for

12    content reasons or for viewpoint discriminatory reasons, as

13    the president's brief characterized -- the White House brief

14    characterizes it, is an unconstitutional act, and we have to

15    adhere to that regardless of which portion of the White

16    House is open.

17         Your Honor, the CBS -- I'm sorry -- the *CNN v. ABC*

18    case specifically says that there is a liberty interest.  It

19    wasn't decided in this circuit.  But it specifically says --

20         THE COURT:  Is that the old Georgia district case?

21         MR. TOBIN:  It is, your Honor.  It's the case

22    where television cameras were barred from the White House.

23         THE COURT:  Right.

24         MR. TOBIN:  And CNN and ABC, the networks all

25    sued.  The Court specifically said that there is a liberty

1    interest in the press pool -- the decision uses those

2    words -- such that you cannot ban for content reasons, which

3    was the argument that the Court accepted was the reason for

4    banning television cameras -- it went on to talk about the

5    importance of multiple voices and multiple media in the

6    press pool.

7         But that court specifically found a liberty

8    interest in the press pool itself and, by extension, the

9    activities and the presence of the press pool.

10         THE COURT:  Can you address *Baltimore Sun*?

11         MR. TOBIN:  Yes.

12         Your Honor, the *Ehrlich* case -- I have some

13    familiarity with it because I was the lead counsel --

14         THE COURT:  All right.

15         MR. TOBIN:  -- in the *Ehrlich* case, your Honor.

16    The *Ehrlich* case involved oral communications and a memo

17    from Governor Ehrlich to the administrative staff saying,

18    Don't speak to the press.

19         Your Honor, there may have been relationships that

20    were interfered with.  But there was no established right,

21    established grappling hook, according to the Fourth Circuit

22    and the district court, for a right that had been taken away

23    from the journalists in the *Ehrlich* case.

24         Additionally, the Court noted that there were

25    other *Baltimore Sun* reporters who were still getting their

1    calls answered and who were still being given access to all

2    of the events that Mr. Nitkin and Mr. Olesker, the reporters

3    in the *Baltimore Sun* case, were banned from.

4         In this case, nobody for the Associated Press --

5    they didn't single out Mr. Miller.  They said the entire

6    organization cannot come to any press events and has now

7    been banned from the east room, the diplomatic room and the

8    presidential motorcade, some of the examples we cited in our

9    briefing.

10         And so *Ehrlich* dealt with oral access.  The Court

11   had trouble with being -- with entering an order compelling

12   the government to speak to them.  That actually wasn't what

13   we were asking.  We were asking for the ban to be lifted and

14   leave people free to speak to us.

15         But, you know, to analogize it here, we are not

16   arguing that the president of the United States has to

17   answer the Associated Press's questions.  If he brings

18   people into -- the pool in, and people are asking him

19   questions, he's perfectly free -- we've seen him do it on

20   television all the time -- perfectly free to ignore any

21   journalist he wants from oral communications.

22         The issue here and what takes it out from under

23   *Baltimore Sun* is that once he lets people into a room, a

24   group called the press pool, once that is the way of things

25   in the White House, a liberty interest attaches to it.

1    Every member of that press pool has a liberty interest.

2    That interest cannot be deprived without due process or in

3    violation of the First Amendment.

4            THE COURT:  I mean, that sounds to me pretty

5    similar to at least how Judge Niemeyer describes the

6    situation there in Maryland, where he describes this larger

7    room that had capacity for 80 persons and your clients, I

8    guess, were still allowed in there.

9            But then there's this smaller governor's

10   conference room, a private area, protected by a guard and a

11   door with keypad access and with the capacity to hold 10 to

12   12 persons, and they had no problem with your clients being

13   prohibited from that smaller area.

14           I mean, that sounds like you could just, you know,

15   substitute in Brady press room and Oval Office for, you

16   know, whatever the -- reception room and governor's

17   conference room, and you've got exactly your situation here.

18           MR. TOBIN:  Well, there was no due process

19   analysis in the *Ehrlich* case.  And if -- Judge Niemeyer said

20   at the very beginning, We limit this case to the First

21   Amendment retaliation claim in the complaint.  And so, your

22   Honor, there is no analysis of that due process issue.

23           THE COURT:  So is that why you see your Fifth

24   Amendment claim as being stronger?

25           MR. TOBIN:  That's why we put it first, your

1    Honor, in addition to the fact that we have homegrown

2    precedent here to rely on, *Karem*, *Ateba*, *Sherrill*, and

3    whatnot.

4            Your Honor, I was in the courtroom when the *Acosta*

5    case -- I was representing a bunch of *amici* in the *Acosta*

6    case.

7            THE COURT:  I'm sure you were involved.

8            MR. TOBIN:  It was my privilege to represent -- we

9    had 75 *amici* representing the spectrum of what people think

10   of in journalism, from Fox News to anyone else.  They joined

11   the *amicus*.

12           When the government asked Judge Kelly to apply

13   *Ehrlich*, Judge Kelly somewhat snarkily responded:  That's

14   across the river.  I'm not bound by that precedent.  I need

15   to square this with *Sherrill*.

16           And as we saw in his decision and in the *Karem*

17   case from Judge Contreras and Judge Bates's decision in the

18   other case, the *Ateba* case, the courts adhere to the

19   *Sherrill* precedent, and *Sherrill* makes very clear that if

20   there is a liberty interest -- and we believe that there

21   is -- in the pool, which the most direct precedent is the

22   *CNN v. ABC* case, once there is an established pool and once

23   there is an established --

24           THE COURT:  Well, I'm certainly not bound by that

25   case.  Right?

1        MR. TOBIN:  No, you are not, your Honor.

2        But it is persuasive in the sense that it follows

3     *Sherrill*, so, you know, it follows the D.C. Circuit

4     precedent itself, your Honor.

5        And once that pool is established, once access is

6     given to that pool and taken from out of the pool, once the

7     White House says, RSVP here for the event tonight in the

8     east room to all journalists, once it opens up that

9     opportunity, it can keep people out for security reasons or

10    for other nondiscriminatory reasons, but it has to publish

11    in advance what the criteria are.  And if a decision is made

12    to exclude, it has to be announced in advance with

13    reasoning.  There must be an opportunity to appeal that

14    decision to the authority who made the announcement, who

15    made the decision, and the response to that appeal has to be

16    in writing and it has to comport with the Constitution.  It

17    can't be arbitrary and it can't be for discriminatory

18    content-based reasons.

19        THE COURT:  So I mean, what are there, like 1,000

20    members of the White House Correspondents' Association or

21    something like that?

22        MR. TOBIN:  I wouldn't dispute that number.

23        THE COURT:  Is your position that all thousand of

24    them have an access right, a due process right, to the Oval

25    Office?

1          MR. TOBIN:  No.  And it's not that they have a due

2    process right to get into the Oval Office.  It's a due

3    process right not to be kicked out when the pool is brought

4    in.  Very different from a constitutional footing

5    standpoint.

6          I'm not here to argue that the president must open

7    the Oval Office even to the press pool if he decides at a

8    given press conference he doesn't want the press in there or

9    he doesn't want the press pool in there.

