UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Associated Press, *Plaintiff*,<br><br>v.<br><br>Budowich, et al., *Defendants*. | Case Number: 1:25-cv-00532<br><br><br>**AMICUS BRIEF OF THE CENTER FOR AMERICAN RIGHTS IN OPPOSITION TO THE ASSOCIATED PRESS MOTION FOR A PRELIMINARY INJUNCTION** |

Christopher E. Mills
D.D.C. Bar. No. SC0008
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
Phone: 843-606-0640
cmills@spero.law

Daniel R. Suhr
  *Pro hac vice filed simultaneously*
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, IL 60614
Phone: 414-588-1658
dsuhr@americanrights.org

*Disclosure Statements*: The Center for American Rights is a non-profit corporation incorporated in the State of Illinois. It does not have any stockholders or owners. The Center is solely responsible for writing and funding the production of this brief.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... 2
INTEREST OF THE AMICUS .............................................................................................. 4
SUMMARY .............................................................................................................................. 4
ARGUMENT ........................................................................................................................... 5
CONCLUSION ..................................................................................................................... 15

## TABLE OF AUTHORITIES

**CASES**

*Alpine Securities Corp. v. Financial Industry Regulatory Authority*, 121 F.4th 1314 (D.C. Cir. 2024) .................................................................................................................. 12

*Am. Broadcasting Cos. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977) ................................ 6

*Anderson v. Cryovac, Inc.*, 805 F.2d 1 (1st Cir. 1986) .................................................. 6

*Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63 (D.D.C. 2023) ............................................ 12

*Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652 (1990) ........................... 7

*Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006) ................ 9, 10, 11, 12, 15

*Bartley v. Taylor*, 25 F. Supp. 3d 521 (M.D. Pa. 2014) ................................................ 9

*Borreca v. Fasi*, 369 F. Supp. 906 (D. Haw. 1974) ...................................................... 6

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ................................................................ 7, 8

*Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164 (3d Cir. 1986) (en banc) ........... 6

*Citizens United v. FEC*, 558 U.S. 310 (2010) .............................................................. 7

*CNN, Inc. v. Trump*, Civ. A. No. 18-2610 (TJK), 2018 WL 9436958 (D.D.C. Nov. 16, 2018) ........................................................................................................................ 12

*Consumers Union of United States, Inc. v. Periodical Correspondents' Ass'n*, 365 F. Supp. 18 (D.D.C. 1973), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975) .... 6

*Courthouse News v. Planet*, 947 F.3d 581 (9th Cir. 2020) ........................................... 6

*Forcade v. Knight*, 416 F. Supp. 1025 (D.D.C. 1976) ................................................. 6

*Frank v. Herter*, 269 F.2d 245 (D.C. Cir. 1959) .......................................................... 8

*Getty Images News Servs. v. DOD*, 193 F. Supp. 2d 112 (D.D.C. 2002) .................... 8

*Huminski v. Corsones*, 386 F.3d 116 (2d Cir. 2004) ................................................... 6

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020) ....................................................... 12

*Lewis v. Baxley*, 368 F. Supp. 768 (M.D. Ala. 1973) .................................................. 6

*MacIver Institute v. Evers*, 994 F.3d 602 (7th Cir. 2021) ................................. 4, 6, 14

*McCoy v. Providence Journal Co.*, 190 F.2d 760 (1st Cir. 1951) ................................ 6

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) .......................................... 8

*Nation Magazine v. DOD*, 762 F. Supp. 1558 (S.D.N.Y. 1991) .................................. 8

*National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022) and 107 F.4th 415 (5th Cir. 2024) ................................................................. 12

*Obsidian Fin. Grp., LLC v. Cox*, 740 F.3d 1284 (9th Cir. 2014) ................................. 8

*Pell v. Procunier*, 417 U.S. 817 (1974) ........................................................................ 7

*Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8 (S.D. Iowa 1971) .......... 6

*Raycom National, Inc. v. Campbell*, 361 F. Supp. 2d 679 (N.D. Ohio 2004) ............ 11

