# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ASSOCIATED PRESS, | |
| Plaintiff, | |
| v. | Case No. 25-cv-532-TNM |
| TAYLOR BUDOWICH, et al., | **Hearing Requested** |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF THE ASSOCIATED PRESS'S
## <u>AMENDED MOTION FOR PRELIMINARY INJUNCTION</u>

Jay Ward Brown (#437686)
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Sasha Dudding (#1735532)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
brownjay@ballardspahr.com
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
duddings@ballardspahr.com

*Counsel for Plaintiff The Associated Press*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ....................................................................... 1

FACTUAL BACKGROUND ........................................................................... 5

    A.    The AP and the White House Press Pool .......................................... 5

    B.    The Gulf of Mexico and Mount McKinley ...................................... 8

    C.    The White House Tries to Coerce the AP into Changing
         its Journalism ................................................................................... 9

    D.    The AP Files this Lawsuit to Vindicate its Constitutional Rights ......... 12

    E.    The White House Seizes Control of the Press Pool and Continues
         to Exclude the AP ........................................................................... 13

ARGUMENT ................................................................................................ 13

I.    THE AP IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ................... 14

    A.    Defendants' Actions Violate the Fifth Amendment Due Process Clause ............. 14

         i.    Defendants' Actions Have Deprived the AP of a Liberty Interest ............ 14

             1.    Liberty Interests Are Broadly Defined .......................... 14

             2.    Courts Widely Recognize a Liberty Interest in
                   Exercising First Amendment Rights ............................... 16

             3.    The Liberty Interest in Exercising First Amendment
                   Rights Extends to Newsgathering and Access ................. 17

             4.    The AP's Liberty Interest in Access Prevents
                   Defendants from Excluding the AP, Without Due
                   Process, from Spaces Open to the Press Pool and
                   Spaces Open to Credentialed Journalists ........................ 18

         ii.    Defendants Failed to Provide the AP with Due Process ............ 21

    B.    Defendants' Actions Violate the First Amendment ............................. 24

         i.    Defendants' Access Denial Resembles *Sherrill*, not *Ehrlich* ............ 25

i

ii.    Defendants' Access Denial Constitutes Impermissible
Retaliation Against the AP Based on Conduct Protected by the
First Amendment .........................................................................................29

iii.   Defendants' Denial of Access Is an Impermissible Viewpoint-
Based Speech Restriction.............................................................................34

iv.    Defendants Unconstitutionally Seek to Compel the AP's Speech.............39

II.    THE AP SATISFIES EACH OF THE OTHER FACTORS WARRANTING
A PRELIMINARY INJUNCTION........................................................................40

    A.    The AP Will Suffer Irreparable Harm Absent a Preliminary Injunction ...............40

    B.    The Balance of Equities and the Public Interest Strongly Favor a
Preliminary Injunction ............................................................................................43

CONCLUSION.....................................................................................................................45

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*ABC v. Cuomo*,
  570 F.2d 1080 (2d Cir. 1977)............................................................................28, 45

*ABC v. Stewart*,
  360 F.3d 90 (2d Cir. 2004)......................................................................................41

*Alaska Landmine, LLC v. Dunleavy*,
  514 F. Supp. 3d 1123 (D. Alaska 2021) ................................................20, 21, 27

*Anderson v. Cryovac*,
  805 F.2d 1 (1st Cir. 1986).......................................................................................45

*Ateba v. Jean-Pierre*,
  706 F. Supp. 3d 63 (D.D.C. 2023).................................................................. *passim*

*Bailey v. Fed. Bureau of Prisons*,
  2024 WL 3219207 (D.D.C. June 28, 2024)............................................................16

*Baltimore Sun Co. v. Ehrlich*,
  437 F.3d 413 (4th Cir. 2006) ........................................................................ *passim*

*Banks v. York*,
  515 F. Supp. 2d 89 (D.D.C. 2007)..........................................................................33

*Bd. of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972)..........................................................................................15, 16

*BE & K Constr. Co. v. NLRB*,
  536 U.S. 516 (2002).................................................................................................29

*Benning v. Comm'r, Ga. Dep't of Corr.*,
  71 F.4th 1324 (11th Cir. 2023) ........................................................................16, 17

*Black Lives Matter D.C. v. Trump*,
  544 F. Supp. 3d 15 (D.D.C. 2021).........................................................................32

*BMW of N. Am. v. Gore*,
  517 U.S. 559 (1996).................................................................................................23

*Borough of Duryea, Pa. v. Guarnieri*,
  564 U.S. 379 (2011).................................................................................................29

*Brandon v. D.C. Bd. of Parole*,
  823 F.2d 644 (D.C. Cir. 1987).........................................................................14, 15

*Branzburg v. Hayes,*
    408 U.S. 665 (1972) ................................................................................................18

*Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy,*
    367 U.S. 886 (1961) ..........................................................................................15, 24

*Citizen's Alert Regarding Env't v. Dep't of Justice,*
    1995 WL 748246 (D.D.C. Dec. 8, 1995) ...........................................................44

*CNN v. ABC,*
    518 F. Supp. 1238 (N.D. Ga. 1981) ....................................................... *passim*

*Cole v. Buchanan Cnty. Sch. Bd.,*
    504 F. Supp. 2d 81 (W.D. Va. 2007) .................................................................31

*Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n,*
    365 F. Supp. 18 (D.D.C. 1973) ....................................................................18, 19

*Cox Broad. Corp. v. Cohn,*
    420 U.S. 469 (1975) ..........................................................................................17, 45

*El Dia, Inc. v. Governor Rossello,*
    165 F.3d 106 (1st Cir. 1999) ...............................................................................34

*Elrod v. Burns,*
    427 U.S. 347 (1976) ..........................................................................................4, 43

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ..............................................................................................21

*Forcade v. Knight,*
    416 F. Supp. 1025 (D.D.C. 1976) ......................................................................18

*Frank v. Herter,*
    269 F.2d 245 (D.C. Cir. 1959) ............................................................... *passim*

*Gannett Co. v. DePasquale,*
    443 U.S. 368 (1979) ..............................................................................................42

*Getty Images News Servs. Corp. v. Dep't of Def.,*
    193 F. Supp. 2d 112 (D.D.C. 2002) ....................................................... *passim*

*Harrison v. Fed. Bureau of Prisons,*
    298 F. Supp. 3d 174 (D.D.C. 2018) ...................................................................33

*Homer v. Richmond,*
    292 F.2d 719 (D.C. Cir. 1961) ............................................................................15

*Huminski v. Corsones*,
   396 F.3d 53 (2d Cir. 2005)..........................................................................41, 45

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
   515 U.S. 557 (1995)...........................................................................................40

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*,
   994 F.3d 602 (7th Cir. 2021) .............................................................................36

*Joseph Burstyn, Inc. v. Wilson*,
   343 U.S. 495 (1952)...........................................................................................16

*Karem v. Trump*,
   404 F. Supp. 3d 203 (D.D.C. 2019) ....................................................................5

\*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020) ................................................................. *passim*

*Knight First Amend. Inst. v. Trump*,
   928 F.3d 226 (2d Cir. 2019)...............................................................................35

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
   508 U.S. 384 (1993)...........................................................................................24

*Maryland v. Craig*,
   497 U.S. 836 (1990)...........................................................................................41

*Matthews v. Eldridge*,
   424 U.S. 319 (1976)...........................................................................................14

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974)................................................................................29, 39, 40

*N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971)......................................................................................24, 25

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
   2025 WL 573764 (D. Md. Feb. 21, 2025) ..........................................................34

*Nation Mag. v. Dep't of Def.*,
   762 F. Supp. 1558 (S.D.N.Y. 1991)....................................................................37

*Nicholas v. Bratton*,
   376 F. Supp. 3d 232 (S.D.N.Y. 2019).................................................................19

*Nieves v. Bartlett*,
   587 U.S. 391 (2019)...........................................................................................29

*Nken v. Holder,*
    556 U.S. 418 (2009)............................................................................................4, 44

*Perry v. Sindermann,*
    408 U.S. 593 (1972)....................................................................................................33

*Police Dep't of City of Chi. v. Mosley,*
    408 U.S. 92 (1972)......................................................................................................34

*Price v. Garland,*
    45 F.4th 1059 (D.C. Cir. 2022).......................................................................35, 36, 38

*Procunier v. Martinez,*
    416 U.S. 396 (1974)....................................................................................................16

*Pursuing Am.'s Greatness v. FEC,*
    831 F.3d 500 (D.C. Cir. 2016) ...........................................................................4, 14, 43

*Quad-City Cmty. News Serv., Inc. v. Jebens,*
    334 F. Supp. 8 (S.D. Iowa 1971) .......................................................................18, 19, 30

*Rankin v. McPherson,*
    483 U.S. 378 (1987)....................................................................................................17

*Reuters Ltd. v. UPI, Inc.,*
    903 F.2d 904 (2d Cir. 1990).......................................................................................42

*Richmond Newspapers, Inc. v. Virginia,*
    448 U.S. 555 (1980)....................................................................................................41

*Riley v. Nat'l Fed'n of the Blind of N.C.,*
    487 U.S. 781 (1988)....................................................................................................39

*Sherbert v. Verner,*
    374 U.S. 398 (1963)....................................................................................................15

*\*Sherrill v. Knight,*
    569 F.2d 124 (D.C. Cir. 1977) ............................................................................ *passim*

*Simms v. Dist. of Columbia,*
    872 F. Supp. 2d 90 (D.D.C. 2012) ........................................................................43, 44

*Stevens v. N.Y. Racing Ass'n, Inc.,*
    665 F. Supp. 164 (E.D.N.Y. 1987) .........................................................................32, 33

*TGP Commc'ns, LLC v. Sellers,*
    2022 WL 17484331 (9th Cir. Dec. 5, 2022) .................................................................36

*The Chi. Reader v. Sheahan*,
    141 F. Supp. 2d 1142 (N.D. Ill. 2001) ............................................................33, 41

*Thompson v. Gallagher*,
    489 F.2d 443 (5th Cir. 1973) ............................................................15, 16

*Times-Picayune Publ'g Corp. v. Lee*,
    1988 WL 36491 (E.D. La. Apr. 15, 1988) ............................................................31

*Toolasprashad v. Bureau of Prisons*,
    286 F.3d 576 (D.C. Cir. 2002) ............................................................33, 34

*United States v. Rhine*,
    652 F. Supp. 3d 38 (D.D.C. 2023) ............................................................35

*United States v. Schulte*,
    436 F. Supp. 3d 698 (S.D.N.Y. 2020)............................................................41

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)............................................................16

*Wilkinson v. Austin*,
    545 U.S. 209 (2005)............................................................15

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................14

*Wooley v. Maynard*,
    430 U.S. 705 (1977)............................................................39

## PRELIMINARY STATEMENT

The Associated Press ("the AP") brings this action to vindicate its rights, to prevent the White House from coercing journalists into using only government-approved language, and to stop government retaliation as a result of speech. The United States Constitution guarantees the press and public the right to think their own thoughts and choose their own words without retaliation by their government. The ability to think and write freely, without government coercion, is the foundation for all of the freedoms that uniquely define American society.[1]

Since February 11, 2025, however, Defendants have tried to coerce the AP – and, by extension, intimidate and control the broader free press – by barring AP journalists from the Oval Office and other spaces open to White House-credentialed journalists, unless the AP primarily uses the name Gulf of America to report on the body of water known for 400 years as the Gulf of Mexico. AP journalists are also banned from larger events – held in some of the White House's biggest spaces, or outside of the White House – that are open to all White House-credentialed journalists so long as they sign up in advance, based explicitly and exclusively on the content of AP's speech. As a result, for the first time – and solely because of the content of its journalism – AP's credentials now provide less access to the White House than the same credentials provide to all other members of the White House press corps, which severely hampers the news from reaching thousands of AP customers and four billion people worldwide.

