## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

        Plaintiff,

   v.

TAYLOR BUDOWICH, et al.

        Defendants.

Civil Action No. 25-cv-532-TNM

## AMICUS CURIAE BRIEF OF THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY IN SUPPORT OF PLAINTIFF THE ASSOCIATED PRESS'S AMENDED MOTION FOR A PRELIMINARY INJUNCTION

Jameel Jaffer
Eric Columbus
Katherine Fallow
Alex Abdo
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Amicus Curiae Knight First*
  *Amendment Institute at Columbia University*

## Corporate Disclosure Statement

Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(A), amicus curiae the Knight First Amendment Institute at Columbia University has no parent corporations and no publicly held corporation owns 10 percent or more of its stock. The Knight Institute is a non-profit, non-partisan organization governed by a nine-member board of directors, five of whom are associated with Columbia University.

Dated: March 5, 2025

/s/ *Jameel Jaffer*
Jameel Jaffer
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Amicus Curiae Knight First*
  *Amendment Institute at Columbia*
  *University*

# Table of Contents

Table of Authorities .................................................................................................... iii

Interest of Amicus Curiae ........................................................................................... 1

Introduction ................................................................................................................ 2

Background ................................................................................................................. 3

Argument.................................................................................................................... 5

    I.      The White House's ban on the AP participating in the press pool is an
              unconstitutional viewpoint-based restriction on speech in a public forum. ................. 5

          A.      Public forum doctrine. ....................................................................... 6

          B.      The White House press pool is a limited public forum and exclusion of
                  the AP is impermissible viewpoint discrimination. ......................................... 7

          C.      The press pool is not government speech....................................................... 11

    II.     An injunction would be in the public interest. ............................................................ 15

Conclusion................................................................................................................. 17

# Table of Authorities

**Cases**

*Archdiocese of Wash. v. Wash. Metro. Area Trans. Auth.*, 897 F.3d 314 (D.C. Cir. 2018) ...................................................................................................................... 7

*Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63 (D.D.C. 2023) ...................................... 9, 10

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) .............. 6, 7

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) ....................................................... 15

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978 ........................................................... 2, 15

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672 (1992) ...................... 7

*John K. MacIver Inst. for Pub. Policy v. Evers*, 994 F.3d 602 (7th Cir. 2021) ............ 10

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) ................................................ 15

*Martin v. City of Struthers*, 319 U.S. 141 (1943) ................................................ 15, 16

*Matal v. Tam*, 582 U.S. 218 (2017) ............................................................... 7, 12, 14

*McCullen v. Coakley*, 573 U.S. 464 (2014) .............................................................. 6, 7

*Mills v. Alabama*, 384 U.S. 214, 219 (1966) ............................................................. 17

*Norse v. City of Santa Cruz*, 629 F.3d 966 (9th Cir. 2010) ........................................ 14

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ...................... 7

*Richmond Newspapers, Inc., v. Virginia*, 448 U.S. 555 (1980) ............................. 11, 15

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ............ 7, 11

*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) ............................................ 8, 9, 15

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ................................................ 12, 14

*Stanley v. Georgia*, 394 U.S. 557 (1969) .................................................................. 15

*TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331 (9th Cir. Dec. 5, 2022) ................................................................................................................ 10

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015) ..... 6, 7, 12

*White Coat Waste Project v. Greater Richmond Trans. Co.*, 35 F.4th 179 (4th Cir. 2022)..................................................................................................................7

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................6, 15

*Zukerman v. U.S. Postal Serv.*, 961 F.3d 431 (D.C. Cir. 2020) ................................6, 7

**Other Authorities**

*Covering the White House*, White House Correspondents' Association, https://perma.cc/Q868-VAKZ..............................................................................3, 4

Jacqui Heinrich (@JacquiHeinrich), X (Feb. 25, 2025), https://perma.cc/6DEN-AJN5........................................................................................................................5

Karoline Leavitt (@PressSec), X (Feb. 25, 2025), https://perma.cc/Y5Q5-7GZW ......................5

Marc Caputo, *Scoop: Why Trump targets AP*, Axios (Feb. 17, 2025), https://perma.cc/5PSL-SSWM ..............................................................................5, 11

Peter Baker, *In Trump's Washington, a Moscow-Like Chill Takes Hold*, N.Y. Times (Feb. 26, 2025), https://perma.cc/9XBS-44ZG ..........................................16

**Interest of Amicus Curiae[1]**

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief. Plaintiff consents to this motion; Defendants do not object to this motion.

