UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

               Plaintiff,

     v.

TAYLOR BUDOWICH,
White House Deputy Chief of Staff, et al.,

             Defendants.

Civil Action No. 25-0532 (TNM)

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Contents ........................................................................................................ i

Table of Authorities .................................................................................................... ii

Introduction ............................................................................................................... 1

Background ................................................................................................................. 2

    I.     General Media Access to the White House Press Facilities ................................... 2

    II.    Special Media Access to the President ................................................................. 4

         A.     General Background on the White House Press Pool ................................. 4

         B.     The Selection of the Daily Press Pool ...................................................... 5

    III.   Limited Media Access Events .............................................................................. 6

    IV.   The Associated Press Continues to Cover the President Similar to Other Media Organizations with No Special Media Access............................................. 8

Legal Standards.......................................................................................................... 8

Argument .................................................................................................................... 9

    I.     The Associated Press Cannot Establish a Likelihood of Success on its Press Pool Claims.......................................................................................................... 10

         A.     There is No Liberty Interest in Having Special Media Access to the President................................................................................................... 11

         B.     The President's Discretion to Choose Who to Grant Special Access Precludes the Associated Press's First Amendment Claim. ..................... 19

    II.    The Associated Press Has Failed to Demonstrate That It Will Suffer Irreparable Harm Absent Its Requested Preliminary Injunction for Its Press Pool Claims.......................................................................................................... 24

    III.   The Associated Press's East Room Claims Fail to Support Preliminary Injunctive Relief................................................................................................. 27

    IV.   The Balance of Equities and the Public Interest Tips Decidedly in Favor of the White House................................................................................................. 29

Conclusion ............................................................................................................... 30

# TABLE OF AUTHORITIES

## Authorities Chiefly Relied Upon

*Ateba v. Jean-Pierre*,
706 F. Supp. 3d 63 (D.D.C. 2023) (Bates, J.),
*appeal pending*, No. 24-5004 (D.C. Cir. argued Oct. 15, 2024) ........................................ 3, 12, 14

*Baltimore Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) ........................................................................................ passim

*Pell v. Procunier*,
417 U.S. 817 (1974) .................................................................................................................. 13

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) ...................................................................................... passim

*Snyder v. Ringgold*,
133 F.3d 917, 1998 WL 13528 (4th Cir. 1998) ................................................................... 20

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ................................................................................................................. 8, 9

*Zemel v. Rusk*,
381 U.S. 1 (1965) .................................................................................................................... 12

## Cases

*ABC, Inc. v. Cuomo*,
570 F.2d 1080 (2d Cir. 1977) ................................................................................................. 22

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) ........................................................................................... 28

*Asante v. Azar*,
Civ. A. No. 20-0601 (TSC), 2020 WL 1930263 (D.D.C. Apr. 21, 2020) ................................... 25

*Bartko v. Dep't of Just.*,
Civ. A. No. 13-1135 (JEB), 2015 WL 13673371 (D.D.C. 2015) ................................................... 9

*Bartley v. Taylor*,
25 F. Supp. 3d 521 (M.D. Pa. 2014) ..................................................................................... 21

*Bowman v. Iddon*,
848 F.3d 1034 (D.C. Cir. 2017) ............................................................................................ 11

*Branzburg v. Hayes*,
408 U.S. 665 (1972) .......................................................................................................... 12, 17

*Buckley v. Valeo*,
424 U.S. 1 (1976) ................................................................................................................ 15

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ....................................................................................... 8, 9

*Chi. Reader v. Sheahan*,
141 F. Supp. 2d 1142 (N.D. Ill. 2001) ............................................................................. 23

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ..................................................................................................... 16, 18

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) ............................................................................................. 9

*Clarke v. United States*,
915 F.2d 699 (D.C. Cir. 1990) (en banc) ......................................................................... 27

*CNN, Inc. v. ABC, Inc.*,
518 F. Supp. 1238 (N.D. Ga. 1981) ................................................................................. 16

*CNN, Inc. v. Trump*,
Civ. A. No. 18-2610 (TJK), 2018 WL 9436958 (D.D.C. Nov. 16, 2018) ....................... 14

*Connick v. Myers*,
461 U.S. 138 (1983) .......................................................................................................... 19

*Ctr. for Nat'l Sec. Stud. v. Dep't of Just.*,
331 F.3d 918 (D.C. Cir. 2003) ............................................................................... 11, 12, 13

*D.T. v. Sumner Cnty. Sch.*,
942 F.3d 324 (6th Cir. 2019) ........................................................................................... 28

*Damus v. Nielsen*,
313 F. Supp. 3d 317, 326 (D.D.C. 2018) (Boasberg, J.) .................................................. 8

*Davis v. Pension Benefit Guar. Corp.*,
 571 F.3d 1288 (D.C. Cir. 2009) ........................................................................................ 8

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) .......................................................................................................... 18

*Henke v. Dep't of Interior*,
842 F. Supp. 2d 54 (D.D.C. 2012) (Boasberg, J.) ............................................................. 9

*Honig v. Doe*,
484 U.S. 305 (1988) .......................................................................................................... 27

*Hospitality Staffing Sols, LLC v. Reyes*,
736 F. Supp. 2d 192 (D.D.C. 2010) (Kollar-Kotelly, J.) ............................................... 8

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) ........................................................................................................ 11, 12

*JB Pictures, Inc. v. Dep't of Def.*,
86 F.3d 236 (D.C. Cir. 1996) ........................................................................................... 12

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ......................................................................................... 14

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........................................................................................... 8, 9

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1867) ........................................................................................... 29

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................................................................................ 9

*Nation Mag. v. Dep't of Def.*,
762 F. Supp. 1558 (S.D.N.Y. 1991) ................................................................................ 28

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ....................................................................................... 29

*PG Publ'g Co. v. Aichele*,
705 F.3d 91 (3d Cir. 2013) ......................................................................................... 23, 24

*Price v. Garland*,
45 F.4th 1059 (D.C. Cir. 2022) ....................................................................................... 23

*Pub. Citizen, Inc. v. Fed. Energy Regul. Comm'n*,
92 F.4th 1124 (D.C. Cir. 2024) ....................................................................................... 27

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ..................................................................................... 8, 29

*Raycom Nat'l, Inc. v. Campbell*,
361 F. Supp. 2d 679 (N.D. Ohio 2004) ....................................................................... 21, 26

*Reed v. Bernard*,
976 F.3d 302 (3d Cir. 2020) ............................................................................................ 24

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ........................................................................................................ 13

*Scahill v. District of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018) ............................................................................ 11

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ................................................................................ 9

*Stevens v. N.Y. Racing Ass'n, Inc.*,
665 F. Supp. 164 (E.D.N.Y. 1987) ........................................................................ 23

*Transwestern Pipeline Co. v. Fed. Energy Regul. Comm'n*,
897 F.2d 570 (D.C. Cir. 1990) .............................................................................. 27

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ............................................................................................... 29

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) .............................................................................. 25

*Youngstown Publ'g Co. v. McKelvey*,
Civ. A. No. 05-0625, 2005 WL 1153996 (N.D. Ohio May 16, 2005) ............................. 17, 21, 28

## **Statutes, Regulations, Rules, and Other Authorities**

Hon. Potter Stewart, "Or of the Press,"
26 Hastings L.J. 631 (1975) .................................................................................. 11

Defendants Taylor Budowich, in his official capacity as White House Deputy Chief of Staff; Karoline Leavitt, in her official capacity as White House Press Secretary; and Susan Wiles, in her official capacity as White House Chief of Staff, respectfully submit this opposition to the amended motion for a preliminary injunction (ECF No. 27, "Amended Motion") filed by Plaintiff, the Associated Press.

