IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ASSOCIATED PRESS,<br><br>     *Plaintiff,*<br><br> v.<br><br>TAYLOR BUDOWICH, in his official capacity as White House Deputy Chief of Staff; KAROLINE LEAVITT, in her official capacity as White House Press Secretary; and SUSAN WILES, in her official capacity as White House Chief of Staff,<br><br>     *Defendants*. | Civil Action No. 25-cv-532-TNM |

**BRIEF OF *AMICI CURIAE* STATE DEMOCRACY DEFENDERS FUND AND FORMER PUBLIC OFFICIALS IN SUPPORT OF PLAINTIFF'S AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

i

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(A), amicus State Democracy Defenders Fund ("SDDF"), a non-profit, non-partisan organization, has no parent corporations and no publicly held corporation owns 10 percent or more of its stock.

**RULE 29(a)(4)(E) CERTIFICATION**

Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(E), SDDF certifies that its counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person — other than SDDF, its members, or counsel — contributed money that was intended to fund preparing or submitting the brief.

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**                                                                 1

**INTRODUCTION AND STATEMENT OF INTEREST OF** *AMICI CURIAE*         3

**BACKGROUND**                                                                                    6

**ARGUMENT**                                                                                       8

**I.   THE PUBLIC INTEREST AND BALANCE OF THE EQUITES SUPPORT GRANTING OF A PRELIMINARY INJUNCTION**                                           8
   A.   Denial of Access Will Inhibit Robust and Critical Reporting                   8
   B.   Denial of Access to the AP Will Encourage Future Administrations to Engage in Similar Behavior, to the Detriment of Our Political Culture                          11
   C.   Denial of Access Will Impair the Role of AP, Which Serves a Particularly Important Role in Informing the Public                                                    13

**CONCLUSION**                                                                                   14

# TABLE OF AUTHORITIES

**CASES**

*Karem v. Trump*, 960 F.3d (D.C. Cir. 2020) ............................................................................... 7

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. (1980) ........... 7

*Near v. State of Minn. Ex rel. Olson*, 283 U.S. (1931) ................................................................ 5

*Near v. State of Minnesota ex rel Olson*, 283 U.S. (1931). ......................................................... 4

*New York Times Co. v. United States*, 403 U.S. (1971) .............................................................. 4

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. (1980) .......................................................... 5

*Saxbe v. Washington Post Co.*, 417 U.S. (1974) ......................................................................... 5

*Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977); *cf. Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, U.S. (1983) ................................................................. 12

**STATUTES**

5 U.S.C. § 3331 ............................................................................................................................ 3

**OTHER AUTHORITIES**

David Folkenflik, *Trump's FCC chief opens investigation into NPR and PBS*, NPR (Jan. 30, 2025), https://www.npr.org/2025/01/30/nx-s1-5281162/fcc-npr-pbs-investigation ................ 8

Brian Stelter, *What Elon Musk's dangerous war with '60 Minutes' is really all about*, CNN (Feb. 18, 2025), https://www.cnn.com/2025/02/18/media/elon-musk-60-minutes-prison/index.html ............ 8

David A. Anderson, *The Origins of the Press Clause*, 30 UCLA L. Rev. 455, (1983) ............ 10

Graham Kates, *Trump sues Des Moines Register over poll, promises more lawsuits against news outlets after ABC News settlement*, CBS News (Dec. 17, 2024), https://www.cbsnews.com/news/trump-threatens-lawsuit-des-moines-register-poll-media/. ... 8

*Guide To The White House Beat*, White House Correspondents' Ass'n, https://perma.cc/ZF7Z-GPXX ............................................................................................... 5

Johanna Maska, *Trump's friendly audience in media briefings*, Johanna Maska (Feb. 18, 2025), https://www.johannamaska.com/p/trumps-friendly-audience-in-media ............ 9

Lauren Easton, *AP Creates Local Investigative Reporting Program*, Associated Press (Feb. 20, 2025), https://www.ap.org/the-definitive-source/announcements/ap-creates-local-investigative-reporting-program/ ............ 12

