## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ASSOCIATED PRESS,

           Plaintiff,

v.

TAYLOR BUDOWICH, et al.,

           Defendants.

Case No. 25-cv-532-TNM

### REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFF THE ASSOCIATED PRESS'S AMENDED MOTION FOR PRELIMINARY INJUNCTION

Jay Ward Brown (#437686)
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Sasha Dudding (#1735532)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
brownjay@ballardspahr.com
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
duddings@ballardspahr.com

*Counsel for Plaintiff The Associated Press*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT .............................................................................................................. 7

I.       THE AP IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ..................... 7

         A.       Defendants' Actions Violate the Fifth Amendment Due Process Clause .............. 8

                  1.       Defendants' Actions Have Deprived the AP of a Liberty Interest ............. 8

                  2.       Defendants Failed to Provide the AP with Procedural Due Process ........ 11

         B.       Defendants' Actions Violate the First Amendment ................................................ 12

                  1.       Defendants have conceded multiple First Amendment arguments ........... 12

                  2.       Defendants fail to justify their egregious viewpoint discrimination .......... 13

                  3.       Forum doctrine further strengthens the AP's First Amendment claims .... 15

II.      THE AP SATISFIES ALL OF THE OTHER FACTORS WARRANTING A
         PRELIMINARY INJUNCTION ............................................................................... 16

         A.       The AP Is Suffering Irreparable Harm Without a Preliminary Injunction ........... 16

                  1.       The AP is Irreparably Harmed by the Exclusion from Events
                           Open to Credentialed Journalists ........................................................... 16

                  2.       The AP is Irreparably Harmed by the Denial of Access to The
                           Press Pool and Larger Events Before February 25 .................................. 18

                  3.       The White House continues to Irreparably Harm the AP's
                           Journalism ............................................................................................... 20

                  4.       The AP Has Experienced Irreparable Financial Harm Due to
                           the Denial of Access ............................................................................... 21

                  5.       The AP Has Experienced Irreparable Harm Due to the
                           Violation of Its Constitutional Rights ...................................................... 22

         B.       The Balance of Equities and the Public Interest Strongly Favor a
                  Preliminary Injunction ......................................................................................... 22

CONCLUSION ........................................................................................................... 25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska Landmine, LLC v. Dunleavy*,
  514 F. Supp. 3d 1123 (D. Alaska 2021) ..............................................................11

*American Federation of Government Employees v. OPM*,
  2025 WL 820782 (N.D. Cal. Mar. 14, 2025)..........................................................24

*Baltimore Sun v. Ehrlich*,
  437 F.3d 410 (4th Cir. 2006) ..................................................................................14

*Bancoult v. McNamara*,
  227 F. Supp. 2d 144 (D.D.C. 2002) ........................................................................13

*Bartley v. Taylor*,
  25 F. Supp. 3d 521 (M.D. Pa. 2014)........................................................................14

*Board of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972)...................................................................................................8

*Benning v. Commissioner, Georgia Department of Corrections*,
  71 F.4th 1324 (11th Cir. 2023) .................................................................................8

*CNN, Inc. v. ABC, Inc.*,
  518 F. Supp. 1238 (N.D. Ga. 1981) ........................................................................10

*CNN, Inc. v. Trump*,
  2018 WL 9436958 (D.D.C. Nov. 16, 2018) ...........................................................25

*Consumers Union of U.S., Inc. v. Periodical Correspondents' Association*,
  365 F. Supp. 18 (D.D.C. 1973)................................................................................10

*DL v. D.C.*,
  187 F. Supp. 3d 1 (D.D.C. 2016).............................................................................18

*Doe v. McHenry*,
  2025 WL 596651 (D.D.C. Feb. 18, 2025) ..............................................................24

*Elrod v. Burns*,
  427 U.S. 347 (1976)..................................................................................................22

*Frank v. Herter*,
  269 F.2d 245 (D.C. Cir. 1959).................................................................................10

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)..................................................................................................24

ii

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
    528 U.S. 167 (2000)................................................................................................17, 20

*Getty Images News Services Corp. v. Department of Defense*,
    193 F. Supp. 2d 112 (D.D.C. 2002) .......................................................................10, 12

*Grundmann v. Trump*,
    2025 WL 782665 (D.D.C. Mar. 12, 2025)...................................................................24

*Harris v. Bessent*,
    2025 WL 679303 (D.D.C. Mar. 4, 2025)................................................................23, 24

*Homer v. Richmond*,
    292 F.2d 719 (D.C. Cir. 1961) .......................................................................................8

*Hopkins v. Women's Division, General Board of Global Ministries*,
    238 F. Supp. 2d 174 (D.D.C. 2002) .......................................................................11, 13

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ..........................................................................22, 24, 25

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..........................................................................................21

*Luokung Technology Corp. v. Department of Defense*,
    538 F. Supp. 3d 174 (D.D.C. 2021) ..............................................................................21

*National Council of Nonprofits v. OMB*,
    2025 WL 597959 (D.D.C. Feb. 25, 2025) ...................................................8, 18, 20, 24

*Nation Magazine v. Department of Defense*,
    762 F. Supp. 1558 (S.D.N.Y. 1991)...............................................................................10

*Northeastern Florida Chapter of Associated General Contractors of America v.
City of Jacksonville*,
    508 U.S. 656 (1993)......................................................................................................20

*New York v. Trump*,
    2025 WL 715621 (D.R.I. Mar. 6, 2025) ........................................................................24

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ....................................................................................24

*NRA of America v. Vullo*,
    602 U.S. 175 (2024).......................................................................................................13

*Pacito v. Trump*,
    2025 WL 655075 (W.D. Wash. Feb. 28, 2025)..............................................................24

iii

*Perkins Coie LLP v. DOJ,*
    2025 WL 782889 (D.D.C. Mar. 12, 2025)..............................................................................24

*PFLAG, Inc. v. Trump,*
    2025 WL 685124 (D. Md. Mar. 4, 2025)................................................................................24

*Police Department of City of Chicago v. Mosley,*
    408 U.S. 92 (1972)................................................................................................................13

*Price v. Garland,*
    45 F.4th 1059 (D.C. Cir. 2022)............................................................................................15

*Pursuing America's Greatness v. FEC,*
    831 F.3d 500 (D.C. Cir. 2016)..............................................................................................22

