**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE ASSOCIATED PRESS,

        Plaintiff,

   v.

TAYLOR BUDOWICH, et al.

       Defendants.

Civil Action No. 25-cv-532-TNM

## AMICUS CURIAE BRIEF OF FIRST AMENDMENT SCHOLARS IN SUPPORT OF PLAINTIFF THE ASSOCIATED PRESS'S AMENDED MOTION FOR A PRELIMINARY INJUNCTION

Jameel Jaffer
Katherine Fallow
Alex Abdo
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Amicus Curiae First Amendment
  Scholars*

**Table of Contents**

Table of Authorities ...................................................................................................... ii

Interests of Amici Curiae ...............................................................................................1

Introduction....................................................................................................................3

Argument .......................................................................................................................4

    I.      Since the Founding Era, the First Amendment has been understood to protect
             the press against viewpoint-based burdens on speech. ....................................................4

    II.     Since the Founding Era, the First Amendment has been understood to prevent
             the government from denying members of the press subsidies or other benefits
             because of their viewpoint. ........................................................................................12

         A.      Postal Subsidies ................................................................................... 13

         B.      Access to Congress .............................................................................. 16

    III.    This history establishes that the White House's viewpoint-based exclusion of
             The Associated Press from serving in the press pool contravenes not only
             contemporary First Amendment doctrine but also historical understandings of
             freedom of speech and press. .....................................................................................23

Conclusion ...................................................................................................................24

## Table of Authorities

**Cases**

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ........................................................ 5

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ............................... 7, 9

*Hannegan v. Esquire, Inc.*, 327 U.S. 146 (1946) ....................................................... 16

*Iancu v. Brunetti*, 588 U.S. 388 (2019) ...................................................................... 6

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ....................................................... 11

*The People v. Croswell*, 3 Johns.Cas. 337 (Sup. Ct. of N.Y. Feb. 13, 1804) ................. 8

*Vidal v. Elster*, 602 U.S. 286 (2024) ........................................................................... 3

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ................................. 5

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)......... 22

**Statutes**

1 Stat. 596 (1798) ........................................................................................................ 9

U.S. Const. Art I., Sec. 5 ............................................................................................ 17

**Other Authorities**

1 Annals of Cong. (1789) ................................................................................ 17, 18, 19

12 Reg. of Debates, 1st Sess. (1836) .......................................................................... 16

2 Annals of Cong. (1790) ...................................................................................... 15, 24

26 Cong. Globe (1840) ............................................................................................... 20

29 Cong. Globe (1847) ..................................................................................... 20, 21, 23

3 Annals of Cong. (1791) ...................................................................................... 14, 15

4 Annals of Cong. (1794) .............................................................................................. 5

Anuj C. Desai, *The Transformation of Statutes into Constitutional Law: How
    Early Post Office Policy Shaped Modern First Amendment Doctrine*, 58
    Hastings L.J. 671 (2007) ................................................................................ 13, 14, 15

Christina E. Wells, *Introduction: The Difficult First Amendment*, 66 Mo. L. Rev. 1 (2001) ........................................................................................................... 4

Congressional Research Service, *Congressional News Media and the House and Senate Press Galleries* (Apr. 13, 2017) ........................................................... 19, 22

Culver S. Smith, The Press, Politics and Patronage: The American Government's Use of Newspapers 1789-1875 (1977) ................................................................. 22

David A. Anderson, *The Origins of the Press Clause,* 30 UCLA L. Rev. 455 (1983)................................................................................................................ 1, 5, 8

David M. Rabban, *The First Amendment in Its Forgotten Years*, 90 Yale L.J. 514 (1981)..................................................................................................................... 12

Donna Lee Dickerson, The Course of Tolerance: Freedom of the Press in Nineteenth Century America (1990)........................................................................ 12

Elizabeth Gregory McPherson, *Reporting the Debates of Congress*, 28 Quarterly J. Speech 141 (1942)........................................................................................... 17, 19

Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765 (2004) ................................ 4

Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 Harv. L. Rev. 2299 (2021)........................................................................................ 14

Geoffrey R. Stone, Perilous Times: Free Speech in Wartime From the Sedition Act of 1798 to the War on Terrorism (2004)......................................................... 9

H.R. Rep. No. 86, 26th Cong., 1st Sess. (1840) ...................................................... 11

James Madison, *The Report of 1800*, National Archives (Jan. 7, 1800), https://perma.cc/9FTC-TUNH ........................................................................... 10

James Madison, *Virginia Resolutions of 1798*, 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution (1836)......................... 10

John Quincy Adams, *Letter to Rufus King* (Oct. 8, 1802), 3 Writings of John Quincy Adams 7 (Worthington Chauncey Ford ed., 1913–1917)......................... 11

Joseph Adelman, Revolutionary Networks: The Business and Politics of Printing, 1763–1789 (2019)................................................................................................. 7

Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246 (2017) ................ 6, 8

Marion Tinling, *Thomas Lloyd's Reports of the First Federal Congress*, 18 William & Mary Q. 519 (1961) ......................................................................... 18, 19

Richard John, Spreading the News: The American Postal System from Franklin to Morse (1995) ....................................................................................................... 14, 15

Robert Post, *Defaming Public Officials: On Doctrine and Legal History*, 12 Am. Bar Found. Research J. 539 (1987) ........................................................................... 8

Stephen Feldman, Free Expression and Democracy in America: A History (2008) .............. 6, 8, 9

*The Kentucky Resolutions of 1798*, National Archives (1798), https://perma.cc/4G7H-U2WM ........................................................................... 10

