# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE ASSOCIATED PRESS,<br><br>    *Plaintiff,*<br><br>    v.<br><br>TAYLOR BUDOWICH, in his official capacity as White House Deputy Chief of Staff; KAROLINE LEAVITT, in her official capacity as White House Press Secretary; and SUSAN WILES, in her official capacity as White House Chief of Staff,<br><br>    *Defendants.* | **Case No. 25-cv-00532-TNM** |

**BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, COMMITTEE TO PROTECT JOURNALISTS, AND NEWS/MEDIA ALLIANCE AS AMICI CURIAE IN SUPPORT OF PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**CORPORATE DISCLOSURE STATEMENT**

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association of reporters and editors with no parent company and no stock.

The Committee to Protect Journalists is an independent, nonprofit organization with no parent corporation and no stock.

The News/Media Alliance is a nonprofit, non-stock corporation organized under the laws of the Commonwealth of Virginia.  It has no parent company.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................................ii

TABLE OF AUTHORITIES ...........................................................................................iv

INTEREST OF AMICI CURIAE ..................................................................................... 1

INTRODUCTION ..................................................................................................... 3

ARGUMENT ........................................................................................................... 7

    I.      For decades, the White House press pool has played an essential role in
           informing the public about the President and the office of the
           presidency. ..................................................................................................... 7

    II.     Excluding the Associated Press from access to White House events on
           the express basis of its editorial viewpoint violates the First
           Amendment. ................................................................................................ 10

CONCLUSION ....................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Am. Broad. Cos., Inc. v. Cuomo*,
    570 F.2d 1080 (2d Cir. 1977) ............................................ 14

*Am. Freedom Def. Initiative v. WMATA*,
    901 F.3d 356 (D.C. Cir. 2018) .......................................... 12

*Balt. Sun Co. v. Ehrlich*,
    437 F.3d 410 (4th Cir. 2006) ........................................... 13

*Cable News Network, Inc. v. Am. Broad. Cos., Inc.*,
    518 F. Supp. 1238 (N.D. Ga. 1981) ..............................passim

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ........................................................ 14

*Comcast Cable Commc'ns, LLC v. FCC*,
    717 F.3d 982 (D.C. Cir. 2013) ............................................ 4

*Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*,
    365 F. Supp. 18 (D.D.C. 1973),
    *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975) ........................................ 11

*Counterman v. Colorado*,
    600 U.S. 66 (2023) .......................................................... 10

*Frank v. Herter*,
    269 F.2d 245 (D.C. Cir. 1959) ..................................... 11, 12

*Frederick Douglass Found., Inc. v. Dist. of Columbia*,
    82 F.4th 1122 (D.C. Cir. 2023) ........................................... 6

*Getty Images News Servs., Corp. v. Dep't of Defense*,
    193 F. Supp. 2d 112 (D.D.C. 2002) .............................. 11, 13

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*,
    994 F.3d 602 (7th Cir. 2021) ............................................ 12

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ............................................ 6

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) .................................................................................. 4, 10

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) .............................................................................. 4, 6, 10

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...................................................................................... 10

*Nation Mag. v. U.S. Dep't of Defense*,
    762 F. Supp. 1558 (S.D.N.Y. 1991) .............................................................. 11

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) ........................................................................................ 7

*Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977) .......................................................... 6, 11, 13

*TGP Commc'ns, LLC v. Sellers*,
    No. 22-16826, 2022 WL 17484331 (9th Cir. Dec. 5, 2022)................ 10, 11, 12, 14

*TikTok Inc. v. Garland*,
    145 S. Ct. 57 (2025).......................................................................................... 4

**Other Authorities**

Aaron Blake, *Obama: 'Of Course' Fox News Is Unfair*, Wash. Post (Feb. 4, 2014),
    https://bit.ly/4beCEjB ..................................................................................... 8

Brian Flood & Brooke Singman, *White House Blocks Associated Press from Oval Office, Air Force One over 'Dishonest' Gulf of America Reporting*, Fox News (Feb. 14, 2025),
    https://perma.cc/GBX8-7EKC ........................................................................ 3

Brian Stelter, *The White House Bans the AP Indefinitely Over the Use of 'Gulf of Mexico'*, CNN (Feb. 14, 2025),
    https://perma.cc/7MYJ-AKVR ...................................................................... 11