10         The issue is once he lets the press pool in, he

11   can't say, I don't like you; you're fake news; you have to

12   get out.  I don't like you; you describe, you know, the

13   right to choose instead of anti-life.  He can't describe the

14   vocabulary that he will use as the filtering criteria to let

15   people in once he's letting the entire pool in.  That's a

16   violation of --

17         THE COURT:  But he's not letting the entire pool

18   in.  Isn't that the point?  There's only 13 people who get

19   in.

20         MR. TOBIN:  The press -- oh, we should back up and

21   talk about definitions.

22         The press pool is a group -- a select group of

23   people who were decided by the White House Correspondents'

24   Association from among the hard pass holders at the White

25   House.

```
 1              THE COURT:  I see.

 2              MR. TOBIN:  So there's a larger group of people

 3     that go to work at the White House to cover the news every

 4     day.  There's a smaller group of them who constitute the

 5     pool.  The Associated Press has been a member of the pool

 6     since its inception.  They have a -- think of it as -- the

 7     General Assembly of the U.N. has permanent council members.

 8     They have permanent, at least as of now, for the deference

 9     of the White House Correspondents' Association, they have a

10     permanent photographer and a permanent text or print person

11     who are part of that larger pool.

12              When a pool event is held, those 13 people, that

13     group of people are the ones who are ushered into the White

14     House and they are the ones who are permitted to observe.

15              THE COURT:  I see.  And so when you say the entire

16     press pool, you're just talking about 13 people, some of

17     whom are randomly chosen, and your clients are always

18     chosen.  Is that right?

19              MR. TOBIN:  Well, they're assigned by the White

20     House Correspondents' Association, so it's not quite random,

21     but it is rotating.  They're all permanent members --

22              THE COURT:  Except as to your clients.

23              MR. TOBIN:  Well, our clients, The New York Times

24     and a couple of others have -- and it's in our briefs --

25     they have a permanent, by choice of the White House
```

1  Correspondents' Association, to which the president has

2  deferred.

3           THE COURT:  Have your clients been chilled in

4  their First Amendment activities?

5           MR. TOBIN:  They have, your Honor.  They are

6  unable to report firsthand on these events.  They have to

7  rely secondhand on other people's reporting.

8           And, you know, that is a First Amendment and

9  irreparable injury.  That was recognized in the *Acosta* case,

10  that when a journalist is barred from covering an event in

11  person, they're deprived of the ability to make percipient

12  observations.  If you're called into the Oval Office, if

13  there is a television camera, for example -- if you're not

14  called in and you have to get your news off the television

15  feed or something like that, you can't observe who's around

16  the room.  If there's other political appointees in the

17  room, if there are donors in the room, if Elon Musk is in

18  the room, you will not know that.

19           THE COURT:  I bet you will.

20           MR. TOBIN:  Excellent point, your Honor.  Maybe it

21  was a bad example.

22           THE COURT:  So help me, though, think -- because

23  my impression is that the press pool serves as the eyes and

24  ears for the -- I guess the hard pass holders.  Is that the

25  correct terminology there?  And so it -- I guess, as I

1    understood at least some of the *amici*, their briefs, that

2    when -- you're really acting as much of a representative

3    when you're in the pool.  Whatever you say, report on is not

4    for attribution.  Anybody -- any hard pass holder can report

5    on that.

6            I mean, that's kind of an unusual situation.  And

7    it feels to me like it saps a lot of the irreparable harm

8    argument, doesn't it?

9            MR. TOBIN:  Well, actually, the press pool doesn't

10   feed all of its materials to people who are not inside.

11   They're allowed to keep the fruits of their own reporting to

12   themselves where, in AP's case, when it's in there, it

13   shares it with its members.

14           That's another part of the harm that we're

15   concerned about, your Honor, is AP is a membership

16   organization, a subscription organization.  Thousands of

17   news rooms around the world.  Those news rooms depend on the

18   AP and Mr. Miller to be able to report in realtime what the

19   president looks like, how his speech is, how he's dressed

20   that day, who else is in the room with them.  As you said,

21   if it were Elon Musk, they'd probably know about it anyway.

22   But other people in the room with the president, how long

23   they're allowed to stay there, what his attitude is toward

24   people, how his breathing pattern is, all of the reasons,

25   your Honor, why we have trials for people to observe

1    witnesses so that they can decide for themselves firsthand

2    credibility issues, clarity issues.

3              If the witnesses were sitting and watching on a

4    video feed, they would lose a lot of the -- or, closer to

5    the analogy, relying on other people to tell them what

6    happened in the room, they would be losing that ability to

7    judge for themselves their percipient observations.

8              THE COURT:  Yes.  I get that point.

9              I guess I'm just -- as I understood the press

10   pool, I thought it has this unusual representative function

11   for everybody in the White House.

12             MR. TOBIN:  It has one journalist who is assigned

13   to write a pool report.  That report comes out later.  So

14   Mr. Miller is permitted to tweet or to text out in realtime

15   what the president is saying and his observations.  That

16   pool report doesn't get disseminated until after the event.

17             So you lose the moment.  You lose the ability.

18   You may lose the news cycle, or at least the news moment, if

19   you're not permitted to be in that room as a member of the

20   pool.

21             THE COURT:  So the government's brief, I think,

22   rebuts this point by pointing to various articles and, I

23   think, videos that your clients put out from these events

24   from which they'd been excluded.

25             Is there some event, maybe one of these more

```
 1    recent ones, that you were not able to report on because you
 2    were excluded?
 3               MR. TOBIN:  Well, the presidential motorcade to
 4    the Governors Association Dinner, and then being in the room
 5    at the Governors Association Dinner was an event that we
 6    weren't able to be in and report on in realtime.
 7               I do want to point out, your Honor --
 8               THE COURT:  I'm sorry.  I wasn't even aware of
 9    that.  Are you -- was that at the White House?
10               MR. TOBIN:  It was not.  I'm a little unsure of
11    that.
12               (Confers with Mr. Miller privately.)
13               The National Building Museum.  It was a
14    pool-invited event.  We were excluded.
15               THE COURT:  Just up the road here.
16               MR. TOBIN:  Indeed.  I was at a wedding there last
17    week.
18               THE COURT:  I don't know -- I mean --
19               MR. TOBIN:  Could I just point out one thing?
20               THE COURT:  Yes.  But I guess -- I'm not sure that
21    the TRO language at least that I had envisioned would cover
22    that type of situation.
23               MR. TOBIN:  Well, it's a good point.  We --
24    Mr. Hudak gave us -- was kind enough to devote some of his
25    Sunday time to chatting with us about the case.  And we
```

1    pointed out to him that the TRO we would be looking for is

2    that there will be no exclusion of the Associated Press from

3    events that the pool is invited to or that the greater White

4    House press corps is invited to.

5            So, for example, Mr. Miller responded

6    affirmatively -- or the AP responded affirmatively today to

7    an event in which the president was sitting with -- at a

8    press conference with French leader Macron.

9            That request was rejected.  That would be an

10    event, if it wasn't a pool event, that we would say is a

11    constitutional problem if the president singles us out for

12    exclusion because we don't -- we're not renaming the Gulf of

13    Mexico.

14            Your Honor, in the government's brief, they cite

15    to two photographs that were taken before the photographers

16    were banned.  So there's a fact error in their brief.  Their

17    illustration on Page 9 with Mr. Fogel, the hostage that was

18    released from Russia, and the picture of the president with

19    Indian leader Modi on Page 6 were both taken on -- February

20    11 on the first one, February 13 on the other one, before

21    the White House expanded the ban from AP's print to AP's

22    photographer.