*Salem Media of Illinois, LLC v. Pritzker,* 1:2020-cv-03212 (N.D. Ill. 2020) ............... 4

*Savage v. Pac. Gas & Elec. Co.*, 26 Cal. Rptr. 2d 305 (Cal. App. 1993) ..................... 6

*Saxbe v. Wash. Post Co.,* 417 U.S. 843 (1974) .............................................................. 7
*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) ................................. 6, 7, 8, 9, 12, 15
*Snyder v. Ringgold*, 1998 U.S. App. LEXIS 562 (4th Cir. Jan. 15, 1998) ........... 11, 15
*Sw. Newspapers Corp. v. Curtis*, 584 S.W.2d 362 (Tex. Civ. App. 1979) ..................... 6
*Tah v. Global Witness Publ., Inc.*, 991 F.3d 231 (D.C. Cir. 2021) .............................. 15
*Times-Picayune Pub. Corp. v. Lee*, Civil Action No. 88-1325, 1988 U.S. Dist. LEXIS 3506 (E.D. La. Apr. 15, 1988) ..................................................................................... 6
*United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368 (S.D. Fla. 2002) ........... 6
*Watson v. Cronin*, 384 F. Supp. 652 (D. Colo. 1974) .................................................... 8
*Westinghouse Broad. Co. v. Dukakis*, 409 F. Supp. 895 (D. Mass. 1976) .................... 6
*Youngstown Publ'g Co. v. McKelvey*, No. 4:05 CV 00625, 2005 U.S. Dist. LEXIS 9476 (N.D. Ohio May 16, 2005) ............................................................................... 11

**OTHER AUTHORITIES**

*News Distortion Complaint Involving CBS Broadcasting Inc., Licensee of WCBS, New York, NY*, FCC MB File 25-73 ........................................................................... 4
*Applications to transfer control of Paramount Global*, FCC MB File 24-275 ............. 4

## INTEREST OF THE AMICUS

The president of the Center for American Rights, Daniel Suhr, while at a prior firm, represented journalists who were denied access to government press briefings. In the first, a reporter from the MacIver News Service was blocked from attending a briefing by the governor's office in Wisconsin to which all other members of the state capitol press corps were invited. *MacIver Institute v. Evers*, 994 F.3d 602 (7th Cir. 2021). In the second, a radio host from Salem Media who had regularly participated in gubernatorial press conferences in Illinois was denied future access by the governor's press secretary. *Salem Media of Illinois, LLC v. Pritzker,* 1:2020-cv-03212 (N.D. Ill. 2020).[1]

More recently, the Center for American Rights has led the fight for media accountability and reform, including by filing complaints against media misconduct with the Federal Communications Commission, Federal Elections Commission, and Iowa courts. *See, e.g.*, *News Distortion Complaint Involving CBS Broadcasting Inc., Licensee of WCBS, New York, NY*, FCC MB File 25-73; *Applications to transfer control of Paramount Global*, FCC MB File 24-275.

## SUMMARY

However conceived as a matter of constitutional doctrine, the right of equal press access to public officials is a limited right: it requires neutral treatment among reporters or press outlets in the provision of generally available access and

---

[1] This brief, done on a short turn-around, draws heavily from the briefing done in those two cases.

4

information. To use the White House as the easy example, the administration may not deny a hard pass to a specific journalist based on his or her coverage.

The flip side of that principle is that a public official does not need to give equal access to special situations. A public official does not need to answer an individual journalist's questions, grant an individual journalist's one-on-one interview request, or be fair in distributing off-the-record tips or tidbits. Public officials can pick-and-choose based on a reporter's or outlet's coverage whether to grant special access or to deny special access.

Applying this body of precedent, Amicus believes the question before this Court in this case is straightforward even if the answer is not: Is participation in the pool-coverage settings like the Oval Office and Air Force One a type of general access (because several journalists are allowed) or a type of privileged access because it is not available to the general press corps and involves limited, special spaces?