Defendants have also, in their own words, "doubled down" on targeting the AP for exercising its First Amendment right to petition the Court in filing this lawsuit. Rather than heed this Court's warning that "[i]t might be a good idea for the White House" to reconsider whether

---

[1] "There is the music of poetry in the order, cadence, structure, and content of the Bill of Rights, especially the First Amendment, if we are wise enough to hear it." Burt Neuborne, *Madison's Music: On Reading The First Amendment* 197 (2015).

"what they're doing is really appropriate in light of the case law," and its indication that their actions are most likely viewpoint discrimination, *see* Feb. 24, 2025 Hr'g Tr. at 40:1-2, 60:21–61:6, the White House commandeered the time-tested pool system for determining outlets with large distribution who ensure that the public stays informed about the President of the United States, all while continuing to bar the AP due to its use of the Gulf of Mexico name.

The AP now moves for a preliminary injunction to stop these unconstitutional actions. The Court should (1) order Defendants to immediately cease banning the AP's White House credentialed journalists from events that are open to all credentialed members of the White House press corps; and (2) order Defendants to immediately rescind their denial of the AP's access to the spaces made open to other White House press pool members.

The AP has repeatedly explained to administration officials that government attempts to control the words that journalists use – and excluding those journalists and retaliating against them when they do not comply – are unconstitutional and contrary to the public interest. Yet White House officials have continued barring AP journalists from one event after another based on nothing more than the content of its speech. This targeted attack on the AP's editorial independence and ability to gather and report the news strikes at the very core of the First Amendment. This Court should remedy it immediately.

Defendants' actions violate the AP's Fifth Amendment due process rights and its First Amendment speech and petition rights. Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65.1, the Court should order Defendants to cease these efforts to coerce the AP into using words that the government prefers. All of the elements justifying preliminary injunctive relief are met: the AP is likely to succeed on the merits; the AP will suffer irreparable harm absent injunctive relief; and the balance of equities and the public interest strongly favor the AP.

**First**, the AP is likely to succeed on the merits of its due process and First Amendment claims.  Journalists' "first amendment interest" in access to areas of the White House open to the press pool and other members of the press corps "undoubtedly qualifies as liberty which may not be denied without due process of law under the fifth amendment." *Sherrill v. Knight*, 569 F.2d 124, 130-31 (D.C. Cir. 1977).  The AP's liberty interest in access is rooted in the First Amendment's protections for newsgathering, which are not limited to the press-pass context. That liberty interest triggers requirements under the Fifth Amendment Due Process Clause, which Defendants failed to satisfy: specifically, the requirements of fair notice in advance; an opportunity to challenge; and a final written explanation of their decision to rescind the AP's access for a legitimate reason other than its editorial judgment.

Defendants have likewise violated the AP's First Amendment rights.  Once the White House opened spaces from the Oval Office to the East Room to the press pool and the larger press corps, the conditions governing journalists' access to those spaces must be both reasonable and viewpoint-neutral.  Courts in this circuit have applied these essential First Amendment constraints on the government in deciding on access, not only to the press briefing room, but also to military-run flights to Guantanamo Bay and to battlefield press pools.  Defendants' efforts to coerce the AP into using government-controlled language violates the First Amendment in multiple ways, constituting impermissible retaliation, content- and viewpoint-based discrimination, and an insidious attempt to compel speech.  Under binding D.C. Circuit precedent, Defendants' arbitrary denial of the AP's "right of access" – as opposed to the "right of interaction" at issue in the distinguishable *Baltimore Sun Co. v. Ehrlich* case – cannot stand.

**Second**, while the law presumes injury when constitutional rights are violated, the AP has also established ongoing and concrete harm as a result of Defendants' access denials  – harm

that grows by the day, as detailed in the AP's accompanying declarations.[2]  The AP's exclusion harms the timeliness and comprehensiveness of reporting by both its text reporters and photographers, who now must rely on the notes and photos of others and after-the-fact cold transcripts instead of live, firsthand reporting, which would capture nuances that are not otherwise discernible through transcripts.  The AP also has been financially harmed, incurring the substantial costs of flying foreign-based AP journalists to the U.S. to cover foreign leaders' visits to the White House for the AP's global audience.  The exclusion of the AP's journalists – both from smaller events as part of the press pool and from larger events ostensibly open to all White House credentialed journalists – hinders the AP's ability to produce timely and complete reporting on the President and White House to the AP's vast readership across the globe, which in turn harms the public's ability to learn about the actions of its government.

**Third**, the balance of the equities and the public interest strongly favor injunctive relief. These factors merge where, as here, the government is the defendant.  *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  As a rule, there is no governmental or public interest in the deprivation of constitutional rights.  *Id.*  Neither Defendants nor the public will experience any harm as a result of an order requiring Defendants to restore the AP's access to spaces open to the press pool and other credentialed journalists.  To the contrary, such an order would serve the public interest by restoring the access that the AP relies on to deliver accurate, nonpartisan, thorough, and timely reporting to billions of readers around the world every day about the workings of the government, a critical public interest.

---

[2] *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (violation of constitutional rights, especially "First Amendment freedoms, . . . unquestionably constitutes irreparable injury"); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (same).

Courts have granted injunctive relief for these reasons in similar circumstances, including when President Trump revoked the White House press passes of journalists Jim Acosta and Brian Karem, *see Karem v. Trump*, 404 F. Supp. 3d 203, 218 (D.D.C. 2019), *aff'd*, 960 F.3d at 667-68; Hr'g Tr., *CNN v. Trump*, No. 18-cv-2610-TJK, 2018 WL 9436958 (D.D.C. Nov. 16, 2018), and when the Reagan White House barred only TV reporters from access to the press pool, *CNN v. ABC*, 518 F. Supp. 1238, 1240-41 (N.D. Ga. 1981).  In those cases, as here, injunctive relief proved necessary to prevent immediate, irreparable harm to the press resulting from the White House's selective, arbitrary denials of access.

Preliminary injunctive relief is even more warranted here, because the White House has explicitly punished the AP based on the content of the AP's journalism, and because the denial of access and chilling effect on speech harms not just a single White House correspondent, but *all* of the AP's journalists—and by extension all of the four billion people worldwide who get their news from the AP each day.  Moreover, the perpetuation of the White House's explicit viewpoint discrimination has a chilling effect on all news coverage of the White House, as journalists and outlets must reasonably worry that any critical coverage may subject them to similar discrimination and harms by the government.

For these reasons, the Court should grant a preliminary injunction ordering the immediate end of the exclusion of the AP from spaces open to members of the White House press pool and to the broader press corps.

## FACTUAL BACKGROUND

### A.    The AP and the White House Press Pool

The AP is one of the world's oldest and most trusted news organizations.  Founded in 1846 and organized as a not-for-profit entity, the AP reaches four billion people every day, including through the thousands of global news outlets that republish the AP's news reports.  The

AP's journalism has achieved global recognition for its fast, accurate, and thorough reporting, and has received 59 Pulitzer Prizes. *See* Am. Compl. ¶ 5. The AP operates without any corporate owner, shareholders, or government backers, and is beholden not to any individual or entity's agenda but only to factual, nonpartisan reporting. Relevant here, the AP is also known for its Stylebook, in which it publishes standards for usage, spelling, and grammar to facilitate consistency in news writing for audiences across the nation and the world. *Id.* ¶ 10.

Given the AP's long history of reporting on the nation's affairs, it is no surprise that the AP was a founding part of the group of reporters covering the White House and the President – a group today known as the White House press pool. *Id.* ¶¶ 6, 37. The pool accompanies the President almost everywhere he goes, serving as the public's eyes and ears. *Id.* AP journalists also attend events open not just to the pool, but to any journalist with a White House press credential, in large spaces such as the East Room, which can fit over 100 journalists. *Id.* ¶ 7.

From the Eisenhower administration until February 25, 2025, the pool's membership was determined by the White House Correspondents' Association (WHCA) and the press corps—not the President. *See* Decl. of George Condon ("Condon Decl.") ¶ 6. The WHCA and the press corps served an important public purpose by independently determining which outlets served as witnesses to history, without the government hand-picking favored outlets or journalists.

The modern White House press pool, in all of its permutations, included three wire reporters (recently, one each from the AP, Reuters, and Bloomberg), four photographers (recently, one each from the AP, Reuters, AFP, and The New York Times), three network television journalists, a radio correspondent, and at least one print reporter. Am. Compl. ¶ 32. The wire services have the broadest reach – particularly among outlets that cannot afford the considerable expense of providing their own coverage of the White House – and the WHCA has

determined that they should always be present in the pool so that the widest possible audience can be informed of the President's activities. *Id.* ¶ 38.

The press pool is over a century old. In fact, an AP reporter became the first documented "pooler" on the presidency in 1881, when he reported on the condition of President James A. Garfield from inside the White House after he was shot. *Id.* ¶ 37. AP pool journalists were also in the motorcade in Dallas when President John F. Kennedy was assassinated, and with President George W. Bush during the September 11 terrorist attacks—providing fast, first-hand reporting to a nation in crisis. *Id.*

The AP's participation in the White House press pool has, for decades, allowed it to send one text reporter and one photographer to report from the Oval Office, Air Force One, and other locations and events open to the press pool. *Id.* ¶¶ 39-40. This access has enabled the AP to provide the timely, fact-based, informative reporting on the White House and President for which the AP is known. *Id.* ¶ 46. The AP is unaware of any prior attempt by the White House to bar an entire news organization from the press pool and from accessing these spaces open to other members of the pool. *Id.* ¶ 47. By observing events in person, pool reporters gain insights that they simply cannot glean secondhand. *See* Condon Decl. ¶¶ 9-13 (highlighting examples).