## Introduction

The White House press pool serves a unique function in our system of democratic governance. For over a century, it has played a singular role in ensuring that Americans have access to accurate and timely information about the President. This institution has long benefited Presidents and press alike—which explains why, apparently, no President had ever before attempted to evict any news organization from it. Having created the press pool to enable access to the President in limited-space contexts ranging from the Oval Office to foreign travel, the White House has developed a forum—whether a "limited public forum" or a "nonpublic forum," as the cases use those terms—from which it may not constitutionally exclude a news organization due to its viewpoints. Yet that is precisely what the White House is doing, by its own admission. The Knight Institute agrees with the arguments advanced in the AP's brief, and submits this brief to focus specifically on these forum issues.

The right to access public institutions without being required to kowtow to authority is a hallmark of democracy. From courtrooms to city council meetings, Americans can watch their government in action without needing to pledge loyalty to its leaders. And where Americans cannot attend in person, the press serves as their proxy—and on the same terms. The press serves as the public's "eyes and ears," *Houchins v. KQED, Inc.*, 438 U.S. 1, 8 (1978) (cleaned up)—and the press pool, through the questions it asks of the President, also serves as the public's voice. To allow the President to expel a member on the basis of its views would cast a chill upon those who remain. The other outlets would know that their continuing participation in the pool could well depend upon their willingness to toe the White House line. And citizens who rely on the press to inform them about their government would suffer as a result.

The First Amendment bars the White House from excluding news organizations from the press pool based on their editorial judgments. The Knight Institute respectfully submits that the Court should require the White House to reinstate the AP and forbid the White House from excluding the AP, or any other news organization, from the press pool on the basis of viewpoint.

## Background

The White House press pool is a small group of writers, photographers and technicians, drawn from a larger group of credentialed White House correspondents, assigned to cover the President's movements and activities on behalf of the broader press corps. *See Covering the White House*, White House Correspondents' Association, https://perma.cc/Q868-VAKZ. The pool enables seamless reporting from spaces that are too small to accommodate larger groups of reporters, such as the Oval Office and Air Force One. *See* Am. Compl. ¶ 31. The size of the pool depends on the President's location but typically includes a minimum of three wire reporters, four photographers, three network television journalists, a radio correspondent, and a print reporter. *See id.* ¶ 32. Poolers are expected to share information with the broader press corps through timely, factual, and objective reports. *See Covering the White House*.

The presidential pool dates back to 1881, when an AP reporter was posted outside President James Garfield's sick room to provide updates on his condition from his shooting in July to his death in September. *See* Am. Compl. ¶ 37. Poolers have traveled with the President since Franklin Delano Roosevelt's presidency; the pool was present when he died in Warm Springs, Georgia. *See Covering the White House.* Poolers were present at the assassination of President John F. Kennedy and the shooting of President Ronald Reagan; they accompanied President George W. Bush when he learned about the September 11, 2001, attacks and as he traveled to various secure locations later that day. *See* Am. Compl. ¶ 37.

Historically, pool membership has been determined by the White House Correspondents Association ("WHCA") and the press corps. *See id.* ¶ 32; *see also* WHCA TRO Amicus Br. at 1, ECF No. 12 ("Since the Eisenhower administration, the WHCA has coordinated logistics related to the White House press pool and briefing room."). The WHCA also distributes pool reports to thousands of news organizations and to the White House Press Office. *See Covering the White House.*

These pool reports and the stories published by pool reporters have been, in turn, the primary source of information for the American public about presidential activities in situations where broader access is not possible—as is the case when the president speaks to the press in the Oval Office or when he is traveling abroad. This reporting includes not only statements made by the President and those with him but also their responses to questions. The substance of the questions, of course, depends on which journalists are asking them.