## INTRODUCTION

This case is not about the rights of "the press"—there are hundreds of media organizations that are part of the White House press pool who have similar access to the White House as the Associated Press. This case is about whether the Constitution compels the President of the United States to privilege the Associated Press above every other media outlet and confer upon it permanent special benefits and access just because prior administrations chose to do so. And the answer to that question is emphatically "no."

The Associated Press's amended request for a preliminary injunction offers nothing new on the core issue presented in this case—i.e., does the First or Fifth Amendment compel the President of the United States to afford special access to a media organization by welcoming it into the most intimate of his work and personal spaces—the Oval Office, Air Force One, and the Mar-a-Lago Club. The Associated Press attempts to cloud this shortcoming in its Amended Motion by suggesting that its "credentials now provide less access to the White House than the same credentials provide to all other members of the White House press corps[.]" Pl. Br. in Supp. of Am. Mot. for Prelim. Inj. (ECF No. 27-1, "PI Br.") at 1. This claim is incorrect. The Associated Press's journalists continue to enjoy the same general media access to the White House press facilities as all other hard pass holders and continue to occasionally have special access to the President. The Associated Press's special access is simply no longer permanent.

As such, this case solely presents the narrow issues of (1) whether the Associated Press has a liberty interest cognizable under the Fifth Amendment in special media access to the President, via the exclusive White House press pool, which is assembled at the President's discretion and now selected by the White House itself, and (2) whether the President can under the First Amendment to afford some journalists, but not others, special media access based on his determinations of who will best convey his message to American citizens.  No court has ever recognized a liberty interest in special media access to the President, and no court has ever held that the President must ignore a journalist's coverage in deciding whether to grant that journalist such access.  Accordingly, the Associated Press cannot meet its burden to establish a likelihood of success on the merits of its claims sufficient to warrant extraordinary immediate injunctive relief.

Nor has the Associated Press established irreparable harm from being treated like the vast majority of media organizations that do not receive special media access to the President.  It continues to cover the President, including during limited access events, by receiving pool reports, videos, and photographs.  Moreover, the Associated Press admits that it has been afforded certain special access to the Oval Office over the past few weeks, undermining its claim that a preliminary injunction is necessary.  Lastly, the balance of equities decidedly tips in favor of the President and his ability to choose who has special access to him.

For these reasons, discussed in detail below, the Court should deny the Associated Press's request for a preliminary injunction.

## BACKGROUND

### I.    General Media Access to the White House Press Facilities

The Executive provides members of the media general access to the White House through its press facilities.  *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) ("[T]he White House has voluntarily decided to establish press facilities for correspondents who need to report

therefrom."). "The press facilities include the James S. Brady Briefing Room, the press offices, the press apron, the North Grounds Stand Up Area, and the Driveway[.]" *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 69 (D.D.C. 2023) (Bates, J.), *appeal pending*, No. 24-5004 (D.C. Cir. argued Oct. 15, 2024); *see also* Budowich Decl. ¶ 4, enclosed herewith as Exhibit 1 ("Opp'n Ex. 1"). Judge Bates recently described the process used by members of the media to gain access to the White House's press facilities:

> The White House offers journalists two principal ways of accessing the press facilities. First, a reporter may obtain a "temporary press pass," known as a "day pass," which is a daily credential issued upon application to the Secret Service. Second, a reporter can obtain a "permanent press pass," known as a "hard pass," which is a credential that allows him or her to come and go freely once the pass is issued. Day pass and hard pass holders can access the [press facilities] at the same times (from 5:30 a.m. to 10:30 p.m.).

*Id.* (cleaned up); *see also* Budowich Decl. ¶¶ 3-4, Opp'n Ex. 1. The White House's press facilities "are perceived as being open to all bona fide Washington-based journalists,]" subject to certain established criteria. *Sherrill*, 569 F.2d at 129. For example, approximately sixty-five media outlets have a seat, or share a seat, in the James S. Brady Briefing Room, and hundreds more journalists have "hard pass" access to the facilities. *See* White House Correspondents' Ass'n, Briefing Room Seating Chart, https://whca.press/wp-content/uploads/2022/08/BriefingRoom2022-eff-1-3-2022.pdf (last visited Feb. 24, 2025); Budowich Decl. ¶ 3, Opp'n Ex. 1.

Relevant here, Associated Press employees continue to enjoy "hard passes" and general access to the White House's press facilities as other journalists, including a front-row, center seat in the James S. Brady Briefing Room. *See* 2d Miller Decl. (ECF No. 27-5) ¶ 15; Briefing Room Seating Chart, *supra*. Ultimately, the Associated Press continues to have general media access to the White House press facilities like any other media outlet. Budowich Decl. ¶¶ 5, 20, Opp'n Ex. 1.

## II.    Special Media Access to the President

### A.    General Background on the White House Press Pool

In addition to affording bona fide members of the press general access to the White House's press facilities, the President affords special media access to a pool of select journalists.  Budowich Decl. ¶ 6, Opp'n Ex. 1.  A hard pass is not, and has never been, sufficient to obtain such access. "One reason the pool exists is because the Oval Office, the president's official workspace, is too small to accommodate every news outlet that would want to cover his executive order signings or meetings with foreign dignitaries."  Laurie Kellman, *The relationship between the White House and its press corps is time-tested — and can be contentious*, Assoc. Press (Feb. 12, 2025), https://apnews.com/article/trump-gulf-mexico-america-ap-first-amendment-4304433d73ad496f5308c9666cbe8e11; *see also* White House Correspondents' Ass'n, Guide to the White House Beat, https://whca.press/covering-the-white-house/resources/guide-to-the-white-house-beat/    (last visited Feb. 24, 2025); Budowich Decl. ¶ 7, Opp'n Ex. 1.  Similarly, there are only thirteen press seats on Air Force One.  *See* Guide to the White House Beat, *supra*; 2d Miller Decl. (ECF No. 27-5) Ex. A.  While the size of the press pool varies depending on the President's location and circumstances, *see* 2d Miller Decl. (ECF No. 27-5) ¶¶ 7-9, Ex. A, "the pool operates with a representative of each medium acting as eyes and ears for the others who can't get in.  When a 'pooled' event is over, the print, television and radio poolers share written notes, video and audio with everyone else who is interested."  Kellman, *supra*.