Malcolm Fergurson, *Trump Cheers MSNBC Firing of Joy Reid, Demands 'Vast Sums of Money'*," The New Republic (Feb. 24, 2025), https://newrepublic.com/post/191867/trump-msnbc-vast-sums-money ............ 8

Marc Caputo, *Scoop: Why Trump targets AP*, Axios (Feb. 17, 2025), https://perma.cc/5PSL-SSWM ............ 6

Meg James, *In Trump's first week, FCC chair signals headaches ahead for media giants*, Los Angeles Times (Jan. 24, 2025), https://www.latimes.com/entertainment-arts/business/story/2025-01-24/trumps-fcc-chairman-resurrects-bias-complaints-against-broadcasters-abc-cbs-and-nbc ............ 8

Penelope Muse Abernathy et al., *The State of Local News Project, 2023 Report*, Local News Initiative, Northwestern University (Nov. 16, 2023), https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2023/report/ ............ 12

Steven M. Cohen, *A Tax on Advertising: First Amendment and Commerce Clause Implications*, 63 N.Y.U. L. Rev. (1988) ............ 10

Ted Johnson, *Fox News and Newsmax Among News Outlets Urging White House to Lift Ban on Associated Press Over Continued References to 'Gulf of Mexico*,' Deadline (Feb. 20, 2025), https://perma.cc/8NTU-TXFK. ............ 11

2

## INTRODUCTION AND STATEMENT OF INTEREST OF *AMICI CURIAE*

Amicus State Democracy Defenders Fund ("SDDF") is a bipartisan, nonprofit organization committed to upholding the rule of law and defending the Constitution. The other *amici curiae* listed below (collectively with SDDF, "*Amici*") are a group of conservative or independent former government officials, including those who were elected as Republicans or served in Republican administrations. Collectively, they have spent decades in public service in the federal government and state government. During their public service, they, like all public officials, had both negative and positive interactions with the press. But they have always held the First Amendment as sacrosanct and believed that the government must not restrain a free press nor retaliate against members of the press because of what they report or their perceived viewpoint. When powerful government officials exclude the press from access to information, as the White House has done with The Associated Press ("the AP") here, they violate one of the most fundamental principles of our democracy. *Amici* submit this brief to urge the Court to uphold those principles and issue a preliminary injunction reversing the actions of the White House.

*Amici's* primary purpose in this brief is not to address the likelihood of AP's success on the merits of its claims under the First and Fifth Amendments, which are fully addressed by AP's brief as well as *amicus* briefs submitted by the Reporters' Committee for the Freedom of the Press, White House Correspondents' Association, and Knight First Amendment Institute of Columbia University. *See* ECF Nos. 20, 21, 27, 32. *Amici*'s purpose is instead to provide the views of a group of conservative former public officials who have themselves experienced hostile press encounters regarding the public interest in granting the injunction sought by the AP.

*Amici*'s north star as public servants has always been adherence to the Constitution, as reflected in their oaths of office. Those *Amici* who served in the House of Representatives took

3

the following oath "I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God." 5 U.S.C. § 3331. *Amici* who served in state positions took similar oaths. For example, one of the *Amici* took a similar oath before assuming his duties as Governor of Minnesota, pledging to "support the constitution of the United States and of this state and to discharge faithfully the duties of his office to the best of his judgment and ability." Minn. Const., Art. V, § 6.

Whatever the specific oath, as public officials *Amici* pledged to support the Constitution. There is no more important directive in the Constitution than to preserve the freedom of speech and of the press. Our country was founded on the principles of free speech and a free press. "In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy." *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J. and Douglas, J., concurring); *see also Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 717 (1931) (In a letter sent by the Continental Congress (October 26, 1774) to the Inhabitants of Quebec: "The importance of [freedom of the press] this consists, besides the advancement of truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are ashamed or intimidated, into more honorable and just modes of conducting affairs."). As public officials, *Amici* have always honored that history, even when it was difficult.

*Amici* and their relevant background are listed below:

4

- **Arne Carlson,** Republican, Governor of Minnesota, 1991 to 1999.

- **Ty Cobb,** White House Special Counsel from 2017 to 2018.

- **Barbara Comstock,** Republican, Representative of the 10th Congressional District of Virginia from 2015 to 2019.