*Raycom National v. Campbell,*
    361 F. Supp. 2d 679 (N.D. Ohio 2004)................................................................................14

*Richmond Newspapers, Inc. v. Virginia,*
    448 U.S. 555 (1980)..............................................................................................................20

*Ridley v. MBTA,*
    390 F.3d 65 (1st Cir. 2004)....................................................................................................6

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995)..............................................................................................................13

*Sherrill v. Knight,*
    569 F.2d 124 (D.C. Cir. 1977) ..................................................................................... *passim*

*Snyder v. Ringgold,*
    133 F.3d 917 (4th Cir. 1998) ................................................................................................14

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982)................................................................................................................8

*West Virginia State Board of Education v. Barnette,*
    319 U.S. 624 (1943)..............................................................................................................13

*Wilcox v. Trump,*
    2025 WL 720914 (D.D.C. Mar. 6, 2025)..............................................................................24

*Wilkinson v. Austin,*
    545 U.S. 209 (2005)................................................................................................................8

*Youngstown Publishing v. McKelvey,*
    2005 WL 1153996 (N.D. Ohio May 16, 2005)......................................................................14

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)..................................................................................................................24

*Zemel v. Rusk*,
   381 U.S. 1 (1965)....................................................................................................................10

*Zukerman v. U.S. Postal Service*,
   961 F.3d 431 (D.C. Cir. 2020)................................................................................................17

## PRELIMINARY STATEMENT

Three weeks ago, this Court advised Defendants that "[i]t might be a good idea for the White House" to reconsider whether prohibiting the AP from attending and reporting on presidential events "is really appropriate in light of the case law." *See* Feb. 24, 2025 Hr'g Tr. at 61:2-6. The chorus of *amici* that has stepped forward since that ban started – from former Republican or independent government officials, to First Amendment advocates, to other journalists who cover the White House – further demonstrate why excluding one news organization from those events on the basis of its editorial choices offends the Constitution and harms the public. In their opposition ("Opp.") (ECF 33), Defendants show that they completely failed to take the Court's warning to heart and have increased their affront to the Constitution.

**First, the White House proudly continues to engage in unabashed viewpoint discrimination.** It doubles down on excluding the AP in defiance of the Constitution and the Court's warning that the White House is violating the law of this Circuit. The White House's response is that it has taken over the press pool, and therefore "the President's discretion" permits it to make any viewpoint-based decision that he commands. Opp. at 2. Yet the White House cannot explain why that discretion would possibly relieve it of its most basic obligations under the First and Fifth Amendments. The President's discretion does not trump the Constitution.

Indeed, Defendants freely admit that in taking over control of the press pool, which operated for generations according to viewpoint-neutral criteria, the White House has replaced it with a pool based solely on who President Trump believes "will best convey *his* message." *Id.* (emphasis added). Defendants likewise proclaim that the decision of whether to allow a news organization to observe and report on presidential activities now depends on "the discretion of the president," by which they appear to mean whether President Trump likes or dislikes that

news organization's reporting.  By taking these actions even after the AP filed this lawsuit, the White House has multiplied its violations of the Constitution, retaliated on the basis of speech and petitioning, inflicted even greater injury on the AP, and increased the chill on the entire White House press corps.

**Second, the White House continues to make arbitrary decisions with no clear, reasonable guidance.**  Compounding these constitutional problems even further, and amplifying the need for this Court's intervention, the White House is making up its press policies on the fly and carrying them out in inscrutable ways.  Initially, only the AP's text journalists were banned, while its photographers could still attend presidential events.  *See* Second Decl. of Zeke Miller ("2d Miller Decl.") ¶¶ 21-24 (ECF 27-5).  Then *all* of the AP's White House journalists were banned.  *Id.* ¶¶ 24-26.  Now, Defendant Taylor Budowich asserts that all AP journalists are "permitted to RSVP" for events open to credentialed White House journalists, and that the AP's journalists "are eligible, *at the President's discretion*, to be admitted to those events consistent with the RSVP process . . . and subject to other general requirements for admission."  *See* Decl. of Taylor Budowich ("Budowich Decl.") ¶ 15 (ECF 33-1) (emphasis added).  Mr. Budowich does not say how the President exercises this "discretion," or what the government considers the "general requirements for admission" aside from having White House credentials.

It is thus no surprise that these arbitrary, unwritten rules continue yielding discriminatory results: on March 12, 2025, for example, the White House admitted an AP photographer to an East Room event for the first time in a month while excluding an AP text reporter – with no reason why one AP journalist satisfied the President's "discretion" and met the "general requirements for admission" that one time, while the other did not.  *See* Third Decl. of Zeke Miller ("3d Miller Decl.") ¶ 10.  And, despite submitting RSVPs to President Trump's March 14,

2025 speech at the Department of Justice, held in the Department's sizable Great Hall, the AP's photographer and text journalists were denied entry. *Id.* ¶ 11. The White House cannot provide any viewpoint-neutral reason – because there is none – for why the AP, which is one of the world's largest news organizations, and which has a long history of nonpartisan and independent coverage of the presidency, is consistently barred from presidential events while other news outlets can attend and report on those same events. Without injunctive relief that compels the White House to apply reasonable and viewpoint-neutral criteria, the AP and others in the White House press corps have no notice and no ability to predict what will happen next.

**Third, the White House itself demonstrates the harm it has caused.** Ironically, in the middle of this litigation, the White House reminded the public why excluding the AP from presidential events cuts off an invaluable source of journalism for the American and global public. On March 4, 2025, President Trump delivered the first joint congressional address of his second term. Because the congressional press galleries – not the White House – controlled press access to his speech, AP journalists were allowed in. *See* 3d Miller Decl. ¶ 3.[1] The next morning, the White House issued a press release boasting that "President Trump's speech was the focus of newspapers across America." *Id.* at Ex. C. To illustrate that wide distribution of the President's message, the White House included front-page images from 18 U.S. newspapers, ranging from major metropolitan papers like the *Boston Globe* to smaller papers like the *Altoona Mirror*. What was the byline on *11 of those 18* front page articles? "Zeke Miller and Michelle L. Price, Associated Press." And what was the credited source of the photos on *12 of those 18* front pages? The AP.