Thomas Gordon, *Cato's Letter No. 15*: *Of Freedom of Speech: That the same is inseparable from publick Liberty*, FIRE, https://perma.cc/MDG7-RM4N ............................. 4

Thomas Jefferson, *Letter to Abigail Adams*, National Archives (July 22, 1804), https://perma.cc/M5H8-HDBE .......................................................................... 11

Wendell Bird, Criminal Dissent: Prosecutions Under the Alien and Sedition Acts of 1798 (2020) ................................................................................................... 6, 11

Wendell Bird, *The Revolution in Freedoms of Press and Speech: From Blackstone to the First Amendment and Fox's Libel Act*, Canopy Forum (Aug. 20, 2020), https://perma.cc/C4JC-SGMX ............................................................. 6

William Stewart, *John Lennox and the "Greenock Newsclout": A Fight against the Taxes on Knowledge,* 15 Scottish Hist. Rev. 322 (1915) .................................... 8

**Interests of Amici Curiae[1]**

Amici are the following First Amendment scholars who have taught courses in constitutional law and/or the First Amendment, published articles and books on these topics, and dedicated significant attention to the study of First Amendment protections. Drawing from their experience, amici submit this brief to assist the Court in deciding the issues presented by this case and to describe the historical evidence concerning the Founders' and other earlier generations' understanding of the central First Amendment principles imperiled by the White House's exclusion of The Associated Press from the White House press pool.

Genevieve Lakier
Professor of Law
Herbert and Marjorie Fried Teaching Scholar
The University of Chicago Law School

RonNell Andersen Jones
University Distinguished Professor
Lee E. Teitelbaum Chair in Law
The University of Utah College of Law

Jack M. Balkin
Knight Professor of Constitutional Law and the First Amendment
Yale Law School

Erin Carroll
Professor of Law
Georgetown Law

Erwin Chemerinsky
Dean and Jesse H. Choper Distinguished Professor of Law
University of California, Berkeley, School of Law

Heidi Kitrosser
William W. Gurley Professor of Law
Northwestern, Pritzker School of Law

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amici curiae or their counsel contributed money that was intended to fund preparing or submitting the brief. Plaintiff consents to this motion; Defendants do not object to this motion.

Christina Koningisor
Associate Professor of Law
UC Law San Francisco

Michael W. McConnell
Richard and Frances Mallery Professor of Law
Director, Constitutional Law Center
Stanford Law School

Robert Post
Sterling Professor of Law
Yale Law School

Jacob M. Schriner-Briggs
Visiting Assistant Professor
Chicago-Kent College of Law

Geoffrey R. Stone
Edward H. Levi Distinguished Service Professor of Law
University of Chicago Law School

Sonja R. West
Otis Brumby Distinguished Professor in First Amendment Law
University of Georgia School of Law

## Introduction

Amici, a group of twelve First Amendment scholars, submit this brief to provide the Court with an overview of the historical evidence that undergirds and illustrates the central First Amendment issues raised in this case. Amici are submitting this brief response to the Court's invitation for *amicus* briefs addressing "originalist research on the First . . . Amendment issues in this case." Minute Order (Mar. 19, 2025).

Amici take no stand in this brief on the degree of importance that courts should accord historical evidence regarding the original meaning of the Speech and Press Clauses. The profound technological and social changes that have occurred since the ratification of the Bill of Rights in 1791 mean that many of the First Amendment questions that courts confront have no clear eighteenth century analogues. And for this reason, many members of the Supreme Court have cautioned against relying solely upon evidence of history and tradition to resolve questions about the First Amendment's scope and limits. *See, e.g., Vidal v. Elster*, 602 U.S. 286, 311 (2024) (Kavanaugh, J., concurring in part) (joined by Roberts, J.) (rejecting the necessity of relying on evidence of historical tradition to determine the constitutionality of a content-based but viewpoint-neutral ban on the federal registration of certain trademarks); *see also id.* at 311–12 (Barrett, J., concurring in part) (same) (joined by J. Sotomayor, Kagan, and Jackson).

Nevertheless, the Supreme Court has often looked to historical evidence to bolster its understanding of the principles underlying the First Amendment, and amici believe that an examination of that history will aid the Court in applying the two central First Amendment principles raised by this case: the principle that the government should not be permitted to restrict speech based on viewpoint, and the principle that access to government property, events, and other benefits may not be conditioned on viewpoint.

These core principles, as illustrated in the historical evidence described in this brief, support The Associated Press's ("AP") First Amendment challenge in this case. The White House's ban on the AP's participation in the press pool was explicitly based on the White House's disapproval of how the AP reports the news, including its editorial choices about what terms to use. The decision to penalize the AP based on its viewpoint, and to withdraw the access to the press pool based on that viewpoint, is contrary to the Founding generation's concern that the government not be able to control the press, the great "bulwark of liberty," by penalizing them for their editorial and expressive choices. Thomas Gordon, *Cato's Letter No. 15*: *Of Freedom of Speech: That the same is inseparable from publick Liberty*, FIRE, https://perma.cc/MDG7-RM4N. These guiding principles have been repeatedly confirmed by the Supreme Court for nearly a century and are foundational to the democratic purposes of the First Amendment.

## Argument

### I.    Since the Founding Era, the First Amendment has been understood to protect the press against viewpoint-based burdens on speech.