*Covering the White House*, White House Correspondents' Ass'n (last visited Feb. 19, 2025),
    https://perma.cc/3WNR-LSZ9 ............................................................... 3, 7, 8

David Bauder, *Trump Says AP Will Be Curtailed at the White House Until It Changes Its Style to Gulf of America*, Associated Press (Feb. 18, 2025),
    https://bit.ly/3EMlSMw ........................................................... 3, 9, 12, 13

*Guide to the White House Beat*, White House Correspondents' Ass'n (last visited Feb. 20, 2025),
    https://perma.cc/ZF7Z-GPXX ............................................................................ 3, 8

Jeremy Barr, *News Outlets Urge White House to Reverse Ban on Associated Press*, Wash. Post (Feb. 20, 2025),
    https://bit.ly/41f4YNU .................................................................................... 5

Jim Rutenberg, *Behind the War Between White House and Fox*, N.Y. Times (Oct. 22, 2009),
    https://bit.ly/3CZoRk2 ................................................................................... 9

Katie Robertson & Maggie Haberman, *A.P. Accuses White House of Violating First Amendment*, N.Y. Times (Feb. 12, 2025),
    https://bit.ly/4ibeSaf .................................................................................... 5

Laurie Kellman, *The Relationship Between the White House and Its Press Corps Is Time-Tested — and Can Be Contentious*, Associated Press (Feb. 12, 2025),
    https://bit.ly/42XdfbX ................................................................................ 7, 8

Lindsay Kornick, *Biden Scolds Reporters Saying He 'Knows More World Leaders' Than They Do in Their Whole 'Goddamn' Lives*, Fox News (Jan. 5, 2025),
    https://perma.cc/9LHG-PN5Q ....................................................................... 9

*Media Coalition to White House: Restore AP Access to Press Pool*, Reporters Comm. for Freedom of the Press (Feb. 20, 2025),
    https://www.rcfp.org/white-house-ap-press-pool-letter/ ................................... 5

Paul Bedard, *Famed NYT Reporter Adam Clymer Dies, Bush Called Him 'Major League Ass–'*, Wash. Exam'r (Sept. 11, 2018),
    https://perma.cc/H8G4-4JR5 ......................................................................... 9

Ted Johnson, *Fox News and Newsmax Among News Outlets Urging White House to Lift Ban on Associated Press Over Continued References to "Gulf of Mexico"*, Deadline (Feb. 20, 2025),
    https://perma.cc/8NTU-TXFK ...................................................................... 4, 5

*With Fox Dispute Intensifying, White House Pledges to Cooperate*, Reporters Comm. for Freedom of the Press (Oct. 20, 2009),
    https://perma.cc/DC23-SJV6 .......................................................................... 8

## INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press (the "Reporters Committee"), the Committee to Protect Journalists ("CPJ"), and the News/Media Alliance (the "Alliance").

Lead amicus the Reporters Committee is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970, when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.[1] Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Committee to Protect Journalists is an independent, nonprofit organization that was founded in 1981 to promote press freedom worldwide. It defends the right of journalists to report the news without fear of reprisal. CPJ is a global organization headquartered in New York City. CPJ's board of directors is composed of prominent journalists, media executives, and leaders from related professions.

The News/Media Alliance represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae or their counsel made a monetary contribution to the preparation or submission of this brief.

hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties. The Alliance diligently advocates for newspapers, magazine, and digital publishers, on issues that affect them today.

As organizations devoted to defending First Amendment freedoms, including the rights of journalists and media organizations to gather and report the news, amici have a powerful interest in ensuring that individual reporters and media outlets are not subject to retaliation for the content of their coverage. Because the punitive denial of a White House correspondent's access to White House facilities has ramifications for all members of the news media, the issues presented in this case are of profound importance to amici.

## INTRODUCTION

"For nearly a century, the story of the American presidency has been written through the eyes of the 'press pool,' the small team of writers, photographers and technicians assigned each day to cover the commander-in-chief on behalf of the broader corps of correspondents."  *Covering the White House*, White House Correspondents' Ass'n (last visited Feb. 19, 2025), https://perma.cc/3WNR-LSZ9.  Because the pool serves the public, not the presidency, seats are allocated by the White House Correspondents' Association—not the White House.  *See Guide to the White House Beat*, White House Correspondents' Ass'n (last visited Feb. 20, 2025), https://perma.cc/ZF7Z-GPXX.