23            So those two are not really purposeful for the

24    Court's analysis because we weren't banned from the room.

25            The other two are -- my understanding is -- are

1    taken from television feeds.  Yes, we can report secondhand

2    by looking at a television screen.  But as I said, your

3    Honor, the ability to have the in-person observation of the

4    president instead of relying on a video feed is the same

5    reason the press argues for access into the courtroom, and

6    the Supreme Court has recognized in *Richmond Newspapers v.*

7    *Virginia* that having the press in to observe proceedings is

8    fundamentally different than hearing about them afterwards.

9           And the analogy I gave the Court earlier is that

10   this is why we have juries sitting near witnesses, to be

11   able to observe their testimony and draw whatever

12   conclusions and then talk about it in the jury room.

13          The press makes observations about the president

14   of the United States when it is in proximity to the

15   president and reports on them.  Those observations are part

16   and parcel of the First Amendment-protected news-gathering

17   activity that the country relies on and has relied on since

18   its founding for journalists.  And AP's members rely on AP

19   to be able to deliver those kinds of percipient observations

20   by either being a member of the press pool or not being

21   excluded from press events because of their content.

22          And so, your Honor, under the Fifth Amendment and

23   under the *Sherrill* analysis, the procedure here was -- did

24   not comport with due process because the AP did not receive

25   meaningful prior notice that if it didn't succumb to the

1    president's will and change its vocabulary to Gulf of

2    America, that it would be deprived of all press events

3    involving the president.

4          White House Press Secretary Karoline Leavitt,

5    Defendant in this case, told Mr. Miller about the ban after

6    it had already been decided, 11 days after the president's

7    policy.  They certainly had -- it was announced.  They

8    certainly had 11 days to start this process.

9          And it went into effect the very same day that it

10    was announced to Mr. Miller.

11          Even then, the notice was incomplete.  As I

12    mentioned, we were told that we couldn't come into the Oval

13    Office when, in fact, it is now extended to every

14    opportunity where the press is invited, and now encompasses

15    both print and photography and events in the east room, the

16    diplomatic room and even the presidential motorcade and even

17    the president's visit to the National Building Museum.

18          The ban was not announced before it went into

19    effect.  AP had no opportunity to challenge the decision

20    before the ban went into effect.  And as Judge Kelly noted

21    in the *Acosta* case, when an important interest is at stake

22    and when the government is able to provide this process

23    before deprivation, it ordinarily must do so consistent with

24    due process.

25          Finally, your Honor, on the due process point, the

1    AP did not receive adequate final written statement of

2    reasons for the decision.  There was a Twitter post from

3    Mr. Budowich.  Susan Wiles, the White House chief of staff,

4    finally responded seven days later to a letter -- to a

5    letter that Ms. Pace, the AP's executive editor, sent.  And

6    all she did was talk about the lies that the AP is telling

7    in its Stylebook and its style guide.  And she, in fact, got

8    it wrong in her email because she said there is no event

9    that the AP is being barred from covering when, in fact, it

10    had already been banned from events like the press

11    conference between President Trump and Prime Minister Modi.

12            In addition to the procedural infirmity, due

13    process has two components:  procedure and substantive.

14    *Sherrill* holds that when the White House denies a journalist

15    access to spaces that are open for the press, it cannot do

16    so for less than compelling reasons, and that arbitrary or

17    content-based criteria -- in that case, for press pass

18    issuance -- are prohibited under the First Amendment.

19            The White House has, after this decision was

20    already made, told us exactly what the reasoning was; and,

21    your Honor, the reason is to impose a vocabulary -- an

22    official way of referring to a geographical point on the

23    map.  And that is quintessentially a content-based decision.

24            I might also add that they clearly picked on AP

25    and nobody else.  In that respect, their decision is

1    completely arbitrary because there are other members of the

2    press pool that adhere to the name Gulf of Mexico.  But they

3    picked the AP, Ms. Wiles's letter tells us, because the AP

4    publishes an influential book called the AP style --

5    Stylebook.  And so the goal of the White House is not only

6    to change AP's vocabulary, but anybody in other newsrooms

7    who adhere to the Stylebook.  And so they picked who I

8    suppose they felt was the strongest member of the media to

9    help them in their mission of changing the national

10   vocabulary.

11          And, your Honor, whether the president's

12   motivation, you know, for trying to change the way we refer

13   to a body of water is patriotism or recognition of the

14   patriotic interest we have in the body of water, or it's

15   some kind of geographical propaganda, we're not asking the

16   Court to decide that.  The prerogative to rename is the

17   president's.  We're not challenging that.  But forcing the

18   press to change it on pain of being excluded from

19   opportunities in the White House that other press are being

20   given is a content-based decision and, under *Sherrill*, that

21   is prohibited.

22          I mean, *Sherrill*, at bottom, is a Fifth Amendment

23   due process vehicle, but it underlies -- every paragraph

24   underlies the First Amendment interest of the press in its

25   autonomy and in not being deprived of that autonomy by

1    arbitrary content-based reasons.

2            And so, your Honor, for both procedural and

3    substantive reasons, getting now to the injunction, the TRO

4    test, the AP is likely to succeed on the merits of its case

5    on Fifth Amendment due process grounds alone.

6            We've already kind of talked around the

7    retaliatory -- the First Amendment claim.  And the claim

8    there is very simple, and it is different than the *Ehrlich*

9    case.  Once space is left open for people to enter the room

10    as part of a press pool, the president is unable to

11    simply -- the White House is unable to simply exclude them

12    as a matter of retaliation or as a matter of content-based

13    restriction or as a matter of coercion.

14            On retaliation and content-based restrictions, we

15    rely principally on *Tornillo v. The Miami Herald*, where the

16    U.S. Supreme Court said the state could not force a

17    newspaper to publish a retraction or write a reply for a

18    candidate.  The quote that I remember from that case is:

19    For better or worse, the decision of what goes into

20    newspapers is a decision of editors, and there has yet to be

21    found a way to let the government influence that decision

22    other than by argument that comports with the First

23    Amendment.

24            And so in terms of the content-based restriction,

25    your Honor, the case of *Reed v. Town of Gilbert* holds that

1    actions are presumptively unconstitutional if they do not

2    satisfy strict scrutiny if they are a content-based

3    restriction.

4            And here, your Honor, there is no -- first of all,

5    the restriction is not narrowly tailored under strict

6    scrutiny because it doesn't apply to all the press; it just

7    applies to the AP singularly.

8            And second of all, it is not a compelling state

9    interest to force the press to change the vocabulary in the

10   way that it reports the news.

11           And in terms of coercion, your Honor, we didn't

12   cite it in our brief, but I would point the Court to the

13   case *NRA v. Vullo*.  It was the unanimous decision of the

14   Supreme Court written by Justice Sotomayor.  And it held

15   that an official in the state of New York could not coerce

16   insurance companies from changing their relationships with

17   the NRA on account of NRA's advocacy for Second Amendment

18   rights.

19           And the Court held that the government is not

20   permitted viewpoint discrimination because that's uniquely

21   harmful to the democratic society, and it's the central

22   point of the First Amendment free speech clause.