That's a difficult question—there is no obvious on-point precedent to Amicus's knowledge, having surveyed the forty or so cases involving these situations. Amicus's conclusion, which seems all the more appropriate for a cautious exercise of judicial power on a preliminary injunction, is that access to special spaces through the pool is not the same as general access via a hard pass.

## ARGUMENT

There is not a uniform answer among courts on where to lodge any right to press access. Most precedents ground it in the First Amendment's freedom of the press guarantee. *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986); *Huminski v.*

5

*Corsones*, 386 F.3d 116, 146-47 (2d Cir. 2004); *Am. Broadcasting Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977); *Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977); *see Courthouse News v. Planet*, 947 F.3d 581, 595 n.8 (9th Cir. 2020).

Other decisions place the right in the Fourteenth Amendment's equal protection clause. *McCoy v. Providence Journal Co.*, 190 F.2d 760, 766 (1st Cir. 1951); *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 15 (S.D. Iowa 1971); *see Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1176 (3d Cir. 1986) (en banc). Yet others consider it as a matter of the free speech clause's forum doctrine. *MacIver Institute v. Evers*, 994 F. 3d 602 (7th Cir. 2021).[2]

Regardless of the constitutional locus of a right to equal press access, several themes emerge from the circuit courts' decisions. First, a right of equal access by the press is predicated on the government's voluntary grant of any access. *Sherrill*, 569 F.2d at 129 ("[A]ppellee's first amendment claim is not premised upon the assertion that the White House must open its doors to the press, conduct press conferences, or operate press facilities. Rather, we are presented with a situation where the White

---

[2] Other decisions on press access also reflect this variety of approaches. In addition to those mentioned elsewhere in the brief, *see United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1375 (S.D. Fla. 2002); *Times-Picayune Pub. Corp. v. Lee*, Civil Action No. 88-1325, 1988 U.S. Dist. LEXIS 3506, at *25 (E.D. La. Apr. 15, 1988); *Forcade v. Knight*, 416 F. Supp. 1025, 1035 (D.D.C. 1976), *aff'd sub nom. Sherrill v. Knight*, 569 F.2d 125 (D.C. Cir. 1977); *Westinghouse Broad. Co. v. Dukakis*, 409 F. Supp. 895, 896 (D. Mass. 1976); *Borreca v. Fasi*, 369 F. Supp. 906, 909-10 (D. Haw. 1974); *Lewis v. Baxley*, 368 F. Supp. 768, 778 (M.D. Ala. 1973); *Consumers Union of United States, Inc. v. Periodical Correspondents' Ass'n,* 365 F. Supp. 18, 22-23 (D.D.C. 1973), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975); *Savage v. Pac. Gas & Elec. Co.*, 26 Cal. Rptr. 2d 305, 317 (Cal. App. 1993); *Sw. Newspapers Corp. v. Curtis*, 584 S.W.2d 362, 365 (Tex. Civ. App. 1979). *See also QuadCity Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 15 (S.D. Iowa 1971).

House has voluntarily decided to establish press facilities for correspondents who need to report therefrom."). The press cannot compel the government to speak just because it wants to listen or know what the government thinks about something. It is only when the government voluntarily opens itself to press access that questions of fair or equal access arise.

Second, the cases often struggle to balance the right of press access with the constitutional reality that the news media as we conceive it does not have unique constitutional standing under the press clause. "We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers." *Citizens United v. FEC*, 558 U.S. 310 (2010) (quoting *Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652, 691 (1990) (Scalia, J., dissenting)). *See Branzburg v. Hayes*, 408 U.S. 665, 684-85 (1972); *Saxbe v. Wash. Post Co.,* 417 U.S. 843, 850 (1974); *Pell v. Procunier*, 417 U.S. 817 (1974). The treatment afforded certain press outlets is primarily a matter of norm and tradition, not constitutional command. "When the Framers thought of the press, they did not envision the large, corporate newspaper and television establishments of our modern world. Instead, they employed the term 'the press' to refer to the many independent printers who circulated small newspapers or published writers' pamphlets for a fee." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 360 (1995) (Thomas, J., concurring). Thus, the "liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods." *Branzburg*, 408 U.S. at 704; *accord Obsidian Fin.*

7

*Grp., LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) (discussing status of a blogger as a member of the press). This Court should not automatically ascribe sacred status to longstanding institutions like the White House Correspondents Association or Associated Press simply because they have done things a certain way for a long while.