When AP text journalists cover presidential events, they are able to send wire reports out instantaneously to the AP's global readership. *See* Second Decl. of Zeke Miller ("2nd Miller Decl.") ¶ 10. When they have done so as part of the press pool, there have been no customs, expectations, or requirements that the AP's text journalists share the information they gathered with other press pool members. *Id.* To the contrary, AP text journalists have vigorously competed with the other wire service pool journalists to provide the fastest and most accurate news reporting at the very moment that the event was happening. *Id.* Likewise, when the AP's

photographers cover presidential events, they are able to send photographs out to AP photo editors, and from there out to the AP's global readership, from the scene and within a minute of the photographer taking them.  Decl. of Jon Elswick ("Elswick Decl.") ¶¶ 6-7.  When they have done so as part of the press pool, there have been no customs, expectations, or requirements that the AP's photographers share the photos they took with the other press pool members.  *Id.* ¶ 5.  To the contrary, the photographers vigorously competed with each other to provide news organizations and others around the world with the fastest and best photographs of the event as it was taking place.  *Id.*

### B.    The Gulf of Mexico and Mount McKinley

On January 20, 2025, President Trump issued an Executive Order renaming a portion of the Gulf of Mexico as the Gulf of America.  Exec. Order No. 14172.  The Gulf shares borders with Mexico and Cuba, and by its own terms the Executive Order applied only to the area within the United States.  The Gulf has been known as the Gulf of Mexico for over 400 years and remains known around the world as the Gulf of Mexico.  Am. Compl. ¶ 50.

In the same Executive Order, President Trump also renamed the mountain Denali as Mount McKinley, reversing a 2015 name change issued by the Secretary of the Interior during President Obama's administration.  *See* Dep't of the Interior Order No. 3337 (Aug. 28, 2015).  The AP addressed both of these name changes on January 23, 2025, when it released guidance specifying that it would refer to the Gulf of Mexico "by its original name *while acknowledging the new name Trump has chosen*" in its reporting and Stylebook.  Am. Compl. ¶¶ 51-52.  The AP explained that, "as a global news agency that disseminates news around the world, the AP must ensure that place names and geography are easily recognizable to all audiences."  *Id.* ¶ 51.  The AP added that it "regularly reviews its style guidance regarding name changes, in part to ensure

its guidance reflects common usage," per its standing policy. *Id.* The AP further announced that it would follow the Mount McKinley name change because the federal government has authority to rename locations within the United States. *Id.* ¶ 52.

**C.    The White House Tries to Coerce the AP into Changing its Journalism**

On the morning of February 11, 2025, White House Press Secretary Karoline Leavitt summoned AP Chief White House Correspondent Zeke Miller to her office. *See* 2nd Miller Decl. ¶ 16. Leavitt told Miller that AP journalists would not be permitted in the Oval Office as press pool members until and unless the AP revised its Stylebook to refer to the body of water known for hundreds of years as the Gulf of Mexico as the Gulf of America. *Id.* ¶ 17. The only reason Leavitt provided to Miller was to compel the AP to change the language of its reporting, which she told Miller was at President Trump's direction. *Id.* ¶ 18. Leavitt did not object to any other conduct by AP journalists. *Id.* ¶ 19.

The AP declined to reverse its editorial decision in response to Leavitt's February 11 demand. Am. Compl. ¶ 53. As a direct result of the AP's refusal to bow to the White House's pressure, White House staff barred an AP text journalist from attending a presidential Executive Order signing and press conference with Elon Musk in the Oval Office that day. *Id.* ¶ 54. The AP's photographer was allowed to attend the event, which was otherwise open to the press pool. *Id.*; Elswick Decl. ¶ 10. The AP's text journalist, but not its photographer, was again barred that evening from attending an event in the Diplomatic Reception Room as the President welcomed home an American freed in a prisoner exchange with Russia. Am. Compl. ¶ 56.

The AP promptly objected to this denial of access. Within an hour of the AP's exclusion from the first Oval Office event, AP Executive Editor Julie Pace published a statement explaining that "limiting our access to the Oval Office based on the content of AP's speech not

only severely impedes the public's access to independent news, it plainly violates the First Amendment." *Id.* ¶ 55.  Leavitt was undeterred, however, and defended the White House's decision during a press briefing the following day by claiming that the AP was telling "lies" by using the Gulf of Mexico name.  *Id.* ¶ 58.

The access denials continued that afternoon, when the AP was barred from an Oval Office press conference during the swearing-in of Director of National Intelligence Tulsi Gabbard.  *Id.* ¶ 59.  That same day, February 12, Pace sent a letter to White House Chief of Staff Susan Wiles, objecting to these denials of access, which "were plainly intended to punish the AP for the content of its speech" in violation of the AP's constitutional rights.  *Id.* ¶ 57; *see also* Second Decl. of Julie Pace ("2nd Pace Decl.") Ex. A.  The AP "strongly urge[d] the administration to end this practice" and offered to meet to discuss the matter in person.  *Id.*

On February 13, 2025, the AP was specifically excluded from a White House East Room press conference held by President Trump and Indian Prime Minister Narendra Modi, which was open to other pool members and journalists with White House press credentials.  *Id.* ¶ 60.  Miller signed up to attend but was barred, while at least one other journalist from another news organization who did not sign up was admitted.  2nd Miller Decl. ¶¶ 23-25.

Pace soon issued another statement, objecting to the AP's "deeply troubling" exclusion, which was "an incredible disservice to the billions of people who rely on The Associated Press for nonpartisan news."  Am. Compl. ¶ 62.  The White House, however, persisted in excluding the AP.  On February 14, 2025, White House Deputy Chief of Staff Taylor Budowich posted online that the AP's journalists were now indefinitely barred from "access to limited spaces, like the Oval Office and Air Force One" due to the AP's refusal to make the Gulf of America the primary term used in its reporting and Stylebook, adding that the AP's "journalists and

photographers will retain their credentials to the White House complex." *Id.* ¶ 63.  Budowich

further claimed, falsely, that the AP had a "commitment to misinformation" and published

"irresponsible and dishonest reporting." *Id.*

An unnamed White House source told journalists that the White House decided to expand

its ban to include AP photographers as well as AP text journalists for the express purpose of

"depriving the organization of the revenue it earns from selling pictures on its news wire." *Id.*

¶ 65.  The next day, White House Deputy Chief of Staff Stephen Miller suggested further

punishing the AP by revoking its White House access entirely.  *Id.* ¶ 66.

On February 18, 2025, Wiles responded to Pace's February 12 letter in which she had

protested the AP's exclusion.  *Id.* ¶ 68; 2nd Pace Decl. Ex. B.  Wiles claimed that "[t]here is no

event that the Associated Press is being barred from covering," an obviously false assertion

given the AP's exclusion from President Trump's press conference with Prime Minister Modi.

Am. Compl. ¶ 68.  Wiles also echoed other officials in writing that the White House's "view as

to why we arrived in this point" is that the AP's Stylebook "has been misused, and at times

weaponized, to push a divisive and partisan agenda" and that the AP should use the Gulf of

America name "as an American guideline." *Id.*

President Trump weighed in as well that day, confirming that the White House would

"keep [the AP] out until such time that they agree that it's the Gulf of America." *Id.* ¶ 69.  The

President doubled down on his retaliation, stating that "the Associated Press has been very, very

wrong on the election, on Trump and the treatment of Trump" and that "they're doing us no

favors and I'm not doing them any favors." *Id.*  President Trump made these statements at a

Mar-a-Lago press conference from which the AP's journalists were barred. *Id.*

The AP continued to seek to vindicate its rights without resorting to litigation. On February 19, 2025, Pace flew to Miami on one day's notice to meet with Wiles. *Id.* ¶ 70. Wiles, however, continued to insist that the AP must revise its Stylebook to adopt the Gulf of America name without qualification. *Id.* Wiles informed Pace that she would discuss the matter with Trump that evening and follow up with her, but to date, AP has not heard further from Wiles. *Id.* Instead, on February 20, 2025, speaking to the Republican Governors Association, President Trump emphasized that the White House is "holding [the AP] out of any news conferences" because of how the AP refers to the Gulf of Mexico, and he predicted this case, remarking that the possibility of the AP prevailing "doesn't matter" because the effort to coerce the AP into using the government's preferred words "is something we feel strongly about." *Id.* ¶ 72.

### D.    The AP Files this Lawsuit to Vindicate its Constitutional Rights

Despite AP's diligent efforts, the White House refused to restore the AP's access. The AP thus had no other option but to file this lawsuit on February 21, 2025, calling on this Court to vindicate the AP's rights to free expression under the First Amendment and to due process under the Fifth Amendment. *Id.* ¶ 73. The animus toward the AP's reporting continued, however. For example, the White House responded to this lawsuit with a statement from Communications Director Steven Cheung, claiming the AP is "clearly suffering from a severe, debilitating case of Trump Derangement Syndrome that has rotted their peanut-sized brains," and vowed that "[w]e will defeat them in court just like we crushed their leftist reporters at the ballot box." *Id.* ¶ 75. While interim U.S. Attorney Martin was seated at counsel's table during the hearing in this case, the U.S. Attorney's Office for the District of Columbia posted the following statement online attributed to him: "As President Trumps' [sic] lawyers, we are vigilant in standing against entities like the AP that refuse to put America first." *Id.* ¶ 15 & n.3.

12

At the conclusion of the hearing, the Court declined to enter a temporary restraining order against Defendants, but the Court cautioned defense counsel that precedent "is uniformly unhelpful to . . . the White House when the White House has banned reporters in the past," and the Court observed that "[i]t might be a good idea for the White House" to reconsider whether "what they're doing is really appropriate in light of the case law." *Id.* ¶ 80.

### E.    The White House Seizes Control of the Press Pool and Continues to Exclude the AP

Choosing to flout this Court's warning, Leavitt announced at a February 25, 2025, press briefing that, going forward, White House officials would determine which news organizations participated in the pool, ending the decades-long deference to the WHCA.  Leavitt announced that the pool would consist of "legacy media" and "new media," with scant additional details. Leavitt had not notified the WHCA or prior pool members before the announcement.  *Id.* ¶ 81.

Leavitt also made clear that she would "double down" on excluding the AP from the pool.  *Id.* ¶ 82.  Following Leavitt's announcement, the number of pool spots allocated to wire service reporters shrank from three (AP, Reuters, and Bloomberg) to one or two (Reuters and/or Bloomberg, with the AP still banned), and the AP has remained barred from participating in the four photographer spots as well.  *Id.* ¶ 84.  The pool has remained largely the same since February 25, with its "legacy" members continuing to participate – except the AP.  Every day, as a result of the access ban, AP journalists remain excluded from events open to the White House press pool, and from events open to all credentialed members of the White House press corps.

## ARGUMENT

A preliminary injunction is warranted when the moving party can show: (1) a likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the absence of such relief, (3) that the balance of equities tips in its favor, and (4) that granting an injunction would

be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because the "[t]he loss of First Amendment 'freedoms'" and other constitutional rights "unquestionably constitutes irreparable injury," *see Pursuing Am.'s Greatness*, 831 F.3d at 511, in such cases, "the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis." *Id.* (D.C. Circuit, on First Amendment grounds, reversing district court's denial of motion for preliminary injunction). Here, all four factors favor the AP and the Court should therefore grant the AP's motion and order Defendants to cease their unconstitutional acts.