On February 11, 2025, Defendant Katherine Leavitt, the White House Press Secretary, informed the AP's Chief White House Correspondent that, at the President's direction, the AP would no longer be permitted into the Oval Office unless it revised its style guidance to use the name "Gulf of America" to refer to the body of water traditionally known as the "Gulf of Mexico," consistent with the President's recent executive order. Am. Compl. ¶¶ 49–51.

On February 14, Defendant Taylor Budowich, a White House Deputy Chief of Staff, announced that, because the AP had not made this revision, it would be banned from "access to limited spaces, like the Oval Office and Air Force One"—i.e., removed from the press pool. *Id.* ¶ 63. AP reporters and photographers have also been barred from certain events open to the broader White House press corps. *See id.* ¶¶ 60, 67, 71. Budowich subsequently told a reporter that "[t]his isn't just about the Gulf of America. This is about AP weaponizing language through their

stylebook to push a partisan worldview in contrast with the traditional and deeply held beliefs of many Americans and many people around the world." Marc Caputo, *Scoop: Why Trump targets AP*, Axios (Feb. 17, 2025), https://perma.cc/5PSL-SSWM. Similarly, Defendant White House Chief of Staff Susie Wiles asserted that "the influence" the AP's "Stylebook has acquired has been misused, and at times weaponized, to push a divisive and partisan agenda." Am. Compl. ¶ 68.

On February 25, four days after the AP filed its complaint in this case and one day after this Court's hearing on the AP's motion for a temporary restraining order, the White House announced that it—rather than the WHCA—would henceforth determine which outlets could participate in the press pool. *See id.* ¶ 81. Bloomberg and Reuters, which had long been assigned two of three slots for wire services, would alternate in a single pool slot for wire services, while the AP would remain barred over its refusal to use the term "Gulf of America." *See id.* ¶ 84.

Defendants assert that "this change is designed to open access to a wide range of media outlets that have not historically been members of the pool while continuing to provide access to legacy members of the pool." Notice, ECF No. 22 (Feb. 28, 2025). Leavitt stated that, via this change, "we are giving the power back to the people." Karoline Leavitt (@PressSec), X (Feb. 25, 2025), https://perma.cc/Y5Q5-7GZW. In response, Fox News Senior White House Correspondent Jacqui Heinrich, a WHCA board member, stated that "[t]his move does not give the power back to the people—it gives power to the White House." Jacqui Heinrich (@JacquiHeinrich), X (Feb. 25, 2025), https://perma.cc/6DEN-AJN5.

## Argument

### I. The White House's ban on the AP participating in the press pool is an unconstitutional viewpoint-based restriction on speech in a public forum.

The press pool plays—and has played since the 19th century—an indispensable role in ensuring that Americans have access to full and accurate information about their government and

its chief executive. The parties have not cited any evidence that any prior President has ever attempted to evict a news organization from the press pool for any reason—much less on the basis of viewpoint. The government has created, maintained, and formalized this forum. The First Amendment does not allow the government to discriminate on the basis of viewpoint in restricting access to it.[2]

### A.  Public forum doctrine.

A public forum is established when the government makes space that it owns or operates available for expressive activity by members of the public. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985).

Public forum analysis generally "divides government property into three categories." *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 447 (D.C. Cir. 2020) (quoting *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1070 (D.C. Cir. 2012)). First, traditional public forums, which include sidewalks and parks, are forums that have been used "immemorially . . . for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). Second, the government can create a public forum by "designation of a place or channel of communication for use by the public at large for assembly and speech." *Cornelius*, 473 U.S. at 802. Limited public forums, a subset of designated public forums, are spaces the government has opened for expressive activity "for certain groups or for the discussion of certain topics." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829

---

[2] This brief focuses on the AP's exclusion from the press pool. The arguments set forth herein apply *a fortiori* to the AP's exclusion from events open to the broader White House press corps.