The White House Correspondents' Association has made clear that the role of a pool reporter is not to benefit their own organization but to act "on behalf of the collective in this role[.]" Guide to the White House Beat, *supra* ("Poolers are expected to share info and quotes by pool report before publishing unilaterally, even on social media.").  That said, the Associated Press contends that its prior seats in the pool did not come with this requirement.  2d Miller Decl. (ECF

No. 27-5) ¶¶ 10-11.  In other words, under the Associated Press's understanding, its prior seats in the pool did not come with the responsibility to "share the information [its journalists] gathered with other press pool members[,]" and instead its special access allowed it to "vigorously compete[ ] with the other wire service pool journalists to provide the fastest and most accurate news reporting at the very moment that the event was happening." *Id.* ¶ 10.  Indeed, the Associated Press's declaration confirms that it viewed its seats in the pool not just to be witnesses to history, but to further the Associated Press's commercial endeavors. *Id.* ¶¶ 10-14.

### B.    The Selection of the Daily Press Pool

In the recent past, up through February 25, 2025, the White House allowed membership of the pool to be determined by the White House Correspondents' Association.  *See generally* Guide to the White House Beat, *supra*; Budowich Decl. ¶ 8, Opp'n Ex. 1.  Under the prior selection process for the press pool, certain media groups (including the Associated Press) received special access to the President above other outlets.  Budowich Decl. ¶ 8, Opp'n Ex. 1.  The Correspondents' Association allocated Associated Press two permanent spots (one reporter and one photographer) of the thirteen or fourteen core spots in the pool, i.e., extra special access.  *See* Budowich Decl. ¶ 8, Opp'n Ex. 1; 2d Miller Decl. (ECF No. 27-5) Ex. A.  For example, under the old system, even well-established media companies such as the Washington Post, Los Angeles Times, CNN, and Wall Street Journal had no permanent spots and were forced to rotate into the pool through spots allocated to print and television journalists.  Budowich Decl. ¶ 8, Opp'n Ex. 1.

On Tuesday, February 25, 2025, the White House Press Secretary announced the White House's intent to change the way it decides who participates in its press pool.  Budowich Decl. ¶ 9, Opp'n Ex. 1.  Under the new process, the press pool is selected among three groups: (1) a television pool selected from a rotation of five television networks; (2) a wire pool selected from two wire services; and (3) additional media outlets selected based upon and appropriate to the

subject matter of the event. *Id.* ¶ 10. There is no categorical ban on media outlets that are critical of the President or that refuse to use the proper name for the Gulf of America. *Id.* ¶ 11. Media outlets that have been highly critical of the President and have continued to refer to the former name "Gulf of Mexico," including the *New York Times* and *Washington Post*, have been admitted to pool events in special access locations. *Id.* ¶ 11.

While the Associated Press's domestic journalists have not continued to receive the extra special access that the White House Correspondents' Association previously afforded them, the Associated Press has recently been present in the Oval Office to cover presidential events. For example, as the Associated Press itself admits, its foreign-based journalists were present for the President's February 27, 2025, Oval Office event with Prime Minister Starmer of the United Kingdom, and the President's February 27, 2025, Oval Office event with Ukrainian President Zelenskyy. Am. Compl. (ECF No. 26) ¶¶ 87, 90.

## III.    Limited Media Access Events

Outside of the Oval Office and other special access spaces, the President holds events at the White House where journalists with hard passes beyond the daily press pool are eligible to RSVP. Budowich Decl. ¶¶ 11, 13, Opp'n Ex. 1. At these events, the White House can accommodate more journalists than it can offer special access in the Oval Office. *Id.* That said, the space is not unlimited. *Id.*

For example, press conferences with foreign dignitaries held in the East Room of the White House can often accommodate up to 180 members of the press (inclusive of television and radio journalists, photographers, and cameraman). *Id.* ¶ 12. Press attendance at these limited press events is typically arranged through an electronic RSVP tool, where journalists seeking access to the event register their interest. *Id.* ¶ 13. The White House then approves or denies the RSVP as

the East Room is unable to accommodate all journalists that seek access to these limited press events. *Id.* ¶ 14.

The Associated Press has complained of not being permitted access to various events. The Associated Press's complaints are unfounded. For example, the Associated Press complains it was excluded from a February 24, 2025, East Room press conference with President Macron of France. Am. Compl. (ECF No. 26) ¶¶ 77-79. For that limited access event, 310 journalists requested access to the East Room for the event and 136 were permitted access. Budowich Decl. ¶ 17, Opp'n Ex. 1. Among those provided access was a foreign-based correspondent of the Associated Press. *Id.*; Am. Compl. (ECF No. 26) ¶ 79.

The Associated Press has also complained of not being permitted access to the February 27, 2025, East Room press conference with Prime Minister Starmer of the United Kingdom. Am. Compl. (ECF No. 26) ¶¶ 87-89. For that limited access event, 308 journalists requested access to the East Room for the event and 172 were permitted access. Budowich Decl. ¶ 18, Opp'n Ex. 1. Among those provided access was a foreign-based correspondent of the Associated Press. *Id.*; Am. Compl. (ECF No. 26) ¶ 89.

The Associated Press has also complained of not being permitted access to the tarmac at Palm Beach International Airport on February 28, 2025, for the arrival of Air Force One. Am. Compl. (ECF No. 26) ¶ 92. That event was not a limited access event similar to the East Room events described above. Budowich Decl. ¶ 19, Opp'n Ex. 1. Instead, a small collection of journalists beyond the press pool was provided special access by the President's advance team to the otherwise non-public tarmac of an open airfield to observe the President exit his aircraft, walk down stairs, and immediately enter a presidential limousine. *Id.*

IV.    **The Associated Press Continues to Cover the President Similar to Other Media <u>Organizations with No Special Media Access.</u>**

Given the nature of pool reporting, it comes as little surprise that the Associated Press's ability to report on the President and his activities has continued despite not having permanent special media access via the White House press pool.  The Government respectfully refers the Court to its opposition to the Associated Press's motion for a temporary restraining order, *see* TRO Opp'n (ECF No. 14) at 6–9, where it details the Associated Press's coverage of the events it continues to rely upon its Amended Motion.  PI Br. (ECF No. 27-1) at 9–11.