- **Mickey Edwards,** Republican, Representative of the 5th Congressional District of Oklahoma from 1977 to 1993.

- **David Emery,** Republican, Representative of the 1st District of Maine from 1975 to 1983.

- **Jim Greenwood,** Republican, Representative of the 8th Congressional District of Pennsylvania from 1993 to 2005.

- **Bob Inglis,** Republican, Representative of the 4th Congressional District of South Carolina from 1993 to 1999 and 2005 to 2011.

- **The Honorable J. Michael Luttig,** United States Court of Appeals for the Fourth Circuit (1991 to 2006).

- **Susan Molinari,** Republican, Representative of the 14th Congressional District of New York from 1990 to 1993 and the 13th Congressional District of New York from 1993 to 1997.

- **Tom Petri,** Republican, Representative of the 6th Congressional District of Wisconsin, 1979 to 2015.

- **Denver Riggleman**, Republican, Representative of the 5th District of Virginia from 2019 to 2021.

- **Claudine Schneider,** Republican, Representative of the Second District of Rhode Island from 1981 to 1991

- **Peter Smith,** Republican, Representative-at-Large of Vermont from 1989 to 1991.

- **David Trott,** Republican, Representative of the 11th Congressional District of Michigan from 2015 to 2019.

- **Joe Walsh,** Republican, Representative of the 8th Congressional District of Illinois from 2011 to 2013

- **William Weld**, Republican, Governor of Massachusetts from 1991 to 1997 and United States Assistant Attorney General for the Criminal Division from 1986 to 1988.

- **Christine Todd Whitman,** Republican, Governor of New Jersey, 1994 to 2001 and Administrator of the Environmental Protection Agency from 2001 to 2003.

## BACKGROUND

In modern history in this republic, the White House press pool has acted as an agent of interested citizens ensuring that Americans have access to accurate and timely information about the President. This institution has long benefited presidents, as well as the press, and the public-at-large — which explains why, apparently, no president had ever before attempted to evict any news organization from it. The foundational benefit from an unrestricted press pool is so well-settled, that no president should evict a news organization from it. *See, e.g.*, *Near v. State of Minn. Ex rel. Olson*, 283 U.S. at 717 (1931); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 582–83 (1980) (Stevens, J., concurring) ("the First Amendment protects the public and the press from abridgment of their rights of access to information about the operation of their government"); *Saxbe v. Washington Post Co.*, 417 U.S. 843, 863 (1974) ("By enabling the public to assert meaningful control over the political process, the press performs a crucial function in effecting the societal purpose of the First Amendment.").

"For nearly a century, the story of the American presidency has been written through the eyes of the 'press pool,' the small team of writers, photographers and technicians assigned each day to cover the commander-in-chief on behalf of the broader corps of correspondents." *Covering The White House*, White House Correspondents' Ass'n (last visited March 11, 2025), https://perma.cc/3WNR-LSZ9. Seats for the press pool have been allocated by the White House Correspondence Association, not the White House, consistent with the intent of the pool to serve the public and not the presidency. *See Guide To The White House Beat*, White House Correspondents' Ass'n, https://perma.cc/ZF7Z-GPXX (last visited March 11, 2025).

6

On February 11, 2025, Defendant Katherine Leavitt, the White House Press Secretary, informed the AP's Chief White House Correspondent that, at the President's direction, the AP would no longer be permitted into the Oval Office unless it revised its style guidance to use the name "Gulf of America" to refer to the body of water traditionally known as the "Gulf of Mexico," consistent with the President's recent executive order. Am. Compl., ¶¶ 49-51.

On February 14, Defendant Taylor Budowich, a White House Deputy Chief of Staff, announced that, because the AP had not made this revision, it would be banned from "access to limited spaces, like the Oval Office and Air Force One" — *i.e.*, removed from the press pool. *Id.*, ¶ 63. AP reporters and photographers also have been barred from certain events open to the broader White House press corps. *See id.*, ¶¶ 60, 67, 71. Budowich subsequently told a reporter that "[t]his isn't just about the Gulf of America…This is about AP weaponizing language through their stylebook to push a partisan worldview in contrast with the traditional and deeply held beliefs of many Americans and many people around the world." Marc Caputo, *Scoop: Why Trump targets AP*, Axios (Feb. 17, 2025), https://perma.cc/5PSL-SSWM. Similarly, Defendant White House Chief of Staff Susie Wiles asserted that "the influence" the AP's "Stylebook has acquired has been misused, and at times weaponized, to push a divisive and partisan agenda." Am. Compl., ¶ 68.