---

[1] AP journalists were, however, barred from the White House press pool that accompanied the President to and from the Capitol. *See* 3d Miller Decl. Ex. A at 1.

**Front Page of the *Chattanooga Times Free Press*, March 5, 2025 (via the White House)**



The White House thus perfectly illustrated the AP's reach and impact when, thanks to the viewpoint-neutral access policies of the congressional press galleries, AP journalists were *not* excluded from covering the President's address. The White House publicity demonstrates why its ban of the AP causes harm, not just to the AP, but to thousands of other news organizations across the country and around the world – and the billions of people who get their news from them – that rely on the AP for high-speed and high-quality reporting on and photos of the President conducting the public's business. The same newspapers that reported on the President's speech, all of which are paying AP customers, are no longer assured of receiving AP content from presidential events.

**Fourth, the White House misstates how the pool operates, to mask the harm it is causing.** The government continues to misstate the AP's role in the press pool and the White House press corps, as well as its requested relief. As the AP has explained, its journalists publish wire reports and photos in real-time when covering presidential events, in competition with the other wire services and photographers. *See* 2d Miller Decl. ¶ 10; Decl. of Jon Elswick ("Elswick

4

Decl.") ¶ 5 (ECF 27-8).  The government claims this violates the principle that "[p]oolers are expected to share info and quotes by pool report before publishing unilaterally, even on social media," because "[p]oolers are acting on behalf of the collective in this role and not as individual journalists."  Opp. at 4 (quoting *Guide to the White House Beat*, WHCA (Apr. 2023) ("*Guide*")).  But the government fails to mention that *only the print pooler* produces such a "pool report" to share with the rest of the pool and the White House press corps.  *See Guide*.  This remains true even after the White House took control of the pool on February 25, 2025.  Wire services like AP, by contrast, report live from presidential events to their customers, a group that includes most if not all of the other news organizations covering the President, as well as thousands of other news organizations that do not have their own White House teams.  *See* 3d Miller Decl. ¶¶ 5-7.  That is how, as the White House highlighted, other news organizations such as the *Chattanooga Times Free Press* published AP-bylined reports about the President's speech to Congress.  The AP did not *share* its reporting with those newspapers – they are AP customers.

The government thus completely misses the mark in claiming that the AP seeks more access, or "special" access, to the detriment of others.  Opp. at 1-2.  To the contrary, the AP's ability to attend and report on presidential events makes it possible for thousands of news organizations – including many other major news organizations in the U.S. – to receive timely and accurate information about the President.  3d Miller Decl. ¶¶ 5-8.  Unconstitutionally excluding AP journalists from presidential events therefore harms the AP's news customers, and their readers, just as it harms the AP itself.

**Fifth, the White House relies only on unlawful viewpoint discrimination to justify the harm it has purposely caused.**  The White House offers only one reason for causing such harm: President Trump does not like that the AP uses the term Gulf of Mexico in its reporting

and Stylebook.[2]  Though "the government rarely flatly admits it is engaging in viewpoint discrimination," *Ridley v. MBTA*, 390 F.3d 65, 86 (1st Cir. 2004), this is that rare case.  *See* Feb. 24, 2025 Hr'g Tr. at 40:1-2 (the Court notes that banning the AP "seems pretty clearly viewpoint discrimination" and asks defense counsel, "How is that not problematic?").  The President does not want the press to use certain words – he wants the press to use the words *he* chooses.  And he is so insistent that, in an effort to coerce the AP to use his official vocabulary, the AP's White House journalists have been excluded from nearly every presidential event for the past month.

Moreover, the White House was so determined to punish the AP for its decision to challenge the ban in this lawsuit that it disregarded this Court's warning.  The White House has now doubled down on the viewpoint-based discrimination by taking control of the press pool and continuing to exclude the AP from its new wire service and photo pool spots.  The government claims that "the President's discretion" permits such a blatant violation of the First and Fifth Amendments.  *See* Opp. at 19.  But its argument relies entirely on inapposite case law concerning whether public officials must *give interviews* to journalists, not whether they must apply viewpoint-neutral criteria in deciding which journalists can *observe and report on* public officials conducting public business.  It also ignores long-settled forum doctrine principles.

The government claims this is a case about seeking "special" treatment – it uses the word "special" nearly 60 times in its opposition brief – but the only party seeking special treatment here is the White House, which asks the Court to exempt it from its obligations under the Constitution.  The AP, on the other hand, asks only that it be allowed to report on the President and the White House on the same terms as any other news organization with White House

---

[2] Per its Stylebook, the AP also "acknowledg[es] the new name" that the President has given to a portion of the Gulf of Mexico.  *See* Am. Compl. ¶ 51.

credentialed journalists, and in accordance with the U.S. Constitution.  Specifically, AP text reporters should not be prevented, based on the news organization's editorial choices, from having the same level of access as other wire services in the pool; AP photographers should not be prevented, based on the news organization's editorial choices, from having the same level of access as other photographers in the pool; and AP journalists should not be excluded, based on the news organization's editorial choices, from attending events open to all credentialed members of the White House press corps.  The only question should be whether AP journalists satisfy reasonable, viewpoint-neutral, written criteria to report on those events, as the First and Fifth Amendments, and the public forum doctrine, require.

As the AP explained in its opening brief ("Am. PI Br.") (ECF 27), the White House's actions have harmed the AP's ability to provide the comprehensive and informative reporting on which its members, customers, and readers rely.  Every day that these exclusions persist causes this continued irreparable harm to the AP.  The Court should grant the AP's motion for preliminary injunction and stop these ongoing constitutional violations immediately.

## ARGUMENT

## I.    THE AP IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

The AP has shown that it is likely to succeed on the merits of its claims because, in Defendants' own words, "the President has subjected the Associated Press to differing treatment from others" expressly due to "its refusal to use the Gulf of America name in its Style Guide." Opp. at 22.  Defendants have violated the AP's Fifth Amendment right to due process and its First Amendment rights to freedom of speech, of the press and to petition the government.

Moreover, contrary to Defendants' claims, *see id.* at 15-16, the AP is not asking for preferential treatment, nor for the creation of new rights.  The AP only asks not to be singled out for *worse* treatment based on viewpoint.  First and Fifth Amendment precedent requires no less.