First Amendment doctrine is famously complicated. The Speech and Press Clauses of the First Amendment have spawned an elaborate and complex body of doctrine, and one that has gotten only more convoluted over time. *See* Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765, 1769 (2004) (noting that when "the First Amendment … show[s] up [in a case], the full arsenal of First Amendment rules, principles, standards, distinctions, presumptions, tools, factors, and three-part tests" show up too); Christina E. Wells, *Introduction: The Difficult First Amendment*, 66 Mo. L. Rev. 1, 1 (2001) (noting the increasing doctrinal difficulty of the First Amendment).

Despite this doctrinal complexity, the animating purpose of the First Amendment is quite simple and has not changed since its ratification in 1791. The central purpose of the speech clauses

of the First Amendment is to ensure that, in the American system of government, "authority here is to be controlled by public opinion, not public opinion by authority." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943). In other words, the First Amendment is intended to safeguard the fundamentally democratic character of our system of government, by ensuring that it is the people, not the government, who decide what views win or lose out in the marketplace of ideas, and ultimately sway elections. *Id.* ("We set up government by consent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent.").

This is how the Supreme Court understands the purpose of the First Amendment's speech clauses today. *See, e.g., 303 Creative LLC v. Elenis*, 600 U.S. 570, 584–85 (2023) ("The framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will and to speak as you think.' By allowing all views to flourish, the framers understood, we may test and improve our own thinking both as individuals and as a Nation." (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 660–661 (2000)); *McCullen v. Coakley*, 573 U.S. 464 (2014) (noting that it is the purpose of the First Amendment "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail") (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)).

This is also how the First Amendment was understood in the Founding Era. As James Madison noted in 1794 on the floor of the House of Representatives, "opinions" cannot be made "objects of legislation" without threatening "the liberty of speech, and of the press." 4 Annals of Cong. 934 (1794) (Rep. Madison). This is because, Madison explained, it is "the nature of Republican Government … that the censorial power is in the people over the Government, not in the Government over the people." *Id.*; *see also* David A. Anderson, *The Origins of the Press Clause,* 30 UCLA L. Rev. 455 (1983) ("Throughout the formative period, the focus of discussion

was on the role of the press in relation to the government. The Quebec Address shows some awareness that the press also had a role in advancing 'truth, science, morality, and arts in general,' but the primary thrust of that document, and the exclusive thrust of all other official declarations, was that freedom of the press was a necessary concomitant of self-government.").

The right to freedom of speech and press was consequently understood in the eighteenth and early nineteenth centuries, much as it is understood today, to prohibit government actions that penalized private speakers and associations of speakers for the opinions they expressed. Just as today we recognize that "viewpoint discrimination is poison to a free society," *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito J., concurring), modern scholarship demonstrates that "the Founders widely thought that the freedom to make well-intentioned statements of one's views belonged to a subset of natural rights, known as 'unalienable' natural rights, that could not be restricted in promotion of the public good and thus fell outside legislative authority to curtail." Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L.J. 246, 255–56 (2017).

As the historian Wendell Bird has chronicled, by the 1770s and 1780s, a "broad understanding of freedoms of press and speech had been the prevalent and then dominant publicly expressed view for a generation before 1798, in both England and America." Wendell Bird, *The Revolution in Freedoms of Press and Speech: From Blackstone to the First Amendment and Fox's Libel Act*, Canopy Forum (Aug. 20, 2020), https://perma.cc/C4JC-SGMX. Printers regularly asserted the idea that the right to freedom of press granted them the right to "discuss[] public men and measures" and even "to censure the most exalted Patrician." Wendell Bird, Criminal Dissent: Prosecutions Under the Alien and Sedition Acts of 1798, at 5 (2020) (quoting the printer Benjamin Franklin Bache); *see also* Stephen Feldman, Free Expression and Democracy in America: A History, 58 (2008) ("[B]y the late 1780s and early 1790s…[n]umerous Americans" embraced the

idea of "[f]reedom of the press [a]s the grand palladium, the bulwark of liberties" and "advocated for [libertarian] reforms" to the common law of libel).

That members of the Founding generation embraced a relatively expansive view of the press freedom reflected the important role that the press was believed to play in the democratic system they were attempting to create. As Professor Joseph Adelman notes, the dominant political theory of the era assumed that "the political world functioned as a constant struggle for power" and that "officials were always at risk of becoming corrupt and attempting to curtail people's liberty." Joseph Adelman, Revolutionary Networks: The Business and Politics of Printing, 1763–1789 at 46 (2019). On this view of the world, the press—and most significantly, the newspaper press—played a vital role in safeguarding the liberty of the people against their endemic vulnerability to the corrupt exercise of power. "Given their structural disadvantage within the political system, the people required recourse to the press in order to expose the corrupt actions of government whenever it threatened the people's liberty." *Id.*

Ensuring that newspapers and other members of the press could expose the corruption of government and otherwise comment critically on its activities was thus a central concern of the period. As the Supreme Court has explained, the First Amendment was "a response to the repression of speech and the press that had existed in England and the heavy taxes on the press that were imposed in the Colonies." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 353 (2010). These taxes were quite obviously meant to punish newspapers that criticized the operations of the crown. The first of what became known as "taxes on knowledge" was imposed by Parliament in 1715 in response to Queen Anne's complaints about the "great license [that newspapers took] in publishing false and scandalous libels such as are a reproach to any Government." William Stewart, *John Lennox and the "Greenock Newsclout": A Fight against the Taxes on Knowledge,*

7

15 Scottish Hist. Rev. 322, 325 (1915). Similar taxes on knowledge were later extended to the colonies. Feldman, at 49.

It was because they hoped it would protect against a repetition of this kind of viewpoint-based retaliation by the federal government that many of the participants in the ratifying debates pressed for the addition to the federal Constitution of an explicit guarantee of press freedom. Anderson, *The Origins of the Press Clause*, 30 UCLA L. Rev. at 468. As one critic of the proposed constitution put it, absent a constitutional guarantee of expressive liberty, "[c]annot Congress, when possessed of the immense authority proposed to be devolved [to it], restrain the printers, and put them under regulation?" *Id.* at 468–469.