This month, Defendants barred The Associated Press ("the AP") from accessing the Oval Office, Air Force One, and other limited spaces that are made open to other members of the press on their transparently viewpoint-based claim that the AP "weaponiz[es] language through their Stylebook to push a partisan world view." David Bauder, *Trump Says AP Will Be Curtailed at the White House Until It Changes Its Style to Gulf of America*, Associated Press (Feb. 18, 2025), https://bit.ly/3EMlSMw (quoting White House Deputy Chief of Staff Taylor Budowich); *see also* Brian Flood & Brooke Singman, *White House Blocks Associated Press from Oval Office, Air Force One over 'Dishonest' Gulf of America Reporting*, Fox News (Feb. 14, 2025), https://perma.cc/GBX8-7EKC; Decl. of Zeke Miller at 3–5 (describing adoption of the ban) (ECF No. 2-3).  That unvarnished effort to punish a news organization for "the exercise of editorial control

and judgment" strikes at the heart of the First Amendment's protections for a free press, *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024) (quoting *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)), which safeguard the freedom of "[j]ournalists, publishers, and speakers of all kinds" to decide without official interference "what stories to tell and how to tell them," *TikTok Inc. v. Garland*, 145 S. Ct. 57, 73 (2025) (Gorsuch, J., concurring in the judgment); *see also Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 994 (D.C. Cir. 2013) ("[T]he FCC cannot tell Comcast how to exercise its editorial discretion about what networks to carry any more than the Government can tell Amazon or Politics and Prose or Barnes & Noble what books to sell; or tell the *Wall Street Journal* or *Politico* or the *Drudge Report* what columns to carry; or tell the MLB Network or ESPN or CBS what games to show; or tell *SCOTUSblog* or *How Appealing* or *The Volokh Conspiracy* what legal briefs to feature." (Kavanaugh, J., concurring)).

Media outlets that may "disagree with [the AP's] editorial point of view from time to time"—and may disagree with the AP's Stylebook on the very issues that angered the White House—have uniformly warned that Defendants' actions here nevertheless threaten their freedom to report the news as they see it. Ted Johnson, *Fox News and Newsmax Among News Outlets Urging White House to Lift Ban on Associated Press Over Continued References to "Gulf of Mexico"*, Deadline (Feb. 20, 2025), https://perma.cc/8NTU-TXFK (quoting Newsmax statement urging the White House to reverse the ban). As a Newsmax spokesperson put it, "We can understand President

Trump's frustration because the media has often been unfair to him, but Newsmax still supports the AP's right, as a private organization, to use the language it wants to use in its reporting," because the outlet "fear[s] a future administration may not like something Newsmax writes and seek to ban us." *Id.* Or put differently, "[t]he many news organizations reporting on the White House have varied editorial approaches but all have the same collective interest in ensuring that no one is excluded based on their constitutionally protected choices." *Media Coalition to White House: Restore AP Access to Press Pool,* Reporters Comm. for Freedom of the Press (Feb. 20, 2025), https://www.rcfp.org/white-house-ap-press-pool-letter/. For just that reason, scores of the nation's major news organizations have stood united this month in urging the White House to reverse the ban. *See id.*; *see also* Jeremy Barr, *News Outlets Urge White House to Reverse Ban on Associated Press*, Wash. Post (Feb. 20, 2025), https://bit.ly/41f4YNU; Katie Robertson & Maggie Haberman, *A.P. Accuses White House of Violating First Amendment*, N.Y. Times (Feb. 12, 2025), https://bit.ly/4ibeSaf (quoting the statement of a *New York Times* spokesperson saying that "[w]e stand by The Associated Press in objecting to governmental retribution for editorial decisions that the Government disagrees with").