23           So, your Honor, the White House's decision to

24   exclude the Associated Press from the press pool is also a

25   violation of the First Amendment because it's retaliation,

1    it's a content-based restriction, and it is an attempt to

2    coerce them into changing the way they report the news.

3          And so, your Honor, we've demonstrated a

4    likelihood of success under the Fifth Amendment and the

5    First Amendment.

6          As far as irreparable harm, in *Karem*, the D.C.

7    Circuit reaffirmed that a prospective constitutional --

8    violation of a constitutional right, which the AP certainly

9    faces with the ban, constitutes irreparable injury per se.

10         And as Judge Kelly noted in *Acosta*, quoting

11   *Sherrill* -- I mentioned this earlier -- constitutional

12   injuries are often considered irreparable due to their very

13   nature.  And he went on to say:  Each day that Mr. Acosta

14   was described [sic] of his liberty interest without the

15   process described in *Sherrill*, he suffers a harm that cannot

16   be remedied because you can't restore access to press

17   briefings that have already taken place.  The damage is

18   already done.

19         And so, your Honor, we've demonstrated irreparable

20   harm and, additionally, likelihood of success.  The balance

21   of the equities favors the TRO because the harm to AP, which

22   is substantial, outweighs the government's interest in

23   excluding the AP, which is being done for illegitimate

24   reasons.

25         And government has no interest in coercing the

1    news media that this Court should recognize.  And that's

2    exactly what Judge Kelly concluded in *Acosta*.

3            And then finally, your Honor, the public interest

4    favors protection of the free press to decide for itself how

5    to report the news and, with the help of this Court, to

6    prevent the government from coercing journalists in how they

7    report the news.

8            THE COURT:  All right.  Thank you, sir.

9            MR. TOBIN:  Thank you, your Honor.

10           THE COURT:  Mr. Hudak.

11           MR. HUDAK:  Good afternoon.

12           THE COURT:  Good afternoon.

13           MR. HUDAK:  This case has a very narrow issue.

14   It's whether the Constitution affords a right to a media

15   organization to have special access to the president.

16           It's not a case about having access to general

17   media facilities, media facilities that every other

18   journalist who is a bona fide journalist with access to the

19   White House has.  It's:  Can the president decide who gets

20   special access to him?  That's what this case is about.

21           And no court has ever ruled that any media

22   organization has a liberty interest or a First Amendment

23   right to special access to the president.  To the contrary.

24   In *Sherrill*, the Circuit went out of its way to explain and

25   distinguish between the general media access that was at

1    issue there to the White House briefing room and other press

2    facilities to special media access.

3              It wrote:  Nor is it the discretion of the

4    president to grant interviews or briefings with selected

5    journalists challenged.  It would certainly be unreasonable

6    to suggest that because the president allows interviews with

7    some bona fide journalists, he must give the opportunity to

8    all.

9              Once the Court recognizes that the president can

10   consider the content of a journalist's speech in assessing

11   whether to give that journalist special media access,

12   whether it's a sit-down interview, an hourlong interview to

13   be televised on television, an exclusive print media

14   interview or otherwise, once the Court recognizes that the

15   president can choose, based upon the content of a

16   journalist's speech, who to give special access to, this

17   case falls apart, because that means that there is no

18   liberty interest, no entitlement that a journalist like the

19   AP can rely on for Fifth Amendment purposes.

20             And as the Fourth Circuit wrote in the *Baltimore*

21   *Sun* case, there is no First Amendment right.  In fact, the

22   Supreme Court has made clear there's no First Amendment

23   right to have access to the White House at all, which is

24   largely the reason we think this has been litigated

25   principally as a Fifth Amendment case.

1           Your Honor, at its core, there is no

2     special-access right for the AP or for any other media

3     organization to have access to the president.

4           THE COURT:  So, Mr. Hudak, I mean, it sounds to me

5     like, at least at this point, we're talking a lot more than

6     some sort of special sit-down with the president.  Right?

7     This is large events at the Building Museum or some event in

8     the east room.  I mean, that's pretty far afield from a

9     one-on-one interview that -- I would certainly agree with

10    you that, you know, the president could say he's just going

11    to hear from X interviewer or not hear from Y interviewer.

12          But that's not really where we are now.  Right?

13          MR. HUDAK:  I don't know, your Honor, because they

14    haven't put any of this information in the record that we

15    can go and verify what they're actually complaining about.

16    Their TRO does not seek any injunction beyond access to the

17    press pool.

18          Paragraph 1 of the proposed TRO is:  Defendants

19    shall immediately rescind the denial of Plaintiff's access

20    to the Oval Office, Air Force One and other limited spaces

21    when such spaces are made open to other members of the White

22    House press pool.

23          We're talking about the pool, 13 seats from

24    thousands of folks that cover the White House and have hard

25    passes.

1          That is obviously special access.  That is

2     obviously more akin to the one-hour sit-down interview than

3     it is to all of the cases they have cited in their briefs

4     regarding hard passes and access to the White House

5     facilities.

6          THE COURT:  But their brief does mention an east

7     room event.  Right?  I mean, that's a pretty big ceremony.

8          MR. HUDAK:  And I don't know the details of it.

9     If you look at the declaration, we weren't able to verify

10    the information, whether or not this was a pool event that

11    had a limited access or not.

12          But, your Honor, if the injunction they're

13    seeking -- and that's what we have been going off of, is

14    their papers, the way they phrased their injunction -- they

15    want access as a pool member to pool events.  That is

16    special access.  And that is not a liberty interest that the

17    AP has, nor is it a constitutional First Amendment interest,

18    because there is no constitutional right to news-gathering.

19    There is a right to news publication, as the Supreme Court

20    has made clear.

21          All the cases -- all the cases that we talk about

22    in the D.C. Circuit focus on the Fifth Amendment aspect that

23    finds that the liberty interest is embodied by the First

24    Amendment.  But all of them talk about a liberty interest,

25    not a First Amendment right, for that reason.

1          But, your Honor, you know, again, if -- just to

2     tease out some examples, if Mr. Ateba, who, you know, has a

3     case pending before the D.C. Circuit and was denied a hard

4     pass in favor of being granted a soft pass whenever he

5     needed White House access -- that was the issue in that

6     case.  Under the AP --

7          THE COURT:  This is Judge Bates's case?

8          MR. HUDAK:  Yes, your Honor.

9          Under the AP's logic, Mr. Ateba would have a right

10    to be in the press pool because he's a journalist, and that

11    is an area open to journalists, notwithstanding the fact

12    that there are only 13 seats in that room.

13          What the AP actually asked here is not just to be

14    part of the press pool, but to have two of the 13 seats

15    specifically dedicated to it.  That's not just special

16    access; that's extra-special access.

17          And certainly there is no requirement for the

18    president to give extra-special access to an organization

19    even if they have historically had that access, even if they

20    are a longstanding member of the journalist community, even

21    if they go back 200 years.

22          The president can choose who to speak with in

23    these special-access events in order for his message to be

24    communicated to the American people.

25          THE COURT:  But is he actually speaking with them?

1    I thought this was more a small group that gets to witness

2    history, be in the room where it happens, what have you,

3    and -- be it a meeting with a prime minister or something

4    like that.