Third, the right of press access is not absolute or open-ended. Press access puts journalists in close proximity to prominent elected officials, so security and background checks are compelling interests. *Sherrill*, 569 F.2d at 129; *Watson v. Cronin*, 384 F. Supp. 652, 658 (D. Colo. 1974). When there are only so many seats in the White House press room, the government may design criteria to award those seats, and the courts can only review such decisions with a light touch. *Getty Images News Servs. v. DOD*, 193 F. Supp. 2d 112, 120 (D.D.C. 2002); *Nation Magazine v. DOD*, 762 F. Supp. 1558, 1573 (S.D.N.Y. 1991); *see Frank v. Herter*, 269 F.2d 245, 247 (D.C. Cir. 1959) (Burger, J., concurring).

Another way in which the right is not unlimited is most relevant here: the right of equal access to open all-media events and information is different from a right of privileged access to special reporting opportunities. The fundamental flaw in the Associated Press's case is its conflation of precedents concerning hard passes (which provide access to all generally available media areas and briefings) and the AP's tradition of special access to restricted areas and events via the pool.

Public officials afford special or privileged access to certain news outlets over others all the time. The President may choose to grant an interview to Fox News but deny a request from *Sixty Minutes*. He may choose to do so because he likes Fox or

8

because he dislikes *Sixty Minutes*. The White House press secretary may not deny a qualifying entity a hard pass but is under no obligation to call on their representative in the briefing room for a question. *Sherrill*, 569 F.2d at 129 (recognizing right of public official "to grant interviews or briefings with selected journalists": "It would certainly be unreasonable to suggest that because the President allows interviews with some bona fide journalists, he must give this opportunity to all."). *See Bartley v. Taylor*, 25 F. Supp. 3d 521, 540 (M.D. Pa. 2014) (similar).

The Fourth Circuit's *Baltimore Sun* case is the best example of the limits of equal press access. *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006). The press office for the Governor of Maryland issued a blanket directive to all state agencies: "no one in the Executive Department or Agencies is to speak with [Baltimore Sun reporter] David Nitkin or [Baltimore Sun columnist] Michael Olesker until further notice. Do not return calls or comply with any requests. The Governor's Press Office feels that currently both are failing to objectively report on any issue dealing with the Ehrlich-Steele Administration." 437 F.3d at 413. Though that policy was in place, the *Sun* personnel continued to have their open records requests fulfilled, to receive press releases, and to attend press briefings.

The Fourth Circuit declined to grant the *Sun* relief, explaining, "Public officials routinely select among reporters when granting interviews or providing access to nonpublic information. They evaluate reporters and choose to communicate with those who they believe will deliver their desired messages to the public. By giving one reporter or a small group of reporters information or access, the official

9

simultaneously makes other reporters, who do not receive discretionary access, worse off. These other reporters are sometimes denied access because an official believes them to be unobjective." *Id*. at 417–18.

Indeed, the *Sun* even conceded, in the opinion's phrasing, that "government officials frequently and without liability evaluate reporters and reward them with advantages of access—i.e., that government officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression." *Id*. at 418. The Court concluded that it did not want to open a pandora's box for complaints from press as to differential treatment: "The challenged government response is a pervasive feature of journalism and of journalists' interaction with government. Having access to relatively less information than other reporters on account of one's reporting is so commonplace that to allow *The Sun* to proceed on its retaliation claim addressing that condition would 'plant the seed of a constitutional case' in 'virtually every' interchange between public official and press." *Id*.