## I.      THE AP IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

The AP is likely to establish that, by barring the AP from spaces open to the press pool and spaces open to other credentialed journalists in order to coerce changes in the AP's reporting, Defendants violated the AP's Fifth Amendment right to due process and its First Amendment right to freedom of speech and of the press.

### A.      Defendants' Actions Violate the Fifth Amendment Due Process Clause

The AP has a protected liberty interest in newsgathering, access, and speech, which is implicated by Defendants' exclusion of the AP from spaces open to the press pool and to larger spaces open to all credentialed journalists. Under the Fifth Amendment, the AP's access thus cannot be denied without due process of law. Yet the AP received no procedural protections, and the denial of access was based on arbitrary and viewpoint-discriminatory reasons—an issue on which the Defendants have, since the Court's initial hearing, doubled-down.

#### i.  Defendants' Actions Have Deprived the AP of a Liberty Interest

##### 1.  *Liberty Interests Are Broadly Defined*

The Due Process Clause "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976). When faced with a due process claim, therefore, courts "first inquire whether the nature of the

14

interest is within the contemplation of the Constitution's 'liberty or property' language."

*Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 647 (D.C. Cir. 1987). "A liberty interest may arise

from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise

from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S.

209, 221 (2005) (cleaned up). "In a Constitution for a free people, there can be no doubt that the

meaning of 'liberty' must be broad indeed." *Bd. of Regents of State Colleges v. Roth*, 408 U.S.

564, 571-72 (1972).

 In a bygone era, the Supreme Court extended due process protections only to interests it

counted as "rights," not "mere privilege[s]." *Cafeteria & Rest. Workers Union, Loc. 473 v.

McElroy*, 367 U.S. 886, 895 (1961). The Court repudiated this doctrine over 60 years ago,

however, reasoning that "[i]t is too late in the day to doubt that . . . liberties" such as free

"expression may be infringed by the denial of or placing of conditions upon a benefit or

privilege." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). Furthermore, the bounds of "liberty"

and "property" were "purposely left to gather meaning from experience." *Roth*, 408 U.S. at 571.

"For that reason," the Supreme Court "fully and finally rejected the wooden distinction between

'rights' and 'privileges' that once seemed to govern the applicability of procedural due process

rights." *Id*. Instead, courts have long recognized that "[o]ne may not have a constitutional right

to go to Baghdad, but the Government may not prohibit one from going there unless by means

consonant with due process of law." *Homer v. Richmond*, 292 F.2d 719, 722 (D.C. Cir. 1961);

*see also McElroy*, 367 U.S. at 894 (whether state actor violated due process by "summarily

denying [employee] access to the site of her former employment . . . cannot be answered by easy

assertion that, because she had no constitutional right to be there in the first place, she was not

deprived of liberty or property"); *Thompson v. Gallagher*, 489 F.2d 443, 446 (5th Cir. 1973)

("The right-privilege distinction has been rejected as a method of analysis . . . because the question is not whether a person has a right to something denied by the government, but whether the government acted lawfully in depriving him of it.").

### 2. Courts Widely Recognize a Liberty Interest in Exercising First Amendment Rights

Americans indisputably enjoy a liberty interest in the exercise of the First Amendment rights. *See, e.g.*, *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (due process attaches to "the exercise of constitutionally protected rights," including "the right of free speech"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 500 (1952) (noting that "the liberty of speech and of the press . . . is within the liberty safeguarded by the Due Process Clause"). The liberty interest is broad—including the right to speak freely, publish freely, and, as discussed below, to gather the news—and applies across a wide variety of contexts. Procedural protections are therefore required "[w]hen a State would directly impinge upon interests in free speech or free press . . . whether or not the speech or press interest is clearly protected under substantive First Amendment standards." *Roth*, 408 U.S. at 575 n.14.

For example, courts have held that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest" protected by due process, "even though qualified of necessity by the circumstance of imprisonment." *Procunier v. Martinez*, 416 U.S. 396, 418 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). A recent decision in this district found that this liberty interest even extends to the use of prison email, rejecting the government's antiquated claim that a prisoner "has no protected liberty interest because the" use of the email system is "a 'privilege'" not a right. *Bailey v. Fed. Bureau of Prisons*, 2024 WL 3219207, at *11 (D.D.C. June 28, 2024); *see also Benning v. Comm'r, Ga. Dep't of Corr.*, 71 F.4th 1324, 1332

16

(11th Cir. 2023) (holding the same, and finding government's privilege "argument misses the mark . . . by the proverbial country mile" given the rejection of the "distinction between 'rights' and 'privileges'"), *cert. denied*, 144 S. Ct. 1457 (2024).  The lack of "a free-standing constitutional . . . right to use the [prison] email system does not affect or resolve the procedural due process question" because "the First Amendment . . . creates a liberty interest" in speaking freely, which is implicated by prisoners' ability to correspond.  *Benning*, 71 F.4th at 1332.

Courts have also found a liberty interest in government employees not being fired "on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987).  Indeed, even if the employee "was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression."  *Id.*

### 3. The Liberty Interest in Exercising First Amendment Rights Extends to Newsgathering and Access

Likewise, the D.C. Circuit recognizes that members of the press and public have a liberty interest in newsgathering, protected by the First Amendment.  "[T]he protection afforded newsgathering" is rooted in "the first amendment guarantee of freedom of the press."  *Sherrill*, 569 F.2d at 129-30.  "Not only newsmen and the publications for which they write, but also the public at large have an interest protected by" the First and Fifth Amendments "in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information."  *Id*.  This is so because "in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."  *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491 (1975).  In

17

short, "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).

The liberty interest in newsgathering includes an interest in the *access* that journalists require to gather the news. Access is an essential part of the press's ability to obtain information and report the news, and "a paper may be prevented from bearing public witness, as much by restricting its access in the first instance to the event as by subsequently restricting distribution of its printed views." *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 16-17 (S.D. Iowa 1971) (*cited in Forcade v. Knight*, 416 F. Supp. 1025, 1032-33 (D.D.C. 1976), *aff'd in part, remanded in part sub nom. Sherrill*, 569 F.2d 124); *see also Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 365 F. Supp. 18, 26 (D.D.C. 1973) ("Access to news, if unreasonably or arbitrarily denied by" government "constitutes a direct limitation upon the content of news" and "has a significant impact when measured in terms of the First Amendment, both upon the publication excluded and others in similar situations"), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975) (cited in *Forcade*, 416 F. Supp. at 1032). Moreover, the interest in access affects not only journalists' interest in gathering and publishing the news, but also "their ability to carry out their employment." *Forcade*, 416 F. Supp. at 1037.

### 4. The AP's Liberty Interest in Access Prevents Defendants from Excluding the AP, Without Due Process, from Spaces Open to the Press Pool and Spaces Open to Credentialed Journalists

The AP has a liberty interest in access to spaces made available to the press pool and to spaces made available to all other credentialed White House journalists. While the White House is not obligated to open those spaces to the pool or press corps in the first instance, once the White House does so, there is a liberty interest in the continued access to those spaces, rooted in the First Amendment. Because of that liberty interest, the White House may not exclude the AP from those spaces without due process.

18

It is beyond dispute that journalists have a liberty interest in press passes.  *See Sherrill*, 569 F.2d at 130-31; *Karem*, 960 F.3d at 665; Hr'g Tr., *CNN v. Trump*, 2018 WL 9436958; *see also, e.g.*, *Nicholas v. Bratton*, 376 F. Supp. 3d 232, 281 (S.D.N.Y. 2019) (applying *Sherrill* as to police department press pass); *Consumers Union*, 365 F. Supp. at 26 (interest in press pass for Congressional galleries); *Quad-City Cmty. News*, 334 F. Supp. at 16-17 (interest in police department press pass).  But the liberty interest in access *is not limited* to press passes.  Instead, the liberty interest extends broadly to "access to areas the government has specifically opened to the press."  *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 75 (D.D.C. 2023), *appeal argued*, No. 24-5004 (D.C. Cir. Oct. 15, 2024) (citing *Sherrill*, 569 F.2d at 129-31; *Karem*, 960 F.3d at 664-67).  Indeed, a court addressing the exclusion of TV media from the press pool held that, "under the First Amendment, they have a limited right of access *to White House pool coverage* in their capacity as representatives of the public and on their own behalf as members of the press," flowing from the "right of access to news or information concerning the operations and activities of government."  *ABC*, 518 F. Supp. at 1244-45 (emphasis added).

Journalists retain this liberty interest for access to spaces small or large, whether for one of 20 media seats on a military flight to Guantanamo or one of the 1,500-plus White House press passes.  *See Sherrill*, 569 F.2d at 129 n.20; *Getty Images News Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 115, 123 n.10 (D.D.C. 2002).  So, too, here, the AP has a liberty interest in access to pool-only events, such as those held in the Oval Office, as well as a liberty interest in events held in larger places like the East Room and the Palm Beach International Airport tarmac that are open to the entire White House press corps.

The liberty interest also exists whether the government first granted that access decades ago or days ago.  *Compare Karem*, 960 F.3d at 660 (addressing liberty interest in "the hard-pass

system [which] has existed in similar form for decades"), and *ABC*, 518 F. Supp. at 1239, 1244 (addressing press pool system under President Reagan and "prior administrations"), *with Getty Images*, 193 F. Supp. 2d at 115 (addressing liberty interest in media seats on Guantanamo flights the military began operating two months prior), *and Frank v. Herter*, 269 F.2d 245, 247 (D.C. Cir. 1959) (per curiam) (Burger, J., concurring) (applying due process and First Amendment protections to "the State Department['s] recent[] conclu[sion] that a limited number, approximately 40, news representatives would be permitted to go to the Chinese mainland"). Here, even though the White House has seized control of the pool membership from WHCA, the White House press pool remains open to the same prior pool members – except the AP – and to additional participants.  Am. Compl. ¶¶ 84-85.  The AP has the same liberty interest in access to those events and spaces today as it did the day before Leavitt's February 25 announcement—an interest rooted in the First Amendment.[3]

It also bears noting "what this case does *not* involve."  *Sherrill*, 569 F.2d at 129.  The AP does not argue that it has a protected interest in "a right of interaction" with the President. *Alaska Landmine*, 514 F. Supp. 3d at 1133 (citing *Sherrill*, 569 F.2d at 129-30; *Getty Images*, 193 F. Supp. 2d at 121).  Holding that "a government official cannot improperly, or without due process, restrict the access of a journalist to a press conference" does not require the official to

---

[3] Indeed, *even if there were no pool*, the AP would still have a liberty interest in access to events and spaces that the government has opened to the press.  *See Getty Images*, 193 F. Supp. 2d at 121 (military's criteria for "determin[ing] which media organizations receive the limited access available" on flights to Guantanamo Bay must "satisfy the due process concerns implicated by restrictions on First Amendment rights" even though military had not created press pool); *see also Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1133-34 (D. Alaska 2021) (applying *Sherrill* in context of exclusion from governor's press conferences, and holding that the "First Amendment interests" in "access to information" "clearly constitute a liberty which may not be denied without due process of law," even where the government "has no process for the credentialing of media").