(1995)). Finally, nonpublic forums exist "[w]here the government is acting as a proprietor, managing its internal operations." *Id.* at 216 (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–79 (1992)).[3]

The level of scrutiny applicable to speech restrictions in these forums depends on the type of forum the government has created. *Zukerman*, 961 F.3d at 447 (citing *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 364 (D.C. Cir. 2018)). For both traditional public forums and designated public forums, speech regulations that discriminate based on content are subject to strict scrutiny. *McCullen*, 573 U.S. at 478; *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). In limited public forums and nonpublic forums, content-based speech restrictions must be viewpoint-neutral and "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806. Speech restrictions that discriminate based on viewpoint are unconstitutional in any type of forum, including nonpublic ones. *Matal v. Tam*, 582 U.S. 218, 243 (2017); *Rosenberger*, 515 U.S. at 829.

### B. The White House press pool is a limited public forum and exclusion of the AP is impermissible viewpoint discrimination.

As the long history of the press pool demonstrates, the White House has created a limited public forum by intentionally opening up spaces in the Oval Office and aboard Air Force One for expressive activities by "certain groups"—here, members of the press. *Walker*, 576 U.S. at 215. The White House created this forum over a century ago for the benefit of the presidency and the

---

[3] Considerable confusion exists about the terminology used to refer to various public forums. *See White Coat Waste Project v. Greater Richmond Trans. Co.*, 35 F.4th 179, 196 n.13 (4th Cir. 2022). Courts have sometimes referred to limited public forums as a subset of designated forums, *see Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 678, as a distinct fourth category of public forum, *see Walker,* 576 U.S. at 215, or as a synonym or subset of "nonpublic" forums, *see Archdiocese of Wash. v. Wash. Metro. Area Trans. Auth.*, 897 F.3d 314, 322, 331 (D.C. Cir. 2018). This brief uses the phrase "limited public forum" to refer to a forum opened by the government to expressive activity but only by certain speakers or on certain topics.

press alike. The pool at once enables the President to convey his message to the American people and enables the press to obtain information about, and question the President about, the President's words and actions. From the administration of President Dwight Eisenhower until last week, the WHCA has controlled the selection of pool members, *see* AP Br. at 6, ECF No. 27-1, as well as the distribution of pool reports to thousands of press organizations that are not part of the pool. As of last week, the White House itself controls selection of the pool members. The function and general composition of the pool, however, has remained unchanged. Approximately a dozen reporters are selected to cover events in the Oval Office and on official travel, and to report back on those events to other members of the press corps and to the public. They are chosen from the larger pool of the press corps to represent different types of media (wire, print, television) and a rotating roster of news outlets. The reporters and news outlets chosen have always been expected to make their own editorial decisions about which speech and what conduct of the President to cover, and how precisely to cover it.

The White House's establishment of the press pool has created a limited public forum, to the benefit of the public as a whole. The pool helps provide a prerequisite for a flourishing democracy: access to an unvarnished view of the words and actions of the nation's chief executive, intermediated by journalists who can report without fear or favor and attempt to hold the President to account through questioning. The relationship has endured even during the eras of rockiest relations between the White House and the press—during the Watergate investigations, and Independent Counsel Kenneth Starr's investigation of President Bill Clinton. Nor did the White House attempt to interfere with the pool during President Trump's first term.

The conclusion that the press pool is a limited public forum is consistent with the D.C. Circuit's decision in *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977). Although the contours of

the public forum doctrine had yet to be established when *Sherrill* was decided, the case represents

an application of that doctrine by another name. In *Sherrill*, the court of appeals held that a reporter

denied access to a White House press pass must be provided "notice, opportunity to rebut, and a

written decision . . . because the denial of a pass potentially infringes upon first amendment

guarantees." 569 F.2d at 128.

> [W]e are presented with a situation where the White House has voluntarily decided
> to establish press facilities for correspondents who need to report therefrom. These
> press facilities are perceived as being open to all bona fide Washington-based
> journalists, whereas most of the White House itself, and press facilities in particular,
> have not been made available to the general public. White House press facilities
> having been made publicly available as a source of information for newsmen, the
> protection afforded newsgathering under the first amendment guarantee of freedom
> of the press requires that this access not be denied arbitrarily or for less than
> compelling reasons.

*Id.* at 129 (cleaned up) .