## LEGAL STANDARDS

"[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).  A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest."  *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted.  *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D. D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another.  *Damus v. Nielsen*, 313 F. Supp. 3d 317, 326 (D.D.C. 2018) (Boasberg, J.) (quoting *Davis v. Pub. Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).  The D.C. Circuit has suggested, without deciding, that *Winter*—which overturned the Ninth Circuit's

"possibility of irreparable harm" standard—"should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Bartko v. Dep't of Just.*, Civ. A. No. 13-1135 (JEB), 2015 WL 13673371, at *1 (D.D.C. 2015) (citing *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011), and *Davis*, 571 F.3d at 1292; *see also League of Women Voters*, 838 F.3d at 7 (declining to address whether "sliding scale" approach is valid after *Winter*). That said, the Supreme Court has confirmed that a plaintiff must satisfy all elements of the standard to succeed. *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 99 n.18 (2024) ("To obtain a preliminary injunction, [plaintiff] was required to establish that she is likely to succeed on the merits, that she would otherwise suffer irreparable harm, and that the equities cut in her favor." (citing *Winter*)).

Even before *Winter*, courts in this Circuit consistently stressed that "a movant must demonstrate 'at least some injury' for a preliminary injunction to issue." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Thus, "if a party makes no showing of irreparable injury, the court may deny the motion without considering the other factors." *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012) (Boasberg, J.) (quoting *CityFed Fin. Corp.*, 58 F.3d at 747); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

## ARGUMENT

In its Amended Complaint, the Associated Press brings two types of First and Fifth Amendment claims—namely, (1) those based on being denied special media access to the press pool, and (2) those based on being denied access to limited media events open to a larger number of journalists than the press pool. The Associated Press is not entitled to be privileged above other

media outlets.  The Associated Press's press pool claims fail because there is no liberty interest in being afforded special media access to the press pool and the President can give special media access to a journalist (e.g., a sit-down interview or access to the Oval Office) based on that journalist's prior coverage without offending the First Amendment.  The Associated Press's request for a preliminary injunction premised on being denied access to East Room events fails as the White House has now confirmed that the Associated Press's journalists are eligible to attend those events without regard to its decision not to use the Gulf of America name.  Also, the Associated Press cannot establish irreparable harm absent an injunction as it concedes it has received access to the Oval Office and limited access events despite not being part of the press pool and has continued its coverage of the President unabated.  Lastly, the equities tip decidedly in favor of the President in deciding who should be afforded access to some of his most intimate environments.

## I.    The Associated Press Cannot Establish a Likelihood of Success on its Press Pool <u>Claims.</u>

The Associated Press lacks a protected liberty interest in special access to the President. And the First Amendment does not preclude a government official from favoring particular journalists with exclusive access, even when the nature of the journalist's coverage is a relevant consideration in deciding who will receive such access.  Accordingly, the Associated Press has no likelihood of succeeding on its press pool claim.[1]

---

[1]    The Associated Press's lack of protected interests dooms its claims in this case.  That said, the United States reserves its rights to raise other arguments and defenses on the merits in this action.

**A.    There is No Liberty Interest in Having Special Media Access to the President.**

For a procedural due process claim under the Fifth Amendment to proceed, a plaintiff must identify a cognizable property or liberty interest at stake.  *See Scahill v. District of Columbia*, 909 F.3d 1177, 1186 (D.C. Cir. 2018) (affirming dismissal of due process claims, holding, to succeed on a procedural due process claim, plaintiff must first "identify a cognizable liberty or property interest"); *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (affirming dismissal of procedural due process claim; "[a] procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections." (citation omitted)).  Here, the Associated Press contends it has a liberty interest arising from the First Amendment in receiving preferential access to the President part of the White House press pool—i.e., having permanent special media access to the President.  PI Br. (ECF No. 27-1) at 14.  The Associated Press is wrong.

1.    Reporters Enjoy No Liberty Interest in Special Access to the President

As the D.C. Circuit has recognized, "[i]n accord with its plain language, the First Amendment broadly protects the freedom of individuals and the press to speak or publish.  It does not expressly address the right of the public to receive information."  *Ctr. for Nat'l Sec. Stud. v. Dep't of Just.*, 331 F.3d 918, 934 (D.C. Cir. 2003).  For this reason, controlling authorities have recognized that the First Amendment generally "does not mandate a right of access to government information or sources of information within the government's control."  *Id.* (quoting *Houchins v. KQED*, 438 U.S. 1, 15 (1978) (plurality opinion) ("There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy." (quoting Hon. Potter Stewart, "Or of the Press," 26 Hastings L.J. 631, 636 (1975), available at: https://moglen. law.columbia.edu/CPC/PotterStewart_OrOfThePress.pdf ("The press is free to do battle against

secrecy and deception in government.  But the press cannot expect from the Constitution any guarantee that it will succeed.")))    Unlike the First Amendment's protections for speech, "disclosure of government information generally is left to the 'political forces' that govern a democratic republic."  *Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 934 (quoting *Houchins*, 438 U.S. at 14-15 (plurality opinion)).  The Supreme Court expressly extended this same logic to the White House in *Zemel v. Rusk*, 381 U.S. 1, 17 (1965), holding that a person lacks a First Amendment right or liberty interest in accessing the White House.  *Id.*  ("the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, [ ] that does not make entry into the White House a First Amendment right.  The right to speak and publish does not carry with it the unrestrained right to gather information").

Equally clear from controlling precedents, "the First Amendment does not provide journalists any greater right of access to government property or information than it provides to members of the public, despite the fact that access to government information 'might lead to more thorough or better reporting.'"  *Ateba*, 706 F. Supp. 3d at 75 (quoting *JB Pictures, Inc. v. Dep't of Def.*, 86 F.3d 236, 238 (D.C. Cir. 1996), and citing *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972)).  Instead, "[a]s it pertains to the press, the First Amendment primarily protects the right to '*communicate* information once it is obtained,' not the ability to collect it."  *Ateba*, 706 F. Supp. 3d at 75 (emphasis in original; quoting *Houchins*, 438 U.S. at 9 (plurality opinion)).  For this reason, "courts have generally refused to find that the First Amendment requires government entities to admit press into places not otherwise open to the public, provide enhanced access to information under the government's control, or afford journalists heightened access to places open to the general public."  *Ateba*, 706 F. Supp. 3d at 75 (collecting citations).

The Supreme Court has been consistent in this view. For example, in *Pell v. Procunier*, 417 U.S. 817, 834–35 (1974), the Supreme Court rejected reporters' contentions that prison restrictions unconstitutionally thwarted their access to have in person access to prisoners. In rejecting that claim, the Court held:

> It is one thing to say that a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources, and that government cannot restrain the publication of news emanating from such sources. It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally. That proposition finds no support in the words of the Constitution or in any decision of this Court.