On February 25, four days after the AP filed its complaint in this case and one day after this Court's hearing on AP's motion for a temporary restraining order, the White House announced that it — rather than the WHCA — would henceforth determine which outlets could participate in the press pool. *See id.*, ¶81. Bloomberg and Reuters, which had long been assigned two of three slots for wire services, would alternate in a single pool slot for wire services, while the AP would remain barred over its refusal to use the term "Gulf of America." *See id.*, ¶ 84.

7

**ARGUMENT**

I.  **THE PUBLIC INTEREST AND BALANCE OF THE EQUITES SUPPORT GRANTING OF A PRELIMINARY INJUNCTION**

In considering requests for preliminary relief, in addition to the likelihood of success on the merits and irreparable harm, courts consider the harm that would be inflicted on the opposing party by the grant of an injunction and weigh the public interest in deciding whether to grant the injunction. Those issues "merge when, as here, the Government is the opposing party." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Niken v. Holder*, 556 U.S. 418, 435 (2009)) (cleaned up). The public interest here strongly favors the grant of the injunction sought by the AP.

A.  **Denial of Access Will Inhibit Robust and Critical Reporting**

There is no public interest in denying due process, particularly to a media organization, where such a denial leads to suppressing or chilling free speech. *See Karem v. Trump*, 960 F.3d 656, 667-68 (D.C. Cir. 2020) (citations omitted) ("enforcement of an unconstitutional law is always contrary to the public interest."); *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 536 (1980) (constitutional restrictions on speech may not be based upon either its content or subject matter). Nor is there a public interest in denying access to an entire media organization based on the content of its speech. As noted in the Memorandum of The Associated Press (at 25-28), this case involves a broad denial of *access* to the President, as opposed to the more limited denial of two of the Baltimore Sun's reporters' *interactions* with state officials at issue in *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 413 (4th Cir. 2006).

There is a strong public interest in maintaining press access now being blocked by White House actions since the press pool acts as representatives of the American public to report on newsworthy subjects without undue government interference. *See Nation Mag. v. U.S. Dep't of*

8

*Def.*, 762 F. Supp. 1558, 1574 (S.D.N.Y. 1991) (citing *Stone, Content Regulation and the First Amendment* 25 Wm. & Mary L. Rev. 189, 203 (1983)). The government should not decide from which press the American people receive their news coverage, and any coercion to the contrary harms the public interest.

The actions of the White House excluding the AP from the press pool and other access to the President and the White House are, without real dispute, efforts to punish that outlet for its use of the longstanding term "Gulf of Mexico" rather than the White House's preferred "Gulf of America" and, apparently, for other aspects of the AP's reporting.

Moreover, those actions can well be understood in the context of numerous other threats made and adverse actions taken by the President and the Administration against media with which it disagrees.[1]

Retaliation against the AP, and the Administration's efforts to intimidate the press generally, could not be more at odds with the principles animating our founders when they wrote the Constitution. Permitting this kind of government interference would inhibit robust critical