Defendants also claim that their latest gamesmanship – seizing control of the press pool and admitting one AP photographer to one event for the first time in a month – undercuts the AP's claims. *Id.* at 30-31, 33-34. The opposite is true: these shifting policies highlight the unreasonable and discriminatory nature of the ban on the AP, and the need for injunctive relief.

### A.    Defendants' Actions Violate the Fifth Amendment Due Process Clause

### 1.    Defendants' Actions Have Deprived the AP of a Liberty Interest

It is unfortunate that the White House views the guarantees under the Constitution as mere "platitudes." Opp. at 17. The Fifth Amendment's Due Process Clause protects precious liberty interests for all Americans, including the interest in gathering news under the First Amendment's speech and press guarantees. *See Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 499 (1982) (due process attaches to "the exercise of constitutionally protected rights," including "the right of free speech").

The law broadly defines liberty interests to encompass any activity that implicates constitutional rights. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-72, 575 n.14 (1972) (due process is required "[w]hen a State would directly impinge upon interests in free speech or free press"); *Homer v. Richmond*, 292 F.2d 719, 722 (D.C. Cir. 1961) ("One may not have a constitutional right to go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law."); *Benning v. Comm'r, Ga. Dep't of Corr.*, 71 F.4th 1324, 1332 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 1457 (2024) ("[T]he First Amendment . . . creates a liberty interest" in prisoners' use of prison email system regardless of the lack of "a free-standing constitutional . . . right to use [that] email system"); *Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, at *17

(D.D.C. Feb. 25, 2025) ("the 'Due Process Clauses generally confer no affirmative right to governmental aid," but when "individuals or organizations have already been awarded certain funds and grants," First Amendment interests are implicated by government "appearing to target specific recipients because they associate with certain ideas"); *see also* Feb. 24, 2025 Hr'g Tr. at 45:11-16 (the Court notes, "[Y]ou can fire people for any number of reasons. . . But if it is motivated by some sort of illegal motives," that "turns into something that is inappropriate.").

Defendants cannot escape this controlling precedent by falsely claiming that the AP invokes an interest in "permanent special media access to the President." Opp. at 11. The AP is not claiming any such "special" interest at all – rather, the AP is asserting its well-settled liberty interest in "the first amendment guarantee of freedom of the press," including "the protection afforded newsgathering," which the D.C. Circuit recognized is held by all members of the press corps. *Sherrill*, 569 F.2d at 129-30. Just as the AP seeks not to be banned from the pool and larger events based on discriminatory, arbitrary, unwritten criteria, a news organization's liberty interest requires non-discriminatory, non-arbitrary, published criteria. It is Defendants who seek "special" consideration in claiming that such binding due process rules do not apply to them.

Defendants also fail to evade *Sherrill* by miscasting it as a "narrow exception to the rule that the First Amendment creates no liberty interests in access," confined to White House press passes alone. *See* Opp. at 14, 20. *Sherrill* is not so narrow. In fact, *Sherrill* frames the liberty interest broadly, as an interest in "the protection afforded newsgathering under the first amendment guarantee of freedom of the press." *Sherrill*, 569 F.2d at 129. And following the same due process reasoning as *Sherrill*, and as this Court warned the government, "uniform" precedent has found that the government's criteria for press access to spaces and events – even where officials were not required to grant access in the first place – must be reasonable and

viewpoint-neutral, in accordance with due process. *See Frank v. Herter*, 269 F.2d 245, 247 (D.C. Cir. 1959) (per curiam) (Burger, J., concurring) (40-person group of reporters permitted to visit China); *Getty Images News Servs. Corp. v. Dep't of Def*., 193 F. Supp. 2d 112, 115, 123 n.10 (D.D.C. 2002) (flights to Guantanamo with only 20 press seats); *Nation Magazine v. Dep't of Def*., 762 F. Supp. 1558, 1573 (S.D.N.Y. 1991) (Gulf War press pool coverage); *CNN, Inc. v. ABC, Inc*., 518 F. Supp. 1238, 1239 (N.D. Ga. 1981) (White House pool coverage); *Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 365 F. Supp. 18, 26 (D.D.C. 1973) (congressional press galleries). Once the government permits press access to a space, whether the East Room or the State Dining Room or the Oval Office or the Brady press briefing room, there is a liberty interest in such access, which may not be deprived without due process.

Indeed, Defendants' invented label of "special" access *make no sense* given that all press access to the White House is "special." As Defendants note, in *Zemel v. Rusk* the Court found that the press and public do not have a freestanding right of access to the White House. 381 U.S. 1, 17 (1965); Opp. at 11. The AP does not claim otherwise. But, as *Sherrill* held, while "the public has no right of access to the White House, and . . . the right of access due the press generally is no greater than that due the general public," once the White House *has* permitted press access, due process "requires that this access not be denied arbitrarily or for less than compelling reasons." 569 F.2d at 129 (citing *Zemel*); *see also* Feb. 24, 2025 Hr'g Tr. at 41:13-19 (the Court notes, "You and I couldn't just waltz into the Brady [press briefing] room whenever we want. They've already received special access. And the question is whether . . . under *Sherrill* . . . they can be prohibited from this smaller press pool based on viewpoint discrimination."). In other words, while due process does not require the government to open new areas in the White House to the press, it *does* require that when the government has done so,

it cannot exclude the press arbitrarily or for discriminatory reasons. That is precisely what the government did in barring the AP from presidential events.

Defendants also mislabel the AP's claimed liberty interest as seeking to "engage with" the President. *See* Opp. at 14-15. But the liberty interest here is a right of *newsgathering* – to be in the room and observe government business – not a right of *interaction*. *See Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1133-34 (D. Alaska 2021) (citing *Sherrill*, 569 F.2d at 129-30). The AP is *not* seeking to compel the President to grant its journalists interviews. The AP is *not* trying to force the President to answer its journalists' questions at press conferences. The AP asks only that its journalists, who are seeking to document history, not be barred from spaces open to members of the White House press pool and other credentialed journalists based on its expression and without due process. *See* Feb. 24, 2025 Hr'g Tr. at 38:1-4 (the Court describes the pool as "a small group that gets to witness history, be in the room where it happens"). For that reason, this case is entirely different from *Baltimore Sun v. Ehrlich*, which did not even address due process. *See* Am. PI Br. at 33-36; *infra* Part I.B (discussing *Sherrill* and distinguishing *Ehrlich* and other cases on this point).