To be clear, there was disagreement in the eighteenth century about how broadly the protections provided to the press by the First Amendment extended. Even "Americans who shared an understanding of speech and press freedoms as natural rights … profoundly disagreed about the legal implications of the First Amendment," and more specifically, about the degree to which it protected newspapers and others who criticized the government in sharp and intemperate ways. Campbell, 127 Yale L.J. at 254. Thus, for example, eighteenth century judges believed that legislators and other actors could punish speakers when they failed to state their views with good intention and instead spoke maliciously or to achieve bad purposes. *See, e.g., The People v. Croswell*, 3 Johns.Cas. 337, 354 (Sup. Ct. of N.Y. Feb. 13, 1804) ("The liberty of the press consist[s] in publishing with impunity, truth with good motives, and for justifiable ends, whether it related to men or to measures."); Robert Post, *Defaming Public Officials: On Doctrine and Legal History*, 12 Am. Bar Found. Research J. 539, 552 (1987) (noting that courts defined the scope of the category of well-intentioned opinions about public matters with "a strong normative sense of the proper spirit in which public discussion should be conducted"). At the same time, many

members of the Founding generation interpreted the government's power to restrict the expression of opinions on matters of public concern quite narrowly, particularly when it came to political opinions, and particularly when it came to the newspapers that represented "the most important means of mass communication of that era." *Citizens United*, 558 U.S. at 353.

This disagreement about the scope of the free speech and press clauses became starkly evident after Congress enacted the controversial Sedition Act of 1798. Feldman, at 79. The Act made it a crime to "publish[] any false, scandalous and malicious writing or writings against the government of the United States." 1 Stat. 596 (1798) (expired 1801). It thereby appeared to engage in much the same kind of viewpoint-based targeting of the press that had led the colonists to reject the yoke of the British monarch. Indeed, the Act, although phrased in general terms, was clearly intended to target the press. Bird, Criminal Dissent at 361.

Defenders of the Sedition Act argued that the Act was nonetheless constitutional because it provided those accused of sedition the right to defend against the charges by establishing before a jury their "good motives" and the truth of what they said, and that was all the First Amendment required. *See* Geoffrey R. Stone, Perilous Times: Free Speech in Wartime From the Sedition Act of 1798 to the War on Terrorism 44 (2004); Feldman, at 79–80 ("Federalists, mindful of the American tradition of dissent . . . enacted the most liberal seditious libel statute then imaginable.").

But others vigorously disagreed. In 1798 the Virginia legislature enacted a Resolution that asserted that "[The Sedition Act] exercises . . . a power not delegated by the Constitution, but, on the contrary, expressly and positively forbidden by one of the amendments thereto—a power which, more than any other, ought to produce universal alarm, because it is levelled against the right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed the only effectual guardian of every other

right." James Madison, *Virginia Resolutions of 1798*, 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, 553–554 (1836). The Kentucky legislature similarly declared its belief that Congress lacked all constitutional power to enact a law of this kind. *The Kentucky Resolutions of 1798*, National Archives (1798), https://perma.cc/4G7H-U2WM. And James Madison—the primary drafter of the First Amendment and drafter of the Virginia Resolution as well— argued in a public defense of the Virginia Resolution that the Sedition Act was unconstitutional, even if it was true that the press acted at times irresponsibly when it reported on the actions of the government. "Some degree of abuse," Madison wrote, "is inseparable from the proper use of every thing; and in no instance is this more true, than in that of the press." Indeed, Madison pointed out, "[h]ad 'Sedition acts' forbidding every publication that might bring the constituted agents into contempt or disrepute, or that might excite the hatred of the people against the authors of unjust or pernicious measures, been uniformly enforced against the press" during the revolutionary period, when the government they targeted was Great Britain, "might not the United States have been languishing at this day, under the infirmities of a sickly confederation? Might they not possibly be miserable colonies, groaning under a foreign yoke?" James Madison, *The Report of 1800*, National Archives (Jan. 7, 1800), https://perma.cc/9FTC-TUNH. The point was clear: democratic government requires significant protection for a critical press—one that is unafraid to "excite the hatred of the people against the authors of unjust or pernicious measures"—if it is to exist in the first place. *Id.*

The Sedition Act became the biggest issue in the presidential election of 1800, and the critics of the Act—the Jeffersonians—prevailed. John Quincy Adams wrote to Rufus King in 1802 that "there was never a system of measures more completely and irrevocably abandoned and rejected by the popular voice" than the Alien and Sedition Acts. John Quincy Adams, *Letter to*