Amici write to underline the threat posed in this case to the historic function of the White House press pool, which—across administrations of both parties—has played a unique role in guaranteeing the free flow of information about the presidency to the

public.  "Not only newsmen and the publications for which they write, but also the
public at large have an interest protected by the first amendment in assuring that
restrictions on newsgathering be no more arduous than necessary, and that individual
newsmen not be arbitrarily excluded from sources of information." *Sherrill v. Knight*,
569 F.2d 124, 129–30 (D.C. Cir. 1977); *see also Karem v. Trump*, 960 F.3d 656, 660 (D.C. Cir.
2020) (emphasizing that "the protection afforded newsgathering under the First
Amendment . . . requires that [press] access not be denied arbitrarily or for less than
compelling reasons" (citation omitted)).  That principle applies with full force to "White
House pool coverage," an "enduring and vital tradition" that makes possible the public
understanding of the presidency "necessary for a determination by the public of the
adequacy of the President's performance." *Cable News Network, Inc. v. Am. Broad. Cos.,
Inc.*, 518 F. Supp. 1238, 1244–45 (N.D. Ga. 1981) (citation omitted).  And here, the AP's
exclusion is not just arbitrary and unjustified but viewpoint-based, an "especially
invidious" form of discrimination often described as "poison" to the free flow of
information.  *Frederick Douglass Found., Inc. v. Dist. of Columbia*, 82 F.4th 1122, 1141 (D.C.
Cir. 2023) (citation omitted); *see Moody*, 603 U.S. at 741–42 ("On the spectrum of dangers
to free expression, there are few greater than allowing the government to change the
speech of private actors in order to achieve its own conception of speech nirvana.").

     To tolerate it in this case would undermine the central meaning of the First
Amendment and the central purpose of the White House pool—to ensure that the

public "never come[s] to depend on a president's aides alone" to understand the nation's highest office.  *Covering the White House*, *supra*.  The AP's motions for a temporary restraining order and preliminary injunction should be granted.

## ARGUMENT

I.   **For decades, the White House press pool has played an essential role in informing the public about the President and the office of the presidency.**

The first White House pool reporter was an AP reporter—Franklin Trusdell, who, after the shooting of President James Garfield, "sat outside his sick room" at the White House, "listening to him breathe and sharing updates with other correspondents."  Laurie Kellman, *The Relationship Between the White House and Its Press Corps Is Time-Tested — and Can Be Contentious*, Associated Press (Feb. 12, 2025), https://bit.ly/42XdfbX.  And since its inception, pool coverage of the presidency has followed the same basic logic:  While the President, the press, and the public all benefit from "the fullest press coverage of White House and presidential activities possible under the circumstances," on occasion "space limitations or other considerations require limiting the number of media representatives who may cover a given event."  *Cable News Network*, 518 F. Supp. at 1239.  Under those circumstances, a smaller group of news outlets—one that has always traditionally included the AP—serves "as eyes and ears for the others who can't get in," Kellman, *supra*, and ultimately as "surrogates for the public," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion).  The pool has provided a firsthand, independent view of some of the most

7

significant moments in the history of the presidency, including the assassination of

President John F. Kennedy, the attempted assassination of President Ronald Reagan,

and the moment in which President George W. Bush learned of the September 11

attacks, *see Covering the White House*, *supra*, to say nothing of the enormous volumes of

daily presidential business that pool reporters have documented over the last century.

      As a matter of longstanding policy, "[t]he White House does not pick the

members of the press pool that goes in to the Oval Office" and other limited-access

spaces; instead, to preserve the pool's function as an independent chronicler of the

presidency, "[t]he pool makeup is decided by the members of the press corps

themselves." Kellman, *supra*; *see also Guide to the White House Beat*, *supra* (noting that

pool seats on Air Force One are allocated by the White House Correspondents'

Association). And that independence is jealously guarded. The current administration,

after all, is hardly the first to find a particular pool outlet's coverage "unfair." Aaron

Blake, *Obama: 'Of Course' Fox News Is Unfair*, Wash. Post (Feb. 4, 2014),

https://bit.ly/4beCEjB. *Compare, e.g., With Fox Dispute Intensifying, White House Pledges to

Cooperate*, Reporters Comm. for Freedom of the Press (Oct. 20, 2009),

https://perma.cc/DC23-SJV6 (quoting President Obama's statement that "I've got one

television station entirely devoted to attacking my administration" and that "you'd be

hard-pressed, if you watched the entire day, to find a positive story about me"),

Lindsay Kornick, *Biden Scolds Reporters Saying He 'Knows More World Leaders' Than They*