5         MR. HUDAK:  Let's take an example, your Honor.  So

6    let's say there is an Oval Office event regarding tariffs.

7    Perhaps the White House would rather have, in the limited

8    space for journalists in the Oval Office in that, folks that

9    cover financial affairs -- *Financial Times*, *The Wall Street*

10   *Journal* -- as opposed to having generalists that don't

11   perhaps know and have the qualifications and expertise to

12   report on tariffs in a way that would be most helpful and

13   communicative to the American public.

14        So what we're talking about here is, if you hold

15   that general wire services like the AP have a constitutional

16   right to be in the Oval Office, the president's office, to

17   be in the -- to be in Air Force One, the president's mode of

18   transportation, to be in his home at Mar-a-Lago where the

19   press goes -- the pool goes when he travels down to

20   Florida -- you are saying that they have an extra-special

21   right of access, more so than any other journalist that

22   covers the White House, to be there and to have not just one

23   seat, but two seats dedicated to them.

24        There's simply no basis for that.  None of the

25   case law we have seen suggests that.  In fact, to the

1    contrary, *Sherrill* goes out of its way to segment what is

2    general access for bona fide journalists from special

3    access.  And *Baltimore Sun* goes out of its way to describe

4    that, and the rough-and-tumble special access is -- can be

5    based upon the content of the journalist's speech.  That's

6    what the *Baltimore Sun* case held.

7          The other case they cite, the only one that even

8    talks about the press pool, is the Georgia case, but that

9    talked about excluding an entire type of media, not a single

10   media member, and nothing about that case suggests that any

11   particular media member has a liberty interest in the press

12   pool.

13         THE COURT:  Yes.  And so I mean, if you're saying

14   it's a bizarre way to assign seats that, based on an

15   organization that's been around 150 years, they get two

16   seats, I mean, I agree with you.  And I mean, it seems to me

17   the White House could certainly decide to throw out the

18   White House Correspondents' Association altogether.

19         But at least as the Plaintiffs have framed it, the

20   White House has accepted the Correspondents' Association's

21   ability to be the referee here and have just discriminated

22   against one organization.  I mean, that does feel kind of

23   problematic here, that the White House is allowing everybody

24   else in based on what a third party says except for

25   Plaintiffs, based on what sounds to me -- tell me if you

1    disagree -- but it seems pretty clearly viewpoint

2    discrimination.  How is that not problematic?

3            MR. HUDAK:  Your Honor, because I think it comes

4    down to:  What is the access?  If it's special access, then

5    the president can decide, based upon the content of the

6    journalists, whether to sit down with them.  For example, in

7    the last administration, there would have been no obligation

8    for President Biden to sit down with InfoWars and have a

9    one-hour-long interview with Alex Jones.  If that's the

10   rule, if the president is not required to do that, then why

11   is the president required to admit certain people into the

12   Oval Office, into a very limited space?

13           And compounding the problem further, why, if he

14   admits certain individuals, don't the individuals that have

15   been excluded also have a claim against the White House and

16   against the president for excluding them?  It collapses upon

17   itself.

18           Once you realize that the president can make

19   content-based determinations of who he's going to afford

20   special access to, then they don't have a claim, because the

21   press pool is special access by any stretch of the

22   imagination.

23           THE COURT:  So I mean, do you agree that the White

24   House could not prevent AP from being part of the hard pass

25   holders?

1       MR. HUDAK:  Without following the due process

2   requirements of *Sherrill* and the other cases they cited, you

3   know, those are binding on this Court and they would -- the

4   White House would have to comply with them.

5       THE COURT:  So I mean, it feels -- I guess the

6   question is whether this situation in the Oval Office or,

7   ostensibly, in the Building Museum is more like the Brady

8   press room or more like a sit-down interview, because, you

9   know, I agree with you that if we're talking about a

10  sit-down interview situation, AP would not have much of a

11  leg to stand on.

12      But I mean, I think, as the Plaintiffs are framing

13  it, I mean, just being able to be part of the White House

14  press association is, if you will, special access.  You and

15  I couldn't just waltz into the Brady room whenever we want.

16  They've already received special access.  And the question

17  is whether they can be -- and they have this right under

18  *Sherrill* to do that -- whether they can be prohibited from

19  this smaller press pool based on viewpoint discrimination.

20      Why isn't *Sherrill* the right way to think about

21  this subset of the overall hard pass holders?

22      MR. HUDAK:  Because I think the hard pass holders

23  all share one commonality:  They're part of a class of bona

24  fide journalists.  And that was the essential part of

25  their -- of the Court's holding.

1              It wrote:  These press facilities are perceived as

2    being open to all bona fide, Washington-based journalists,

3    whereas most of the White House itself, and the press

4    facilities in particular, have not been made available to

5    the general public.  White House press facilities having

6    been made publicly available as a source of information for

7    newsmen, a protection afforded news-gathering under the

8    First Amendment guarantee of the press applies.

9              They are of the general category of bona fide

10   journalists.  We're not arguing that here today.

11             But there isn't similar criteria for who gets

12   special access among that class of reporters.  There isn't

13   any requirement in the Constitution.  The president hasn't

14   opened, ever, the Oval Office to all news-gathering

15   organizations, so it is not one of these spaces where there

16   might be a limited exception for news-gathering that is

17   different from access to the general public.

18             The class in *Sherrill* is all bona fide

19   journalists.  And if a facility is opened up to all bona

20   fide journalists, then the White House needs to comply

21   with -- there's a liberty interest and due process attaches.

22             The Oval Office is not open to that.  Air Force

23   One is not open to that.  Mara-a-Lago is not to open that.

24             And just to stretch the hypothetical more, and why

25   we think this is more like the one-hour-long interview than

1    it is, you know, the Brady press room, let's say the

2    president wanted to go and have a sit-down with *Morning Joe*

3    and have, you know, five or six -- I forget how many people

4    are on that show.  But that's five or six people he's

5    talking to.

6           What if he added -- what if it was a roundtable

7    with MSNBC and CNN?  Does that mean that the AP would be

8    entitled to go there?

9           I mean, at some point in time these are all

10   special-access -- limited-access opportunities for the

11   president to talk to certain media organizations.

12          The fact that the -- it is -- you know, the AP has

13   historically enjoyed that access does not have a

14   constitutional right -- they do not have a constitutional

15   right to continue to enjoy that access in perpetuity, which

16   is essentially their argument.  And their argument is not

17   just that; it's that they have the right and other people do

18   not.  Because *The Washington Post* does not have a permanent

19   seat in the press pool, as I understand it.  They are a

20   rotator.

21          You know, all of the newspapers across the United

22   States that are part of the pool rotate in and out of it.

23   You know, *USA Today* is a rotator.

24          You start to think about, Well, if the AP has this

25   right, why doesn't *The Washington Post*?  And you eventually

1    collapse in on itself.  Every single decision the White

2    House would then make about who should be in the press pool

3    and who wouldn't would be an everyday violation of the First

4    Amendment or the Fifth Amendment's liberty interest by

5    someone.

6              And the *Baltimore Sun* teaches us that that doesn't

7    make sense, that, under the Fifth Amendment, those

8    protections don't exist.

9              THE COURT:  Yeah.  So I mean, I hear you.  And it

10   seems to me there would be any number of content-neutral

11   reasons that the president could exclude the Plaintiffs from

12   the Oval Office.