Thus, the Court concluded that "giving preferential access to some reporters and refusing to give access to or answer the questions of other reporters" "generally renders the conduct not actionable." *Id*. The Court reached that decision even though it explicitly acknowledged that the governor was targeting these reporters for their reporting. *Id*. at 419 ("the official disagrees with the substance or manner of the reporter's previous expression in reporting").

Other courts have reached similar conclusions. In *Raycom National, Inc. v.*

10

*Campbell*, 361 F. Supp. 2d 679, 683 (N.D. Ohio 2004), the district court held that a mayor could deny certain access to a reporter, even based on the reporter's reporting, as long as the reporter still had equal access to general information (here, the same access conferred by a hard pass).

In another Ohio case, the district court thoroughly canvassed existing caselaw: "A review of these cases reveals that a limited constitutional right of access applies only where comments by government officials are offered in a forum effectively open to all members of the press. This rule emphasizes the distinction between general and privileged access to information . . . ." *Youngstown Publ'g Co. v. McKelvey*, No. 4:05 CV 00625, 2005 U.S. Dist. LEXIS 9476, at *19 (N.D. Ohio May 16, 2005), *opinion vacated, appeal dismissed as moot*, 189 F. App'x 402 (6th Cir. 2006). In a line very applicable to this circumstance, that court concluded, "A reporter may achieve privileged access to government information, but a reporter does not have a constitutional right to maintain privileged access." *Id.*

The Associated Press's briefing wrongly conflates the hard pass at issue in *Sherrill*[3] with inclusion in the press pool for access to special spaces like the Oval Office and Air Force One. This Court should question that conflation. The Associated Press retains its hard passes and access to the briefing room. The Fourth Circuit in *Baltimore Sun* recognized the distinction between an open press briefing (here, a hard pass) and the "discretionary access" which may be granted to a "small group of

---

[3] And *Karem v. Trump*, 960 F.3d 656, 659 (D.C. Cir. 2020); *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 69 (D.D.C. 2023); and *CNN, Inc. v. Trump*, Civ. A. No. 18-2610 (TJK), 2018 WL 9436958 (D.D.C. Nov. 16, 2018)

11

reporters" but denied to others (here, the small pool group). The AP may have "achieve[d] privileged access" in the past, but that is not a permanent right.

Nor does the WHCA enjoy a permanent right to arrange the press pool. Indeed, it seems constitutionally questionable to assert that a private corporation run by self-interested industry competitors can be delegated the power to regulate the access of others—or, more precisely, to have a private corporation of industry insiders exercise *carte blanche* discretion over the "neutral criteria" by which their competitors have access. *See Alpine Securities Corp. v. Financial Industry Regulatory Authority*, 121 F.4th 1314 (D.C. Cir. 2024)[4]; *Ass'n of Am. R.R. v. United States DOT*, 721 F.3d 666 (D.C. Cir. 2013) (*Amtrak I*), *vacated on other grounds*, 575 U.S. 43 (2015); *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022) and 107 F.4th 415 (5th Cir. 2024) (all questioning the delegation of public power over others to private organizations).

The White House's decision to end WHCA's power to determine the pool does not affect this analysis. This case is about whether the White House must allocate press access to the President in limited, exclusive settings like the Oval Office or Air Force One on a neutral basis or whether it may do so on a discretionary basis. The White House previously exercised its discretion to allow WHCA to make those allocations. If the White House now exercises its discretion to make those allocations

---

[4] "For a delegation of governmental authority to a private entity to be constitutional, the private entity must act only as an aid to an accountable government agency that retains the ultimate authority to approve, disapprove, or modify the private entity's actions and decisions on delegated matters." *Alpine*, 121 F.4th at 1325 (cleaned up).

12

directly, then the issue has not changed: the White House is granting access to limited spaces on its own discretion rather than on neutral criteria. The White House cannot do that if these are open opportunities of general access, just like hard passes. However, if they are not open opportunities of general access, but rather privileged opportunities of special access, it may do so. Either way, the role of WHCA does not matter.