20

"take or answer questions from a journalist" employed by the AP or any other outlet "at any such event." *Id.* The AP only asks that the White House stop denying it access to places where it can observe and report on public officials doing the public's business based on the perceived viewpoint of the AP's speech; it is *not* asking for those officials to interact with the AP. *See infra* Part I.B.i (discussing *Sherrill* and distinguishing *Ehrlich* on this point). The First and Fifth Amendments protect that access.

### ii.  Defendants Failed to Provide the AP with Due Process

Due process requires the government to follow constitutionally "adequate procedures" before denying a protected liberty interest. *Sherrill*, 569 F.2d at 131 n.24. Because a denial of access "implicates important first amendment rights," the requirements of due process must be applied in a "particularly stringent" manner. *Karem*, 960 F.3d at 665 (cleaned up). Specifically, Defendants were required to provide to the AP, before reaching a final decision (1) "notice of the factual bases for denial," (2) "an opportunity for the applicant to respond to these," and (3) "a final written statement of the reasons for denial" of access, (4) which reasons may not be "arbitrar[y]" or "less than compelling." *Sherrill*, 569 F.2d at 129-30.

Defendants have not even attempted to dispute that they failed to provide the AP with due process in all of these respects:

**<u>First</u>**, Defendants failed to provide fair notice of their decision to deny access. The AP was entitled to "receive fair notice not only of the conduct that would subject it to punishment, but also of the magnitude of the sanction that the White House might impose," which now includes the AP's exclusion and the changes to the pool as a whole. *Karem*, 960 F.3d at 665 (cleaned up). To be "constitutionally sufficient," notice must be provided "*prior to being sanctioned.*" *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 257 (2012) (emphasis added). Yet the AP learned of the White House's initial decision when Leavitt summoned Miller to

21

announce what Defendants had *already* decided: that the AP would no longer be permitted in the Oval Office as part of the press pool unless AP revised its Stylebook guidance to use the Gulf of America name.  Am. Compl. ¶ 49.  Indeed, Defendants began barring AP journalists from attending pool events that day.  *Id.* ¶¶ 54, 56.  Leavitt's notice was also incomplete, as she did not state that the ban would extend to the AP's ability to report from areas other than the Oval Office, including the Diplomatic Reception Room, the East Room, Mar-a-Lago, and Air Force One.  *Id.* ¶¶ 56, 60, 64, 69.  Because Defendants never "formally articulated or published" or informed the AP of "this standard for denial of" access prior to imposing it, let alone notified the AP of the severe nature of the sanctions, Defendants failed to meet the notice requirements of due process.  *Sherrill*, 569 F.2d at 130; *Karem*, 960 F.3d at 660, 665.

**Second**, Defendants did not provide the AP with an opportunity to challenge the President's decision to bar AP journalists' access before the ban took effect, nor have Defendants provided the AP a formal opportunity to challenge the access denial since that time.  Am. Compl. ¶ 93.  Instead, White House officials have doubled down on this decision, continuing to insist that the only way the AP can regain access is by bowing to their demands as to use of the Gulf of America name.  *Id.* ¶¶ 68-69, 82; 2nd Pace Decl. Ex. B.

**Third**, Defendants did not provide to the AP the required final written statement of the reasons for their decision.  *Sherrill*, 569 F.2d at 131.  Leavitt announced the already-final decision to Miller verbally, after summoning him to her office.  Am. Compl. ¶ 49; *cf.* Hr'g Tr., *CNN*, 2018 WL 9436958 (noting, as to the revocation of CNN reporter Jim Acosta's White House press pass, that "when an important interest is at stake and when the government is able to provide this process before deprivation, it generally must do so").  Budowich's short post online describing the denial of AP's access falls far short of the constitutionally required written notice

of the bases for denial.  Am. Compl. ¶ 63.  So, too, does Wiles' subsequent letter to the AP,
which was based on the demonstrably inaccurate claim that "[t]here is no event that the
Associated Press is being barred from covering."  *Id.* ¶ 68.  Leavitt's February 25 announcement
of the changes to the press pool then failed to mention the AP at all, let alone describe its
continuing exclusion.  *Id.* ¶ 81.  "[T]hese belated efforts" to reduce the government's arbitrary,
unsupportable decision to some form of writing "were hardly sufficient to satisfy due process."
Hr'g Tr., *CNN*, 2018 WL 9436958.

 **Fourth**, Defendants made the decision to deny the AP access "arbitrarily or for less than
compelling reasons."  *Sherrill*, 569 F.2d at 129; *see also BMW of N. Am. v. Gore*, 517 U.S. 559,
587 (1996) (Breyer, J., concurring) ("This constitutional concern, itself harkening back to the
Magna Carta, arises out of the basic unfairness of depriving citizens of life, liberty, or property,
through the application, not of law and legal processes, but of arbitrary coercion.").  Indeed,
Defendants' denial of the AP's access is *both* arbitrary *and* based on illegitimate reasons.

 The denial of access is arbitrary because the AP is the only news organization banned for
not exclusively using the Gulf of America name, even though other pool members and other
credentialed journalists, like the AP, continue to use the name Gulf of Mexico, while noting the
President's Executive Order.  Am. Compl. ¶ 85.  Further underscoring the arbitrariness of the
decision, the AP does in fact "acknowledge[e] the new name Trump has chosen," consistent with
its editorial guidance.  *Id.* ¶ 51.  And, as discussed in detail below, Defendants' access denial is
based entirely on an impermissible desire to punish the AP for the content and perceived
viewpoint of its speech.  *See id.* ¶¶ 68-69; *Sherrill*, 569 F.2d at 129 (access denials are "violative
of the first amendment" when "based upon the content of the journalist's speech"); *Ateba*, 706 F.
Supp. 3d at 86 ("The government may not 'den[y] access to a speaker solely to suppress the

point of view he espouses." (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993))).  For that same reason, in a case assessing the government's selection of 40 correspondents permitted to travel to China, the D.C. Circuit held that if the choice "was limited only to Democrats or only to Republicans, obviously that would be improper and would fall." *Frank*, 269 F.2d at 247 (Burger, J., concurring); *cf. McElroy*, 367 U.S. at 898 (government employee "could not constitutionally have been excluded from the [workplace] if the announced grounds for her exclusion had been patently arbitrary or discriminatory," e.g., "she could not have been kept out because she was a Democrat or a Methodist").

Defendants' improper, arbitrary, and express motive to punish the AP for its speech renders the need for injunctive relief especially clear here, as compared to the line of press pass cases, where the government's stated interests were in security and decorum. *Cf. Karem*, 960 F.3d at 665; *Sherrill*, 569 F.2d at 130.  Defendants have not met a single one of the constitutionally mandated requirements of due process.  Their arbitrary, unlawful denial of the AP's access to events open to the press pool and to other credentialed journalists cannot stand.[4]

**B.    Defendants' Actions Violate the First Amendment**

Defendants also have violated the AP's First Amendment rights.  The government's unprecedented and dangerous effort to coerce the AP into using its preferred language is the very sort of harm the First Amendment was drafted to prevent.  As the Supreme Court has observed,

> In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors.  The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government.  The

---

[4] Indeed, the White House's commandeering of the press pool itself failed to satisfy due process. Leavitt announced the change in control over the pool during a press briefing, rather than in writing, with no advance notice to pool members, providing no opportunity to object, and lacking any final written statement of reasons for the sudden abandonment of the time-tested system for keeping the public fully informed about the President.  *See* Am. Compl. ¶¶ 81-85.

> press was protected so that it could bare the secrets of the
> government and inform the people.  Only a free and unrestrained
> press can effectively expose deception in government.

*N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).  Indeed, the

government's attempted censorship violates the First Amendment in at least three ways,

constituting unlawful retaliation, viewpoint-based discrimination, and compelled speech.

### i.    Defendants' Access Denial Resembles *Sherrill*, not *Ehrlich*

Defendants' denial of the AP's access to press pool and press corps events is the legal

equivalent of the denial of a hard pass that the D.C. Circuit found unconstitutional in *Sherrill*,

569 F.2d 124.  It is not equivalent to the denial of interviews and information-sharing that the

Fourth Circuit permitted in *Ehrlich*, 437 F.3d 413 (4th Cir. 2006).  *See* Feb. 24, 2025 Hr'g Tr. at

57:13–58:15 (requesting briefing on this distinction).  To start, only *Sherrill* is binding precedent

on this Court, and only *Sherrill* contains a due process analysis.  *Sherrill* and its progeny

therefore squarely control the AP's due process claim in this case.

Moreover, the facts in *Sherrill* are a far closer fit here, as the AP's case concerns the

constitutionally protected "right of access," not the "right of interaction" at issue in *Ehrlich*.  In

*Sherrill*, the Nation's Washington correspondent had applied for a White House press pass and

the Secret Service denied the application, later revealing the denial was due to security concerns.

569 F.2d 124.  Although the *Sherrill* Court did not go into detail on the hard pass system, the

later press pass cases explained that "for decades, the White House has granted special access

passes" to journalists, which let them into "tightly controlled" White House spaces such as the

press briefing room and offices, and the ability to "come and go from the White House as they

wish, subject to a security screening at the door."  *Ateba*, 706 F. Supp. 3d at 69 (quoting *id.*).

Having a hard pass does not mean that a White House official must answer the holder's questions or grant them interviews.[5]  Instead, the hard pass permits the holder to "enter the White House at a moment's notice" to access certain otherwise restricted areas made available to the press, and to attend briefings and events in those areas.  *Ateba*, 706 F. Supp. 3d at 77.  Given the liberty interest in that access, it may not be denied arbitrarily or without due process.  *Id.* at 76;

The journalists in *Ehrlich*, on the other hand, *retained their ability to access press conferences* – they were banned *only* from being called on or granted interviews.  There, the Press Office of Maryland Governor Robert Ehrlich had issued a directive that "no one in the Executive Department or Agencies is to speak with [Baltimore Sun reporter] David Nitkin or [Baltimore Sun columnist] Michael Olesker until further notice" due to a perceived lack of "objective[ity]" in their reporting.  *Ehrlich*, 437 F.3d at 413.  When Nitkin called officials who had previously answered his calls, they would decline to pick up the phone or to comment, saying, "I can't talk to you."  *Id.*  Despite the edict, Nitkin was able to attend press conferences in the governor's 80-person reception room.  *Id.* at 414.  To be invited to press conferences, "the media could request to be included on the e-mail notification list.  Because Nitkin had requested to be on the notification list, he was notified of and invited to public press conferences."  *Id.*  The governor also held smaller press "briefings" in a private conference room "with the capacity to hold 10 to 12 people. The persons invited to press briefings were called by telephone or invited in person."  *Id.*  "[U]sually no more than five reporters [we]re invited to press briefings."