The conclusion that the press pool is a limited public forum is also consistent with Judge

Bates' recent decision in *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 78 (D.D.C. 2023), *appeal*

*pending*, No. 24-5004 (D.C. Cir. argued Oct. 15, 2024). In that case, a reporter who had lost his

expedited "hard pass" access to the White House press area sued the White House on, *inter alia*,

First Amendment grounds. As Judge Bates noted in *Ateba*, although the case "preceded modern-

day forum analysis, the *Sherrill* court's characterization of the Press Area is akin to that of a First

Amendment forum—government property that public officials have opened to certain members of

the public for certain types of communication (here, newsgathering)." *Id.* Judge Bates ultimately

declined to resolve the parties' dispute as to whether the White House press facilities constituted

a limited public forum or a nonpublic forum "since regardless of the type of forum at issue—

nonpublic or limited public—the standard of review is the same: whether a challenged limitation

is reasonable and viewpoint neutral." *Id.* at 80. The court ruled in favor of the government and held that the plaintiff had not stated a viewpoint discrimination claim. *See id.* at 78–91.[4]

This case is not materially different from those cases. Here, the White House has excluded the plaintiff from participation in the press pool, rather than in the provision of press passes, but this is a distinction without a difference. The press pool, like the press facilities and areas at issue in *Sherrill* and *Ateba*, represents a space opened on a limited basis to a limited class of people: journalists who are covering the White House. And none of these spaces has ever been allocated on the basis of viewpoint.

The White House's decision to ban the AP from the press pool based on the AP's editorial decisions thus impermissibly excludes the AP from a limited public forum based on the viewpoint of the AP's speech. The White House does not deny that it acted based on viewpoint. President Trump said "[w]e're going to keep them out until such time that they agree that it's the Gulf of America," while saying in the same breath that the AP "has been very, very wrong on the election, on Trump and the treatment of Trump." Am. Compl. ¶ 69. Similarly, Defendant Chief of Staff Susie Wiles wrote to the AP that the White House's "view as to why we arrived in this point" is

_____

    [4] Likewise, the Seventh Circuit and (in an unpublished decision) the Ninth Circuit have held that viewpoint discrimination is impermissible in making decisions regarding applications for press passes to attend press conferences held by public officials. In *TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331 (9th Cir. Dec. 5, 2022), the Ninth Circuit described a county press conference as a limited public forum and held that the plaintiff, a reporter for a conservative online publication, had been subjected to viewpoint discrimination in violation of the First Amendment. In *John K. MacIver Institute for Public Policy v. Evers*, 994 F.3d 602 (7th Cir. 2021), the Seventh Circuit described a gubernatorial press availability as a nonpublic forum after concluding that it was neither a traditional public forum nor a designated public forum (but apparently did not consider whether it was a limited public forum). *See id.* at 609–10. The court noted that viewpoint discrimination would have been impermissible in a nonpublic forum but found that the plaintiff, a think tank supporting limited government, had not actually suffered such discrimination. *See id.* at 610, 615.

that "the influence" the AP's "Stylebook has acquired has been misused, and at times weaponized, to push a divisive and partisan agenda." *Id.* ¶ 68. And Defendant Deputy Chief of Staff Taylor Budowich said "[t]his isn't just about the Gulf of America. This is about AP weaponizing language through their stylebook to push a partisan worldview in contrast with the traditional and deeply held beliefs of many Americans and many people around the world." Marc Caputo, *Scoop: Why Trump targets AP*, Axios (Feb. 17, 2025), https://perma.cc/5PSL-SSWM.[5]

In a possible effort to moot this case, the White House announced that it, rather than the WHCA, would henceforth select pool participants. But notably the White House has *not* abolished the pool itself; nor has it reversed its viewpoint-based exclusion of AP.[6] Indeed, the government's stated rationale for wresting control away from the WHCA only confirms that it still conceives of the pool as a forum: "to open access to a wide range of media outlets that have not historically been members of the pool while continuing to provide access to legacy members of the pool." Notice, ECF No. 22. The violation of the First Amendment is thus ongoing, and requires this Court's intervention.

### C. The press pool is not government speech.

The government appears to believe that the press pool is not a forum of any sort but rather government speech. The press pool, on this theory, is a mere microphone for the President and a means for him to transmit his words and images to the American public. This is not correct.