*Id.* (internal citations omitted). The Supreme Court reached this conclusion despite the reporters in *Pell* making many of the same arguments for in person access that the Associated Press makes here—e.g., that in person access is a "superior method of newsgathering[.]" *Id.* at 833.

To be sure, controlling precedents have created certain exceptions to these consistent holdings that the First Amendment contains no right of access and affords no liberty interest in the same. But those exceptions are exceeding rare and exceptionally narrow. For example, in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) (plurality opinion), the Supreme Court held that the public and press have a right of access to criminal trials. As the D.C. Circuit has summarized the holding of *Richmond Newspapers*: "the Court explained that the First Amendment 'was enacted against the backdrop of the long history of trials being historically open' and thus incorporated the notion of public access to criminal trials." *Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 934. While the D.C. Circuit has somewhat expanded the right of access recognized in *Richmond Newspapers* to other facets of criminal prosecutions, *see id.*, "[n]either the Supreme Court nor [the D.C. Circuit] has applied the *Richmond Newspapers* test outside the context of criminal judicial proceedings or the transcripts of such proceedings." *Id.* at 935. Indeed,

underscoring the highly limited nature of the access interest found in *Richmond Newspapers*, controlling precedents have refused to extend its rationale to matters adjacent to criminal prosecutions—e.g., addresses of arrestees or identities of national security detainees.  *Id.* at 935 ("We will not convert the First Amendment right of access to criminal judicial proceedings into a requirement that the government disclose information compiled during the exercise of a quintessential executive power[.]").

When it comes to the White House, the D.C. Circuit has also recognized one narrow exception to the rule that the First Amendment creates no liberty interests in access.  In *Sherrill*, the court ruled that a journalist has a liberty interest sufficient for procedural due process protections in accessing "White House press facilities" that have "been made publicly available as a source of information for newsmen[.]"  569 F.2d at 129.  In the wake of *Sherrill*, every reported case in this jurisdiction has addressed the confines of that right—i.e., the right to procedural protections if a journalist's general White House press access is being suspended or terminated.  *See, e.g.*, *Karem v. Trump*, 960 F.3d 656, 659 (D.C. Cir. 2020) (considering suspension of White House hard pass); *Ateba*, 706 F. Supp. 3d at 69 (considering rules regarding hard passes); *CNN, Inc. v. Trump*, Civ. A. No. 18-2610 (TJK), 2018 WL 9436958 (D.D.C. Nov. 16, 2018) (considering suspension of hard pass).  None have recognized the existence of an additional liberty interest in being part of a special group with enhanced access to the President beyond the general media access that most credentialed journalists receive.

To the contrary, against the right for journalists to have general access to White House press facilities, cases have held that a government official need not engage with, or provide special access to, journalists.  Plainly, the President has associational rights of his own and need not associate with or endorse views contrary to his own.  *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 15

(1976) ("The First Amendment protects political association as well as political expression.").  For example, in *Sherrill* itself, the D.C. Circuit noted its case did not concern "the discretion of the President to grant interviews or briefings with selected journalists[,]" remarking "[i]t would certainly be unreasonable to suggest that because the President allows interviews with some bona fide journalists, he must give this opportunity to all."  569 F.2d at 129.  Now that the White House itself is selecting the membership of the press pool—i.e., the White House now selects a handful of reporters to receive special access in the form of Oval Office briefings with the President and his invited guests—a journalist's presence in it is functionally the same as giving "briefings with selected journalists[,]" the scenario that *Sherrill* went out of its way to distinguish from general media access to the White House.  *Sherrill* holds this activity is not one that any journalist has a liberty interest protected under the Fifth Amendment in enjoying.

Similarly in *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 417–18 (4th Cir. 2006), where a media outlet similarly brought claims alleging the denial of special access due to the content of its reporting, the Fourth Circuit noted:

> Public officials routinely select among reporters when granting interviews or providing access to nonpublic information.  They evaluate reporters and choose to communicate with those who they believe will deliver their desired messages to the public.  By giving one reporter or a small group of reporters information or access, the official simultaneously makes other reporters, who do not receive discretionary access, worse off.  These other reporters are sometimes denied access because an official believes them to be unobjective.

*Id.*  The Fourth Circuit held that this behavior in no way offended the Constitution.  *Id.*

Here, the White House deciding not to afford the Associated Press special media access to the President via the White House press pool plainly falls into the latter, non-actionable category of claims.  The Associated Press does not allege, because it cannot, that the White House press pool is "perceived as being open to all bona fide Washington-based journalists" like the White House press facilities discussed in *Sherrill*, 569 F.2d at 129.  Instead, the press pool clearly affords

"a small group of reporters" discretionary special access to the President, the circumstance presented in *Baltimore Sun* and distinguished in *Sherrill*.  The Constitution does not entitle the Associated Press to a guaranteed status in the press pool, and the Associated Press can point to no case holding that any journalist has such a sweeping liberty interest protectable under the confines of the Fifth Amendment's procedural due process clause.

> 2.    The Authorities Cited by the Associated Press Do Not Suggest Reporters
> Have a Right to Special Access Through the Press Pool

The lone, decades-old, non-controlling case cited by the Associated Press where a court addressed the rights of media companies in the White House press pool, *CNN, Inc. v. ABC, Inc.*, 518 F. Supp. 1238, 1239 (N.D. Ga. 1981), does not support its extraordinary request here.  In *CNN*, the court considered whether to enjoin provisionally the White House Press Office's policy of "excluding all television media representatives from covering certain White House and presidential events[.]"  *Id.*  The court did so, entering a preliminary injunction prohibiting the White House "from totally excluding television news representatives from participating in pool coverage of Presidential activities and White House events until a trial on the merits can be held in this case."  *Id.* at 1246.  But importantly, the court did not command that any single television news organization be included in the pool—the Associated Press's ask here.  Any such command would have run contrary to well established precedents.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 352 (2010) ("We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers." (collecting citations)).  Moreover, the court's logic turned on the policy implementing a total blockage of television media, not the exclusion of one media group as alleged here.  *Id.* at 1245 ("Television film coverage of the news provides a comprehensive visual element and an immediacy, or simultaneous aspect, not found in print media.").  As such, *CNN* cannot be read as establishing a

liberty interest in any particular journalist to participate in the pool or receive special access to the President therefrom.