---

[1] Meg James, *In Trump's first week, FCC chair signals headaches ahead for media giants*, L.A. Times (Jan. 24, 2025), https://www.latimes.com/entertainment-arts/business/story/2025-01-24/trumps-fcc-chairman-resurrects-bias-complai nts-against-broadcasters-abc-cbs-and-nbc (FCC investigations against ABC, NBC, and CBS, and President Trump's lawsuits against ABC and CBS); David Folkenflik, *Trump's FCC chief opens investigation into NPR and PBS*, NPR (Jan. 30, 2025), https://www.npr.org/2025/01/30/nx-s1-5281162/fcc-npr-pbs-investigation (FCC investigations against PBS and NPR); Graham Kates, *Trump sues Des Moines Register over poll, promises more lawsuits against news outlets after ABC News settlement*, CBS News (Dec. 17, 2024), https://www.cbsnews.com/news/trump-threatens-lawsuit-des-moines-register-poll-media/ (President Trump's lawsuits against the Des Moines Register and the Pulitzer Prize Board); Frank Langfitt, *Trump funding freeze halts decades of U.S. democracy work around the world*, NPR (Feb. 18, 2025) https://www.npr.org/2025/02/16/nx-s1-5297844/trump-musk-democracy-usaid-authoritarian-human-rights-funding-f reeze (Administration cutting off funding to pro-democracy media abroad); Brian Stelter, *What Elon Musk's dangerous war with '60 Minutes' is really all about*, CNN (Feb. 18, 2025), https://www.cnn.com/2025/02/18/media/elon-musk-60-minutes-prison/index.html (Elon Musk calling for "long prison sentences" for journalists at "60 Minutes"); Malcolm Ferguson, *Trump Cheers MSNBC Firing of Joy Reid, Demands 'Vast Sums of Money'*," The New Republic (Feb. 24, 2025), https://newrepublic.com/post/191867/trump-msnbc-vast-sums-money (President Trump stating that NBC and MSNBC "should be forced to pay vast sums of money for the damage they've done to our Country");

9

reporting, and encourage the press to tailor its work to please the President and avoid sanctions of the sort experienced by the AP.

A recent press conference provides insight into the way viewpoint-based retaliation against press organizations disfavored by the Administration can result in a changed journalistic climate, where reporters seek to curry favor with government officials rather than pose challenging questions that foster robust public debate. During a recent press conference with President Trump and Indian Prime Minister Narendra Modi – from which the AP was excluded (Am. Compl., 60) – the first question from the press permitted in the room was, "You are both very popular leaders in your respective countries. You have spoken about a commonsense diplomatic doctrine. So what's a Trump-Modi doctrine that we should expect from the USA?" Johanna Maska, *Trump's friendly audience in media briefings*, Johanna Maska (Feb. 18, 2025) https://www.johannamaska.com/p/trumps-friendly-audience-in-media. A subsequent question was, "President Trump, first of all, congratulations for the fantastic 24 days of your presidency, historic and unprecedented decisions that you made, transformational reforms." *Id.* The President responded to the latter question, "I like her, I like her." *Id.* This kind of exchange fails to provide the American public with any real information to understand and evaluate critical public matters, in this example an important international relationship.

As former public officials, *Amici* acknowledge that aggressive press scrutiny can be challenging for those who serve in government. They have experienced that scrutiny themselves. But they also believe that a rigorous and challenging press is vital to democracy and thus the American people. The Founders' purpose in adopting the First Amendment was clear: "[t]he press was to serve the governed, not the governors." *New York Times Co.*, v. United States, 403

U.S. at 717 (Black, J., and Douglas, J., concurring); *see also*, *Nation Magazine* U.S. Dep't of Def., 762 F. Supp. at 1573 (S.D.N.Y. 1991) ("Regardless of whether the government is constitutionally required to open the battlefield to the press as representatives of the public, a question that this Court has declined to decide, once the government does so it is bound to do so in a non-discriminatory manner."). "[R]ight conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection." *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943). Therefore, permitting the White House to exclude the AP serves only to hinder freedom of speech afforded to all Americans and favors only the governors.

**B. Denial of Access to the AP Will Encourage Future Administrations to Engage in Similar Behavior, to the Detriment of Our Political Culture**

*Amici* are deeply familiar with the ebb and flow of politics and the motivations of those who hold political office. President Obama held office for two terms, President Biden for one term, and President Trump has embarked on his second term. The precedents set by each administration inform what the following administration believes it can or should do to advance its policy agenda. Dealing with the press is a critical part of advancing an administration's agenda. In a time of polarized public and political views, there will be temptations for an administration to object to press it does not believe is fair in presenting its messages. As noted at pages 7-8 of the Reporter's Committee for the Freedom of the Press amicus brief (ECF No. 21), the Reagan, George W. Bush, Obama, and Biden administrations all experienced frustration with what they viewed as unfair and hostile press outlets. But no retaliatory actions were implemented.