## 2. Defendants Failed to Provide the AP with Procedural Due Process

Defendants failed even to argue that they provided the AP with the "adequate procedures" that due process requires before denying a protected liberty interest. *Sherrill*, 569 F.2d at 131 n.24. Defendants thus concede the point. *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a [party] files an opposition to a motion . . . addressing only certain arguments raised by the [movant], a court may treat those arguments that the [non-moving party] failed to address as conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004). Nor could Defendants have prevailed on such an argument, as they failed to meet every single requirement of due process: (1) "notice of

11

the factual bases for denial," (2) "an opportunity for the applicant to respond to these," and (3) "a final written statement of the reasons" for excluding the AP, (4) which reasons may not be "arbitrar[y]" or "less than compelling." *Sherrill*, 569 F.2d at 129-30; *see* Am. PI Br. at 29-32. To comply with the Constitution, Defendants must follow these procedural requirements, and allow the press to attend and report on pool events and credentialed press events based on reasonable, viewpoint neutral, and published criteria that do not discriminate against the AP. *See Sherrill*, 569 F.2d at 129-30 (government "must publish or otherwise make publicly known the actual standard employed in determining" access, which "must not be denied arbitrarily or for less than compelling reasons"); *Getty Images*, 193 F. Supp. 2d at 12 (same).

### B.    Defendants' Actions Violate the First Amendment

For over a month now, in violation of the First Amendment, Defendants have excluded the AP's White House journalists from pool events and other events open to all White House credentialed journalists, merely because the President dislikes the AP's reporting. This access ban is no less discriminatory, retaliatory, or coercive now that the White House has taken control of the press pool. To the contrary, these unprecedented actions only highlight the lengths to which Defendants will go to punish the AP for its reporting and editorial choices. The First Amendment therefore provides an independent and alternative basis for injunctive relief.

### 1.    Defendants have conceded multiple First Amendment arguments

The AP has shown that the access ban violates the First Amendment in four different ways. First, the ban constitutes unconstitutional retaliation for the AP's exercise of its speech and press rights. Am. PI Br. at 28-34. Second, the ban amounts to unconstitutional retaliation for the AP's exercise of its right to petition this Court. *Id.* Third, the ban is an unconstitutional viewpoint-based speech restriction. *Id.* at 34-39. Fourth, the ban is an unconstitutional attempt to compel the AP's speech. *Id.* at 39-40. The government's responses to the first and third

arguments are fatally flawed, as discussed below, but the government *did not even try* to respond to the second and fourth arguments. By failing to address these points, the government conceded them. *Hopkins*, 238 F. Supp. 2d at 178. That concession is sufficient to demonstrate likelihood of success on the merits. *See, e.g.*, *Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149-50 (D.D.C. 2002) (reinforcing well-settled principle that unaddressed arguments are conceded).

2.      **Defendants fail to justify their egregious viewpoint discrimination**

The Supreme Court has made it clear over the past century that viewpoint-based discrimination "is uniquely harmful to a free and democratic society." *See NRA of Am. v. Vullo*, 602 U.S. 175, 187 (2024); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"). Indeed, even during World War II, in an opinion that referenced and distinguished the United States from "our present totalitarian enemies," the Supreme Court declared that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The ban on AP's access, which Defendants admit is viewpoint-based, *see* Opp. at 13, openly violates this rule.

Under this torrent of precedent, Defendants hold up the flimsiest umbrella: they claim the President's "discretion" permits him to discriminate against the AP's speech and editorial choices based on viewpoint. *Id.* at 13-16. But *none* of the cases that Defendants cite concludes

that a government official has "discretion" to discriminate based on viewpoint when deciding

which journalists can *observe and report on* that official conducting public business in areas with

limited space. Instead, these cases hold only that the First Amendment does not require officials

to *interact* with those journalists:

- In *Baltimore Sun v. Ehrlich*, the Fourth Circuit held that a governor did not violate the First Amendment in directing state officials not "*to speak with*" two reporters. 437 F.3d 410, 413 (4th Cir. 2006) (emphasis added).

- In *Snyder v. Ringgold*, the Fourth Circuit held that a police chief did not violate the First Amendment in deciding not *to communicate orally with or provide exclusive interviews* to journalists from a particular news organization. 133 F.3d 917 (4th Cir. 1998).

- In *Bartley v. Taylor*, a district court concluded that the First Amendment did not force an athletic director *to provide comment to or be interviewed* by a particular reporter. 25 F. Supp. 3d 521, 540 (M.D. Pa. 2014).

- In *Raycom National v. Campbell* and *Youngstown Publishing v. McKelvey*, district courts concluded that city officials were not required *to provide comment to or be interviewed* by journalists from particular news organizations. *Raycom*, 361 F. Supp. 2d 679, 688 (N.D. Ohio 2004); *Youngstown*, 2005 WL 1153996, at *1 (N.D. Ohio May 16, 2005), *vacated as moot*, 189 F. App'x 402 (6th Cir. 2006).

Defendants thus have no basis to claim that "[t]hese cases addressed circumstances that

mirror the facts presented here." Opp. at 22. Not one of them addressed a situation where a

government official forbade a particular news organization from observing and reporting on that

official conduct on the basis of that organization's viewpoint. The array of cases that the AP

cited in its opening brief – standing for the proposition that when space is limited the government

must use reasonable and viewpoint-neutral criteria to decide which journalists can attend an

event and observe public business – thus provide the correct doctrine for the Court to apply to

these facts. *See* Am. PI Br. at 36-38; *see also* Br. of Amicus Curiae Reporters Comm. for

Freedom of the Press at 9-13 (ECF 21).