*Rufus King* (Oct. 8, 1802), 3 Writings of John Quincy Adams 7, 9 (Worthington Chauncey Ford ed., 1913–1917). One of Thomas Jefferson's first acts as President was to pardon all those who had been convicted and sentenced under the Sedition Act. Jefferson later explained to Abigail Adams that he had done so because he believed the Sedition Act to be a constitutional "nullity, as absolute and as palpable as if Congress had ordered us to fall down and worship a golden image." Thomas Jefferson, *Letter to Abigail Adams*, National Archives (July 22, 1804), https://perma.cc/M5H8-HDBE. And when in 1840 Congress repaid the fines imposed on those found guilty under the Act, it affirmed in the strongest terms its view of the uncontestable unconstitutionality of the Act. H.R. Rep. No. 86, 26th Cong., 1st Sess. (1840) ("The committee are of opinion that the [Sedition Act] was unconstitutional, null, and void, passed under a mistaken exercise of undelegated power, and that the mistake ought to be corrected by returning the fine so obtained, with interest thereon . . . The committee do not deem it necessary to discuss at length the character of that law, or to assign all the reasons, however demonstrative, that have induced the conviction of its unconstitutionality. No question connected with the liberty of the press ever excited a more universal and intense interest… or [was] so conclusively settled by the concurring opinions of all parties, after the heated political contests of the day had passed away."); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964) ("Although the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history.").

By the first few decades of the nineteenth century, then, it was largely settled that the government could not punish members of the press simply because it didn't like how they reported news and information or believed that it would foment disorder. Bird, Criminal Dissent at 359 ("[D]espite the defendants' losses in their prosecutions for criminal dissent, the battle over the Bill of Rights ended in victory for freedoms of press and speech in two senses. It spread belief in a

broad understanding of those freedoms, while vividly demonstrating the dangers from a narrow understanding that brought criminal prosecution of opposition press and speech and of the opposition party as sedition.").

This did not mean that newspapers were immune from prosecution for what they printed. Libel laws, obscenity laws, and other kinds of "public morals" prohibitions constrained newspapers' editorial choices in all sorts of ways. *See generally* David M. Rabban, *The First Amendment in Its Forgotten Years*, 90 Yale L.J. 514 (1981). But it did mean that, then as now, the government had to show some reason other than its dislike of their partisan affiliation, their opinions, or their style of reporting to justify sanctioning the press, either directly or indirectly. Donna Lee Dickerson, The Course of Tolerance: Freedom of the Press in Nineteenth Century America, at xii (1990) ("Nineteenth century Americans embraced a strong libertarian ideology that endorsed a press unrestrained by government even in the most trying times.").

## II. Since the Founding Era, the First Amendment has been understood to prevent the government from denying members of the press subsidies or other benefits because of their viewpoint.

Punishment was not the only government action understood in the eighteenth and nineteenth centuries to be constrained by the First Amendment and the natural rights it reaffirmed. Lawmakers recognized that even when they acted not to *restrain* the press but to *empower* it—by providing newspapers and others with subsidies or benefits that were intended to enable them to more effectively provide the people with the information they needed to govern themselves—free speech principles required that those benefits be provided in a manner that did not give government officials too much power to control the press.

Lawmakers concluded as much because they recognized that the provision of benefits provided government actors an effective means of controlling the press and manipulating the flow

of information to the public. This recognition was the fruit of bitter experience. During the colonial period, British postmaster-generals had used their control over access to the significant communications technology that was the royal postal service to favor certain publishers, and disfavor others. Anuj C. Desai, *The Transformation of Statutes into Constitutional Law: How Early Post Office Policy Shaped Modern First Amendment Doctrine*, 58 Hastings L.J. 671, 679–80 (2007) ("Recognizing that a monopoly over the 'conduit' through which people communicated provided unique opportunities for disseminating 'content,' early eighteenth century postmasters began to take on another role—printer—and to provide a complementary service to postal delivery: publishing news….As one might imagine, control over the postal network gave postmasters the ability to undermine competing printers."). No less a figure than Benjamin Franklin was impacted by this kind of discrimination when the postmaster general of Philadelphia refused to permit his newspaper access to the mail. *Id.* (noting that "[i]n order to distribute his publication, Franklin had to bribe the post-riders.").

Their negative experience with the evils of a highly discretionary system of disseminating government benefits to the press led eighteenth and nineteenth century lawmakers to insist that, while freedom of the press did not necessarily require the government to provide newspapers access to the mails or other valuable benefits so that they could report the news, if the government chose to do so, freedom of the press required that it do so in a viewpoint-neutral manner.

### A.    Postal Subsidies

This belief about what free speech principles required of the government when it provided benefits to the press was articulated most passionately, and extensively, during the three years of congressional debates that preceded the enactment of the Postal Act of 1792. The Postal Act represents the most significant piece of postal legislation ever enacted in the United States and

brought about a radical change to federal postal policy. Richard John, Spreading the News: The American Postal System from Franklin to Morse 30 (1995). Prior to 1792, the American postal service, like the royal postal service that preceded it, had been run as a money-making venture for the government. The 1792 Post Office Act embraced instead an "educational" rather than a fiscal rationale for the postal service—one that viewed the purpose of the U.S. mails to disseminate information to the body politic, rather than to raise money for the government. *Id.* at 30. It therefore granted newspapers access to the mails at subsidized rates, in order to ensure, as Elbridge Gerry, a supporter of the new law, put it in 1791, that "information, contained in any one paper within the United States, might immediately spread from one extremity of the continent to the other; thus the whole body of the citizens will be enabled to see and guard against any evil that may threaten them." 3 Annals of Cong. 289 (1791).

While there was broad agreement in Congress about the importance of facilitating the circulation of newspapers in this way, lawmakers were uncertain at first how broadly the subsidies should extend. Early on in debates about the new law, some proposed a policy of allowing only a few newspapers to access the mail at the subsidized rates. John, at 33. They argued that such a policy was necessary to ensure that the system was not overwhelmed by the flood of newspapers. Desai, at 691.