*Do in Their Whole 'Goddamn' Lives*, Fox News (Jan. 5, 2025), https://perma.cc/9LHG-PN5Q (quoting President Biden's statement referring to Fox News reporter Peter Doocy as a "stupid son of a b–"), *and* Paul Bedard, *Famed NYT Reporter Adam Clymer Dies, Bush Called Him 'Major League Ass–'*, Wash. Exam'r (Sept. 11, 2018), https://perma.cc/H8G4-4JR5 (quoting President George W. Bush's statement referring to *New York Times* reporter Adam Clymer with a profane epithet), *with* Bauder, *supra* (quoting President Trump's statement that the AP "has been very, very wrong on the election on Trump and the treatment of Trump").  And Presidents are free, of course, to advance their criticisms of news coverage they find unfair, but official retaliation crosses a different line.

When the Reagan Administration, for instance, briefly excluded all television journalists from the pool, the networks quickly challenged their disparate treatment—and just as quickly won an injunction reversing the Press Office's decision.  *See Cable News Network*, 518 F. Supp. at 1245–46.  And when the Obama Administration attempted to exclude Fox News from a pool interview with White House adviser Kenneth Feinberg—on the theory that Fox was "not a news network"—uniform backlash from Fox's peer organizations in the press room swiftly prompted the administration to change course.  Jim Rutenberg, *Behind the War Between White House and Fox*, N.Y. Times (Oct. 22, 2009), https://bit.ly/3CZoRk2.  Never, to amici's

knowledge, has an administration successfully asserted the right to dictate access to

White House facilities on the basis of the President's taste (or not) for coverage.

## II. Excluding the Associated Press from access to White House events on the express basis of its editorial viewpoint violates the First Amendment.

The First Amendment leaves the choice of how to cover "public issues"—

"whether fair or unfair"—to the free press, not the federal government. *Moody*, 603 U.S.

at 738 (quoting *Tornillo*, 418 U.S. at 258). To bar the AP's access because it exercised

"editorial control and judgment" in a manner that angered the President, *Tornillo*, 418

U.S. at 258, jeopardizes the core function of the White House press pool and "violates

our foundational notions of a free press," *TGP Commc'ns, LLC v. Sellers*, No. 22-16826,

2022 WL 17484331, at *5 (9th Cir. Dec. 5, 2022) (holding that viewpoint-based exclusion

of reporter from county press conference violated the First Amendment). And to let the

threat of ejection reduce the White House pool to a house organ of the presidency, able

to report freely only to the extent it avoids angering the President, would be

incompatible with the basic insight that the "'uninhibited, robust, and wide-open'

debate that the First Amendment is intended to protect" depends on an independent

news media. *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (quoting *N.Y. Times Co. v.*

*Sullivan*, 376 U.S. 254, 270 (1964)).

The White House has justified excluding the AP from limited-access events until

it alters its editorial policy on references to the Gulf of Mexico on the theory that the

First Amendment "does not ensure their privilege of unfettered access to limited spaces,

like the Oval Office and Air Force One." Brian Stelter, *The White House Bans the AP Indefinitely Over the Use of 'Gulf of Mexico'*, CNN (Feb. 14, 2025), https://perma.cc/7MYJ-AKVR (quoting White House Deputy Chief of Staff Taylor Budowich). But as this Court and other federal courts have already explained, "[w]hile it is perfectly true that reporters do not have an unrestricted right to go where they please in search of news . . . the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation." *Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 365 F. Supp. 18, 25–26 (D.D.C. 1973), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975); *accord TGP Commc'ns, LLC*, 2022 WL 17484331, at *5; *see also Sherrill*, 569 F.2d at 298–99 ("where the White House has voluntarily decided to establish press facilities," otherwise-qualified news organizations cannot "be arbitrarily excluded"). That basic guarantee of nondiscrimination has been recognized in contexts as diverse as Guantanamo Bay, *see Getty Images News Servs., Corp. v. Dep't of Defense*, 193 F. Supp. 2d 112, 120 (D.D.C. 2002); the battlefield, *see id.* (citing *Nation Mag. v. U.S. Dep't of Defense*, 762 F. Supp. 1558, 1574–75 (S.D.N.Y. 1991)); the selection of correspondents to travel to foreign soil otherwise off-limits to the public, *see Frank v. Herter*, 269 F.2d 245, 247–48 (D.C. Cir. 1959) (Burger, J., concurring); and, of course, the White House pool itself, *see Cable News Network*, 518 F. Supp. at 1245.