13             But I mean, are you disputing the Plaintiff's

14   claim in terms of why this decision was made?  I mean,

15   Ms. Wiles's email, that looks to me to be pretty

16   viewpoint-based.

17             MR. HUDAK:  It's my understanding of the record

18   that the decision to not give special access to the AP is

19   because of their decision not to recognize the name Gulf of

20   America.  So it is a content-based determination that the

21   White House, including the president himself, as the AP

22   themselves reported, has made that determination that the

23   president, when it -- when he's providing special media

24   access, wants to provide media access to folks that are, you

25   know, following the executive order that the body of water

```
1    is the Gulf of America.  You know, it abuts South America

2    and North America; it just doesn't abut Mexico.

3              But it -- that's the White House's view, is

4    that --

5              THE COURT:  Yes.

6              MR. HUDAK:  -- it doesn't -- it wants to

7    have objective --

8              THE COURT:  Mr. Hudak.

9              MR. HUDAK:  Yeah.

10             THE COURT:  I get that.  But I mean, you know,

11   there's any -- you can fire people for any number of reasons

12   or you can -- there are many actions that a government

13   official can take.  But if it is motivated by some sort of

14   illegal motives, then, all of a sudden, something that is

15   otherwise appropriate turns into something that is

16   inappropriate.  And how is this viewpoint-based decision not

17   constitutionally violative in a way that any other

18   justification for removing the AP might not be?

19             MR. HUDAK:  Because, your Honor, I think the --

20   for example, the circumstance you identified, you know,

21   terminating an employee, well, the employee has a property

22   interest in their job, so the due process clause attaches.

23   And there are laws also against retaliation in that respect.

24             Here, there is no liberty interest.  There is no

25   interest whatsoever protected by the Fifth Amendment, which
```

1    is the threshold inquiry.  If you don't have an interest

2    protected by the Fifth Amendment, there is no unlawful

3    animus that can attach.

4          And again, we get back to the situation of an

5    hourlong sit-down interview.  If President Biden -- because

6    he never did one, to my knowledge -- didn't want a sit-down

7    with Alex Jones and talk about gun control, he had every

8    right to do so based upon the content of Mr. Jones's speech.

9    It wasn't about anything else.  If that request was ever

10   made, he could make that decision based upon the content in

11   Mr. Jones's speech and the content alone.

12         Here, it's not even a viewpoint that is being

13   expressed, I guess.  It is -- in talking about what the Gulf

14   of America is, it's terminology to describe a body of water

15   that abuts America.

16         And if a president doesn't have to sit down with

17   someone whose views they find repugnant and their journalist

18   integrity to be compromised, then why does the president

19   need to afford someone special access to the Oval Office

20   when they aren't using the terminology that U.S. law now

21   recognizes?

22         THE COURT:  And I recognize that, you know,

23   Mr. Tobin has mentioned incidents just now that you and I

24   were not aware of.

25         But to the extent that he has pointed to specific

```
1       Oval Office interactions, do you believe those were

2       interviews?

3               MR. HUDAK:  If he's talking about Oval Office

4       interactions, the only people, as I understand it, that have

5       access to the Oval Office are the press pool in ordinary --

6               THE COURT:  I think he was talking about a meeting

7       with the prime minister of India, perhaps.  I mean, there

8       were specific incidents that -- I at least got the

9       impression that they were -- the press pool was there more

10      as witnessing history than some sort of sit-down interview.

11              MR. HUDAK:  Well, certainly history is written by

12      the people that observe it.  And if the White House believes

13      that the special access to the president's actions will be

14      more fairly described by certain journalists versus others,

15      because of their past history and the content of their past

16      publications, he certainly can do that in special-access

17      events.

18              In general access events, he can't.  That's what

19      *Sherrill* holds.

20              THE COURT:  So -- but are you claiming that these

21      were interviews?  Or are you saying that they're like

22      interviews because only a few people are allowed to be

23      there?

24              MR. HUDAK:  The latter, your Honor.  It talks

25      about what is special access versus what is general access.
```

 1    I think that's the dichotomy here.

 2         It's special access where only a certain group of

 3    journalists are being selected by the president to either

 4    hear his message or hear his interactions with a foreign

 5    leader.  Then that's special media access.  And it can't

 6    accommodate general media access.  You can't fit all 1,000

 7    members of the White House press organization that have hard

 8    passes into the Oval Office.

 9         So the White House -- the president has the

10    ability to distinguish, amongst those journalists that he

11    feels will carry his message to the American public and most

12    widely spread it in the manner that he wishes.

13         THE COURT:  So isn't Mr. Tobin right that

14    *Baltimore Sun* is a First Amendment case -- and I think it's

15    pretty helpful to you as a First Amendment case, but it

16    really doesn't do much work for their Fifth Amendment claim?

17         MR. HUDAK:  Well, I think the only liberty

18    interest that could be identified for Fifth Amendment

19    purposes has to trace its origins back to the First

20    Amendment.  It has to trace the liberty to be a member of

21    the press and be a news-gatherer or a news -- you know, the

22    freedom of press that is embodied in the First Amendment.

23         If they don't have a First Amendment right, then I

24    don't understand how they would have a liberty interest as

25    well.

1      And again, I think *Sherrill* is very helpful when

2   it goes out of its way to describe what the case is not

3   about and finds it, in fact, unreasonable, it notes, that

4   someone would suggest that the president has to afford

5   everyone an interview when it affords only some the

6   opportunity.

7      And that's exactly what the case is here, is that

8   by providing some special access does not mean all have to

9   have special access.  And that means that no liberty

10  interest attaches.  And if there's no liberty interest,

11  there can be no Fifth Amendment due process claim.

12            THE COURT:  All right.

13            MR. HUDAK:  If your Honor wants to talk about

14  irreparable harm just for a second.

15            THE COURT:  Yes.

16            MR. HUDAK:  You know, we tried to address the

17  events that were described in the declaration with

18  sufficient particularity that we could identify them.  So

19  they reference the meeting with Prime Minister Modi.  They

20  referenced the American who was detained by the Russians

21  coming to the White House.  Those are the events they

22  mentioned.

23            And we went on their website.  And it's clear they

24  fully covered them.  Not just through photographs -- maybe

25  the photographer hadn't been suspended at that point -- but

1    they have quotes that are directly attributable to the

2    president and the other participants in the meeting.

3            In my understanding, the pool reports they get, in

4    fact, identify every person in the room aside from

5    logistical and support staff.  The pool reports are actually

6    available online, so your Honor can go and look at them

7    himself.  But the pool reporter identifies who's in the

8    room, who's speaking, what they're saying, what the

9    observations are.

10           In fact, if I understood Mr. Tobin, that somehow

11   the AP could tweet out observations before they send those

12   observations to the pool reporters, that's -- it's my

13   understanding that's inconsistent with the White House

14   Correspondents' Association's guidance on what it is to be a

15   pool reporter.  They say you cannot unilaterally report

16   information until you report it to the pool.  So they're

17   getting the same level of access to the Oval Office, to Air

18   Force One, to Mar-a-Lago that publications such as *The*

19   *L.A. Times*, *The Boston Globe*, get.