At the end of the day, this Court must decide whether access to small and private spaces—the Oval Office, Air Force One—must be rationed among journalists based on some neutral criteria or if these are privileged spaces over which the White House has complete control to grant access on a non-neutral basis.

In the first scenario, the White House can decide among different neutral criteria—a flat rotation among hard-pass holders, granting seats based on circulation or region or medium to ensure balance between wire services, broadcasters, newspapers, etc., or some other system that is neutral (whether administered directly or through the WHCA). Regardless of the specific neutral criteria chosen, this Court will be holding that journalists have a constitutional right to equal access (awarded based on neutral criteria) as long as a dozen other journalists are invited into the same space.

Where is the Court to draw that line? A dozen seats on Air Force One? A small group interview with the President over lunch at a table that seats eight? If it is anything other than a one-on-one interview, must access be awarded based on neutral criteria?

The Court should be reluctant to cast so broad a right—to order the President to allocate seats on a neutral basis to journalists anytime two or more are gathered. Yet that is essentially what the AP and its amici seek—if there are a dozen press seats on Air Force One, they must be allocated on a neutral basis, and they cannot be denied based on whether the White House likes or dislikes a journalist's coverage.

That is a far more aggressive assertion of judicial power than is appropriate to vindicate the limited right at issue here. The Associated Press retains its hard pass and its access to the briefing room. It cannot demand, as a matter of constitutional command, access to private spaces in the White House or on Air Force One simply because other journalists are given such access in the White House's discretion.

For the same reasons, the Court should reject the constitutional consequence of the AP's assertions as to content-based discrimination or viewpoint retaliation. Since time immemorial, public officials have sought to shape their news coverage by favoring certain journalists and disfavoring others. They have also sought to punish journalists whom they perceive to be unfair or untrustworthy with limited or lesser access. As long as those decisions are made in a way that does not deny the journalist equal access to open information and events, such decisions do not offend the First Amendment. *See Baltimore Sun*, 437 F.3d at 417–18 ("other reporters are sometimes denied access because an official believes them to be unobjective"); *Snyder v. Ringgold*, 1998 U.S. App. LEXIS 562 (4th Cir. Jan. 15, 1998) (noting the "widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of

confidentiality or otherwise distorted their comments"). *See also Raycom Nat'l*, 361 F. Supp. 2d at 686 ("by exercising their First Amendment right not to speak with a media organization they view as irresponsible, Defendants did not engage in retaliatory conduct prohibited by the First Amendment"); *Bartley*, 25 F. Supp. 3d at 541.

## CONCLUSION

"The First Amendment guarantees a free press to foster a vibrant trade in ideas. But a biased press can distort the marketplace [of ideas]. And when the media has proven its willingness—if not eagerness—to so distort, it is a profound mistake to stand by unjustified legal rules that serve only to enhance the press' power." *Tah v. Global Witness Publ., Inc.*, 991 F.3d 231, 254–56 (D.C. Cir. 2021) (Silberman, J., dissenting).

This Court need not reconsider any "unjustified legal rules" here. It can follow the rule recognized in *Sherrill* and explicated in *Snyder* and *Baltimore Sun*: the right of equal press access to generally available events and information is not the same as a right of privileged press access to limited events and information. Though it may be contrary to long-established practices, it seems that access to Air Force One and the Oval Office falls more on the side of privileged access than generally available access, and thus is something the White House may award or deny in its discretion.

Dated: March 3, 2025

Respectfully submitted,

s/ Christopher E. Mills
Christopher E. Mills
D.D.C. Bar. No. SC0008
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
Phone: 843-606-0640
cmills@spero.law

Daniel R. Suhr
  *Pro hac vice filed simultaneously*
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, IL 60614
Phone: 414-588-1658
dsuhr@americanrights.org

*Counsel for Amicus Center for American Rights*