---

[5] Indeed, as the court noted in *Ateba*, although plaintiff had held White House press passes, he "was ignored by the Press Secretary, who generally refused to take his questions or grant him interviews with the President."  *Ateba*, 706 F. Supp. 3d at 70; *see also Karem*, 960 F.3d at 661-62 (CNN correspondent Acosta, prior to revocation of hard pass, "at a presidential press conference" had "ask[ed] several questions that elicited no response from President Trump," and Playboy correspondent Karem "shouted a question at the President, who ignored it").

*Ehrlich*, 356 F. Supp. 2d 577, 580 (D. Md. 2005), *aff'd*, 437 F.3d 410. Nitkin had been excluded from one briefing and not invited to another, but "other reporters from The Sun attended both briefings." *Ehrlich*, 437 F.3d at 414. Moreover, the Sun "ha[d] not maintained. . . that the Governor's directive actually chilled its reporting on state government matters." *Id.* at 415.

      The ban here on the AP's access to spaces open to the White House press pool and to the larger press corps is therefore far more like *Sherrill* than like *Ehrlich*. Critically, *Ehrlich* concerned the "right of interaction," not the protected "right of access"; the AP's case is the reverse. *Alaska Landmine*, 514 F. Supp. 3d at 1133. The Fourth Circuit framed *Ehrlich* as a dispute over journalists' ability to obtain "discretionarily afforded information" and "answer[s] to] questions." *Ehrlich*, 437 F.3d at 418. The complaint likewise challenged the reporters' ability to have their questions answered. *See* Compl. ¶¶ 18-20, *Ehrlich*, 2004 WL 3121774 (D. Md. Dec. 3, 2004) (alleging that "the policy prohibits individuals who are willing to speak to Mr. Nitkin and Mr. Olesker from exercising their right to do so," that "state government employees . . . have refused to speak to him," and that "numerous state government employees have not returned telephone calls from" plaintiffs). The *Ehrlich* case thus was not about The Sun reporters' access to *physical spaces*.

      The AP's claims, however, just like those at issue in *Sherrill*, center on the AP's ability to *physically access* "press facilities for correspondents who need to report therefrom." *Sherrill*, 569 F.2d at 129. The AP is not litigating, just as the *Sherrill* court did not address, whether the AP will ultimately be called on at a press conference or ever granted an exclusive interview. *Id.* The AP is instead asking not to be banned – on the basis of its perceived viewpoint – from the *spaces* where other White House journalists are able to observe and report on the President's handling of the public's business. Moreover, unlike in *Ehrlich*, all of the AP's White House

journalists have been turned away despite submitting RSVPs for every large event and to every pool event in large spaces since the ban took effect. *See* Am. Compl. ¶¶ 60, 78, 88. The AP thus remains barred from large events and spaces where breaking news is made every day. The result is that the AP's press credentials now provide its journalists less access to the White House than the same press credentials provide to all other members of the White House press corps.

As to the smaller, five-reporter press briefings described in *Ehrlich*, those too are unlike the current scenario. Other Sun reporters were allowed to attend both briefings from which the plaintiffs had been excluded, *Ehrlich*, 437 F.3d at 414, while here all AP journalists are excluded from all events large and small. Moreover, the AP does not challenge the President's authority to grant an audience with one reporter or a group of five; rather, as in *Sherrill*, the AP challenges the President's ability to categorically bar it from access to spaces that are otherwise open to a defined group of journalists – either the press pool or the entire White House press corps – on the basis of the AP's speech. *Cf. Sherrill*, 569 F.2d at 129.

Finally, *Ehrlich*'s persuasive authority is questionable. *Ehrlich* is at odds with decisions holding that selectively restricting journalists' access to generally available information based on public officials' dislike of their speech and views is, in fact, unconstitutional. *See, e.g.*, *ABC v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977) (candidates could not selectively exclude one network from "invitation only" election event but admit other journalists); *Frank*, 269 F.2d at 247 (Burger, J., concurring) (invitations to journalists permitted travel to China must be reasonable, viewpoint neutral); *Getty Images*, 193 F. Supp. 2d at 120 (when inviting journalists to cover Guantanamo, military "must make selections in a manner that is reasonable").

In sum, this case is like *Sherrill*, not *Ehrlich*. As in *Sherrill*, therefore, the denial of the AP's access here is unconstitutional and cannot stand.

### ii. Defendants' Access Denial Constitutes Impermissible Retaliation Against the AP Based on Conduct Protected by the First Amendment

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). Unconstitutional retaliation occurs when a plaintiff shows:

> (1) he or she engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him or her.

*Ateba*, 706 F. Supp. 3d at 86 n.10 (cleaned up). The AP satisfies each element of this test.

**First**, the AP engaged in First Amendment protected activity. The AP's reporting and editorial decisions, including to primarily continue using the name Gulf of Mexico, sit at the very core of every American's rights to free thought and free expression. The First Amendment's protections for reporting like the AP's derive from the "practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 257 (1974). The First Amendment therefore protects the press's "exercise of editorial control and judgment." *Id.* at 258.

The AP is also being targeted for the exercise of its constitutionally protected right to petition. The First Amendment's "Petition Clause protects the right of individuals to appeal to courts . . . for resolution of legal disputes." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011). The Supreme Court has "recognized this right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights," which "is implied by the very idea of a government, republican in form." *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002) (cleaned up). The AP sued the White House seeking vindication of its constitutional rights. Due to this lawsuit – immediately after the Court admonished the White House that it needed to

rethink its unlawful actions – Defendants "double[d] down" on excluding the AP from spaces open to the pool and press corps.  Am. Compl. ¶¶ 81-82.

As with its right to petition the Court, the First Amendment protects the AP's access to the spaces and events to which it is currently banned.  The First Amendment protects newsgathering and the access which facilitates that newsgathering, in spaces large and small. *See supra* Part I.A.i.  "[A] paper may be prevented from bearing public witness, as much by restricting its access in the first instance to the event as by subsequently restricting distribution of its printed views."  *Quad-City Cmty. News*, 334 F. Supp. at 16-17.  The D.C. Circuit has therefore concluded that "the protection afforded newsgathering under the first amendment" extends to journalists' right to report from "White House press facilities [that] hav[e] been made publicly available as a source of information for newsmen."  *Sherrill*, 569 F.2d at 129.  Press pool members such as the AP thus have, "under the First Amendment," "a limited right of access to White House pool coverage in their capacity as representatives of the public and on their own behalf as members of the press," which flows from the "right of access to news or information concerning the operations and activities of government."  *ABC*, 518 F. Supp. at 1244-45.

What that means is, *if* the government decides to open a space like the Oval Office or the East Room to the press, *then* the Constitution forbids the government from banning journalists from those places based on the content of their reporting, or for the purpose of coercing those journalists into using government-favored words and not using government-disfavored words, or even for suing the White House.  The Constitution further forbids the government from denying access without due process to those spaces it has chosen to open.  "If, for example, the choice" by the government of "a limited number, approximately 40, news representatives [] permitted to

go to the Chinese mainland" were "limited only to Democrats or only to Republicans, obviously that would be improper and would fall." *Frank*, 269 F.2d at 247 (Burger, J., concurring).

**Second**, Defendants retaliated against the AP in ways sufficient to chill the speech and petitioning of a similarly situated person of ordinary firmness. By barring the AP from accessing areas open to the press pool or to the entire press corps, until and unless the AP turns over its reporters' vocabulary to the White House, Defendants have chilled the AP's exercise of its First Amendment speech and petitioning rights. Am. Compl. ¶ 94. The AP's text reporters have been harmed in their ability to report on key in-the-room context and publish breaking news in real time. 2nd Miller Decl. ¶¶ 10-11, 30. The AP's photographers also have been harmed in their ability to provide photographs of newsworthy events, via the AP's photo editors, within a minute of the photographer taking them. *See* Elswick Decl. ¶¶ 6-7, 15.

Other news organizations' First Amendment rights are also likely to be chilled. Courts have made clear in other cases that such speech-chilling access denials satisfy this factor, and in this case they satisfy the factor as well. *See, e.g.*, *Cole v. Buchanan Cnty. Sch. Bd.*, 504 F. Supp. 2d 81, 87 (W.D. Va. 2007) (noting that a reporter "is now significantly restricted in his ability to report on school activities such as sporting events and student exhibitions open to the public," and that the First Amendment activity of similarly situated reporters "could reasonably be chilled"), *rev'd on other grounds*, 328 F. App'x 204 (4th Cir. 2009); *see also Times-Picayune Publ'g Corp. v. Lee*, 1988 WL 36491, at *9 (E.D. La. Apr. 15, 1988) (enjoining law enforcement agency from retaliating against reporter by denying access to press conferences based on the content of their news coverage, and holding that "[o]fficial discrimination against a news media organization in retaliation for the content of its news stories violates 42 U.S.C. § 1983"). The same chilling effect is now present here as well.

31

**Third**, as Defendants themselves repeatedly have admitted, this access denial is based entirely on the AP's constitutionally protected speech: specifically, its editorial decision not to make the Gulf of America the primary term used in its reporting and Stylebook. The White House could hardly have made its retaliatory motives clearer:

- Leavitt blamed the ban on the AP's alleged "lies," Am. Compl. ¶ 58;

- Budowich said that the access denial resulted from the AP's "commitment to misinformation" and "irresponsible and dishonest reporting," *id.* ¶ 63;

- Wiles attributed the access denial to the AP's supposedly "divisive and partisan agenda," *id.* ¶ 68;

- Defendants' boss, President Trump, said of the decision to "keep [the AP] out" that "the Associated Press has been very, very wrong on the election, on Trump and the treatment of Trump," *id.* ¶ 69, and that the possibility of the AP prevailing in a lawsuit over the White House's actions "doesn't matter" because the effort to coerce the AP into using the government's preferred words "is something we feel strongly about," *id.* ¶ 72;

- An unnamed White House source told journalists that the White House decided to expand its ban to include AP photographers as well as AP text journalists to "depriv[e] the organization of the revenue it earns from selling pictures on its news wire," *id.* ¶ 65; and

- An unnamed White House advisor told journalists, "The AP and the White House Correspondents Association wanted to f--k around. Now it's finding out time," *id.* ¶ 82.

These explicit efforts to punish the AP's speech are all textbook examples of retaliation based on protected First Amendment activity. *See Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 47 (D.D.C. 2021) (finding, as to First Amendment retaliation claim arising from forcible displacement of protesters, that "plaintiffs have plausibly alleged that the defendants did not have a non-retaliatory motive for their actions"), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023); *see also Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987) (finding, as to governmental access restriction on reporter's camera use that "applies to no other member of the press," that "the first amendment prohibits government from

32

restricting a journalist's access to areas otherwise open to the press based upon the content of the journalist's publications").