---

[5] Even if the press pool were considered a "nonpublic" forum, the exclusion of the AP from that forum would still violate the First Amendment because viewpoint discrimination is unlawful in any type of forum. *See, e.g.*, *Rosenberger*, 515 U.S. at 829.

[6] Of course, the closure of a democratically significant public forum (and the resulting denial of access) could itself present difficult First Amendment questions if it were a response to the viewpoints expressed in the forum. *See generally Richmond Newspapers, Inc., v. Virginia*, 448 U.S. 555 (1980).

To determine whether the government is engaging in its own speech, courts conduct a "holistic inquiry" that examines three factors: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022).

The Court has found the third factor to be dispositive even in cases where the first two factors are equivocal. In *Shurtleff*, the Court held that Boston violated the First Amendment by refusing to fly a Christian flag on a flagpole outside Boston City Hall that had long been used by private groups to fly their flags upon request. The Court emphasized that Boston had exerted minimal control over the flag-raising program and never before rejected a flag request. *Id. at* at 257. By contrast, in *Walker*, the Court concluded that Texas's specialty license plate designs constituted government speech and therefore that Texas could reject a proposed design that featured the Confederate battle flag. *See* 576 U.S. at 219.

In *Walker*, the Court noted that, historically, license plates have communicated state messages via slogans and distinctive designs, that license plate designs are "closely identified in the public mind with the State" because they are state-issued, mandatory, and heavily regulated, *id.* at 212  (cleaned up), and that the government "maintain[ed] direct control over the messages conveyed" via laws and regulations requiring state approval of every specialty plate design. *Id.* at 213. Even then, the Court was careful to later limit the potential reach of *Walker*, noting that the case "likely marks the outer bounds of the government-speech doctrine." *Matal*, 582 U.S. at 238.

This case more closely resembles *Shurtleff* than *Walker*.

With regard to the first factor, the history of the century-old press pool indicates that the press has long exercised its independent curatorial judgment in deciding how to report on the

President's words and actions. The pool transmits messages from the government *and* from the press—which authors the pool reports and shapes the discussion via the questions that reporters ask the President. To be sure, the press is largely there to hear what the President has to say and to see what he is doing. But if that were sufficient to establish that the reporters' presence reflected government speech, then attendance at *any* government press conference—or, for that matter, at any town hall or school board meeting—would represent government speech.

Second, the press pool is not associated with the government in the public mind. It is understood that the journalists present will report on the President's words and deeds based on their own editorial judgments; that they will independently determine what warrants dissemination to the public and how precisely to disseminate it; and that they will ask questions, if any are taken, to serve the interests of their audience rather than those of the government. Indeed, given the press's frequently adversarial relationship with the President, a group of reporters posing questions to him is rarely viewed as an instrument of his own speech. This differs markedly from one-on-one or small-group interviews, in which the time, place, and interlocutors have been specifically selected to advance the President's agenda, and the topics of discussion may have been pre-approved by the President.

Third, the government has not "maintain[ed] direct control" over the press pool. Its members had long been selected by the White House Correspondents Association, and Plaintiff is unaware of *any* prior White House attempt to bar a news organization from membership in the press pool. Am. Compl. ¶ 33. Even now, after announcing that it will determine pool membership going forward, the White House does not purport to exercise "direct control" over the pool. Unlike state-manufactured license plates, the government does not even see the work of the press pool until it is made public. The press pool much more closely resembles the Boston private flag-raising

program, in which the city had never before interfered with a private party's choice of flag or even sought to see it beforehand. *Shurtleff*, 596 U.S. at 257. Of course, unlike with the flags, content provided by the government is included in the expression at issue. But if that were dispositive, then *any* reporting on presidential speech could be shoehorned into the government speech doctrine.

To be clear, the above forum analysis and government speech analysis would not apply to *ad hoc* interviews with the President. Almost by definition, a one-off interview is not a "forum." The press pool, however, is an ongoing, continuing entity, which exists even before the President utters a word—and even if he does not.