In its Amended Motion, the Associated Press suggests that liberty interests are broadly defined and that courts recognize liberty interests in exercising First Amendment rights, including news gathering activities. PI Br. (ECF No. 27-1) at 14-18. But these general platitudes regarding what interests are protectable under the Fifth Amendment do nothing to address the specific question here—whether one media organization has a liberty interest in receiving special access to the President through a highly limited press pool. None of the general authorities cited by the Associated Press assist in answering that specific question. Indeed, some of the authorities clearly cut against the Associated Press's arguments in this case. For example, in *Branzburg*, 408 U.S. at 684 (cited in PI Br. (ECF No. 27-1) at 18), the Court held that "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." 408 U.S. at 684. In holding that the press is not above the law and must appear to testify when properly summoned to a grand jury, the Court remarked, "[d]espite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations." *Id.* Far from supporting the Associated Press's arguments, *Branzburg* confirms that the press's liberty interests derived from the First Amendment do not include the ability to venture into spaces that are not generally open to the press. *See also, e.g.*, *Youngstown Publ'g Co. v. McKelvey*, Civ. A. No. 05-0625, 2005 WL 1153996, at *4 (N.D. Ohio May 16, 2005) ("No constitutional right of access applies, however, to instances in which the press seeks a special privilege of access over and above that of the general public."), *vacated as moot*, 189 F. App'x 402 (6th Cir. 2006).

Also, while the Associated Press argues that it "has a liberty interest in access to spaces made available to the press pool," *id.* at 18, it makes no attempt to limit that argument. That is, if the Associated Press has such a liberty interest, every one of the multitude of White House hard pass holders would presumably have the same interest—i.e., the Associated Press cites nothing to suggest that it, and not all other media organizations, has legally protected interests in covering the President. And if every hard pass holder enjoys that same protectable liberty interest, and there is limited physical space for the press pool, how can the Associated Press insist on a preliminary injunction that commands the White House to give it access to the determinant of its journalistic peers? Plainly, it cannot as a matter of law. *Cf. Citizens United*, 558 U.S. at 352 ("We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers." (collecting citations)); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 782 (1978) ("the press does not have a monopoly on either the First Amendment or the ability to enlighten"). It is perhaps for this reason that *Sherrill* distinguished the general press access to White House press facilities where a liberty interest is found (which the Associated Press continues to enjoy) from the special access that interviews and briefings with select reporters, where it is not. *Sherrill*, 569 F.2d at 129 ("Nor is the discretion of the President to grant interviews or briefings with selected journalists challenged. It would certainly be unreasonable to suggest that because the President allows interviews with some bona fide journalists, he must give this opportunity to all.").

Ultimately, providing special media access to the President is a quintessentially a discretionary choice of the Executive. No court has recognized that a particular media member has a liberty interest protected by the Fifth Amendment in perpetually securing special access to the President through the White House press pool. This Court should not be the first.

**B.    The President's Discretion to Choose Who to Grant Special Access Precludes the Associated Press's First Amendment Claim.**

The Associated Press's First Amendment press pool claim is based on the premise that it is unlawful for the White House to deny it special media access to the President because it refuses to use the name "Gulf of America" in its Style Guide. This very type of claim has been addressed and rejected in many cases. The Court should do the same here.

For example, in *Baltimore Sun*, a newspaper sued the Governor of Maryland seeking to enjoin his direction that no one in the Governor's office speak with certain of the newspaper's reporters because they were "failing to objectively report on any issue dealing with the" Governor's administration. 437 F.3d at 413. The newspaper alleged that the restriction was actionable under the First Amendment as retaliatory and a content-based regulation of the newspaper's speech. *Id.*

The Fourth Circuit began its analysis by noting, "[n]ot every government restriction [ ] is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory." *Id.* at 416 (cleaned up). It continued by noting that "when the challenged government action, whether conduct or speech, is so pervasive, mundane, and universal in government operations that allowing a plaintiff to proceed on his retaliation claim would 'plant the seed of a constitutional case' in 'virtually every' interchange" it is not actionable retaliation. *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 148–49 (1983)).

In analyzing the newspaper's claim, the court noted that "reporting is highly competitive, and reporters cultivate access—sometimes exclusive access—to sources, including government officials." 437 F.3d at 413. The court further observed that there is a "common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter" and an "equally widespread practice of public officials declining to speak to reporters whom they view

as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments[.]" *Id.* at 418 (quoting *Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528, at *1, *4 (4th Cir. 1998) (unpublished)). So much so that the newspaper in the case acknowledged "that government officials frequently and without liability evaluate reporters and reward them with advantages of access—i.e., that government officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression." 437 F.3d at 418. Accordingly, the court concluded that to permit the newspaper "to proceed on its retaliation claim addressing that condition would 'plant the seed of a constitutional case' in 'virtually every' interchange between public official and press[,]" and "no actionable retaliation claim arises when a government official denies a reporter access to discretionarily afforded information or refuses to answer questions." *Id.* The court also held that "a reporter endures only de minimis inconvenience when a government official denies the reporter access to discretionary information or refuses to answer the reporter's questions because the official disagrees with the substance or manner of the reporter's previous expression in reporting" and that the Governor's order to his subordinates not to speak to the newspaper only regulated government speech, not the newspaper's. *Id.* at 420–21.

Notably, the court in *Baltimore Sun* is not alone in rejecting claims of the sort the Associated Press brings here. For example, in *Snyder*, the Fourth Circuit confronted a similar claim. There, a journalist complained that a police department's press officer refused to participate in filmed interviews with the journalist due to the content of the journalist's prior reporting, which purportedly included breaching confidentiality of "off-the-record" information, paging press staff on weekends, and misrepresenting comments in prior pieces. 1998 WL 13528, at *2. The journalist argued that the press officer was engaged in viewpoint discrimination made unlawful by

the First Amendment because the press officer continued to give filmed interviews with other media outlets. *Id.* The court rejected the reporter's section 1983 claim. In so doing, the court reasoned:

> [I]t is a large analytical leap from holding that government may not regulate or prohibit private speech on the basis of content or viewpoint to holding that government may not make "content-based" distinctions between reporters in granting access to government information. Indeed, the government can certainly control the content of its own speech in ways it could never regulate or control the content of private speech. Arguably, by analogy, the government should be able to choose to limit its audience in a way it could not choose to limit the audience available to private speakers.

*Id.* at *4. Notably, the court also remarked on "[t]he many weaknesses in plaintiff's position" that all reporters must be afforded the same access when it comes to government information:

> it would preclude the equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments. Additionally, even if the right was somehow limited to situations in which access is provided to a broad spectrum of reporters, the plaintiff's rule would still presumably preclude the White House's practice of allowing only certain reporters to attend White House press conferences, even though space constraints make it impractical to open up the conference to all media organizations.