If the White House now is permitted to exclude press voices it does not believe adequately tell its story, subsequent administrations will view such actions as legitimate tools to

11

advance their agendas. Here, a Republican administration denied access to the AP. But allowing this kind of action will significantly increase the risk that a future Democratic administration will take a similar action and restrict access for media outlets it considers hostile. Permitting the White House to persist in its denial of access would facilitate a political culture in which governing administrations shut out disfavored media, to the detriment of the robust reporting and public debate the First Amendment seeks to promote. *See* Steven M. Cohen, *A Tax on Advertising: First Amendment and Commerce Clause Implications*, 63 N.Y.U. L. Rev. 810, 839, n.56 (1988) (freedom of the press not only functions to safeguard the marketplace of ideas, but also sanctions a fourth institution, outside the government, that would work as an additional check on the three official branches.); David A. Anderson, *The Origins of the Press Clause*, 30 UCLA L. Rev. 455, 490--91 (1983) (describing the adversarial relationship between the press and democracy as a check on the government, one which a government may try to suppress, and as such freedom of press is a necessary element of self-government).

That concern is undoubtedly one reason such outlets as Fox News and Newsmax have objected to the actions of the White House here. Ted Johnson, *Fox News and Newsmax Among News Outlets Urging White House to Lift Ban on Associated Press Over Continued References to 'Gulf of Mexico,'* Deadline (Feb. 20, 2025), https://perma.cc/8NTU-TXFK (as a Newsmax spokesperson put it, "We can understand President Trump's frustration because the media has often been unfair to him, but Newsmax still supports the AP's right, as a private organization, to use the language it wants to use in its reporting," because the outlet "fear[s] a future administration may not like something Newsmax writes and seek to ban us.") *Id*.

12

In sum, granting the injunction against restricting the AP's access will help prevent a political environment in which tools of intimidation by the party in power drive the nature and content of reporting.

### C. Denial of Access Will Impair the Role of AP, Which Serves a Particularly Important Role in Informing the Public

The Associated Press is unique in its reach, both globally and throughout the United States. "The AP's journalism reaches four billion people per day via news outlets around the world – whatever their political orientation – that rely on the AP to gather information and generate reporting that those news outlets republish for the benefit of their audiences." Am. Compl., 5. Because of that reach, the AP performs an important role in informing the public.

That role is particularly important to the public in areas of the country outside of large cities, where media outlets are less likely to have their own Washington or foreign bureaus and rely heavily on the stories investigated and written by the AP. Such reliance on the AP is increasing, as local newspapers are financially struggling and local and even regional newspapers are closing in ever greater numbers. *See e.g.*, Penelope Muse Abernathy and Sarah Stonebely, *The State of Local News Project, 2023 Report*, Local News Initiative, Northwestern University (Nov. 16, 2023), https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2023/report/ ("the number of local news outlets continued to contract at an even steeper rate in 2023. On the current trajectory, by the end of next year, the country will have lost a third of its newspapers since 2005."); Lauren Easton, *AP Creates Local Investigative Reporting Program*, Associated Press (Feb. 20, 2025), https://www.ap.org/the-definitive-source/announcements/ap-creates-local-investigative-reporting-program/ (describing the creation of a Local Investigative Reporting Program in addition to existing Local News

13

Success Team helping to localize national stories for member audiences).

Some *Amici* live in and have represented constituents in such regions. Excluding the AP from the press pool and other access to the President limits the public's access to full information about what its government is doing. "Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977); *cf. Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, U.S. 575, 585 (1983) (ruled that "use tax" on the cost of paper and ink products used by periodic publications in excess of $100,000 a year violated the freedom of the press by singling out the press). The access restrictions imposed on the AP by the White House violate the Constitution and are profoundly antithetical to the public interest.

## CONCLUSION

For these reasons, as well as those set forth in Plaintiff's brief and other *amicus* briefs in this case, *Amici* respectfully urge that AP's amended motion for a preliminary injunction be granted.


Respectfully submitted,

*/s/ Norman L. Eisen*
Norman L. Eisen, [9112170186]
**STATE DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org

14