### 3.    Forum doctrine further strengthens the AP's First Amendment claims

The government further errs in responding to the argument that viewpoint-based discrimination against the AP also violates forum doctrine.[3]  The government misreads *Price v. Garland*, 45 F.4th 1059 (D.C. Cir. 2022), which further strengthens the AP's claims.  There, a filmmaker did not obtain a permit from the National Park Service to record video in a national park and received a "violation notice" after the film that included the video premiered, and the filmmaker sued the government claiming that the statute requiring such permits to film was unconstitutional under forum doctrine.  *Id.* at 1065-66.  The D.C. Circuit held that forum doctrine did not apply in those circumstances because merely *recording* video, "like typing a manuscript, is not itself a communicative activity; it is merely a step in the creation of speech that will be communicated at some other time, usually in some other location."  *Id.* at 1070.  When AP journalists cover presidential events, however, those journalists *are* communicating, in real time, to other journalists (including other pool participants) and the public.  *See* 2d Miller Decl. ¶ 10 ("When AP text journalists covered presidential events, they were able to send wire reports out instantaneously to the AP's global readership."); Elswick Decl. ¶¶ 6-7 (same as to photos).  AP journalists are thus engaged in "the dissemination of information," which *is* a "communicative activity" under *Price*.  Because forum doctrine holds that even in the most speech-restrictive settings, the government cannot discriminate against speakers on the basis of their viewpoint, *see* Am. PI Br. at 34-38; *see also* Br. of Amicus Curiae the Knight First Amendment Institute at 5-11 (ECF 32), the viewpoint-based ban on the AP here is blatantly unconstitutional.

---

[3] The government minimizes that argument as a "suggestion by some amici," *see* Opp. at 23, when the AP made the argument itself in its opening brief, *see* Am. PI Br. at 34-38.

## II.    THE AP SATISFIES ALL OF THE OTHER FACTORS WARRANTING A PRELIMINARY INJUNCTION

### A.    The AP Is Suffering Irreparable Harm Without a Preliminary Injunction

Defendants cannot dismiss the harms that the ban has caused to the AP's reporting and finances, nor can they erase the harms they caused the AP before the White House took control of the press pool on February 25 and before Defendants allowed one AP photographer to attend one event on March 12.  Opp. at 24-25.  The AP has been irreparably harmed, and will continue to be so harmed each day that passes without injunctive relief.

### 1.    The AP is Irreparably Harmed by the Exclusion from Events Open to Credentialed Journalists

The AP's claims over its month-long exclusion from events open to all credentialed White House journalists, such as those held in the East Room, are not moot just because one AP photographer was allowed into one such event.  *See* Opp. at 27-28; Am. Compl. ¶¶ 110-23.  The government is factually and legally wrong in arguing otherwise.

In his declaration, Mr. Budowich states that "under the revised policy," the AP's journalists "are part of the group of journalists permitted to RSVP for East Room press conferences" and "are eligible, at the President's discretion, to be admitted to those events consistent with the RSVP process . . . and subject to other general requirements for admission." Budowich Decl. ¶ 15.  Defendants further represent that "the Associated Press's journalists are eligible to attend those events without regard to its decision not to use the Gulf of America name." Opp. at 10, 28.  The facts, however, show otherwise.

On March 12, one day after Defendants' filings, the White House accepted the RSVP of the AP's *photographer* to a St. Patrick's Day Reception with the Taoiseach of Ireland held in the East Room.  *See* 3d Miller Decl. ¶ 10.  The AP's *text journalist*, however, was turned away, despite having also timely submitted an RSVP.  *Id.*  The photographer's admission marks the

first time that an AP White House journalist has been permitted to attend an event in the East Room since Defendants instituted the access ban a month ago, despite submitting RSVPs for every event in the interim. *See id.* Ex. A; 2d Miller Decl. Ex. B. Further, on March 14, AP text journalists and an AP photographer were denied entry into President Trump's speech at the Justice Department's large Great Hall, despite submitting RSVPs. 3d Miller Decl. ¶ 11. An access restriction clearly remains in effect. As discussed below – just as the White House intends – the AP's continued exclusion from credentialed press events irreparably harms its ability to report the news as it happens, in a thorough manner, with the context only available to those in the room. *See* Decl. of George Condon Jr. ¶ 10 & Ex. B (ECF 27-9) (describing the importance of the AP's in-the-room access to East Room St. Patrick's Day event hosted by President Clinton).

Even if the AP's text journalists and photographers were suddenly allowed back into credentialed press events on the same basis as other journalists, the AP's claim would not be moot and its harms would not be erased. Defendants' gamesmanship is a classic example of voluntary cessation, an exception to mootness. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (cleaned up). A defendant's voluntary cessation does not moot a claim unless the defendant carries the "heavy burden" of establishing "that (1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation." *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 442 (D.C. Cir. 2020). The bar is especially high where a defendant ends the

challenged conduct "*because of* th[e] litigation," as the conduct could restart once the litigation ends. *DL v. D.C.*, 187 F. Supp. 3d 1, 11 (D.D.C. 2016) (emphasis in original).

Here, Defendants have not even *tried* to show that the access ban will not recur or that the AP is no longer experiencing its effects. *Cf.* Opp. at 28. Defendants have never described the criteria or discretion underlying their purportedly "revised policy" under which every decision remains "at the President's discretion." *See* Budowich Decl. ¶ 15. Defendants have not given *any* reason to believe that, going forward, the AP's photographers and text journalists will be admitted to credentialed press events according to reasonable, viewpoint-neutral criteria, on the same basis as other credentialed journalists. The exclusion of the AP's text journalist from the same East Room event and of its text journalists and photographer from the Justice Department event underscores the temporary, incomplete nature of any purported change – and the need for judicial intervention. *See Nat'l Council of Nonprofits*, 2025 WL 597959, at *18 (noting, in enjoining nonprofit funding freeze, "[w]hile funds have resumed flowing to some recipients, that does not erase the imminence or irreparability of what another pause would entail. . . . A single disbursement does not protect a recipient when the next disbursement is equally as vital.").

As a court in this Circuit recently held, in rejecting the government's mootness arguments and granting injunctive relief, while "the government is normally entitled to a presumption of good faith on voluntary cessation," "the court will not confer that presumption when the government says one thing while expressly doing another. And it will not reward parties who change appearances without changing conduct." *Id.* at *11. The AP's claims are similarly live.

### 2.    The AP is Irreparably Harmed by the Denial of Access to The Press Pool and Larger Events Before February 25

Defendants also ask this Court to ignore the irreparable harms they caused the AP before February 25 – when, one day after this Court advised Defendants to reconsider their access ban

due to the "uniformly unhelpful" circuit precedent, they took control of the press pool in a blatant effort to more easily engage in viewpoint discrimination against the AP based on its speech and editorial choices. *Cf.* Opp. at 24-25; Feb. 24, 2025 Hr'g Tr. at 60:21-61:6. After going to such extreme lengths to punish the AP, Defendants claim, incredibly, that "those harms (if any) are not likely to occur again." Opp. at 25. Not only are the AP's harms likely to continue occurring, they *have* occurred daily for the past month.