This proposal was soundly rejected, however, because lawmakers feared "that if Congress awarded this privilege selectively, it would greatly increase the ability of the government to manipulate the electorate." John, at 34. No one objected to the distinctions the law drew between newspapers and other kinds of publications, such as books and magazines. Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 Harv. L. Rev. 2299, 2314–15 (2021) (noting that the Act gave newspapers far more favorable subsidies than other kinds of publications

because "members of Congress believed that the information that newspapers conveyed was more politically valuable than the information that magazines and books conveyed"). But lawmakers expressed great alarm at the possibility that, were Congress or the Postmaster General vested with the power to decide which newspapers could enter the mails, they could use this power, just as the royal postmasters once had, to permit newspapers they favored, but not newspapers they disliked, to access the mails. Desai, at 691 (In an era in which the Postmasters General had significant partisan connections, "[lawmakers] worried that selective admission would provide the government with a tool for propaganda."). The result, Gerry warned, would be to establish the kind of "Court Press" that had no place in a democratic system. 2 Annals of Cong. 1680 (1790).

When the Postal Act was enacted, it therefore granted all newspapers, regardless of their content, access to the mails at very modest rates. John, at 36. Very few of the lawmakers who voted for the Postal Act believed that the significant economic benefits the new law provided newspapers were constitutionally required. But the statements of Gerry and other lawmakers during the legislative debates strongly suggest that they believed that a law that either explicitly or in effect discriminated against newspapers because of their viewpoint would raise serious constitutional questions. As one lawmaker put it, when deciding what rates applied to what newspapers, lawmakers should proceed carefully, "lest some infringement of the liberty of the press . . . be the consequence." 3 Annals of Cong. 286 (1791) (Rep. Page).

By the mid-nineteenth century, this view of how freedom of press applied to the mails— that it did not require the postal subsidies but required viewpoint neutrality—had become well accepted. Even as avowed a defender of slavery as John C. Calhoun argued in 1836, in response to efforts to exclude abolitionist newspapers from the mails, that these "incendiary publications" had the same constitutional right to access the mails as any other newspapers because "if it be

admitted that Congress has the right to discriminate in reference to their character, what papers shall or what shall not be transmitted by the mail, [it] would subject the freedom of the press, on all subjects, political, moral, and religious, completely to its will and pleasure." 12 Reg. of Debates App. 73, 1st Sess. (1836).

The Supreme Court later ratified this constitutional understanding in *Hannegan v. Esquire* when it recognized that the First Amendment imposes significant constraints on the government's ability to exclude speech from the mails. *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 155–56 (1946) ("We may assume that Congress has a broad power of classification and need not open second-class mail to publications of all types … But grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld *on any grounds whatsoever*. Under that view the second-class rate could be granted on condition that certain economic or political ideas not be disseminated…. [We will not] assume that Congress made such a radical departure from our traditions and undertook to clothe the Postmaster General with the power to supervise the tastes of the reading public of the country.) (emphasis added). A long tradition of constitutional practice therefore supports the existence of a right of non-viewpoint-discriminatory press access to the U.S. mails.

### B.    Access to Congress

This understanding of how First Amendment protections apply when members of the press seek to access government benefits—including the benefit of access to government facilities—was not limited to the postal context. Lawmakers articulated a very similar view of how First Amendment constraints applied to a very different kind of government benefit: namely, the right of access to the floor of the House and Senate chambers.

Like the right of postal subsidies, press access to the houses of Congress was not something that was understood in the eighteenth and nineteenth centuries to be constitutionally mandated. The Constitution requires each house of Congress to "keep a Journal of its Proceedings, and from time to time publish the same," U.S. Const. Art I., Sec. 5, but says nothing about whether members of the press might be let into the house, to provide a more detailed account of the proceedings. Eighteenth-century lawmakers therefore felt empowered to exclude not only the press but members of the public from their chamber—as the Senate did until 1795. Elizabeth Gregory McPherson, *Reporting the Debates of Congress*, 28 Quarterly J. Speech 141 (1942).

Nevertheless, an early debate about rights of access to the House—which did permit members of the public and the press access to the chamber as early as April 1789, *id.*—makes clear that lawmakers understood that, even if the right of access was not constitutionally compelled, the First Amendment nevertheless limited the bases on which members of the press could be denied that access. The debate was triggered by Representative Burke's introduction, in 1789, of a resolution to censure the newspapers that had reported on the House debates thus far. 1 Annals of Cong. 952 (1789). The resolution claimed that the several newspapers that had been permitted access not only to the public galleries of the House but to the floor of the chamber—where proximity made it much easier to hear what representatives said—"misrepresented these debates in the most glaring deviations from the truth, often distorting the arguments of the members from the true meaning . . . thus throwing over the whole proceedings a thick veil of misrepresentation and error." *Id.* The fact that reporters were allowed access to "very foot of the Speaker's chair," Burke argued, meant that these misrepresentations carried with them the tacit endorsement of the House. *Id*. As such, Burke moved to have the reporters barred from reporting on the House debates altogether, or at least, removed to the public gallery. *Id.* at 952 (resolving that "to misrepresent the

debates of the House, whether it arises from incapacity, inattention, or partiality, has a mischievous tendency to infringe the freedom of debate, and that this House should no longer give sanction to it."); *id.* at 954 (statement of Rep. Page) (interpreting the resolution as an attempt to "driv[e] the gentlemen who were at the foot of the Speaker's chair to the gallery").