Having implemented the pool system, then, the White House may not, consistent with the First Amendment, bar access to pool members on grounds that are repugnant to the principle of viewpoint neutrality. *See Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018) ("For the Government to *change* the nature of a forum in order to deny access to a particular speaker or point of view surely would violate the First Amendment." (emphasis added)); *see also John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610 (7th Cir. 2021) (viewpoint discrimination impermissible in "limited-access press conference"); *TGP Commc'ns, LLC*, 2022 WL 17484331, at *4–5 (same). And here the White House makes no secret of its motivation. It excluded the AP because it is targeting the substance of the AP's reporting, which it perceives as "partisan." Bauder, *supra* (quoting Deputy Chief of Staff Budowich); *see TGP Commc'ns, LLC*, 2022 WL 17484331, at *4–5 (government's perception that journalist has "political views" and "doesn't seek the truth" is viewpoint-based). But having long ratified the policy that pool membership is chosen by the press, without regard to an outlet's editorial perspective or its friendliness to the administration, the White House cannot condition access to White House facilities on the AP's viewpoint now. *Cf. Frank*, 269 F.2d at 247 ("If, for example, the choice [of correspondents permitted to travel to Communist China] was limited only to Democrats or only to Republicans, obviously that would be improper and would fall." (Burger, J., concurring)).

None of the other public justifications the White House has offered for the ban can undermine the clarity of those principles. The White House's insistence that the President has no obligation to field the AP's questions, for instance, *see* Bauder, *supra*, is irrelevant, because the AP is objecting to its exclusion from *spaces*, not asserting a right to force the President's own *speech*. The AP's challenge here does not implicate "the discretion of the President to grant interviews or briefings with selected journalists," *Sherrill*, 569 F.2d at 129, or to speak in response to some inquiries but not others, *see Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 413–14 (4th Cir. 2006) (no First Amendment claim where gubernatorial administration ordered officials not to "speak with" particular reporters but news organization itself had "not been denied any access by the directive"). Having "allocat[ed] limited space for media coverage" to the AP through the pool system in the first place, the White House can revoke that access only on "reasonable" grounds "in a non-discriminatory manner"—not because the AP caught the President's ire. *Getty Images*, 193 F. Supp. 2d at 120.

At base, the White House has not pretended that it has any viewpoint-neutral justification for the ban—no valid "limiting considerations such as confidentiality, security, orderly process, spatial limitation," or the like. *Cable News Network*, 518 F. Supp. at 1244. Instead, the AP has been excluded from limited-access events because it reports the facts as the AP sees them rather than as the President sees them. But "[p]ermitting 'truth' to be determined by the [government] violates our foundational

notions of a free press." *TGP Commc'ns, LLC*, 2022 WL 17484331, at *5. One of the fundamental animating principles of the First Amendment is that government efforts "to command where a person may get his or her information or what distrusted source he or she may not hear" are incompatible with our "freedom to think for ourselves." *Citizens United v. FEC*, 558 U.S. 310, 356 (2010). In the White House's preferred world, "the danger would be that those of the media who are in opposition or who the [President] thinks are not treating him fairly would be excluded. And thus we think it is the public which would lose." *Am. Broad. Cos., Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977). To protect the core function of the White House pool—to provide the "public insight . . . necessary for a determination by the public of the adequacy of the President's performance," *Cable News Network*, 518 F. Supp. at 1244—and the First Amendment's guarantees for an independent press, the AP's motions should be granted.

## CONCLUSION

For the reasons given herein, amici respectfully urge that the AP's motions for a temporary restraining order and preliminary injunction be granted.

Dated: April 11, 2025                                Respectfully submitted,

                                                     /s/ Bruce D. Brown
                                                     Bruce D. Brown
                                                     (D.C. Bar No. 457317)
                                                        *Counsel of Record for Amici Curiae*
                                                     Lisa Zycherman
                                                     Gabriel Rottman

Grayson Clary
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Telephone: 202.795.9300
[bbrown@rcfp.org](mailto:bbrown@rcfp.org)

*Counsel for Amici Curiae*