20           I don't understand how they can insist that the

21   president invite them into the Oval Office when he wants to

22   speak with other members of the press.  And that's exactly

23   what they are asking the Court to order here.

24           THE COURT:  Well, I think it's a little more

25   nuanced than that.  Right?  They are asking that the

1    president can't prohibit them from joining on a

2    discriminatory basis.  And I think that would be the same

3    as -- true for any of these other newspapers or

4    publications.  Right?

5              MR. HUDAK:  Well, let me put it this way:  If

6    tomorrow the White House decides to abolish the press pool

7    and it wants to have just one television journalist that

8    they pick out, one radio reporter, one print journalist,

9    that's it, that they want just to pick the people that they

10   want to pick to have special access to the Oval Office, and

11   they don't want anyone else in there, I think they can do

12   that, and I don't think that offends the Constitution.

13             Now, if it was a space that was open to the

14   general media or the general public, they clearly could not

15   do that, because that's what *Sherrill* instructs.  But there

16   is no right to have special access to the Oval Office.

17   There's no right to enter the Oval Office as a journalist.

18   It is at the president's grace and discretion.

19             THE COURT:  I mean, the *Baltimore Sun* case, you

20   know, kind of goes through this whole, I think, 1983

21   analysis of whether rights were chilled.  Do you think that

22   has much applicability here?

23             MR. HUDAK:  I do.  I think that for them to state

24   a First Amendment claim -- because one of their claims under

25   the First Amendment, as I understand it, is either a

1   compulsion or chilling effect.  I think they need to show

2   that they have been chilled and that this is not simply a

3   *de minimis* degradation of a First Amendment right, if one

4   exists.

5           If their First Amendment rights have been chilled,

6   then I don't understand how any nonpool White House press

7   member's rights aren't chilled on a daily basis.  There's 13

8   seats.  The fact that they can't all fit into the White

9   House, every single one of them, under the AP's

10  interpretation of *Sherrill*, would have a right to be in the

11  Oval Office.

12          So I think this would -- if there is a

13  special-access right that is afforded to journalists, that

14  would have to be the liberty interest here for due process

15  purposes.  The White House would be forced to either invite

16  everyone in or make individualized determinations under the

17  due process clause about why, you know, *The Financial Times*

18  didn't come to this one, but McClatchy did.  And I think

19  that that -- the administrative burden that that would put

20  on the White House to determine who to give special access

21  to and who to invite into the Oval Office -- I mean, again,

22  that's an order running directly to the executive and the

23  executive staff about who should go into the president's

24  office.

25          THE COURT:  Sure.  Yeah.  It's just -- again, it's

1    about the motivation.  Right?  And I think you're right:

2    There's a lot of things the president can do with the press

3    pool.  It's just, can he limit the press pool based on a

4    content-based justification?

5             MR. HUDAK:  Let me address that.

6             So if -- you know, if, in two weeks, he has a

7    media event for tariffs and he thinks, you know:  The 13

8    people that would best be in this meeting to best

9    communicate to the American public what I'm talking about

10   are folks that are in the financial journalistic community

11   as opposed to the general journalistic community, that's

12   certainly a content-based determination.  Undoubtedly, it

13   is.

14            But I can't imagine that any court would say that

15   that deprives nonfinancial journalists the -- of their First

16   Amendment rights or their due process rights.  That simply

17   doesn't make any sense because the president has -- is

18   giving certain folks special access based upon the subject

19   matter of his actions.  That's based upon their content.

20   Those journalists have content that is aimed at financial

21   matters as opposed to matters of general public concern.

22   But it doesn't offend the Constitution.

23            THE COURT:  All right.  Thank you, Mr. Hudak.

24            MR. HUDAK:  Thank you, your Honor.

25            THE COURT:  Mr. Tobin, I'll give you the last

 1     word.

 2               MR. TOBIN:  Sure.

 3               THE COURT:  Maybe you can address that tariffs

 4     hypo.

 5               MR. TOBIN:  Sure.  Your Honor, in a sense,

 6     inviting a specialized group of journalists to focus on a

 7     subject matter is a content-based restriction, sure.  But if

 8     it's being done on an individualized basis by the subject

 9     matter, just like we don't have a problem -- a

10     constitutional problem if the president invites Tucker

11     Carlson in for a one-on-one interview.  He can pick

12     individual people.

13               The issue for us is once he picks the pool, names

14     at a pool event, or opens it up to all of the White House

15     press corps in the east room, he can't then exclude people

16     because of that.  It's a difference in making an individual

17     choice to bring somebody in versus making a choice to bring

18     the whole group in, whether it's the pool or the White House

19     press corps, and then kicking you out because of content.

20     That's where the Constitution comes in.

21               THE COURT:  Okay.  But wouldn't the selection, in

22     Mr. Hudak's hypo, also have constitutional significance?

23               MR. TOBIN:  In the sense of a content -- I mean,

24     it sounds like it, your Honor, because it is based on the

25     content.  You're a reporter who covers terrorism issues.

1      I don't think we would have the same

2  constitutional problem if it were defined in that area and

3  made on an individual-basis choice.

4      If there were a White House national security

5  association of journalists and they were all invited in as a

6  routine matter, as a historic matters for generations, as a

7  pool, if you will, and then the president says, I don't like

8  the way *Nation Magazine* or *Mother Jones* reports on national

9  security issues, you have to get out, that becomes the

10  tipping point of a constitutional violation, both as a

11  matter of due process and as First Amendment content-based

12  restriction.

13      THE COURT:  All right.  Anything else, sir?

14      MR. TOBIN:  Yes.  Very briefly.

15      I just wanted to note, we did talk in our papers

16  about the east room event, about the diplomatic room event

17  where it was more -- larger pool events.  Indeed, things go

18  to the east room because they don't have room in the Oval

19  Office for a larger group of people.  They want more people

20  to be brought in.  So it is in our papers.  We did discuss

21  it.

22      We are asking for the injunction, the TRO, to

23  order the White House not to exclude the AP from events that

24  are opened up to the pool or to the general press corps.  I

25  think that's very clear and simple enough in the relief that

1    we're seeking.

2         And, your Honor, you know, this case is so much

3    about nomenclature and terminology, Gulf of Mexico, Gulf of

4    America, the First Amendment right of access versus the

5    First Amendment right not to be excluded.

6         He has introduced -- Mr. Hudak introduced the

7    words "special access" in his brief filed this morning.

8         Your Honor, all access to the White House is, in a

9    sense, special access.  There is no constitutional right to

10   be in the White House in the first place.  *Zemel v. Rusk*

11   tells us that.  But once you let people in, it becomes a

12   different constitutional analysis, your Honor.  I know the

13   Court appreciates that.  And that's where we come from on

14   this issue.

15        The president, once he sets up -- the White House

16   sets up a pool or a group of people to come into, whether

17   it's the White House itself or the Oval Office or the east

18   room or the Building Museum, they cannot be excluded based

19   on the content of their reporting or the president's dislike

20   of the reporting.

21        THE COURT:  All right.  Thank you, sir.

22        Why don't we take about a ten-minute break here.

23   Thank you.

24        MR. TOBIN:  Thank you, your Honor.

25        (Thereupon a recess was taken, after which the

1    following proceedings were had:)

2         THE COURT:  All right.  I have before me the

3    motion for a temporary restraining order.  I've carefully

4    considered the parties' briefing and arguments.  At this

5    early stage, I'm denying the motion for a restraining order,

6    but I will order expedited preliminary injunction briefing

7    momentarily.