**Fourth**, even an "ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a First Amendment right." *Banks v. York*, 515 F. Supp. 2d 89, 112 (D.D.C. 2007) (cleaned up). Therefore, "acts that are insufficient, standing alone, to constitute a constitutional violation may nevertheless give rise to a First Amendment retaliation claim" when done for impermissible reasons. *Harrison v. Fed. Bureau of Prisons*, 298 F. Supp. 3d 174, 183 (D.D.C. 2018) (citation omitted). For example, addressing non-renewal of a university employee's contract allegedly "made in retaliation for his exercise of the constitutional right of free speech," the Supreme Court noted that, even when "a person has no right to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. . . . This would allow the government to produce a result which it could not command directly." *Perry v. Sindermann*, 408 U.S. 593, 597-98 (1972) (cleaned up).

Likewise, prison officials may not deny entry to a reporter in retaliation for her journalism because, even though the prison "may not have had a legal obligation to admit" her, "it may not refuse to do so because she exercised her First Amendment rights." *The Chi. Reader v. Sheahan*, 141 F. Supp. 2d 1142, 1146 (N.D. Ill. 2001); *cf. Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (although the government has "discretion to decide where to house prisoners," such that "prisoners generally have no constitutionally-protected liberty interest in being held at, or remaining at, a given facility," the government "may not transfer an

33

inmate 'to a new prison in retaliation for exercising his or her First Amendment rights'"). Government officials similarly may not retaliate against newspapers by withdrawing advertising or removing the paper's designation as an outlet for the publication of local laws and notices, even if they were not required to buy ads or designate the paper in the first place. *See El Dia, Inc. v. Governor Rossello*, 165 F.3d 106, 110 (1st Cir. 1999).

The AP has a Fifth Amendment liberty interest in access to spaces open to the press pool and the entire press corps, rooted in the First Amendment's newsgathering protections. *See supra* Part I.A.i. Case law also is clear that denying the AP's journalists access to those spaces, carried out in retaliation for the AP's protected speech and petition activity, and based on the President's animus toward the AP's reporting, violates the First Amendment as well.

Defendants' unconstitutional denial of access, expressly based on dislike of the content and perceived viewpoint of the AP's speech, further warrants preliminary injunctive relief.

### iii.    Defendants' Denial of Access Is an Impermissible Viewpoint-Based Speech Restriction

Defendants' denial of the AP's access to areas open to other press pool members, and to areas open to the entire White House press corps, is also unconstitutional because that denial amounts to viewpoint-based speech discrimination that the First Amendment flatly forbids. *See, e.g.*, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, at *24 (D. Md. Feb. 21, 2025) (entering preliminary injunction to prevent "textbook viewpoint-based discrimination"), *appeal filed*, No. 25-1189 (4th Cir. Feb. 27, 2025).

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). "When considering [t]he amount of access to which the government must give the public for First Amendment activities, courts generally

34

apply forum analysis." *Ateba*, 706 F. Supp. 3d at 79. In a forum analysis, "a court classifies the government property by type of forum (i.e., public, designated public, limited public, or nonpublic) and applies the appropriate standard to evaluate the constitutionality of limitations on the First Amendment activity." *Id*.

As the D.C. Circuit has explained, courts recognize four types of forums. First, "[a] traditional public forum is property that has 'time out of mind' been used to assemble and to communicate with others," such as "public streets and city parks." *Price v. Garland*, 45 F.4th 1059, 1067 (D.C. Cir. 2022). Second, "[a] designated public forum is government property that has not traditionally been regarded as a public forum but the Government has intentionally opened up for that purpose." *Id.* at 1067-68 (cleaned up). Third, a "limited public forum" exists when "the Government has create[d] a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Id.* at 1067-68. Fourth, "nonpublic forums" are "all remaining public property." *United States v. Rhine*, 652 F. Supp. 38, 63 (D.D.C. 2023).[6] Although the government has greater authority to regulate access to limited and nonpublic fora, "restrictions on first amendment activity . . . must not discriminate against speech on the basis of *viewpoint*, and the restriction must be *reasonable* in light of the purpose served by the forum."

---

[6] The definition of nonpublic forum is broad: "all remaining public property" that does not qualify as a public forum of some other type. *Rhine*, 652 F. Supp. 3d at 63. Most of the spaces the AP has been barred from are unquestionably public property: the Oval Office is not President Trump's private office, and Air Force One is not his private plane. The AP has also been barred from private property that the President used to host events and press conferences, such as the National Building Museum. Am. Compl. ¶ 72. "However, the fact that government control over property is temporary, or that the government does not 'own' the property in the sense that it holds title to the property, is not determinative of whether the property is," in fact, "sufficiently controlled by the government to make it a forum for First Amendment purposes. Temporary control by the government can still be control for First Amendment purposes." *Knight First Amend. Inst. v. Trump*, 928 F.3d 226, 235 (2d Cir. 2019), *vacated on other grounds sub nom. Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220 (2021) (holding President Trump's personal Twitter account was subject to forum analysis).

*Price*, 45 F.4th at 1072 (emphasis added) (cleaned up); *see also Ateba*, 706 F. Supp. 3d at 78 (noting both limited and nonpublic fora are governed by the same standard).

Here, the spaces that the White House has opened to the press pool, such as the Oval Office, and the spaces that the White House has opened to the larger credentialed press corps, such as the East Room, function as limited or nonpublic fora in which access restrictions must be both *viewpoint-neutral* and *reasonable*. Indeed, as another court in this District has observed, although *Sherrill* "preceded modern-day forum analysis, the *Sherrill* court's characterization of the Press Area is akin to that of a First Amendment forum" which "public officials have opened to certain members of the public for certain types of communication (here, newsgathering)." *Ateba*, 706 F. Supp. 3d at 78 (holding White House briefing room and spaces open to pass-holders were "nonpublic or limited public" fora). Likewise, "[r]ecent cases in other circuits have accepted the premise that the denial of a reporter's access to a press briefing is a cognizable First Amendment violation, reviewable in the traditional framework of a First Amendment forum and subject to an order requiring not only due process, but access." *Id.* at 76 (citing *TGP Commc'ns, LLC v. Sellers*, 2022 WL 17484331, at *4-5 (9th Cir. Dec. 5, 2022) ("[E]ven in limited public forums where the government opens a traditionally private place for speech on limited topics, such as opening the County facilities for press conferences as the County did here, the First Amendment's protections against content-based and viewpoint-based restrictions are robust."); *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610 (7th Cir. 2021) (governor's "limited-access press conference—an event that is not open to the public and not held on government property dedicated to open communication" was "a non-public forum")).

Courts in this circuit and elsewhere have drawn on forum doctrine in holding that when press pools are formed or limited spaces are opened to the press, access restrictions must be

reasonable and viewpoint-neutral.  For example, in a case challenging the Defense Department's criteria for allocating the 20 press seats on military flights to Guantanamo Bay, the court stated that *"a military base like Guantanamo Bay is not a public forum"* but access restrictions must still be *"reasonable"* and pass *"careful judicial scrutiny."  Getty Images*, 193 F. Supp. 2d at 119 (emphasis added).  Likewise, by "[e]stablishing pools for coverage of the 'initial stages' of the Persian Gulf conflict, the government, in essence, determined that the war theatre was a limited public forum" to which access must be regulated "in a non-discriminatory manner."  *Nation Mag. v. Dep't of Def.*, 762 F. Supp. 1558, 1573 (S.D.N.Y. 1991).  Similarly, although the case preceded modern forum analysis, the D.C. Circuit required the State Department to use reasonable, viewpoint-neutral criteria in selecting correspondents permitted to travel to China, holding that if the choice "was limited only to Democrats or only to Republicans, obviously that would be improper and would fall."  *Frank*, 269 F.2d at 247 (Burger, J., concurring).

The AP has suffered viewpoint-based exclusion from spaces open to the press pool and press corps, which are nonpublic or limited public fora.  Because the AP's "journalist[s] seek[] access to a forum—opened by the White House—on the same terms as other journalists," the White House cannot control that access "in entirely viewpoint-discriminatory ways."  *Ateba*, 706 F. Supp. 3d at 78.  Once the government opens areas to the press pool – or to the pool plus other reporters – or to all credentialed White House journalists, the government cannot deny access in order to suppress speech the government dislikes.  Instead, the government's "regulations must be reasonable and viewpoint neutral."  *Id.*  Failing that, "the denial of a reporter's access" is "a cognizable First Amendment violation, reviewable in the traditional framework of a First Amendment forum and subject to an order requiring not only due process, but access."  *Id.* at 76.

Defendants' exclusion of the AP here was neither viewpoint-neutral nor reasonable. As outlined above, the Trump administration has, at every turn, made clear that the AP's exclusion from events like these is expressly based on its perceived viewpoint—*i.e.*, the AP's refusal to use only the government's preferred name for the Gulf of Mexico. "Viewpoint discrimination occurs when the government targets a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id.* at 86 (cleaned up). While the AP is known around the world for its nonpartisan, fact-based reporting, Defendants nonetheless have made clear that they are targeting *what they claim to be* a news organization that was "very, very wrong on the election, on Trump and the treatment of Trump," and that "push[es] a divisive and partisan agenda" at odds with the President's. Am. Compl. ¶¶ 68-69. That constitutes impermissible viewpoint-based discrimination.

Defendants' access ban on the AP is also unreasonable. Reasonableness is measured in light of "the purpose of the forum and all the surrounding circumstances." *Price*, 45 F.4th at 1068. "'[R]easonableness' requires something more than the toothless 'rational basis' test used to review the typical exercise of a state's police power." *Id.* at 1072. Instead, "equal access claims by the press warrant careful judicial scrutiny." *Getty Images*, 193 F. Supp. 2d at 119. The purpose of allowing members of the press pool and press corps access to spaces in the White House and elsewhere is to inform the public of the operations of government. Press coverage serves the "public awareness and understanding of the President's behavior [which] facilitates his effectiveness as President" and "is also necessary for a determination by the public of the adequacy of the President's performance." *ABC*, 518 F. Supp. at 1244. Barring the AP from events open to the pool and press corps is wholly unreasonable in light of "the purpose of the forum," and furthers no goal other than punishing the AP for its speech. Such an explicitly

viewpoint-based, unreasonable access denial is unconstitutional, and this Court should enjoin the Defendants to remedy these actions.

> iv.       **Defendants Unconstitutionally Seek to Compel the AP's Speech**

Defendants' actions are unconstitutional for the additional reason that they seek to compel the AP's speech in violation of the First Amendment.  It is well established "that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 797 (1988) (the First Amendment's protections apply to "decision[s] of both what to say and what *not* to say").  This principle applies to *all* speakers, and to *any* governmental attempts to compel speech in service of a particular viewpoint or agenda, but especially to government efforts to compel the speech of a news organization, whose editorial independence is at stake.