The contrast between an appearance before a press pool and a one-on-one or small-group interview is well understood in other contexts. For example, members of a city council frequently talk to the press in informal settings. No one would suggest that those interactions are governed by the forum doctrine. But the city council meetings themselves are indeed governed by that doctrine, because those meetings are spaces that the government has historically opened up to the public, in a formal manner, for expression. *See, e.g.*, *Norse v. City of Santa Cruz*, 629 F.3d 966 (9th Cir. 2010) (en banc).

Extending the government speech doctrine to a century-old institution with which the government had never before interfered would stretch it to its breaking point. As Justice Alito wrote for the Court in *Matal*:

> [W]hile the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints. For this reason, we must exercise great caution before extending our government-speech precedents.

582 U.S. at 235.

## II. An injunction would be in the public interest.

For the reasons described above, the AP is likely to succeed on the merits of its constitutional claims. Further, an injunction here would be manifestly in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The press acts as "surrogates for the public," *Richmond Newspapers*, 448 U.S. at 572–73, which relies on journalists in order to be informed about what their government is up to. "Without the information provided by the press, most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975).

It is "well established" that the First Amendment "protects the right to receive information." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also, e.g.*, *Lamont v. Postmaster General*, 381 U.S. 301 (1965); *Martin v. City of Struthers*, 319 U.S. 141 (1943). This is certainly true where, as here, the information involves the activities of the President. As the D.C. Circuit noted in *Sherrill*: "Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." 569 F.2d at 129–30.

Defendants' actions, if not enjoined, would impede in multiple ways the public's ability to use the press as its "eyes and ears," *KQED, Inc.*, 438 U.S. at 8. First, the public would not get the benefit of Plaintiff's participation in the press pool. Second, the President—or a future President— could impose further demands as a condition for allowing an outlet to remain in the press pool. An outlet that refused to write that Ukraine started the war, or that the 2020 election was stolen, could

find itself booted from the pool. And a future President with diametrically opposed views could retaliate against news organizations from the other direction.

Finally, if a press organization can be kicked out of the press pool because of its viewpoints, then the public suffers a third, more insidious injury: the remaining members of the press pool would have a strong incentive to soften their coverage of the White House. If the White House can evict one outlet from the press pool due to its due to its coverage, it can dangle a sword over those that remain.

This phenomenon is familiar to those who have lived under authoritarian regimes. In a recent account in the *New York Times*, reporter Peter Baker recalled an episode from his coverage of the early years of Vladimir Putin's presidency, when the press in Russia enjoyed significantly more freedom than it does now. Baker described the fallout from President Putin's dissatisfaction with a press pooler:

> She asked too many questions that the president didn't like. She reported too much about criticism of his administration. And so, before long, Yelena Tregubova was pushed out of the Kremlin press pool that covered President Vladimir V. Putin of Russia.
>
> In the scheme of things, it was a small moment, all but forgotten nearly 25 years later. But it was also a telling one. Mr. Putin did not care for challenges. The rest of the press pool got the message and eventually became what the Kremlin wanted it to be: a collection of compliant reporters who knew to toe the line or else they would pay a price.

Peter Baker, *In Trump's Washington, a Moscow-Like Chill Takes Hold*, N.Y. Times (Feb. 26, 2025), https://perma.cc/9XBS-44ZG.

"It seems trite but necessary to say that the First Amendment to our Constitution was designed to avoid these ends by avoiding these beginnings." *West Va. State Board of Educ. v. Barnette*, 319 US 624, 641 (1943). Starting down this road would plainly not serve the public interest. Indeed, it is precisely what the First Amendment's special concern for the press—which

"serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials," *Mills v. Alabama*, 384 U.S. 214, 219 (1966)—was designed to prevent.

## Conclusion

For the foregoing reasons, this Court should award Plaintiff the injunctive relief that it requests and any other relief that the Court deems appropriate.

Dated: March 5, 2025

Respectfully submitted,

/s/ *Jameel Jaffer*
_____
Jameel Jaffer
Eric Columbus
Katherine Fallow
Alex Abdo
Knight First Amendment Institute
   at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Amicus Curiae Knight First*
   *Amendment Institute at Columbia*
   *University*