*Id.* at *4; *see also Bartley v. Taylor*, 25 F. Supp. 3d 521, 539 (M.D. Pa. 2014) (dismissing First Amendment claim premised on athletic director of public university directing her staff not to communicate with sports reporter based on his prior critical reports); *Raycom Nat'l, Inc. v. Campbell*, 361 F. Supp. 2d 679, 684 (N.D. Ohio 2004) (denying preliminary injunction; finding no First Amendment violation when mayor directed city administrators and staff to refuse television station's request for interviews based on prior reports the mayor viewed as "irresponsible and untrustworthy"); *Youngstown Publ'g*, 2005 WL 1153996, at *6 ("Access to individual comments and off-the-record statements is privileged access to information not generally made available to entire press or the public. . . . [A] limited constitutional right of access

applies only where comments by government officials are offered in a forum effectively open to all members of the press.").

These cases addressed circumstances that mirror the facts presented here. The President has subjected the Associated Press to differing treatment from others that have recently received special media access through the press pool because of its refusal to use the Gulf of America name in its Style Guide. While this denial of special media access may be new in form, the President, like other Presidents, have exercised their discretion to grant access to different media organizations based on the content of their coverage—e.g., granting hours-long interviews to some and refusing to call on others in a crowded briefing room. That the Associated Press may have long received special media access to the President does not mean that such access is constitutionally compelled in perpetuity. And that the Associated Press is now experiencing a lack of special media access is simply part of a "journalist's accepted role in the 'rough and tumble' political arena[.]" *Balt. Sun*, 437 F.3d at 418. It is not a First Amendment violation.

The cases cited by the Associated Press to support its contrary view are inapposite. For example, in suggesting that the Fourth Circuit's 2006 opinion in *Baltimore Sun* is of questionable persuasive authority, the Associated Press cites *ABC, Inc. v. Cuomo*, 570 F.2d 1080, 1081 (2d Cir. 1977), a matter arising from a union dispute with a television network in New York City. PI Br. (ECF No. 27-1) at 28. In *ABC*, the workers for one network (ABC) were on strike and other networks (NBC and CBS) threated to refuse to cover candidates' post-election activities if ABC were permitted access to the same in solidarity with the striking workers. *Id.* at 1082. Accordingly, the local government threatened to arrest ABC's television crew for trespass if they attempted to access the candidates' post-election events, and the court enjoined the government's intended actions. *Id.* Importantly, there was no indication that the events were not open to all journalists.

To the contrary, in crafting its order of provisional relief, the court "want[ed] the networks to be on a par" with each other and expressly conditioned its injunction on all networks "participat[ing] simultaneously in the broadcasts in question." *Id.* at 1084. Nothing about this holding suggests that government officials need to provide special access to reporters without regard to their prior coverage or undermines the logic of *Baltimore Sun* and the other authorities collected above.

The same goes with the other cases regarding press access that the Associated Press cites— they concern allegations of being denied access to spaces or persons that general press are permitted. *See, e.g.*, *Chi. Reader v. Sheahan*, 141 F. Supp. 2d 1142, 1143 (N.D. Ill. 2001) (reporter alleged denied access to "physical spaces within the jail where . . . accredited press members are routinely admitted"); *Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987) (bar on reporter's use of camera "applies to no other member of the press and that other press representatives are accorded access to the paddock area of defendant's tracks to take photographs").

Lastly, the suggestion by some amici that this case should be governed by a traditional public versus nonpublic forum analysis is misplaced. *See* Knight 1st Am. Inst. Amicus Br. (ECF No. 32) at 5-11. The well-established forum analysis is used to assess the constitutionality of limitations on expressive activities. *See, e.g.*, *PG Publ'g Co. v. Aichele*, 705 F.3d 91, 99 (3d Cir. 2013) ("when addressing traditional issues of free speech on government property, courts apply the well-established forum analysis (where the essential formulation is whether the government may restrict 'access' to a particular forum)"). But the issues here do not turn on expressive activities. Instead, the Associated Press seeks access to spaces and people. That issue is not governed by the traditional forum analysis that is used to assess restrictions on speech. *See Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022) (finding forum analysis inappropriate to

filmmaker's recording endeavors; "[b]ecause a filmmaker does not seek to communicate with others at the location in which he or she films . . . it would be a category error to apply the speech-protective rules of a public forum to regulation of an activity that involves merely a noncommunicative step in the production of speech"); *PG Publ'g*, 705 F.3d at 99 (finding no First Amendment right of access to voting process; "Importantly, we do not address here limitations on access to a forum for speech purposes; indeed, we are not concerned here with expressive conduct or speech at all. . . . Rather, our focus is on access to information. Thus, we do not believe that the traditional forum analysis is apposite here."); *Reed v. Bernard*, 976 F.3d 302, 324 n.13 (3d Cir. 2020) ("right-of-access jurisprudence does not map neatly onto the forum analysis required by the Free Speech Clause"), *vacated due to subsequent dismissal*, No. 20-1632, 2021 WL 1897359 (3d Cir. May 4, 2021).

## II.    The Associated Press Has Failed to Demonstrate That It Will Suffer Irreparable Harm Absent Its Requested Preliminary Injunction for Its Press Pool Claims

Even were the Associated Press likely to prevail on its claims, it has suffered no irreparable harm. The Associated Press claims that the White House's unwillingness to select it for the press pool harms it because its non-selection (1) stymies its ability to provide comprehensive information to its customers; (2) thwarts its ability to provide quick reporting; and (3) has resulted in financial harm. PI Br. (ECF No. 27-1) at 40–43. The record belies the first two contentions and the third is legally insufficient for a preliminary injunction.

As an initial matter, to the extent the Associated Press points to events that predate the White House's new pool selection process, injuries from those events are no longer relevant. The Associated Press cannot rely on injuries from being "suspended" from a now defunct slate of media selected by the White House Correspondents' Association. Whatever rights or interests the Associated Press derived from the White House Correspondents' Association selection of it under

the old press system cannot be cured through prospective injunctive relief as a new system is in place to select the press pool. That is, the only injuries relevant to the Amended Motion are those that will clearly arise from the White House not selecting the Associated Press from the pool under the new pool selection process. As such, the Associated Press cannot point to injuries predating February 25, 2025, as a basis for its alleged irreparable harm because those harms (if any) are not likely to occur again. *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future.").

Next, the Associated Press's claims of monetary harm are insufficient for provisional injunctive relief. "It is also well settled that economic loss does not, in and of itself, constitute irreparable harm." *Id.* Economic losses can only "be sufficient if they are unrecoverable and threaten the existence of the business or, in the non-profit context, result in substantial reduction of services." *Asante v. Azar*, Civ. A. No. 20-0601 (TSC), 2020 WL 1930263, at *3 (D.D.C. Apr. 21, 2020) (collecting authorities; denying motion for preliminary injunction). At most, the Associated Press claims a few thousand dollars of travel costs it has incurred to ensure it has Oval Office access through its foreign-based reporters in the form of routine travel costs. *See* Corr. 2d Pace Decl. (ECF No. 28) ¶¶ 5–7. Although its Executive Editor rhetorically categorizes theses costs as "significant," nowhere does the Associated Press contend that these minor financial expenditures threaten the existence of its business or somehow result in the reduction of its services. As such, they are clearly insufficient to establish irreparable harm.