There is simply no mootness issue here. Since February 11, the AP has been barred from accessing events open to the press pool and to other credentialed journalists. That access ban remains in full force under the White House-selected pool just as it was under the prior pool. The other wire services and photographers remained part of the pool after February 25; only the AP is barred due to its speech. That was true on February 24 and it remains true today:

| | WHCA-run Press Pool before Feb. 11 | WHCA-run Press Pool (with White House ban on AP) Feb. 11-25 | White House-run Press Pool after Feb. 25 |
|---|---|---|---|
| **Wire Services** | 3 spots (AP, Bloomberg, and Reuters) (non-rotating) | 2 spots (Bloomberg and Reuters) (non-rotating) | 1-2 spots (Bloomberg and/or Reuters) (sometimes rotating at the insistence of the White House) |
| **Photo** | 4 spots (AFP, AP, Reuters, and NYT) (non-rotating) | 3 spots (AFP, Reuters, and NYT) (non-rotating) | 3 spots (AFP, NYT, Reuters) (non-rotating) |
| **TV** | 1 three-person network crew (rotating) | 1 three-person network crew (rotating) | 1 three-person network crew (rotating) |
| **Radio** | 1 spot (rotating) | 1 spot (rotating) | 1 spot (White House-selected) |
| **Print** | 1 spot (rotating) | 1 spot (rotating) | 1 spot (White House-selected) |
| **Other** (now "New Media") | 1 spot (rotating) | 1 spot (rotating) | 3 spots (White House-selected) |

*See* 3d Miller Decl. ¶ 8 & Ex. D.

To find that the AP's harms before February 25 "are no longer relevant," *see* Opp. at 24, would let the White House target the AP with impunity.  Under Defendants' theory, if they changed the pool again tomorrow but continued barring the AP based on its speech, that would restart the clock and the AP's harms to date would not count.  This theory is dangerous and unsupported.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993) (claim not moot where defendant city replaced challenged ordinance with version that "disadvantages [plaintiffs] in the same fundamental way," as "[t]here is no mere risk that [defendant] will repeat its allegedly wrongful conduct; it has already done so").[4]

### 3.    The White House continues to Irreparably Harm the AP's Journalism

Defendants' access denials irreparably harm the AP's ability to provide the timely and comprehensive reporting on which its members and readers rely.  *See* Am. PI Br. at 48-51.  Relying on video feeds, notes, and transcripts is simply no substitute for the contemporaneous, in-person newsgathering opportunities the AP had before the ban.  *See* 2nd Miller Decl. ¶¶ 11, 30; Elswick Decl. ¶¶ 5-7, 15-16; *cf. Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 597 n.22 (1980) ("[T]he 'cold' record is a very imperfect reproduction of events.").  Although Defendants make much of the fact that the AP's foreign journalists were able to travel to the United States to report on a few events with the foreign leaders they are assigned to cover, Opp. at 26, this *ad hoc*, narrow workaround is wholly inadequate.  In fact, flying the AP's foreign journalists overseas has increased the harm to AP due not only to the costs involved, but also to

---

[4] Alternatively, any mootness concerns would give way to the voluntary cessation doctrine, for the same reasons as the credentialed press event claims discussed above.  *See Friends of the Earth*, 528 U.S. at 189.  "This rings especially true when the cessation 'follow[s] the entry of a TRO'" or, in this case, on the Court's admonition to Defendants at the TRO hearing to reconsider their access ban.  *Nat'l Council of Nonprofits*, 2025 WL 597959, at *10.

the drain on the time and staffing of foreign bureaus, which detracts from their coverage of other important matters like the war in Ukraine. *See* Second Decl. of Julie Pace ("2d Pace Decl.") ¶¶ 5-7 (ECF 28). Moreover, most press events do not involve a foreign leader's visit. Yet those purely domestic events are of keen public interest, from cabinet meetings to events for governors to the President on his own. The AP, and by extension its readers and customers, are irreparably harmed by the denial of access to press pool and credentialed press events.

### 4. The AP Has Experienced Irreparable Financial Harm Due to the Denial of Access

The AP has also experienced irreparable economic harm. *Cf.* Opp. at 25. Indeed, the AP's economic losses are significant and growing, as evidenced by an advertiser's recent cancelation of a $150,000 contract due to Defendants' access ban. *See* Decl. of Kristin Heitmann ¶ 9. Advertising customers have expressed concern about the White House's targeting of the AP and have expressed hesitation about entering into new contracts or continuing existing contracts with the AP for this reason. *Id*. Additionally, multiple AP customers have expressed questions and concerns about the limitations on the AP's coverage of the White House and the President that the administration's access ban has imposed. *Id*. ¶ 6. And, again, the AP has had to pay to fly in its foreign journalists to cover events its White House journalists can no longer attend. *See* 2d Pace Decl. ¶¶ 5-7. These economic losses are unrecoverable due to sovereign immunity, which limits the AP to nonmonetary relief, and thus constitute irreparable harm. *See Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021) (issuing injunction).

Additionally, the AP has been harmed because the "actions taken by the defendant have perceptibly impaired the organization's programs" and "the defendant's actions directly conflict with the organization's mission." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (citations omitted) (cleaned up). The access ban has impaired the AP's

ability to deliver its journalism with the timeliness and thoroughness at the heart of its mission. *See* Elswick Decl. ¶¶ 13-17; 2nd Miller Decl. ¶ 30.

> **5.    The AP Has Experienced Irreparable Harm Due to the Violation of Its Constitutional Rights**

Defendants also wholly ignore the well-established doctrine – applied in White House press access cases – that "a prospective violation of a constitutional right constitutes irreparable injury for . . . purposes" of injunctive relief. *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  In addition to the record of concrete, ongoing harms to the AP due to Defendants' access ban, the AP has been irreparably harmed by Defendants' infringement on its First and Fifth Amendment rights.  Defendants offer no rebuttal to this point, nor could they.