Although many members of the House had expressed, in other contexts, criticisms about the quality of newspaper reporting on their debates, *see* Marion Tinling, *Thomas Lloyd's Reports of the First Federal Congress*, 18 William & Mary Q. 519, 533 (1961) ("The question of the accuracy of the newspaper reports and the advisability of closing the doors to reporters were of perennial interest in the House"), Representative Burke's efforts to censure the press and perhaps also drive them from the chamber generated sharp criticism because it was perceived as an attack on the independence of the press. One representative argued, for example, that while there were undoubtedly errors in how the press reported the debates, this was no reason to exclude them from access. Despite newspapers putting "into his mouth sentiments which his heart never felt, nor his head comprehended," he insisted that he would never choose to suppress the "valuable information" that reporters provided to the public. 1 Annals of Cong. 953 (1789) (Rep. Stone). Another argued baldly that Burke's resolution "involv[ed] … an attack upon the liberty of the press." *Id.* at 954  (Rep. Hartley). And James Madison expressed his view that it was "improper to throw impediments in the way of such information as the House had hitherto permitted." *Id.* at 955. These criticisms reflected strong unease with the effort to exclude the press from the House *because* representatives disliked the content of their reporting.

Burke attempted to defend himself by clarifying that the purpose of his motion was not in fact to prevent reporters from sitting in on the debates at all but to express disapproval of one reporter—the well-connected William Lloyd—and his monopolization of the prime spot on the

floor. *Id.* at 954. *See also* Tinling, at 534. Burke nevertheless agreed to withdraw the resolution. 1 Annals of Cong. 954 (1989). That did not prove the end of the matter, however. Even though the motion was withdrawn, reporters evidently felt themselves to be no longer welcome on the floor of the House and withdrew to the gallery. But this departure prompted other complaints. Representative Page complained, for example, that the newspapers had "given great satisfaction to many of the constituents of that House" and expressed his wish that the reporters return to their seats "lest it might be insinuated by the jealous enemies of our Government, that the House of Representatives were more republican and indulgent the last session than this." *Id.* at 1095–1096. Another representative acknowledged that, although ultimately it was the right of members of the House to decide whether to grant members of the press access in the first place, it was best to leave it to the reporters themselves to decide "the admission of such persons as thought themselves qualified and were inclined to take down and publish their debates and proceedings." *Id.* at 1097 (Rep. White).

Ultimately the House settled on a practice under which space was reserved for reporters on the floor of the House, but representatives did not dictate who had access to those spaces. McPherson, at 142 ("When Congress transferred from New York to Philadelphia, four seats on the window sills were provided for the use of reporters."). In this way, lawmakers avoided any perception of endorsing the (often highly partisan) news reports that came out of the chamber, but without granting preferential privilege to newspapers based on viewpoint. And the Senate settled on something like this approach when it began to permit regular access to the press in the late eighteenth century. Congressional Research Service, *Congressional News Media and the House and Senate Press Galleries* (Apr. 13, 2017)*,* at 1 ("By the middle of the 1800s, each chamber had

established its own designated reporters' gallery space. In 1877, the House and Senate decided to create a committee of correspondents to oversee press gallery membership and administration.").

Congress's commitment to this principle of viewpoint neutrality was tested in the lead up to the Civil War. For example, in 1840, Representative Graves angrily complained about allegations, printed in the *Globe* newspaper, that he engaged in sneaky legislative maneuvers to prevent discussion of a proposal to renew the gag rule then imposed on members of Congress who wished to discuss the abolition of slavery on the floor of Congress. 26 Cong. Globe 128, 1st Sess. (1840). Graves insisted that he had not intended, as alleged, to "finesse" the debate and promised to vote "to expel any Reporter … who dares to misrepresent a political adversary by reporting a part of his speech that may do him injustice." *Id.* Graves did not make such a motion, however, and after another member of the House indicated that the *Globe* would be open to printing any corrections of the record, the matter appeared to be closed. *Id.*

Another prominent discussion by lawmakers about the right of the press to access the government on viewpoint-neutral terms came in 1847, when Senator Yulee introduced two resolutions. The first resolution accused the newspaper the *Union* of having published a "libel upon the character of this body," and provided that the newspaper's editors "be excluded from the privilege of admission to the floor of the Senate." 29 Cong. Globe 366 (1847). The second resolution provided that the reporters from the *Union* be excluded even from the public gallery of the House for the rest of the session. *Id.* These resolutions generated an intense, extensive and passionate debate about the meaning of freedom of the press as it related to questions of press access to Congress. Some Senators defended the propriety of Yulee's motion by arguing that access to the chamber was a privilege that they were fully in their rights to deny. *Id.* at 406 (Sen. Westcott).

Others, however, compared Yulee's resolutions to the now infamous Sedition Acts, because of their viewpoint-based targeting of the press. Senator James Mason argued for example that just as the Sedition Act attempted "to manacle the press," Yulee's resolutions attempted to do "that which the American people wisely decided both Houses of Congress concurrently cannot do." 29 Cong. Globe 411 (1847). As Mason argued,

> In the Constitution which we all here have sworn to support, it is expressly declared that Congress shall pass no law abridging the freedom of the press;…. What were the terms of that sedition law? The terms were, that if any should print or publish any defamatory matter of the President or the Congress, or either House, with intent to bring them into contempt or disrepute, they should be fined and imprisoned. Now, what is the extent of this resolution? It is, that if the printer to the Senate shall print or publish a libel, or matter defamatory of the Senate, tending to bring it into contempt and disrepute, not that they shall be fined or imprisoned, but that they shall be cut off in their business relations and intercourse with this Chamber… a penalty equal to a fine, if not a very heavy fine, if not equal to imprisonment.