8         I do think it would be helpful to have the benefit

9    of thorough briefing from both sides and additional facts,

10   given the stakes to all parties.

11        I'm denying immediate relief for the following

12   reasons:

13        First, there are differences between this case and

14   prior cases that make full briefing particularly important.

15   The Plaintiff's main case, *Sherrill v. Knight*, 569 F.2d 124

16   from the D.C. Circuit in 1977, establishes a First Amendment

17   right to White House press passes for bona fide Washington

18   journalists.

19        The Plaintiff's own briefing says that the

20   government is not revoking their White House press passes.

21   So we're not dealing with a denial of access to the

22   traditional press areas completely.

23        Rather, the AP complains of being banned from more

24   private areas, like the president's office, the executive

25   mansion and Air Force One.  This is an important factual

1    distinction.  It remains to be seen whether that fact is

2    important legally; but at this early stage, I can't say that

3    the AP has shown a likelihood of success here.

4            I'm also looking to *Baltimore Sun v. Ehrlich*, 437

5    F.3d 410, from the Fourth Circuit in 2006, finding no

6    violation where the governor banned specific reporters from

7    access to top officials.  I think this is one of the areas

8    that additional factual development would be helpful to

9    understand what exactly these events are that the Plaintiffs

10    have been banned from.

11            Second, the Court is not inclined to act

12    precipitously to grant a TRO against the executive office of

13    the president, especially when the TRO would direct

14    Defendants to allow Plaintiff access to highly restricted

15    areas, like the Oval Office.

16            The Plaintiff is requesting, quote, "an

17    extraordinary remedy," closed quote, that is granted only

18    sparingly, never as of right.  I'm looking to *Chaplaincy of

19    Full Gospel Churches v. England*, 454 F.3d 290, Page 297,

20    from the D.C. Circuit in 2006.

21            Third, Defendants have raised important questions

22    about the irreparable harm prong.  Specifically, Defendants

23    claim that the 13 pool reporters allowed into limited-access

24    spaces are acting on behalf of the entire White House press

25    corps, and that they must freely share information without

1    attribution.

2            This suggests that the AP can get access to the

3    same information whether or not its staff are part of the

4    gaggle of 13.

5            I don't believe there's any information before me

6    now showing the AP has been unable to report on any specific

7    event because of Ms. Wiles's directive.

8            Fourth, the Associated Press waited over a week

9    after having been banned before filing suit.  I don't fault

10   them for seeking resolution short of litigation.  I think

11   that's commendable.  But this course of conduct suggests

12   that this is not the type of dire situation that would merit

13   TRO relief before I have complete briefing from both

14   parties.

15           I am not implying that the ten days have in any

16   way dampened the parties' arguments on irreparable harm or

17   likelihood of success.  I'm just noting that this case is

18   different from some of the other cases pending in this

19   courthouse right now where a plaintiff faces severe and

20   potentially unalterable consequences should relief not be

21   granted immediately.

22           In short, as things stand now, I don't believe a

23   TRO is appropriate.

24           Having said that, I will review the parties' full

25   briefs on the motion, with any accompanying declarations,

1    with an open mind.

2         A couple of areas that I'm particularly interested

3    in additional factual development are, first, as I say,

4    understanding better what these events are that the

5    Plaintiff has been banned from, and are they really more

6    like the interviews that Mr. Hudak analogizes them to or

7    more like the large press events that regularly happen in

8    the Brady press room?

9         Secondly, and relatedly, Mr. Tobin has referred

10   to, apparently, larger events more recently, like the

11   Building Museum event.

12        I think that would also -- the size of the pool

13   would also be a relevant factor.

14        I'd also -- Mr. Tobin also mentioned that there

15   are specific advantages that the reporters who are in the

16   press pool have, being able to tweet apparently

17   simultaneously and have additional information that's not

18   available to those who are not in the press pool.  I think

19   coming to some sort of declaration on -- or direction to

20   regulations would be helpful on that.

21        In closing, I'll just note, Mr. Hudak, that I

22   think the case law in this Circuit is uniformly unhelpful

23   to, I think, the White House when the White House has banned

24   reporters in the past.  Mr. Tobin describes this as a fluid

25   situation where the AP's reporters have -- where their

 1    conditions have changed.

 2            It might a good idea for the White House to think

 3    about another change, whether this is -- what they're doing

 4    is really appropriate in light of the case law.  But as I

 5    say, at this point, I can't say that the Plaintiffs have

 6    made out their -- met their burden for a TRO.

 7            All right.  Mr. Tobin, are you going to be looking

 8    to provide supplemental briefing or declarations?  Or should

 9    I just order an opposition to your current motion?

10            MR. TOBIN:  Given the Court's -- the questions the

11    Court has asked, we would appreciate the opportunity to

12    submit that.

13            THE COURT:  How long do you want?

14            MR. TOBIN:  One week, your Honor.

15            THE COURT:  Okay.  So if I ask for a motion -- I

16    guess it would be a motion for a preliminary injunction,

17    then, by March 3rd, can I get an opposition from you by

18    March 10th, Mr. Hudak?

19            MR. HUDAK:  Looking around at others in the

20    courtroom, I think that --

21            THE COURT:  They've all left you.

22            MR. HUDAK:  No.  My colleagues are in the

23    courtroom still, your Honor.

24            If I could have March 11th, just to have the

25    Tuesday so that -- the Monday --

```
 1              THE COURT:  That's fine.

 2              MR. HUDAK:  -- is usually quite hectic.

 3              THE COURT:  That's fine.

 4              Yes.  So that will be due on the 11th.

 5              If I can get your reply, Mr. Tobin, by the 17th.

 6              And are the parties available for a motions

 7    hearing on the 21st at 10:00 a.m.?  Mr. Tobin, does that

 8    work for you?

 9              MR. TOBIN:  Your Honor, I'm committed to be out of

10    town on March 21.

11              THE COURT:  Okay.  3:30 on the 20th?  Does that

12    work for you?

13              MR. TOBIN:  I hate to bargain with the Court.

14    Could we do it the 19th?  Does the Court have availability?

15              THE COURT:  I'm not available.

16              MR. TOBIN:  How about earlier on the 20th?

17              THE COURT:  I can do 10:00 a.m. on the 20th.

18              Does that work for you, Mr. Hudak?

19              MR. HUDAK:  That's good for the Government, your

20    Honor.

21              THE COURT:  Okay.  Any questions or anything

22    further we need to discuss, Mr. Tobin?

23              MR. TOBIN:  Nothing for the Plaintiffs, your

24    Honor.

25              THE COURT:  Mr. Hudak?
```

1              MR. HUDAK:  No, your Honor.  Thank you very much.

2              THE COURT:  All right.  Thanks, folks.

3              (Proceedings concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 24th day of February, 2025.

11

12                   <u>/s/ Lisa Edwards, RDR, CRR</u>
                     Official Court Reporter
13                   United States District Court for the
                       District of Columbia
14                   333 Constitution Avenue, Northwest
                     Washington, D.C. 20001
15                   (202) 354-3269

16

17

18

19

20

21

22

23

24

25