The proposition that the government may not conscript news organizations into the service of its agenda is clearly articulated in *Tornillo*.  There, the Supreme Court held unconstitutional under the First Amendment a Florida law providing that political candidates subject to criticism in a newspaper had "the right to demand that the newspaper print, free of cost to the candidate, any reply the candidate may make to the newspaper's charges."  418 U.S. at 244.  While the Court acknowledged the goal of ensuring that "a wide variety of views reach the public," it nonetheless held that the law's means of pursuing that goal unconstitutionally intruded on editorial independence.  *Id.* at 248, 254, 258.  As the Court explained:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials – whether fair or unfair – constitutes the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

*Id.* at 258.  The government's attempt to force the AP to use certain words when referring to an international body of water presents precisely the same First Amendment problem.  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (the "general rule . . . that the speaker has the right to tailor the speech . . . applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid").

## II.    THE AP SATISFIES EACH OF THE OTHER FACTORS WARRANTING A PRELIMINARY INJUNCTION

### A.    The AP Will Suffer Irreparable Harm Absent a Preliminary Injunction

The AP has experienced and will continue to experience concrete harm as a result of Defendants' attempts to coerce the AP to adopt the government's preferred speech through denials of access.  The AP's exclusion from pool events (e.g., in the Oval Office) and from events open to any journalist with a White House press pass (e.g., in the East Room) hinders its ability to produce wide-ranging and timely White House reporting, which in turn impacts the billions of people worldwide who read AP content.

**First**, Defendants' access denials harm the AP's ability to provide the comprehensive and informative reporting on which its members, customers (including thousands of news outlets), and readers rely.  *See Karem*, 960 F.3d at 666 (for White House reporters, "sustained access is essential currency").  The AP's text reporters must now rely on limited video feeds and notes, and computer-generated transcripts, from the events Defendants barred them from attending, instead of their own first-hand observations.  *See* 2nd Miller Decl. ¶¶ 11, 30.  The AP's photographers cannot take their own photos in real-time and transmit them to AP photo editors for near-instantaneous publication to readers around the world, cannot capture the nuances and details that are otherwise unavailable from transcripts, and cannot make their own editorial judgments on which parts of the events are newsworthy.  *See* Elswick Decl. ¶¶ 5-7, 15-16.

40

Courts have made clear that there is simply no substitute for live, in-person access. This is a key reason why courtrooms must generally be open to members of the press and public. "[T]he availability of a trial transcript is no substitute for a public presence at the trial itself" because "the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 597 n.22 (1980) (Brennan, J., concurring). "[O]ne cannot transcribe an anguished look or a nervous tic. The ability to see and to hear a proceeding as [it] unfolds is a vital component of the First Amendment right of access." *ABC v. Stewart*, 360 F.3d 90, 99-100 (2d Cir. 2004); *United States v. Schulte*, 436 F. Supp. 3d 698, 705 (S.D.N.Y. 2020) (allowing reporters "to be present for each [witness's] testimony to assure access to visual observations (e.g., of witness demeanor) that only a person in the courtroom can make"). Because of the inadequacy of transcripts, "[a] person singled out for exclusion from the courtroom, who is thereby barred from first-hand knowledge of what is happening there, moreover, is placed at an extraordinary disadvantage in his or her attempt to compete in the 'marketplace of ideas' about the conduct of judges and the judicial system." *Huminski v. Corsones*, 396 F.3d 53, 84 (2d Cir. 2005).[7]

For the same reasons, the AP's forced reliance on after-the-fact transcripts and others' notes and photos is no substitute for the live, in-person access it had before Defendants' ban. *"Reporters frequently do resort to alternate sources when first-hand observations are not possible, but that in no way negates that actually being there is optimal." Sheahan*, 141 F. Supp. 2d at 1146 (emphasis added). Further, both in-person text reporting and in-person photography

---

[7] The Confrontation Clause shares similar aims, ensuring that "the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness," but of "compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

by the AP's own journalists is essential, because "[e]ach picture tells a story and carries a reminder of the truth contained in the old adage that weighs one picture against a thousand words." *Reuters Ltd. v. UPI, Inc*., 903 F.2d 904, 908 (2d Cir. 1990); *see also ABC*, 518 F. Supp. at 1245 ("visual impressions can and sometimes do add a material dimension to one's impression of particular news events" and "the importance of conveying the fullest information possible increases as the importance of the particular news event or news setting increases").  The AP cannot observe and report on the President's demeanor, appearance, tone, or expressions, or on the presentation of others in the room with him.  2nd Miller Decl. ¶ 30; Condon Decl. ¶¶ 8, 13.

Nor can the AP take its own straightforward photographs to accompany its own nonpartisan reporting.  *See* Elswick Decl. ¶ 12.  Instead, AP can only republish a small number of photos taken by a few other photographers in the press pool, which greatly delays delivery of images to AP customers and clients and provides a smaller set of photos for them to consider publishing.  *Id.* ¶ 15.  As a result, AP customers – including U.S. newspapers that typically use AP photographs – are instead selecting photos from other sources even for their front pages.  *Id.* ¶ 16.  The AP is thus harmed every day that it is denied first-hand access to White House pool events and to larger events open to all members of the White House press corps.

**Second**, Defendants' access denials harm the AP's ability to produce reporting quickly— an essential attribute of a wire service.  *See* 2nd Miller Decl. ¶¶ 10, 14, 30.  "As a practical matter . . . the element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly."  *Gannett Co. v. DePasquale*, 443 U.S. 368, 442 n.17 (1979) (Blackmun, J., concurring in part).  Because the AP must now base its reporting on transcripts and limited notes and video feeds, it can no longer publish the news as it breaks.  *See* 2nd Miller Decl. ¶ 30.  These delays have harmed, and continue to harm, the AP and, as a

result, the thousands of news outlets and billions of readers that rely on the AP's journalism. Many of those customers do not have the resources to cover even large White House events on a daily basis. Instead, they count on the AP to cover the President for them and deliver news as quickly as possible from the White House.

**Third**, the AP has suffered concrete financial harm by being forced to incur the substantial costs of flying foreign-based AP journalists to the U.S. to cover foreign leaders' visits to the White House for the AP's global audience, as those foreign-based AP journalists are arbitrarily permitted to cover presidential events even though the AP's White House journalists remain banned from those exact same spaces. *See* 2nd Pace Decl. ¶¶ 5-7.

Even without this record, irreparable injury is *presumed* where, as here, the plaintiff has shown a substantial likelihood of success on the merits of its constitutional claims. Indeed, it is axiomatic that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *see also Pursuing Am.'s Greatness*, 831 F.3d at 511 (same). "[A] violation of Fifth Amendment due process rights" also constitutes irreparable injury that "support[s] injunctive relief." *Karem*, 960 F.3d at 668. The extensive record of the AP's harms, however, makes the need for relief even clearer.

### B.    The Balance of Equities and the Public Interest Strongly Favor a Preliminary Injunction

The balance of equities and the public interest weigh decisively in the AP's favor, particularly given the grave constitutional problems on the merits.[8] These factors "'merge

---

[8] The AP also asks that no bond be required or that only a nominal amount be set. Rule 65(c) "vests broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (cleaned up). Waiving the bond requirement, or requiring the posting of only a nominal amount in security, is appropriate here because, *inter alia*, injunctive relief will cause no monetary damages to Defendants and because the AP seeks to vindicate its

when,' as here, 'the Government is the opposing party.'" *Id.* (quoting *Nken*, 556 U.S. at 435). The government has no legitimate interest in abrogating due process and denying the AP access, based on the content of the AP's speech, to spaces open to other members of the press pool and spaces open to members of the larger White House press corps. To the contrary, the government's interest in coercing the AP into using government-preferred words is *illegitimate*. Nor will rescinding the ban on the AP's access harm or even inconvenience Defendants, as "[t]he proposed injunctive relief would not require the White House to create a particular type of pool system, it would merely prohibit the . . . total exclusion" of the AP from the places the White House makes open to the press pool and to other credentialed journalists. *ABC*, 518 F. Supp. at 1246. At bottom, "the Constitution, . . . does not permit [Defendants] to prioritize any policy goal over the Due Process Clause" or First Amendment, "and enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668 (cleaned up).[9]

Conversely, ending the AP's access denial will benefit the government and public. As to the government, press and "pool coverage of presidential activities is important to the President. A public awareness and understanding of the President's behavior facilitates his effectiveness as President." *ABC*, 518 F. Supp. at 1244. As to the public, the AP's "participation in White House pool coverage benefits the public by informing it of the activities of its government," as does the AP's presence at larger press events. *Id.* at 1246. As the D.C. Circuit has made clear, "[n]ot

---

constitutional rights. *See, e.g.*, *id.*; *Citizen's Alert Regarding Env't v. Dep't of Justice*, 1995 WL 748246, at *12 n.10 (D.D.C. Dec. 8, 1995) ("[N]ominal bond is sufficient and appropriate where public interest groups seek enforcement of environmental laws.").

[9] The White House at the February 24 hearing repeatedly raised the straw man argument that the President has the right to speak with, or not speak with, whomever he chooses. As the Court noted, however, the AP is not asking for an order to compel the President to speak with it. Rather, as the Court observed, journalists in the press pool are part of "a small group that gets to *witness* history." Feb. 24, 2025 Hr'g Tr. at 38:1-2 (emphasis added).

only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Sherrill*, 569 F.2d at 129-30; *see also Cox*, 420 U.S. at 491 ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations[.]"). When only "those of the media who are in opposition or who the [official] thinks are not treating him fairly [are] excluded" from access, "it is the public which w[ill] lose." *Cuomo*, 570 F.2d at 1083; *see also Huminski*, 396 F.3d at 84 ("Exclusion of an individual reporter . . . 'allows the government to influence the type of substantive media coverage that public events will receive,' which effectively harms the public." (quoting *Anderson v. Cryovac*, 805 F.2d 1, 9 (1st Cir. 1986))).

Ordering Defendants to rescind their ban on the AP's access to spaces open to members of the press pool and to members of the larger press corps will serve the public's powerful interest in staying informed about what the President is doing day in and day out. This Court should therefore protect the AP's constitutional rights, and promote the public interest, by entering such an order as promptly as possible.

## CONCLUSION

Coercively depriving journalists of their interests in liberty, free expression, and the ability to seek redress in court completely contradicts our shared American values. For the reasons set forth above, the AP respectfully requests that this Court issue a preliminary injunction requiring Defendants to immediately rescind their ban on AP's access to areas open to the White House press pool and to areas open to other credentialed journalists.

45

Dated:  March 3, 2025                    Respectfully submitted,

                                         BALLARD SPAHR LLP

                                         */s/ Jay Ward Brown*
                                         Jay Ward Brown (#437686)
                                         Charles D. Tobin (#455593)
                                         Maxwell S. Mishkin (#1031356)
                                         Sasha Dudding (#1735532)
                                         1909 K Street NW, 12th Floor
                                         Washington, DC 20006
                                         Tel: (202) 661-2200
                                         Fax: (202) 661-2299
                                         brownjay@ballardspahr.com
                                         tobinc@ballardspahr.com
                                         mishkinm@ballardspahr.com
                                         duddings@ballardspahr.com

                                         *Counsel for Plaintiff The Associated Press*