Getting to the meat of the Associated Press's claims of harm—i.e., that it cannot report firsthand on the President's actions—those contentions also fail. As explained above, the Associated Press has had firsthand access to the President since the new press pool selection

process has been in effect, observing firsthand the most important presidential interactions in the past few days with the leaders of the United Kingdom, France, and Ukraine. Far from being totally ostracized from special access events, the Associated Press has obtained access through other channels. The Associated Press has failed to explain in its Amended Motion why it believes that it will not enjoy similar access while this litigation is pending. While that access may not afford the Associated Press a presence at each intimate gathering that the President has with the press pool, no such privilege can reasonably exist for any press organization. As in *Raycom National*, the requested injunction here "would have the effect of conferring preferential status on" the Associated Press as it would require the White House to give the Associated Press guaranteed access to the press pool when many other media outlets have none at all. *Raycom Nat'l*, 361 F. Supp. 2d at 684. The Court should not insist that the Executive provide such an exclusive entitlement to the Associated Press.

Lastly, the Associated Press has successfully been using pool reports timely reported through articles and videos the events from which the White House supposedly excluded it. This is consistent with other members of the White House press corps who do not have special access to the President by being members of the press pool covering a particular event (e.g., the L.A. Times, the Financial Times, the Boston Globe). Consequently, the Associated Press has failed to demonstrate that the suspension of its special media access necessitates an emergency order for it to continue its journalistic endeavors. Also, the Associated Press continues to use the moniker the "Gulf of Mexico" in its Style Guide to refer to the body of water whose shores include many countries and localities beyond Mexico, all of which are in North or South America. Consequently, there has been no discernable chilling effect on the organization's speech or an actual compulsion to change that speech. *See, e.g.*, *Balt. Sun*, 437 F.3d at 419 (finding no chilling effect by being

excluded by the Governor; "As typical reporters, they are used to currying their sources' favors, and even though they may have been foreclosed from directly accessing sources when the sources became unhappy with how their information was being reported, they have not been chilled to any substantial degree in their reporting, as they have continued to write stories for *The Sun*, to comment, to criticize, and otherwise to speak with the full protection of the First Amendment.").

Accordingly, even could the Associated Press establish some likelihood of success on its claims to compel the White House to give it special media access, it cannot demonstrate irreparable harm necessitating a preliminary injunction in this case.

## III.    The Associated Press's East Room Claims Fail to Support Preliminary Injunctive Relief

As the record now makes clear, the Associated Press is eligible to participate in East Room press conferences and similar events.  Budowich Decl. ¶ 15, Opp'n Ex. 1.  Accordingly, its motion premised on being denied access to those events affords no basis for a preliminary injunction.

"Derived from Article III, the mootness doctrine ensures that federal courts decide only 'actual, ongoing controversies.'" *Pub. Citizen, Inc. v. Fed. Energy Regul. Comm'n*, 92 F.4th 1124, 1127 (D.C. Cir. 2024) (quoting *Honig v. Doe*, 484 U.S. 305, 317 (1988)).  "Under this doctrine, even where litigation poses a live controversy when filed, a federal court must refrain from deciding the dispute if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Pub. Citizen*, 92 F.4th at 1127 (cleaned up; quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc), and *Transwestern Pipeline Co. v. Fed. Energy Regul. Comm'n*, 897 F.2d 570, 575 (D.C. Cir. 1990)).  "A case is moot if a 'decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Pub. Citizen*, 92 F.4th at 1127 (quoting *Transwestern Pipeline*, 897 F.2d at 575).

Here, the White House has now confirmed that the Associated Press's journalists are eligible to participate in East Room events (or what the Associated Press terms "credentialed press events") at the discretion of the White House consistent with the RSVP process and subject to other general requirements for admission—the process used for other White House hard pass holders. Thus, any order from this Court, be it preliminary or final, will neither presently affect the Associated Press's rights nor have a more-than-speculative chance of affecting them in the future. The Associated Press's claims in this regard are therefore moot and cannot support a likelihood of success on the merits. *See, e.g., Youngstown Publ'g*, 189 F. App'x at 404-05 (plaintiff's media access claims were moot when city government rescinded direction not to communicate with reporter); *Nation Mag. v. Dep't of Def.*, 762 F. Supp. 1558, 1570 (S.D.N.Y. 1991) (plaintiff's media access claims were moot when agency lifted regulations constraining press access).

Even were the Associated Press's East Room claims not jurisdictionally moot, those claims fail to support its need for a preliminary injunction. Unlike jurisdictional mootness, the Associated Press has the burden to demonstrate it will suffer irreparable harm absent the requested injunction that is "both certain and immediate" rather than "speculative or theoretical." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (internal quotation marks omitted); *see Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1332 (D.C. Cir. 2024) ("parties seeking a preliminary injunction, among other things, must clear a 'high standard' and demonstrate that their injury is 'both certain and great'" (alteration omitted)). For the same reasons this claim is jurisdictionally moot, the Associated Press has at least failed to meet the irreparable-harm requirement. That alone dooms the Associated Press's request for a preliminary injunction mandating access to the East Room and similar events.

**IV.    The Balance of Equities and the Public Interest Tips Decidedly in Favor of the <u>White House</u>**

The final two factors in the provisional relief analysis—balancing the equities and the public interest—often overlap in the context of an action to enjoin the government. *See Pursuing Am.'s Greatness*, 831 F.3d at 511.    A court "'should pay particular regard for the public consequences'" of injunctive relief.    *Id.* at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).    This is especially so here where the Associated Press asks this Court to overrule a discretionary decision made by the President himself.    *See generally Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867) ("An attempt on the part of the judicial department . . . to enforce the performance of [executive and political] duties by the President [is] 'an absurd and excessive extravagance.'"); *Newdow v. Roberts*, 603 F.3d 1002, 1011 (D.C. Cir. 2010) ("issuing an injunction to prevent [the President's subordinates] from implementing the future President's inaugural plan would be folly, akin to enjoining a sound technician from turning the Chief Justice's microphone on when administering the oath").

\*    \*    \*

## CONCLUSION

For these reasons, the Court should deny the Associated Press's amended motion for a preliminary injunction. A proposed order is enclosed herewith.

Dated: March 11, 2025     Respectfully submitted,
    Washington, DC

            EDWARD R. MARTIN, JR., D.C. Bar #481866
            United States Attorney


By:     */s/ Brian P. Hudak*
            BRIAN P. HUDAK
            Chief, Civil Division
            601 D Street, NW
            Washington, DC 20530
            (202) 252-2500 (main)

            *Attorneys for the United States of America*