> **B.    The Balance of Equities and the Public Interest Strongly Favor a Preliminary Injunction**

The balance of equities and the public interest further weigh strongly in favor of granting a preliminary injunction.  Neither the government nor the public has any interest in Defendants' viewpoint-based exclusion of a particular news organization in violation of the First and Fifth Amendments.  As Defendants state, "[a] court 'should pay particular regard for the public consequences' of injunctive relief."  Opp. at 29 (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).  Quite so.  As that very case goes on to say, "the government's interest *is* the public interest" and "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation."  *Pursuing Am.'s Greatness*, 831 F.3d at 511.  "The public's interest in protecting First Amendment rights and [plaintiff's] ability to exercise those rights" thus "outweigh any interest in the continued enforcement" of an unconstitutional policy such as the AP access ban.  *Id.* at 512.

The AP's ability to observe and report on presidential events informs the public about the activities of the President and other public officials, which is essential in a democracy.  Indeed, as 17 conservative or independent former government officials explained in their amicus brief, a rigorous and challenging press is *vital* to democracy and the public.  *See* Br. of Amici Curiae State Democracy Defenders Fund & Former Public Officials at 13 (ECF 36).  Permitting Defendants to target the AP sets a dangerous precedent, enabling future administrations of either party to single out disfavored news organizations, endangering free speech and press for years to come.  *See id.* at 14-15 ("That concern is undoubtedly one reason such outlets as Fox News and Newsmax have objected to the actions of the White House here.").

Banning the AP has a particularly dangerous ripple effect for the public as well, as audiences across the country and the world rely on the AP to inform them of the White House's activity through its customer news organizations.  *See* Br. of Amicus Curiae WHCA at 6-7 (ECF 20).  The public's interest in the AP's far-reaching journalism is, unfortunately, compounded by the shrinking of local news and the inability of many news organizations to pay for their own White House journalists.  *See* 2d Miller Decl. ¶ 13.  As seen with the AP's coverage of President Trump's address to Congress, people across the country thus rely on the AP's journalism to stay informed about current affairs.  *See* 3d Miller Decl. ¶¶ 3-6, Exs. B & C.

Defendants do not address any of these issues.  They claim instead that injunctive relief is against the government's interest and public interest because the AP access ban was "made by the President himself."  Opp. at 29.  The AP, however, "does not ask the Court to enjoin President Trump," and "Defendants cite no authority for the proposition that a court lacks the power to enjoin the President's *subordinates* to restrain the President's violation of law."  *Harris v. Bessent*, 2025 WL 679303, at *12 (D.D.C. Mar. 4, 2025) (emphasis added) (granting

injunctive relief and citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952), where the Court prohibited the Secretary of Commerce from following President Truman's orders)).  Plainly, "injunctive relief against executive officials . . . *is* within the courts' power." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (citing *Youngstown*, 343 U.S. at 584; *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866)) (emphasis added).  Defendants' other cited case, *Newdow v. Roberts*, 603 F.3d 1002, 1011 (D.C. Cir. 2010), is equally off topic.  Opp. at 29. There, the court declined to enjoin Chief Justice Roberts, members of the clergy, and others from participating in religious elements of President Obama's inauguration because an injunction "would not prevent the claimed injury" as the defendants were "not responsible for the offending conduct and the future President could simply find other willing assistants not subject to the injunction to carry out his wishes." *Roberts*, 603 F.3d at 1011.  Here, conversely, the White House Chief of Staff, Deputy Chief of Staff, and Press Secretary are directly responsible for banning the AP, and enjoining them would prevent the AP's injury and serve the public interest.

Indeed, federal officials are often subject to injunctions, which courts have issued at a near-daily pace under the current administration.[5]  Of particular relevance here, courts in this district granted injunctive relief against officials in the *Acosta* and *Karem* cases due to the unconstitutional denial of reporters' press passes, noting that "enforcement of an unconstitutional law is always contrary to the public interest."  *See Karem*, 960 F.3d at 668 (affirming injunction

---

[5] *See, e.g.*, Order, *Am. Federation of Gov't Employees v. OPM*, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025); *Perkins Coie LLP v. DOJ*, 2025 WL 782889 (D.D.C. Mar. 12, 2025); *Grundmann v. Trump*, 2025 WL 782665, at *11 (D.D.C. Mar. 12, 2025); *Wilcox v. Trump*, 2025 WL 720914, at *17 (D.D.C. Mar. 6, 2025); *New York v. Trump*, 2025 WL 715621, at *16 (D.R.I. Mar. 6, 2025); *Bessent*, 2025 WL 679303, at *14; *PFLAG, Inc. v. Trump*, 2025 WL 685124, at *29 (D. Md. Mar. 4, 2025); *Nat'l Council of Nonprofits*, 2025 WL 597959, at *18; *Pacito v. Trump*, 2025 WL 655075, at *25 (W.D. Wash. Feb. 28, 2025); *Doe v. McHenry*, 2025 WL 596651, at *1 (D.D.C. Feb. 18, 2025).

against Press Secretary); *CNN, Inc. v. Trump*, 2018 WL 9436958 (D.D.C. Nov. 16, 2018) (enjoining President Trump and his Chief of Staff, Press Secretary, and Deputy Chief of Staff).

An injunction in this case is thus more than just proper – it is necessary to prevent the ongoing violation of the AP's constitutional rights.

## CONCLUSION

Coercively depriving journalists of their interests in liberty, free expression, and the ability to seek redress in court completely contradicts our shared American values. For the reasons set forth above and in its opening brief, the AP respectfully requests that this Court issue a preliminary injunction requiring Defendants to immediately rescind their ban on AP's access to areas open to the White House press pool and to areas open to other credentialed journalists. Consistent with the First and Fifth Amendments, the Court should order Defendants to apply only reasonable, viewpoint-neutral, and published criteria to determine membership in the press pool and allocate access to presidential events that are open to all White House credentialed journalists.

Dated:  March 17, 2025

Respectfully submitted,

BALLARD SPAHR LLP

*/s/ Jay Ward Brown*
Jay Ward Brown (#437686)
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Sasha Dudding (#1735532)
1909 K Street NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200 | Fax: (202) 661-2299
brownjay@ballardspahr.com
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
duddings@ballardspahr.com

*Counsel for Plaintiff The Associated Press*