*Id.* Senator Cass similarly insisted that the Senate lacked the power to "punish … newspaper editors, or … newspaper writers who may call in question its actions, or the motives of its members" except in perhaps the most extreme cases, "far different than this," when "summary interference is necessary to protect [the Senate] in the execution of its duties." *Id.* at 415.

In the face of the withering and extensive criticism of his colleagues, Senator Yulee agreed to withdraw the second resolution. *Id.* at 411. The first resolution narrowly passed, but only after supporters insisted that it would have no effect on the ability of the newspaper's reporters to access the floor of the chamber but would merely prevent the newspaper's publishers from profiting from "business relations" they conducted with Senators while on the floor. *Id.* at 411 (arguing that critics of the second resolution were "entirely mistaken if [they] suppose[] that a resolution to deprive [editors] of [th]e privilege [of accessing the Senate floor] can in any manner trench on their rights as printers" and insisting that "[t]hey will carry on their business just as fully after as before [the resolution].") And by the end of the nineteenth century, both houses of Congress had moved to a

21

practice that denied members of either body the right to admit or exclude members of the press. Congressional Research Service, at 1 (noting that since 1877, decisions about access to the gallery have been made by "committee[s] of [private] correspondents" not lawmakers themselves).

Lawmakers' commitment to the principle of government neutrality when it came to the dissemination of government benefits had limits. It was widely assumed, for example, that decisions about which newspapers would receive the valuable contracts to print government notices that helped fund the press throughout the nineteenth century would be made, at least partly on the basis of partisan considerations. Culver S. Smith, The Press, Politics and Patronage: The American Government's Use of Newspapers 1789-1875, at 81 (1977) ("With the growth of government operations [in the early nineteenth century], the quantity of required printing grew markedly, as did the profits for doing it. Washington newspaper publishers lobbied for a share of the printing, using their political friends in and out of Congress to get it… By the time of Jackson the government printing patronage had become a fact of American life."). These awards were different from rights of access to press galleries, however, insofar as what they achieved was to effectively conscript the newspaper to communicate the government's own message—and in cases where different government actors wanted to communicate different messages, they chose different printers to do so. *Id.* at 79 (noting the frequent changes in who received government printing contracts prompted by shifting political dynamics in both Congress and the White House). In these decisions, decisions involving what would today be viewed as acts of "government speech," lawmakers and executive branch officials evidently felt considerable freedom to decide on the basis of their political sympathies. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.").

In contrast, as the incidents described above illustrate, when it came to the vital question of who was permitted to access the House and Senate legislative chambers so that they could report on its activities on their own behalf, lawmakers relied upon a very similar understanding of freedom of the press as that which undergirded federal postal policy. Lawmakers' embrace of this view of the First Amendment was more tentative and uneasy than in the postal context, due to evident concern with the possibility that they would be understood to endorse the views of the newspapers they permitted access. Nevertheless, here as elsewhere, lawmakers recognized the very serious threat to the independence of the press that the discretionary, and viewpoint-discriminatory, denial of the right to access created. They recognized that the "inevitable consequence" of permitting members of Congress to exclude newspapers from their chambers because they did not like how those newspapers reported on their legislative activities would be "to hold a rod over the editor, thereby restraining the press." 29 Cong. Globe 411 (1847).

### III. This history establishes that the White House's viewpoint-based exclusion of The Associated Press from serving in the press pool contravenes not only contemporary First Amendment doctrine but also historical understandings of freedom of speech and press.

The historical evidence provided above provides strong support for the conclusion that when White House officials decided to exclude the AP from the White House press pool because they disliked the AP's editorial decisions, they violated First Amendment rights as they would have been understood in the late eighteenth and early nineteenth centuries.

The history demonstrates that members of the Founding generation, and lawmakers and jurists in the early decades of the Republic, recognized that the First Amendment's guarantees of freedom of speech and press prevent the government from discriminating against the press because it dislikes their opinions or how they report the news. The history demonstrates also that this important principle of viewpoint neutrality applied not only to punishments or other burdens the

23

government imposed on members of the press, but also to decisions to deny certain news organizations benefits that others received so that they could report the news to the people.

Although the evolving and dynamic nature of our free speech tradition means that historical practice is not usually sufficient to determine the outcome of disputes that involve the regulation of speech, the history presented here demonstrates how profoundly the viewpoint-based denial of access to the AP violates fundamental principles of the American free speech tradition—principles that have been recognized, not only in the modern case law, but since the ratification of the First Amendment in 1791. It threatens to create the very thing the First Amendment is intended to prevent: a "Court Press." 2 Annals of Cong. 1737 (1790).

## Conclusion

For the foregoing reasons, the historical evidence concerning the First Amendment supports the AP's First Amendment claim in this case. Because the AP is likely to succeed on its First Amendment claim, the Court should grant the AP's request for preliminary injunctive relief.

March 26, 2025                                        Respectfully submitted,

                                                      /s/ Jameel Jaffer
                                                     Jameel Jaffer
                                                     Katherine Fallow
                                                     Alex Abdo
                                                     Knight First Amendment Institute
                                                       at Columbia University
                                                     475 Riverside Drive, Suite 302
                                                     New York, NY 10115
                                                     (646) 745-8500
                                                     jameel.jaffer@knightcolumbia.org

                                                     *Counsel for Amicus Curiae First Amendment
                                                       Scholars*